# **EXHIBIT 5**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JEANETTE BASS,** | ) | |
| | ) | **Case No. 19 CV 7557** |
| **Plaintiff,** | ) | |
| **v.** | ) | **Judge John Kness** |
| | ) | |
| **SGT. ANDREW DAKURAS,** | ) | |
| **individually, and THE CITY OF** | ) | |
| **CHICAGO, a Municipal Corporation,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendants.** | ) | |

## <u>COVER LETTER</u>

    Exhibit 5 is the deposition transcript of Vasile Talos, a non-party responding officer, taken on February 10, 2021 and recorded by certified court reporter Jodi Ann Feign.

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3

 4

 5   JEANETTE BASS,              )
                                 )
 6             Plaintiff,        )
                                 )
 7        vs.                    ) No. 19 CV 7557
                                 )
 8   LT. ANDREW DAKURAS,         )
     Individually and THE        )
 9   CITY OF CHICAGO, a          )
     Municipal Corporation,      )
10                               )
               Defendants.       )
11

12

13                  The deposition of VASILE TALOS, called

14   by the Plaintiff for examination, pursuant to notice

15   and pursuant to the Federal Rules of Civil Procedure

16   for the United States District Courts pertaining to

17   the taking of depositions, taken before JODI ANNE

18   FEIGN, Certified Shorthand Reporter and Notary

19   Public within and for the County of Cook and State

20   of Illinois, remotely via Zoom Videoconference on

21   the 10th day of February, 2021.

22

23

24
```

```
 1      PRESENT:

 2

 3          GREGORY E. KULIS & ASSOCIATES, LTD.

 4              (30 North LaSalle Street
                 Suite 2140
 5               Chicago, Illinois 60602
                 312-580-1830
 6               ggizzi@kulislawltd.com)

 7

        By:  MS. GIANNA GIZZI,
 8            Appearing on behalf of the Plaintiff;

 9

10          CORPORATION COUNSEL-CITY OF CHICAGO

11              (30 North LaSalle Street
                 Suite 900
12               Chicago, Illinois 60602
                 iris.chavira@cityofchicago.org)
13
        By:  MS. IRIS CHAVIRA,
14           MS. EMILY DORY,
             MS. STEPHANIE SOTOMAYOR,
15            Appearing on behalf of the Defendants.

16

17                  *  *  *  *  *  *  *  *  *  *

18

19

20

21

22

23

24
```

1

2                        I N D E X

3    Witness:

4    VASILE TALOS,

5          Direct examination by Ms. Gizzi      5-37

6

7

8                  *   *   *   *   *   *   *   *   *

9

10

11                      E X H I B I T S

12

13    None marked at this time.

14

15

16

17

18

19

20

21

22

23

24

1          THE COURT REPORTER:  Before we proceed, I

2    will ask counsel to agree on the record that under

3    the current national emergency pursuant to

4    Section 319 of the Public Health Service Act, there

5    is no objection to this deposition officer

6    administering a binding oath to the witness by

7    videoconference.

8          Please state your agreement on the

9    record.

10          MS. GIZZI:  Plaintiff's attorney agrees on

11    the record.

12          MS. CHAVIRA:  No objection by defendant,

13    City of Chicago.

14          MS. DORY:  And no objection by defendant

15    Dakuras.

16          (Witness duly sworn.)

17          MS. GIZZI:  For the record, this is the

18    deposition of Officer Vasile Talos in the case of

19    Jeanette Bass verse Andrew Dakuras, case number 2019

20    CV 7557.

21          This deposition is taken pursuant to

22    notice on February 10th, 2021, at 10:00 and in

23    accordance with all applicable rules of the U.S.

24    Northern District of Illinois and the Federal Rules

```
 1      of Civil Procedure.
 2                          VASILE TALOS,
 3      called as a witness on behalf of the Plaintiff
 4      having been first duly sworn on oath, was examined
 5      and testified as follows:
 6                       DIRECT EXAMINATION
 7                     BY:  MS. GIZZI
 8          Q.    Good morning, Officer.
 9          A.    Good morning, counsel.
10          Q.    My name is Gianna, and I'm attorney for the
11      plaintiff in this case, Bass verse Dakuras.
12                    First, could I have you state and spell
13      your first and last name?
14          A.    Yes.  My full name is Vasile, V-A-S-I-L-E,
15      T-A-L-O-S.
16          Q.    Officer Talos, have you ever been deposed
17      before?
18          A.    No.
19          Q.    Okay.  So I'm going to go over a couple
20      ground rules that will give us a better idea of how
21      the deposition is going to go.
22                    If you have any questions throughout me
23      going through these rules, you can just let me know.
24                    Okay?
```

```
1           A.    Thank you.
2           Q.    So first and most obviously, you are
3    testifying under oath today.  So that means that you
4    have to -- you are legally obligated to provide
5    truthful answers.
6                 Do you understand that?
7           A.    Yes, I do.
8           Q.    Okay.  In response to all the questions,
9    you'll need to respond with verbal responses, and
10   that means no head shakes or nods or uh-huhs.
11                Does that make sense?
12          A.    I understand.
13          Q.    Okay.  And if you don't understand a
14   question I'm asking or you are unsure about what I'm
15   asking, just let me know and I can clarify or
16   rephrase the question.
17                Okay?
18          A.    Yes, I will.
19          Q.    But if you do answer a question, I will
20   assume that you understood it and -- unless you tell
21   me otherwise.
22                Okay?
23          A.    Yes.
24          Q.    Okay.  And if at any point throughout the
```

1    deposition you want to correct an answer that you

2    made earlier, you can do so.  You just specify to

3    what question and answer you are correcting.

4                    Okay?

5         A.    Okay.

6         Q.    Also, if at any time during the deposition

7    you want to take a break, you can do so, just let me

8    know, raise your hand, anything like that.

9                    The only caveat is that if a question

10   is pending, I ask that you first answer the question

11   and then we take a break.

12                   Okay?

13        A.    Okay.   Thank you.

14        Q.    And lastly, I will try my best to wait

15   until you finish responding before I start asking

16   another question, and I ask that you do the same for

17   three reasons.

18                   Mostly because the court reporter

19   cannot take down two people talking at once.  You

20   also may deprive one of the attorneys of an

21   objection.

22                   And lastly, because you might

23   anticipate where I'm going with a question, but it

24   could be different than you anticipate and then it

```
1        makes it confusing on the transcript later on.
2                     Does that make sense?
3        A.    Yes.
4        Q.    Okay.  Great.
5                     First, what is your date of birth?
6              MS. CHAVIRA:  I'm going to object.  He's
7        not going to give his date of birth on the record.
8              MS. GIZZI:  Okay.
9                     Q.  What is your age?
10       A.    I'm 41 years old.
11       Q.    And what city or town were you born in?
12       A.    I was born in Romania Clujnaeoca.
13             MS. REPORTER:  Could you spell that,
14       please?
15             THE WITNESS:  C-L-U-J-N-A-E-O-C-A.
16             MS. REPORTER:  Thank you very much.
17             THE WITNESS:  You're welcome.
18             MS. GIZZI:  Q.  When did you move to the
19       United States?
20       A.    2001.
21       Q.    Did you attend high school in the United
22       States?
23       A.    No.
24       Q.    Okay.  And did you graduate high school?
```

```
 1          A.    Yes.
 2          Q.    What did you do immediately after high
 3     school?
 4          A.    I graduated technical university.  I have a
 5     major in engineering.
 6          Q.    And what year did you graduate from there?
 7          A.    2003.
 8          Q.    After you graduated with -- with that
 9     degree, what did you do next in terms of career or
10     work?
11          A.    So I was in construction business.  I was
12     in commercial transportation business and personal
13     transportation business.
14          Q.    Okay.  And did you review any documents or
15     videos in preparation for today's deposition?
16          A.    Yes.
17          Q.    What did you review?
18          A.    I reviewed by body worn camera with the
19     recording that show the event that I was a part of
20     on that date and I reviewed my documentation.
21          Q.    And when you say that day, are you
22     referring to June 23rd, 2019?
23          A.    Correct.
24          Q.    To clarify, what documentation are you
```

1      referring to that you reviewed?

2          A.    The case report that I wrote, the video

3      recording recorded by my body worn camera for that

4      particular incident.

5          Q.    And where are you currently employed?

6          A.    I'm part of CPD, 18th District.

7              MS. REPORTER:   I'm sorry, what district was

8      that?

9              THE WITNESS:   18th District.

10             MS. REPORTER:   Thank you.

11             THE WITNESS:   You're welcome.

12             MS. GIZZI:   Q.   And when did you graduate

13     from the academy prior to becoming a law enforcement

14     officer?

15         A.    2016.

16         Q.    Before -- before becoming an officer with

17     the Chicago Police Department, were you employed as

18     an officer in another police department?

19         A.    No.

20         Q.    So you have worked at CPD for about five

21     years?

22         A.    Correct.

23         Q.    What is your current job title?

24         A.    Police officer.

```
 1          Q.    Was that your same job title in 2019?

 2          A.    Correct.

 3          Q.    Do you currently have a supervisor?

 4          A.    Yes, I do.

 5          Q.    And who would -- who would that be?

 6          A.    We have multiple supervisors.  I have one

 7   assigned to my beat every day.

 8          Q.    To clarify, does that mean that you have

 9   multiple supervisors at any given time or they

10   rotate?

11          A.    They rotate.

12          Q.    Okay.  Do you remember who your supervisor

13   was in June, 2019 or on June 23rd?

14          A.    I don't recall.

15          Q.    Have you ever been disciplined as a police

16   officer?

17          A.    No.

18          Q.    Are you aware of any civilian complaints

19   that have been filed against you as a police

20   officer?

21                MS. CHAVIRA:  Objection, form, foundation.

22                    Go ahead.

23                MS. GIZZI:  Q.  Officer, you have to

24   answer.
```

1          A.    Not that I know of.

2          Q.    Have you ever given a statement to COPA or

3     formerly known as IPRA?

4          A.    No.

5          Q.    Have you ever been a party to a lawsuit

6     before?

7          A.    No.

8          Q.    Either throughout the academy or since

9     finishing the academy, have you received training in

10    mental health calls?

11         A.    I don't recall.

12         Q.    So as you sit here today, you don't

13    remember if you've had mental health training as a

14    police officer?

15         A.    We do have a lot of in-service and on-line

16    trainings.  I don't recall a particular one related

17    to CIT (phonetic).

18         Q.    Okay.  Do you know an individual by the

19    name of Andrew Dakuras?

20         A.    Yes.

21         Q.    And what is the nature of your relationship

22    with Officer Dakuras?

23         A.    I worked under his supervision for a while.

24         Q.    And when was he your supervisor?

```
 1          A.    Well, he left the district a while ago and
 2     he's currently working in another district.
 3                    To be more specific, he's been my
 4     supervisor -- one of my supervisors until the end of
 5     last year.
 6          Q.    When you say last year, do you mean 2020?
 7          A.    Correction, 2019 -- 2019.
 8          Q.    Okay.  Okay.  Do you socialize with Officer
 9     Dakuras outside of work?
10          A.    Sometimes.
11                MS. DORY:  Objection to form.  I'm just
12     going to object to form.
13                MS. CHAVIRA:  Go ahead.  You can answer.
14                THE WITNESS:  Sometimes.
15                MS. GIZZI:  Q.  About how frequently if you
16     could you approximate that you socialize with
17     Officer Dakuras?
18          A.    Every few months.
19          Q.    And approximately, how many years have you
20     known Officer Dakuras?
21          A.    Three to three and a half.
22          Q.    From June 23rd, 2019 to the present time,
23     have you spoken with Officer Dakuras about Jeanette
24     Bass?
```

```
 1          A.   No.

 2          Q.   From June 23rd, 2019 to the present time,

 3   have you spoken to Officer Dakuras about the

 4   incident for this lawsuit?

 5          A.   Just --

 6               MS. CHAVIRA:  I'm going to object to form.

 7               And -- you're you are including the day

 8   of the incident, correct?

 9               MS. GIZZI:  No, after.  So June 24th.

10               MS. CHAVIRA:  Go ahead, Officer.

11               THE WITNESS:  No, we're not talking about

12   work.

13               MS. GIZZI:  Q.  So I can gather what your

14   answer will be on this, but for the record, did you

15   work on June 23rd, 2019?

16          A.   Yes.

17          Q.   Okay.  And do you remember what shift you

18   worked that day?

19          A.   I was third watch.

20          Q.   And what area were you assigned during that

21   shift?

22          A.   According to my report, I was assigned to a

23   rapid car which technically drives around and

24   answers to in-progress calls everywhere in the
```

1    district.

2         Q.    And that's the 18th District?

3         A.    Correct.

4         Q.    On June 23rd, 2019 during that shift, were

5    you working with a partner or by yourself?

6         A.    I was working with a partner.

7         Q.    And what is the name of that partner?

8         A.    My partner on that day is not working in

9    the district anymore.  It was under her status.  It

10   was -- her name was Kate Morriarety (phonetic).

11        Q.    Do you remember receiving a call and

12   responding to an incident at 20 -- 260 East

13   Chestnut?

14        A.    Yes.

15        Q.    Do you remember approximately what time

16   during your shift you received that call?

17        A.    I don't recall.  It was sometime in the

18   afternoon.

19        Q.    And what was your understanding of why you

20   were sent to that location?

21        A.    It came as assisting supervisor.  And I

22   went over the air, and I informed my dispatcher that

23   I'm heading -- I'm heading on that way to assist one

24   of my supervisors.

1          Q.    Okay.  And this is a question that's just

2     based on my lack of knowledge.

3                You received that call from the

4     dispatch that you needed to assist the supervisor

5     or --

6                MS. CHAVIRA:  I'm just going to object to

7     the extent that mischaracterizes his testimony.

8                But go ahead and answer.

9                THE WITNESS:  1810 (phonetic) because I was

10    assigned to Sergeant Dakuras on that day, went over

11    the air and informed the dispatcher that he needs

12    assistance.

13               Everybody in 18th District and one --

14    and the First District were able to acknowledge and

15    hear that message.

16               But on my beat, I answered the radio

17    and I informed the dispatcher that I'm heading that

18    way.

19               MS. GIZZI:  Q.  Okay.  Okay.  Thank you.

20               And approximately, how many minutes did

21    it take for you to get to the location of the call?

22         A.    I would say somewhere between five to seven

23    minutes.

24         Q.    During your route to that call, did you

1    receive anymore information about the call or the

2    supervisor who was sending that message out?

3       A.   I remember he stated over the radio no

4    rush, don't get anyone hurt.  He just made it an

5    assistance.

6       Q.   And what was the first thing that you did

7    when you arrived at the location of the call?

8       A.   I located him.  Ms. Jeanette Bass was on

9    the 27th floor.  And she was already assisted by the

10    EMS or CFD personnel.  She was already on the

11    stretcher.

12       Q.   And when you say you located him, do you

13    mean your supervisor, Officer Dakuras?

14       A.   Correct.  They informed us where their

15    location.

16       Q.   And when you arrived on the 27th floor,

17    approximately, how many officers were already

18    present, if you remember?

19       A.   I recall one officer in the elevator.  But

20    again, I was -- I reviewed my body worn camera in

21    order to be able to give you this answer.

22           And I don't recall other officers, but

23    I recalled CFD or EMS personnel being on scene --

24       Q.   Okay.  And approximately --

1      A.    -- with --

2      Q.    I'm sorry.

3      A.    -- with Sergeant Dakuras.

4      Q.    Okay.  And besides Sergeant Dakuras, how

5   many, you know, EMS or paramedics were present from

6   what you remember or what you remember reviewing on

7   the body worn camera?

8      A.    I don't recall.

9      Q.    Before June 23rd, 2019, had you ever

10  responded to a call of Jeanette Bass?

11     A.    No.

12     Q.    When you arrived on the 27th floor as you

13  just mentioned, who was the first person you spoke

14  with in that situation?

15     A.    It was an outside unit in the elevator, an

16  officer who informed us that -- I wasn't sure if it

17  was 27th floor where I'm supposed to go to locate my

18  supervisor, and we discussed about the location of

19  where we are about to go.  That's what I recall.

20     Q.    Okay.  Was that confirmed that it was --

21  they were in fact on the 27th floor?

22     A.    Correct.

23     Q.    So when you get up to the 27th floor --

24  Well, strike that.

```
 1                      Did you continue to proceed to the 27th
 2    floor?
 3         A.    Correct.
 4         Q.    Okay.  And when you arrived on the 27th
 5    floor, who was the first person you spoke with?
 6         A.    I don't recall.
 7         Q.    Do you remember at any point speaking with
 8    Jeanette Bass?
 9         A.    Yes.  I was one of the officers who
10    assisted her in the ambulance.
11         Q.    Before the ambulance, did you speak with
12    Ms. Bass?
13         A.    No.
14         Q.    Did you speak with Officer Dakuras on the
15    27th floor at any point?
16         A.    I spoke with Officer -- with Sergeant
17    Dakuras, but I don't recall if I spoke with him on
18    the 27th floor or while we were assisting this
19    person into the ambulance.
20         Q.    And when you did speak with Officer
21    Dakuras, what was nature of that conversation or
22    what did he relate to you?
23         A.    I learned that Ms. Jeanette Bass is
24    mentally confused and he arranged for a mental
```

1    health transport.

2         Q.   Did he explain to you why he was there in

3    the first place, and there, at her condo unit?

4         A.   At later time, I documented everything on

5    the paper after I spoke with my supervisor, Sergeant

6    Dakuras.

7              And he related to me that it was a call

8    for requesting supervisor.  And she was in need of

9    medical attention.

10             And she change her behavior, ran out of

11   her apartment with her hand on my supervisor.  And

12   for safety reasons, he placed her in handcuffs so

13   she can be transported -- safely transported to the

14   hospital.

15        Q.   Okay.  So to clarify, you learned that and

16   had that conversation with Officer Dakuras before

17   you completed the case report?

18        A.   Correct.

19        Q.   After you arrived on scene with Ms. Bass on

20   the 27th floor, did other assisting officers arrive,

21   do you remember?

22        A.   According to my video that I was recorded

23   with my body worn camera, there was multiple units

24   on scene.

1          Q.    Do you remember approximately how many

2     units had responded to his call?

3          A.    I would say four to six officers.  It could

4     have been more.

5          Q.    You mentioned that she was on the stretcher

6     when you arrived?

7          A.    Yes.  Correct.

8          Q.    Did Officer Dakuras indicate why she was on

9     a stretcher to you?

10         A.    I don't recall.

11         Q.    Did -- according to your observations, did

12    Ms. Bass look injured when you arrived?

13         A.    No.

14         Q.    When you arrived, was Ms. Bass in

15    handcuffs?

16         A.    Yes.

17         Q.    Do you remember if Ms. Bass was strapped

18    down on the stretcher when you arrived?

19         A.    I don't recall.

20         Q.    And when you got downstairs in the lobby of

21    the condo building, you mentioned that you went with

22    Ms. Bass in the ambulance; is that correct?

23         A.    Yes.  I was one of the officers who

24    assisted Ms. Bass into the ambulance all the way to

1      the hospital.

2            Q.    Okay.  And who was the other or were other

3      officers?

4            A.    It was only me in the ambulance.

5            Q.    Okay.  So to clarify, you rode in the back

6      of the ambulance with Ms. Bass on the way to the

7      hospital?

8            A.    Correct.

9            Q.    And at that point, did you have any

10     conversations with Ms. Bass in the ambulance?

11           A.    Correct.

12           Q.    You did?

13           A.    Yes.

14           Q.    Okay.  And what was Ms. Bass saying to you

15     or you saying to her?

16           A.    First, I introduced myself.  And I observed

17     that her behavior was changing a lot.  So we had --

18     I had to repeat my answers, and she repeated her

19     questions over and over again telling me that

20     personnel -- not verbatim, building personnel is

21     constantly recording her while she's naked in her

22     apartment.

23           Q.    And you said that you observed her changing

24     her behavior.

1              Can you explain what you mean by that?

2        A.    Yes.  She was --- in my observation -- I'm

3    not a doctor or a counselor, and I explain to her

4    that.

5              In my observation at that point, she

6    appeared to be in need of -- needed medical

7    assistance because she was either very calm or

8    yelling or screaming, making aggressive hand

9    gestures and repeating over and over again the same

10   thing.

11       Q.    And when you state that she needed medical

12   assistance, are you referring to medical assistance

13   for emotional reasons or for physical reasons?

14       A.    Emotional reasons.

15       Q.    Do you remember if Ms. Bass acknowledged

16   what you were saying when you were introducing

17   yourself and explaining what you just testified that

18   you explained to her?

19       A.    I recall that I introduced myself the first

20   thing I had a chance.  We shook hands, and that was

21   started from there.

22             I repeated a lot of times that I'm not

23   a doctor or a counselor.  I asked her politely not

24   to yell at the medical personnel in the ambulance

1    because they are trying to help.

2              Again, I explained to her I'm not a

3    doctor or a counselor.  We are going to go to the

4    hospital.  As soon as we get to the hospital -- you

5    are not under arrest.

6              As soon as we get to the hospital, I'm

7    going to remove those handcuffs.  Those handcuffs

8    are for safety only.

9              We want to make sure that you are safe

10   and all these wonderful people around you that are

11   trying to take care of you are going to stay safe.

12   Not verbatim.

13     Q.    Okay.  Okay.  And that answered my next

14   question.

15              That she -- clarify, Ms. Bass was still

16   in handcuffs during that ambulance ride to the

17   hospital?

18     A.    Correct.  But I promised her that I'm going

19   to remove those as soon as we get out of the

20   ambulance and into the hospital to check in.

21     Q.    Okay.  Did Officer Dakuras meet you at the

22   hospital, if you remember?

23     A.    Officer -- my supervisor showed up in the

24   parking lot.  And that's all I recall.

1        Q.    Okay.  But you don't remember if he

2    assisted in bringing her or checking her into the

3    hospital?

4        A.    He was not in the hospital.

5        Q.    Throughout that ambulance ride with

6    Jeanette Bass, did she say anything about Officer

7    Dakuras?

8        A.    She was frustrated that she was placed in

9    handcuffs.  Not verbatim.  And I did my best to

10   explain to her that she is not under arrest.  It is

11   for safety reasons only.

12       Q.    And that leads me to my next question.

13             You said that you needed to leave the

14   handcuffs on her for safety reasons.

15             What -- who was the primary concern of

16   safety if you had taken those handcuffs off?

17       A.    She was making aggressive hand gestures,

18   even though she was handcuffed, and constantly

19   yelling at the medical personnel inside of the

20   ambulance, plus I was sitting right next to her in

21   within less than two feet.

22       Q.    Okay.  And when she was yelling at the

23   paramedics, can you explain what she was saying in

24   that ambulance ride that she was yelling?

1      A.    From what I recall, she refused to give

2    them her information so she can be put in the system

3    and get the proper help as soon as she gets into the

4    hospital.

5                 And again, she was making an aggressive

6    hand gestures.  And I politely explained to her that

7    they're just trying to do the job and help her,

8    which I had succeed had at some point.

9      Q.    Okay.  At any point during your interaction

10   with Ms. Bass, did you hear her say that she wanted

11   to harm herself?

12     A.    No.

13     Q.    At any point during your interaction with

14   Ms. Bass, did you hear her threaten to hurt anyone?

15     A.    She didn't make any threats.

16     Q.    In your experience, was Ms. Bass displaying

17   behavior that suggested she was suicidal?

18     A.    No.

19     Q.    From your observations, did Jeanette Bass

20   appear intoxicated throughout your interaction with

21   her on June 23rd, 2019?

22     A.    I couldn't tell.

23     Q.    So you don't remember or was there nothing

24   that you saw that eluded that she was intoxicated?

1          MS. CHAVIRA:  I'm going to object to the

2     extent that misstates his prior testimony or

3     mischaracterizes it.

4               But, go ahead and answer, Officer.

5          THE WITNESS:  To my observation, to my

6     knowledge and experience, it appeared to be off her

7     medication.

8               But I repeat, I'm not a doctor or a

9     counselor.  I'm just a first responder.

10         MS. GIZZI:  Q.  Okay.  To clarify, you said

11    off her medication?  Did I hear you correctly?

12         A.   Or some type of treatment.

13         Q.   And can you explain why -- other than what

14    you've already testified to -- why that was your

15    conclusion, that she -- that Ms. Bass was off her

16    medication or not receiving some treatment?

17         A.   To my knowledge and experience, it's

18    typical behavior for people who are off medication

19    or some type of treatment the way that she was

20    acting.

21         Q.   And can you elaborate on what way she was

22    acting that gave you that impression?

23         A.   Making aggressive hand gestures, changing

24    her behavior from being very, very calm and polite

1    to yelling, screaming, repeating the same things

2    over and over again.

3             To me, it appeared to be mental --

4    mentally confused and in need of some type of

5    medical help as soon as possible.

6        Q.   Did you ever ask Ms. Bass if she was on

7    medication or prescribed medication?

8        A.   No.

9        Q.   Did you hear any other officer or first

10    responder ask Ms. Bass that question?

11        A.   I don't recall.

12        Q.   Just to backtrack a little bit, did you

13    ever enter Jeanette Bass's condo unit on the -- I

14    don't know if it's on the 27th floor -- but within

15    the 260 East Chestnut building?

16        A.   If we are referring about her apartment,

17    I've never been to her apartment.

18        Q.   Okay.  But you didn't go into inside of her

19    unit at any point?

20        A.   No.

21        Q.   You referred to Ms. Bass as being mentally

22    confused.

23             What gave -- can you elaborate on what

24    gave you that impression besides the repetition and

1    hand gestures, if anything?

2         A.   The way she was rolling her eyes.  The way

3    she was scanning her surrounding.  And like I said,

4    her total behavior, the totality of circumstances.

5         Q.   Okay.  Did you ever ask Ms. Bass if she

6    wanted to be admitted or receive psychological

7    treatment?

8         A.   No.  But I informed her that I'm not a

9    doctor or a counselor.  And as soon as we go to the

10   hospital, doctors are going to check on her and let

11   her know.

12        Q.   Besides this incident on June 23rd, 2019,

13   have you been involved with any other call that

14   you've responded involving involuntarily committing

15   someone to a hospital?

16        A.   I have assisted a few calls, yes.

17        Q.   Approximately, how many?

18        A.   For suicidals, I would say a few of them,

19   three to five.  But I've assisted between 20 to 30

20   calls that involve people in need of being

21   transported to the hospital, people in need of

22   medical attention.

23        Q.   When you say you were assisting on those

24   calls, do you mean that you were not the first

```
 1    officer there or could you explain what you mean by
 2    assisting?
 3         A.   Stating 20 to 30, I can't recall in how
 4    many of those situations I was the first responder.
 5         Q.   Since June 23rd, 2019, have you responded
 6    to any calls to the condo building located at 260
 7    East Chestnut?
 8         A.   I don't recall.  It's a huge building.  It
 9    has probably over 200 apartments.
10         Q.   And since the date of the incident, have
11    you responded to any calls concerning Jeanette
12    Bass?
13         A.   No.
14         Q.   Have you interacted with Jeanette Bass
15    since this incident in June, 2019?
16         A.   No.
17         Q.   And you mentioned this earlier, but to
18    clarify, were you wearing a body worn camera on your
19    shift on June 23rd, 2019?
20         A.   Yes.
21         Q.   And at what point did you activate that
22    camera?
23         A.   I usually activate the camera as soon as I
24    acknowledge the job with the dispatcher.
```

1       Q.   Have you spoken with anyone else about the

2   June 23rd, 2019 incident?

3       A.   Besides my attorney?

4       Q.   Yes.

5       A.   No.

6       Q.   Have you spoken with anyone else besides

7   your attorney about this deposition?

8       A.   No.

9       Q.   My last question for you for now is:  What

10  is your understanding based on your training and

11  experience of what a mental health crisis is?

12      A.   A mental health crisis means --

13           MS. CHAVIRA:  Hold on.  I'm going to object

14  to the form of the question.

15           But go ahead and answer, if you know.

16           MS. DORY:  And I'm going to join in the

17  objection.

18           THE WITNESS:  A mental health crisis in my

19  opinion is a situation when a first responder, like

20  the CFD or CPD or EMS employee doesn't respond to it

21  as soon as possible, with my hand up, not being able

22  to help that person in need of medical assistance

23  and with my hand up responding to the same call when

24  that person can injure herself or himself or can

```
1       injure other people.
2               MS. GIZZI:  Okay.  Thank you.
3                       Can we take a five minute break, you
4       guys?
5               MS. CHAVIRA:  Sure.
6                       Officer Talos, can you mute yourself
7       and turn off your video?
8                               (WHEREUPON, a short recess was
9                                taken.)
10              MS. GIZZI:  Okay.  Let's go back on the
11      record.
12                      Q.  I have a couple more questions for
13      you, Officer.
14                      What was your understanding of your
15      role in assisting your supervisor, Officer Dakuras,
16      on June 23rd, 2019?
17              MS. CHAVIRA:  Objection, form.
18                      But go ahead and answer.
19              THE WITNESS:  When I assisted Sergeant
20      Dakuras, first, for his safety and Ms. Jeanette
21      Bass's safety, too.
22              MS. GIZZI:  Q.  Okay.  And did Officer
23      Dakuras instruct you to ride with Ms. Bass to the
24      hospital?
```

1      A.    I don't recall how I ended up assisting Ms.
2  Jeanette Bass into the ambulance.  But I'm glad I
3  did that.
4      Q.    And once you arrived at, I believe it was
5  Northwestern Hospital, who was the first person you
6  spoke with from -- as far as medical personnel when
7  you arrived there?
8      A.    To my knowledge and experience in those
9  particular calls, first thing we do, we go to the
10  front desk.
11            We provide them information, and we
12  always request the name of the doctor who is
13  supervising the floor on that day.
14      Q.    And is that what you also did on June 23rd,
15  2019 in transporting Ms. Bass?
16      A.    I don't recall how I ended up getting that
17  information.  Sometimes I meet the doctor, but they
18  are not always available.
19            They have a huge staff and they have to
20  supervise everybody who work.
21      Q.    Do you remember if you went to the front
22  desk, though, to check her in or was it someone
23  else?
24      A.    I can only -- it happened awhile ago.  I

1    can only rely on my body worn camera video footage.

2    And I'm shown at the front desk.

3    Q.   And after that -- after you went to the

4    front desk, what do you remember happening as far as

5    your interaction with Ms. Bass or the medical staff?

6    A.   What I normally do in those type of

7    situations -- I don't remember that particular

8    day.  I gather the information and I go straight to

9    the district to document everything on my behalf.

10    Q.   And you said that you don't remember if you

11    did that for this incident?

12    A.   Can you repeat again?

13    Q.   Yeah.  Sorry.

14          Do you remember doing that process for

15    this incident or are you just speaking that

16    generally that you do that?

17    A.   I documented everything.  I was the officer

18    who documented the report for mental health

19    transport.

20    Q.   And did that documentation include a

21    petition for involuntary commitment?

22    A.   I don't recall.

23    Q.   And if you know, why did Officer Dakuras

24    not be the one to do the documentation?  Is that

1    standard procedure?

2         A.    I don't recall on my behalf.  I documented

3    what had to be documented.

4         Q.    But did Officer Dakuras ask you to fill out

5    that documentation or did you do it on your own?

6         A.    I don't recall.  But I've done my

7    documentation and I've done my report.

8              He might have asked me, but I -- I

9    don't recall.

10        Q.    Okay.

11        A.    He takes care of his officers.  He wants to

12   make sure that everything is documented all the time

13   no matter what type of incident that we attend.

14        Q.    Okay.  And you touched on this earlier, but

15   do you have any education or -- on dealing with

16   mental health crisis?

17        A.    In my career so far, almost five years like

18   we talked, I've done a lot of in-service and

19   e-learning training.

20              I'm sure I've done some of them, but I

21   don't recall which one.

22        Q.    Other than those types of training

23   programs, have you received any education or taken

24   any courses on mental health or responding to mental

```
1    health calls?

2         A.   No.

3         Q.   Okay.

4              MS. GIZZI:  That's all questions I have.

5                   Thank you, Officer.

6              THE WITNESS:  Thank you very much.  Thank

7    you.

8              MS. CHAVIRA:  With can we take a quick,

9    five minute break?

10             MS. GIZZI:  Sure.

11             MS. CHAVIRA:  Thanks.

12                  (WHEREUPON, a short recess was

13                    taken.)

14             MS. CHAVIRA:  All right.  Okay.  I don't

15   have any questions for him.

16             MS. DORY:  And I also do not have any

17   questions for the Officer.

18             MS. CHAVIRA:  And if we could reserve

19   signature and order a copy of the transcript, PDF

20   only is fine.

21             MS. REPORTER:  Sounds good.

22

23

24
```

```
1              MS. GIZZI:  We don't need a copy.
2                  Thank you, Jodi.
3              MS. REPORTER:  You're welcome.
4              MS. DORY:  Thank you, everyone.
5
6                  (Witness excused.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
     JEANETTE BASS,                 )
 4                                  )
               Plaintiff,           )
 5                                  )
          vs.                       ) No. 10 CV 7557
 6                                  )
     LT. ANDREW DAKURAS,            )
 7   individually, and THE CITY OF  )
     CHICAGO, a Municipal           )
 8   Corporation,                   )
                                    )
 9             Defendants.          )

10

11              I, VASILE TALOS, hereby certify that I

12   have read the foregoing transcript of my deposition

13   taken on February 10, 2021, consisting of pages 1

14   through 41, and that to the best of my knowledge it

15   is a true and correct transcript of said deposition,

16   except as I have changed it on the attached sheets

17   in accordance with the rules provided by the said

18   Court.

19                     _____
                                 Deponent
20
     SUBSCRIBED AND SWORN TO
21   before me this _____day
     of _____, 2021.
22
     _____
23         Notary Public

24
```

```
 1      UNITED STATES OF AMERICA      )
        NORTHERN DISTRICT OF ILLINOIS )
 2      EASTERN DIVISION              )    SS.
        STATE OF ILLINOIS             )
 3      COUNTY OF COOK                )

 4

 5                  I, JODI ANNE FEIGN, Certified Shorthand

 6      Reporter and Notary Public in and for the County of

 7      Cook and State of Illinois, do hereby certify that

 8      VASILE TALOS was first duly sworn by me to testify

 9      the whole truth and that the above deposition was

10      reported stenographically by me and reduced to

11      typewriting under my personal direction.

12                  I further certify that the said

13      deposition was taken at the time remotely via Zoom

14      Videoconference and that the taking of said

15      deposition commenced on the 10th day of

16      February, 2021, at 10:00 o'clock a.m.

17                  I further certify that I am not a

18      relative or employee or attorney or counsel of any

19      of the parties, nor a relative or employee of such

20      attorney or counsel or financially interested

21      directly or indirectly in this action.

22

23

24
```

1          In witness whereof, I have hereunto set

2     my hand and affixed my seal of office at Chicago,

3     Illinois, this 27th day of February, A.D., 2021.

4

5

6

7

8

9                    *Jodi Anne Feign CSR*
                     JODI ANNE FEIGN, CSR

10

11     License No. 084-003375

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    JAF Reporting
         111 West Washington, Suite 1259, Chicago, IL 60602
 2                 630-605-1257/frankienb@aol.com

 3                                       February 27, 2021

 4       Assistant Corporation Counsel
         Ms. Iris Chavira
 5       30 North LaSalle Street, Suite 900
         Chicago, IL 60602
 6
         In Re:  Jeanette Bass vs. Lt. Andrew Dakuras, et al
 7       Case No. 19 CV 7557

 8       Dear Ms. Chavira:

 9       Enclosed please find one copy of the deposition
         transcript of Mr. Vasile Talos, taken in the
10       above-captioned cause on the 10th day of February,
         2021 along with the original of the signature page
11       and errata sheets for the witness to sign.

12       Please have the witness review his transcript,
         making whatever corrections he may have only on the
13       errata sheets I have provided, not on the deposition
         transcript.
14
         After he has reviewed his deposition, please have
15       him sign each correction sheet, if any, at the
         bottom of the page, sign the signature pages, and
16       have them notarized by any notary public.  Then,
         within 30 days of today, return the original and one
17       copy of the signature page and errata sheets, if
         any, to my office, keeping a copy for yourself.  If
18       they are not returned by said date, an affidavit
         will be attached to the transcript pursuant to the
19       procedure outlined in Rule 30 (e) of the Rules of
         Civil Procedure for the United States District
20       Courts and the deposition will be completed and will
         be "used as fully as though signed."
21
         Thank you for your cooperation in this matter.  If
22       you have any questions, please do not hesitate to
         call me.
23                                       Sincerely,
                                         Jodi Anne Feign, CSR
24       cc Ms. Gizzi
```