# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JEANETTE BASS,** | ) | |
| | ) | **Case No. 19 CV 7557** |
| **Plaintiff,** | ) | |
| **v.** | ) | **Judge John Kness** |
| | ) | |
| **SGT. ANDREW DAKURAS,** | ) | |
| **individually, and THE CITY OF** | ) | |
| **CHICAGO, a Municipal Corporation,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendants.** | ) | |

## COVER LETTER

Exhibit 6 is the deposition transcript of Michael Litt, a friend of Plaintiff, taken on March 3, 2021 and recorded by certified court reporter Raelene Stamm.

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4   JEANETTE BASS,            )
 5              Plaintiff,     )
 6         -vs-                ) No. 19 C 7557 CITY
 7   OF CHICAGO, et al.,       )
 8              Defendants.    )
 9
10        The videoconference deposition of
11   MICHAEL LITT, called for examination pursuant to
12   the Rules of Civil Procedure for the United States
13   District Courts pertaining to the taking of
14   depositions, taken before Raelene Stamm, a
15   Certified Shorthand Reporter licensed by the State
16   of Illinois, on the 3rd day of March, 2021, at the
17   hour of 1:00 p.m.
18
19
20
21
22
23   Reported by:  RAELENE STAMM, CSR
24   License No.:  084-004445
```

**Page 2**

```
 1   APPEARANCES:
 2
 3        KULIS LAW
 4        BY:  MS. GIANNA GIZZI  (via video)
 5        30 North LaSalle Street
 6        Suite 2140
 7        Chicago, Illinois  60602
 8        (312) 580-1830
 9             On behalf of the Plaintiff;
10
11        CITY OF CHICAGO
12        DEPARTMENT OF LAW
13        BY:  MS. LANIYA MOORE  (via video)
14        2 North LaSalle Street
15        Suite 420
16        Chicago, Illinois  60602
17        (312) 744-6737
18             On behalf of the Defendant,
19             Lieutenant Leuke Dakuras;
20
21
22
23
24
```

**Page 3**

```
 1   APPEARANCES:  (Continued)
 2
 3        CITY OF CHICAGO
 4        LAW DEPARTMENT
 5        BY:  MS. STEPHANIE SOTOMAYOR  (via video)
 6        2 North LaSalle Street
 7        Suite 420
 8        Chicago, Illinois  60602
 9        (312) 744-8791
10             On behalf of the Defendant,
11             City of Chicago.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1                  I N D E X
 2   WITNESS                        EXAMINATION
 3   MICHAEL LITT
 4        By Ms. Moore                  6
 5        By Ms. Sotomayor             56
 6        By Ms. Gizzi                 60
 7        By Ms. Moore  (Further)      61
 8
 9
10
11
12
13               E X H I B I T S
14   NUMBER                       IDENTIFICATION
15
16        (No exhibits marked.)
17
18
19
20
21
22
23
24
```



1    COURT REPORTER: We are on the record.
2        This deposition is being taken by means of
3    Zoom video conference.
4        The attorneys participating in this
5    deposition acknowledge that I am not physically
6    present in the deposition, and the oath will be
7    administered remotely.
8        The parties and their counsel consent to
9    this arrangement and waive any objections to this
10   manner of reporting.
11       Will all counsel present please state your
12   name, who you represent, and indicate your
13   agreement on the record?
14       MS. MOORE: Hi, my name is Laniya Moore. I
15   represent Lieutenant Dakuras in this case, and I
16   agree to the terms.
17       MS. SOTOMAYOR: Stephanie Sotomayor on behalf
18   of defendant city, and I agree to the terms.
19       MS. GIZZI: Gianna Gizzi on behalf of
20   Plaintiff, Jeanette Bass, and I, too, agree to the
21   terms.
22                      (WHEREUPON, the witness was
23                       duly sworn.)
24

                                                    5

1                MICHAEL LITT,
2    called as a witness herein, having been first duly
3    sworn, was examined and testified as follows:
4                EXAMINATION
5    BY MS. MOORE:
6        Q.  Sir, can you please state your name and
7    spell it for the record?
8        A.  Michael Litt, M-i-c-h-a-e-l, L-i-t-t.
9        Q.  Let the record reflect that this is the
10   deposition of Michael Litt taken pursuant to
11   subpoena in the matter of Jeanette Bass v. City of
12   Chicago, et al., Case Number 19 C 7557, pending in
13   the Northern District of Illinois before the
14   Honorable Judge Ness.
15       This deposition is being taken pursuant to
16   the Federal Rules of Civil Procedure, the Federal
17   Rules of Evidence, and all applicable locals rules
18   of the United States District Court for the
19   Northern District of Illinois.
20       My name is Laniya Moore, and as you just
21   heard me state, I represent Lieutenant Dakuras.
22   And just for the record can I have all counsel
23   introduce themselves?
24       MS. SOTOMAYOR: Stephanie Sotomayor on behalf

                                                    6

1    of defendant city.
2        MS. GIZZI: Gianna Gizzi on behalf of
3    plaintiff, Jeanette Bass.
4    BY MS. MOORE:
5        Q.  Mr. Litt, am I saying it correct?
6        A.  Yes.
7        Q.  Okay. Do you understand that this is your
8    deposition that we are taking today?
9        A.  Yes, I do.
10       Q.  Do you understand that you are under oath,
11   meaning you are sworn to tell the truth when
12   answering my questions today?
13       A.  Yes, I do.
14       Q.  Okay. Have you ever been deposed before?
15       A.  Yes, I have.
16       Q.  How many times?
17       A.  Once, I believe.
18       Q.  And what kind of case was that that you
19   were deposed in?
20       A.  I was the plaintiff in a personal injury
21   case.
22       Q.  You say you were the plaintiff in a
23   personal injury case?
24       A.  Yes.

                                                    7

1        Q.  Okay. And what happened in that case, if
2    you know, if you remember?
3        A.  It was decided against me.
4        Q.  Okay. So you have been deposed, so I'm
5    gonna go through some ground rules to make sure
6    we're on the same page because I don't know how
7    long ago it was and just to make sure we're on the
8    same page.
9        So if you have any questions or if there's
10   anything that you do not understand during this
11   deposition, please stop me at any time, and I'll be
12   happy to rephrase the question if needed.
13   Otherwise, if you answer my question, I'm going to
14   assume that you understood my question; is that
15   fair?
16       A.  Yes.
17       Q.  Also, please answer out loud because the
18   court reporter can't take down nods of the head,
19   uh-huh, shrugs of the shoulders. So if you happen
20   to do that, please don't take offense if I ask you
21   is that a yes or is that a no. I just want to be
22   clear for the record.
23       A.  Yes.
24       Q.  Also, the court reporter can only take one

                                                    8



1  person at a time, take down what one person is
2  saying at a time.  So I am going to try my hardest
3  not to talk over you.  I ask that you do not --
4  that you do the same, that you don't try to talk
5  over me, okay?
6      A.   Sure.
7      Q.   And last, but not least, if you need to
8  take a break, feel free to let me know.  The only
9  thing that I ask is that if there's a question
10 pending, that you answer that question before you
11 take a break, okay?
12     A.   Yes.
13     Q.   Before we begin I want to ask you some
14 preliminary questions, and these questions aren't
15 to offend you.  I ask everybody that I depose.  I'm
16 not trying to imply anything or insinuate anything.
17         Are you currently under the influence of
18 any medication, drugs, alcohol or other substance
19 that may affect your ability to give truthful and
20 accurate testimony here today?
21     A.   No.
22     Q.   So just to be clear, you're able to answer
23 my questions truthfully and completely today,
24 right?

9

1      A.   Yes.
2      Q.   Now, you told me that you were deposed
3  before.  You were a plaintiff in a personal injury
4  lawsuit.  Have you ever testified in court?
5      A.   I don't think so, no.  I don't remember
6  ever having testified.
7      Q.   Okay.  And the personal -- well, strike
8  that.
9          The personal injury lawsuit that you told
10 me that you were deposed in, do you remember what
11 year that was?
12     A.   It would have been 2000 or 2001, around
13 then.
14     Q.   Have you ever been a defendant in a
15 lawsuit?
16     A.   No.
17     Q.   Did you speak with an attorney in
18 preparation for this deposition today?
19     A.   Yes, I did.
20     Q.   And who was that?
21     A.   Both counsel for the plaintiff.
22     Q.   And when you say both counsel for the
23 plaintiff, are you referring to Greg Kulis and
24 Gianna Gizzi?  And excuse me if I'm pronouncing

10

1  Gizzi, if I'm pronouncing it wrong.
2      A.   Yes, I am.
3      Q.   Who was present?  Other than the
4  attorneys, who was present for the meeting?
5      A.   It was a telephone conference.
6      Q.   Okay.  When did you speak with the
7  attorneys on the telephone?
8      A.   Yesterday afternoon.
9      Q.   How long was that conversation?
10     A.   I would say about 15 minutes perhaps.
11     Q.   And what was that conversation about?
12     A.   The mechanics of testifying and what I
13 might know about the case, some suggestions as to
14 how I might conduct myself.
15     Q.   And what were those suggestions that were
16 given to you on how to conduct yourself?
17     A.   Answer truthfully, don't volunteer, don't
18 talk over.
19     Q.   And did you tell them what you knew about
20 the lawsuit?
21     A.   About the lawsuit?
22     Q.   What exactly did you tell them during your
23 meeting with them?
24     A.   They asked me what I had recalled in

11

1  connection with incidents that are the basis for
2  the lawsuit, I believe, and I told them what my
3  recollections were.
4      Q.   And you only spoke to Gianna and Greg
5  Kulis that one time in preparation for the
6  deposition, right?
7      A.   That's right.
8      Q.   Did you speak with anyone else in
9  preparation for this deposition other than the
10 attorneys that you just told me about?
11     A.   I spoke briefly to the plaintiff about it
12 sometime ago.
13     Q.   When you say sometime ago, was it last
14 week?  Was it a month ago?  What do you mean by
15 sometime ago?
16     A.   A week or two weeks, something like that.
17 I don't remember exactly.
18     Q.   Was this in person or was this over the
19 phone?
20     A.   Over the phone.
21     Q.   And what was said during that conversation
22 that you had with plaintiff a week or two ago?
23     A.   I was trying to sort out the dates of the
24 events.  I think that was all we -- all I inquired

12

1  about.
2      Q.   When you say sort out the dates of the
3  events, what exactly do you mean?
4      A.   There was -- her apartment -- the building
5  management came into her apartment.  That was on
6  one date.  And then sometime after that she was
7  arrested and taken to Northwestern Hospital.  That
8  was another date.  I had no real recollection as to
9  what -- when those dates were, and that's what I
10  was asking about.
11      Q.   Okay.  Did you review any documents in
12  preparation for this deposition?
13      A.   No, I didn't.
14      Q.   You didn't look at any videotapes or
15  any -- listen to any audio, right?
16      A.   That's right.
17      Q.   Okay.  Did you tell anyone that you were
18  sitting for a deposition today?
19      A.   I told a couple of friends of mine.
20      Q.   And who were -- who are those friends that
21  you told?  What's their names?
22      A.   Stewart Coffman and Marilyn Litt.
23      Q.   And what exactly did you tell them?
24      A.   That I'd been subpoenaed to provide a

13

1  deposition in connection with a case involving an
2  acquaintance of mine.
3      Q.   Okay.  Did you tell them anything else or
4  have any other conversation with them about sitting
5  for a deposition?
6      A.   No, I don't think so.
7      Q.   Okay.  And I know you told me that you
8  spoke with Greg and Gina yesterday regarding
9  preparation for this deposition, but my next
10  question in regards to that is at any time other
11  than what you just told me about, at any time have
12  you ever spoken with Gina or Greg about this case?
13      A.   No, I haven't.
14      Q.   Well, I was then gonna ask this question,
15  but I think you know the answer because I said it
16  about twice now in this deposition.  But you are
17  aware that I represent Lieutenant Dakuras in this
18  lawsuit, correct?
19      A.   Yes.
20      Q.   And when did you first learn about this
21  lawsuit?
22      A.   I don't know.  The plaintiff, Jeanette,
23  must have told me at some time, but I . . .
24      Q.   Has it been years you've known about this

14

1  lawsuit?  Months?
2      A.   I suppose months, but I don't -- you know,
3  I just don't know.  I don't know when it was filed,
4  so . . .
5      Q.   Okay.  So did you become -- I know you
6  just told me, but I just want to make sure it's
7  clear for the record.
8          But you first became aware of the lawsuit
9  because Jeanette or plaintiff told you about it?
10      A.   Yes.
11      Q.   And what do you recall her telling you
12  about this lawsuit?
13      A.   I don't recall the conversation.  No
14  recollection.
15      Q.   What is your understanding of what this
16  lawsuit is about?
17      A.   I understand she's claiming damages
18  against the city and against the officer for
19  injuries she sustained in connection with an arrest
20  or seizure of her person.
21      Q.   And have you spoken with anyone about this
22  lawsuit other than the attorneys that you just told
23  me about, but have you spoken to anyone else about
24  this lawsuit?

15

1      A.   Other than the people I mentioned that I
2  told I was being deposed, I don't -- I don't think
3  I -- no, I haven't talked to anybody about it.
4      Q.   So just so it's clear, you've spoken with
5  Stewart Coffman about this lawsuit, correct?
6      A.   Well, just about the deposition, not about
7  the substance of the lawsuit, I don't think.
8      Q.   Okay.  And Marilyn Litt, did you talk to
9  her about the deposition only or the lawsuit?
10      A.   I just believe -- I believe it was just
11  the deposition.
12      Q.   Okay.  And you have spoken with plaintiff
13  about this lawsuit, correct?
14      A.   Yes.
15      Q.   And about how many times have you spoken
16  with her about this lawsuit?
17      A.   I don't know.  I spoke to her once or
18  twice in the last few weeks, and she must have
19  mentioned it before that, but I don't -- I don't
20  really recall.
21      Q.   So what you do recall is at least once or
22  twice in the last few weeks, correct?
23      A.   Yes.
24      Q.   Do you know the plaintiff that's bringing

16



1    the lawsuit, bringing this lawsuit, Miss Bass?
2        A.   Yes, I do.
3        Q.   And how long have you known Miss Bass?
4        A.   About 16 or 17 years.
5        Q.   Are you related to plaintiff?
6        A.   No, I'm not.
7        Q.   So are you friends with the plaintiff?
8        A.   Yes.
9        Q.   And how would you describe your
10   relationship with the plaintiff?  Would you say you
11   all are close?
12       A.   We're pretty close friends, yeah, I would
13   say.
14       Q.   And how did you meet her?
15       A.   We were -- I met her in the park.  I had a
16   dog at that time and she did.  And I met a lot of
17   people in the park with dogs.  She was one of them.
18       Q.   When is the last time you spoke with her?
19       A.   Probably yesterday.  Possibly the day
20   before, but I think yesterday.
21       Q.   And what did you speak to her about
22   yesterday or the day before?
23       A.   I don't -- she was -- she mentioned an
24   arrangement for me about conferring with her

                                                   17

1        A.   She's my former spouse.
2        Q.   Oh, okay.  Are you currently enrolled in
3    school?
4        A.   I take adult education classes.  I'm not
5    enrolled in a degree program or . . .
6        Q.   And when you say -- what do you mean by
7    adult education classes?  What does that mean?
8        A.   The Newberry Grammar School offer
9    online -- currently online adult education classes.
10   I take them.
11       Q.   Okay.  And you're currently enrolled in
12   adult education class, right?
13       A.   Yes.
14       Q.   What's the highest level of education
15   you've completed?
16       A.   Juris doctor.
17       Q.   Just out of curiosity, where did you go
18   toll law school?
19       A.   Stanford.
20       Q.   Are you currently employed?
21       A.   I'm retired.
22       Q.   Lucky you.  I'm trying to get there.  Got
23   a long time.
24            What kind of personality would you say in

                                                   19

1    counsel.  Other than that, I don't remember the
2    substance of the conversation.
3        Q.   Are you plaintiff's guardian?
4        A.   No, I'm not.
5        Q.   Do you know if she has a guardian?
6        A.   Not to my knowledge.
7        Q.   Okay.  Mr. Litt, how old are you?
8        A.   76.
9        Q.   And when's your birthday?
10       A.   May 6, 1944.
11       Q.   Where do you currently live or reside?
12       A.   You want my address?
13       Q.   Yes, sir.
14       A.   201 East Chestnut Street, Chicago.
15       Q.   And is that a condo or a house or an
16   apartment?
17       A.   A condo.
18       Q.   And how long have you lived at 201 East
19   Chestnut?
20       A.   30 years about.
21       Q.   Do you live there with anyone else?
22       A.   No, I don't.
23       Q.   And Marilyn Litt, are you related to
24   Marilyn Litt?

                                                   18

1    your opinion that the plaintiff has?
2        MS. GIZZI:  Objection to form.
3    BY MS. MOORE:
4        Q.   You can answer.
5        A.   I'm not sure how to answer it to describe
6    a personality.
7        Q.   Would you say the plaintiff has a friendly
8    personality?  Would you say she has an aggressive
9    personality?
10       A.   I would say changeable, friendly.  I
11   wouldn't describe her as aggressive, but . . .
12       Q.   You would say changeable?
13       A.   Yeah, friendly frequently.  Would not
14   describe her as aggressive, but . . .
15       Q.   So when you say changeable, like what do
16   you mean by changeable?
17       A.   Sometimes she's reserved.  Sometimes she's
18   outgoing and friendly.
19       Q.   Okay.  Is she more reserved than being
20   outgoing and friendly --
21       A.   Well --
22       Q.   -- based on your opinion?
23       A.   No, I wouldn't say.  I don't know.  And I
24   haven't seen her in public for a long time, I don't

                                                   20

Michael Litt 03/03/2021

1  think.
2      Q.   Okay.  So when's the last time you saw her
3  in public?
4      A.   A considerable time before the start of
5  the pandemic.  I don't know.
6      Q.   When you say a considerable time before
7  the start of the pandemic, I think the pandemic
8  happened in March of last year, I think.  So that
9  would be 2020.
10     A.   Yeah, I don't --
11     Q.   So -- go ahead.  I'm sorry.
12     A.   No, I'm sorry.  I don't -- I don't recall
13  seeing her in public for a long time.  I haven't
14  seen her since the pandemic started, seen her in
15  person that is.  And I don't --
16     Q.   Have you seen her in person at all in 2020
17  before the pandemic?
18     A.   I don't remember.  I may have.
19     Q.   How often would you see her when you did
20  see her in person?
21     A.   It's really inconsistent.  Sometimes I
22  wouldn't see her for weeks or months.  Sometimes
23  I'd see her once or twice a week.  It really
24  varied.

21

1      Q.   And based off the times that you would see
2  her like once a week or whatever you just
3  mentioned, what type of personalty would she
4  display?  Would it be the more outgoing most of the
5  time or would it be the reserved.
6      A.   Well, it would be more outgoing.  I mean,
7  I'm not -- I wasn't seeing her in public.  It would
8  just -- you know, she would just be seeing me.  So,
9  you know, she was -- somebody she knew, so . . .
10     Q.   Okay.  Would you consider plaintiff a good
11  role model.
12     A.   In some respects I suppose and not in
13  others.  I don't -- I don't know.  She tries to
14  help people which I think is a good thing.
15     Q.   And you said and others.  What do you mean
16  by and other times you wouldn't consider her a good
17  role model?
18     A.   Well, I just meant that she's not --
19  doesn't seem particularly well or happy.  So I
20  don't -- I don't think -- that's not something that
21  you'd want to model yourself after.
22     Q.   And when you say she doesn't seem
23  particularly well or happy -- strike that.  Strike
24  that.

22

1      Okay.  So going back to the statement you
2  just made when you say she doesn't appear to be
3  well or happy, are you basing this off of
4  post-COVID which is post-March 2020 or are you
5  basing this off of your previous interactions
6  prior-COVID which is in 2020?
7      A.   Oh, I think both.  My sense is that her --
8  with the injuries that she apparently sustained and
9  the isolation that she suffered, that, you know,
10  it's made her -- it's restricted her life and made
11  her more unhappy, so . . .
12     Q.   When you say the isolation that she
13  suffered, are you saying due to COVID?  What do you
14  mean?
15     A.   Well, I suppose in part due to COVID.  I
16  don't know, but she was -- I think she's isolated
17  herself more since the injuries she sustained
18  either because of the injuries themselves or the
19  effect on her personality.  I don't -- I don't
20  entirely know.
21     Q.   And I guess my next question is, how do
22  you know that she's isolated herself?
23     A.   She's -- she said that she's stayed home,
24  hasn't gone out.  And before the pandemic I would

23

1  occasionally see her in her apartment, and she
2  would not go out.
3      Q.   Have you ever known plaintiff to have a
4  temper?
5      A.   I can't -- I can't think of any specific
6  instances.  I wouldn't -- I don't know.
7      Q.   Have you ever known plaintiff to have a
8  problem with authority?
9      A.   I don't -- again, I can't think of
10  specific instances, so I don't know.
11     Q.   Have you ever known plaintiff to appear
12  paranoid, in your opinion?
13     A.   I wouldn't know.  I guess my answer would
14  be no.
15     Q.   Have you ever seen plaintiff use illegal
16  drugs?
17     A.   No.
18     Q.   Have you ever seen plaintiff take
19  prescription pills that were not hers?
20     A.   No.
21     Q.   Okay.  I know you mentioned that you see
22  plaintiff, and correct me if I'm wrong, but I know
23  you mentioned that you see plaintiff kind of like
24  sort of in passing and I guess around the

24

```
 1   neighborhood.  Do you all hang out together?
 2       A.  Well, I haven't seen her for over a year
 3   now, I don't think, and I don't know that I'd say
 4   that we hang out.  We'd occasionally go for a walk.
 5   Sometimes she would make dinner.  When we had dogs,
 6   we'd bring the dogs to play together.
 7       Q.  So how often would you go for a walk with
 8   plaintiff, if you remember?
 9       A.  Oh, I don't remember.  Rarely.
10       Q.  So going back, I know you said you haven't
11   seen her since the pandemic, and you didn't really
12   see her in 2020.  In 2019, how often would you go
13   for a -- would you go for a walk with plaintiff in
14   2019?
15       A.  Well, not that I remember.  I mean,
16   sometimes she'd ask me to walk her to a doctor's
17   appointment or something like that, and I would do
18   that, but I don't remember specific instances of
19   that.
20       Q.  And going to -- you said that you would go
21   to dinner with plaintiff, right?  Or would she make
22   you dinner?
23       A.  Years ago we'd go to dinner sometimes.
24   More recently she would sometimes make me dinner.
```
25

```
 1       Q.  When you say recently, when's the last
 2   time that she made you dinner?
 3       A.  It was maybe sometime last year.  I have
 4   no recollection of that.
 5       Q.  Okay.  And I guess I'll start with --
 6   well, let me just make sure.  Obviously we're in
 7   2021, so in the year of 2021 have you had, I guess
 8   in essence for lack of better words, had play dates
 9   with your dogs with plaintiff?
10       A.  Both of our dogs had died sometime ago,
11   so . . .
12       Q.  I'm sorry to hear that.
13       A.  Thank you.
14       Q.  And exactly when did -- when did your dog
15   pass away?
16       A.  March 9, 2018.
17       Q.  Are you aware if Jeanette pays mortgage?
18       A.  I don't believe she does, no.
19       Q.  And why do you say that?
20       A.  I believe she told me that her -- I think
21   her brother has title to her apartment, and I don't
22   think he took -- I think she said he didn't take a
23   mortgage.  I believe that's what I was told.
24       Q.  Did she tell you what brother that was or
```
26

```
 1   his name?
 2       A.  She did, but that name escapes me.
 3       Q.  Do you know if Jeanette pays for utilities
 4   in her condo?
 5       A.  No, I don't know.
 6       Q.  Do you know if Jeanette pays for
 7   groceries?
 8       A.  I believe her son pays for her groceries,
 9   but I'm not -- at least at one time she had said
10   that.
11       Q.  And when you say at one time, what year
12   was that that she had said that her son paid for
13   groceries?
14       A.  Within the last two or three years.  I
15   can't be more precise than that.
16       Q.  Has plaintiff ever borrowed money from
17   you?
18       A.  No.
19       Q.  Have you ever had to support plaintiff
20   financially in any way?
21       A.  No.
22       Q.  Do you know if anyone else had to support
23   plaintiff financially in any way?
24       A.  Well, I would infer that her brother must
```
27

```
 1   be paying the assessment if he owns the apartment,
 2   but that's an inference of mine, so I don't really
 3   know.
 4       Q.  Okay.  Have you ever lived with the
 5   plaintiff?
 6       A.  No.
 7       Q.  Have you ever gotten into any arguments
 8   with the plaintiff?
 9       A.  I suppose we must have over the length of
10   time, but I don't remember.  I don't remember any.
11       Q.  Why do you say you suppose you have?
12       A.  Well, it's -- I mean I've known her a long
13   time.  We've must have disagreed about some things,
14   I just don't recall.
15       Q.  Do you know if plaintiff has ever gotten
16   into an argument with any of her family members?
17       A.  She's mentioned having arguments with her
18   family members.  Yes.
19       Q.  And what family members is that?
20       A.  Well, I don't remember their names.  The
21   brother who I referred to, her sister her mother.
22       Q.  Do you know what they -- what she would
23   argue about with her brother?
24       A.  If she told me, I don't remember.
```
28



1    Q.   Do you know what she would argue about
2 with her sister?
3    A.   No.
4    Q.   Do you know what she would argue about
5 with her mom?
6    A.   No, I don't.  If she told me, I don't
7 remember.
8    Q.   Do you know if she's told you if she's
9 ever gotten physical in an argument with her
10 brother?
11   A.   I don't think she's ever said that, that
12 she has.
13   Q.   And I know you mentioned earlier that you
14 suppose that you may have had an argument with
15 plaintiff at some point based off the time span
16 that you've known each other.
17        Has any of those or any of those arguments
18 or any arguments that you may or may not have had
19 with plaintiff became physical?
20   A.   No.  I'm not talking about -- I'm talking
21 about a disagreement about something, a time for
22 dinner or something, not --
23   Q.   Okay.
24   A.   Not something serious.

                                              29

1    Q.   Okay.  Do you know if plaintiff -- any
2 arguments that plaintiff may have had with her
3 mother that has turned into something physical?
4    A.   I vaguely recall that she said that her
5 mother had hit her, but I believe that was -- that
6 was probably when she was very young.  I don't --
7 beyond that I can't say.
8    Q.   When you say her mother had hit her when
9 she was very young, are we talking like some years
10 ago or we talking about as far as -- what do you
11 mean by that?
12   A.   Oh, adolescent or in her -- living at
13 home, I think.  I only have the vaguest
14 recollection of the story.
15   Q.   Okay.  And do you know if she hit her
16 mother back?
17   A.   She -- no, she never said that.
18   Q.   And just to be clear, I just want to make
19 sure it's clear for the record.  I know you said
20 that you haven't saw plaintiff in 2021, and I guess
21 I'm trying to figure out when was the last time
22 that you saw plaintiff in person.  Like what year
23 was that?
24   A.   I don't -- I don't know.  It could have

                                              30

1 been early in 2020.  More likely it was sometime in
2 2019.
3    Q.   And do you recall or remember the
4 circumstances behind seeing plaintiff in person?
5    A.   No, I don't.  I saw her in the hospital in
6 connection with this, the subject matter of the
7 litigation; but I must have seen her after that, I
8 just don't recall.
9    Q.   What hospital was that?
10   A.   Northwestern Emergency Room.
11   Q.   Do you know if plaintiff has ever filed a
12 complaint -- I'm sorry.  Strike that.
13        Do you know if plaintiff has ever had a
14 complaint filed against her while she resided at
15 260 East Chestnut?
16   A.   No, I don't.
17   Q.   Do you know if plaintiff has ever filed a
18 complaint with her management in the building where
19 she resides at which is 260 East Chestnut?
20   A.   She has complained to management, I
21 believe, yes.
22   Q.   And how many times has she complained to
23 management that you are aware of?
24   A.   I don't know.

                                              31

1    Q.   Would you say more than once?
2    A.   Yes.  I remember she complained about
3 pipes or holes in her ceiling, something of that
4 nature.
5    Q.   Do you remember anything else that she's
6 complained about to the building management?
7    A.   No, I don't know.  I mean, of course I
8 know when she told me.
9    Q.   Right.  In regards to the complaint about
10 the pipes, do you know when she made that complaint
11 to the building management?
12   A.   No, I don't.
13   Q.   Do you know the outcome of that complaint
14 that she made with the management in regards to the
15 pipe?
16   A.   No, I don't.  And I don't -- I have no
17 idea when she may have mentioned that to me anyway.
18   Q.   Do you know what year she made that
19 complaint to management about the pipe?
20   A.   No.  No, I don't.
21   Q.   Are you aware if plaintiff had any other
22 issues with the management company that she
23 currently lives at?
24   A.   None that I recall, no.

                                              32



1   Q.   Okay.  Do you know anything about an issue
2  that plaintiff had with the condo association the
3  day before plaintiff's interaction with
4  Lieutenant Dakuras?
5       A.   I'm not sure when it was, but I am aware
6  that she -- she said that the representatives of
7  management company came into her apartment.  I had
8  thought that was several days before, but I don't
9  know.
10      Q.   Okay.  And what else did she tell you
11 about that particular incident that happened
12 several days before or the day before?
13      A.   She said that they -- representatives of
14 the building came in, building management came into
15 her apartment without advanced notice and
16 photographed her and the apartment, I guess, or
17 videoed her.
18      Q.   Did she tell you anything that she did as
19 a result of the building management coming into her
20 apartment without notice?
21      A.   She said that she called the police.
22      Q.   Did she tell you what was the outcome of
23 that call from the police?
24      A.   Well, she said that the policemen came to

33

1  her apartment and injured her and arrested her and
2  took her to Northwestern Hospital.
3       Q.   So I'm gonna backtrack a little bit.  I
4  think you're a step ahead of me.  I just want to be
5  clear as far as when plaintiff says that the
6  building management came into her apartment or her
7  condo without advanced notice, she called the
8  police.  And do you know if the police came to her
9  apartment when she called the police?
10      A.   Well, that -- my understanding is that
11 that's when this -- the incident that resulted in
12 her injuries occurred.  That she called the police,
13 the police -- one officer came and then took her to
14 Northwestern Hospital.  If there was -- I mean,
15 there could have been several calls to the police.
16 I wouldn't know.
17      Q.   Okay.  So are you aware if she ever
18 received a report from the police in regards to the
19 incident with the building management?
20      A.   She received a police report, but I don't
21 know what it was -- what it was for.
22      Q.   Okay.  So as I stated earlier, as far as I
23 believe you got a little bit ahead of me in regards
24 to the police incident that you just referenced, so

34

1  I just want to be clear for the record.
2       You are aware that there was an incident
3  that transpired between police and plaintiff,
4  correct?
5       A.   Yes.
6       Q.   And just to be clear, you were not
7  physically present during the incident that
8  plaintiff had with the police?
9       A.   That's right.
10      Q.   And did plaintiff ever attempt to call you
11 during her interaction with the police?
12      A.   She did call me, yes.
13      Q.   Did you answer?
14      A.   Yes.
15      Q.   And what do you recall from that phone
16 call?
17      A.   I don't remember the substance of it.  I
18 just remember she was very upset.
19      Q.   And you mentioned earlier that plaintiff
20 was taken to a hospital, right?
21      A.   Yes.
22      Q.   And what hospital was that?  I think you
23 said it, but I just want to be clear.
24      A.   The Northwestern Hospital Emergency Room.

35

1       Q.   Are you aware if plaintiff called you
2  while she was on her way to the emergency room?
3       A.   I believe she called me when she was in
4  the emergency room.  I don't --
5       Q.   Okay.  And did you answer?
6       A.   Yes, I did.
7       Q.   And what happened during that
8  conversation?
9       A.   She asked me to come to the emergency room
10 which I did.
11      Q.   Did she tell you what happened or why she
12 needed you to come to the emergency room?
13      A.   If she did, I don't recall.
14      Q.   So other than her telling you to come to
15 the emergency room, that's the only thing that you
16 remember about the conversation that you had with
17 plaintiff while she was in the emergency room at
18 Northwestern, right?
19      A.   Before I got to the emergency room, yes.
20      Q.   About how long was that conversation that
21 you had with plaintiff?
22      A.   I don't recall.  I suppose it would have
23 been very brief, but I don't know.
24      Q.   When you say very brief, you mean minutes

36



**Page 37**

1  like ten minutes? Five minutes? What do you mean
2  very brief?
3       A.   I would guess it would be half a minute or
4  something where she just called and asked me to
5  come to the emergency room.
6       Q.   And did you go to the emergency room at
7  Northwestern?
8       A.   Yes. Yes, I did.
9       Q.   So tell me what happened when you arrived
10  at the emergency room at Northwestern?
11       A.   Well, she was in -- I don't know how to
12  describe it, like an alcove, you know, an enclosed
13  area. And she asked me to get her a cable for
14  her -- a charger cable for her phone which I did.
15  I left and I bought a cable and came back.
16       Q.   Anything else that you remember when you
17  went to Northwestern Emergency Room?
18       A.   There -- I don't -- no, I don't. I recall
19  there were emergency staff who would come in to see
20  her while I was there briefly, but I don't remember
21  any of the exchanges.
22       Q.   Just to be clear, you don't remember any
23  conversation -- well, let me strike that.
24            Did you ever have a conversation with any

**Page 38**

1  doctors while you were at Northwestern Emergency
2  Room?
3       A.   I don't think so. I don't think so.
4       Q.   Did plaintiff ever tell you what happened
5  or why she was at the emergency room at
6  Northwestern?
7       A.   I don't know if she told me at that time.
8  I mean, probably she did, but she's told me since
9  that she was taken there by the officer who came
10  into her apartment.
11       Q.   Okay. But as far as gearing back towards
12  the Northwestern aspect, you don't recall if she
13  told you at that particular time the reason why she
14  was at Northwestern Emergency?
15       A.   I don't recall the conversation. I mean,
16  she must have told me that she was brought there by
17  the officer.
18       Q.   But as you sit here today, you don't
19  recall if she told you why?
20       A.   No, I don't -- no, I don't recall any
21  conversation with her other than she requested me
22  to get her a phone cable.
23       Q.   Did you ever see an officer when you were
24  at Northwestern Emergency -- or let me strike that.

**Page 39**

1       Q.   Did you ever see a Chicago police officer
2  while you were at the emergency room, Northwestern,
3  with plaintiff on the day of the incident?
4       A.   No.
5       Q.   Did the medical staff say anything to you
6  about plaintiff's condition?
7       A.   I don't think so.
8       Q.   Okay. In your opinion what was
9  plaintiff's disposition when you saw her in the
10  emergency room?
11       A.   She was very upset. Beyond that I can't
12  say.
13       Q.   And why did you think she was very upset?
14  Was she yelling? What indicators or what did she
15  do to indicate to you that she was very upset?
16       A.   She was moving around a lot. She was
17  making inquiries of the staff leaving the alcove
18  where she was situated. She'd leave there to
19  question the staff, but I don't remember what the
20  substance of the exchanges were.
21       Q.   But based off the substance of the
22  exchanges you got, she was very upset?
23       A.   Yeah, she appeared upset. She might have
24  said something to that effect. I just don't

**Page 40**

1  remember.
2       Q.   But as you sit here today you don't recall
3  if she said or what she said or if she said
4  anything to the effect that she was upset?
5       A.   No, I don't remember what she said.
6       Q.   How long were you at Northwestern
7  Emergency Hospital?
8       A.   I don't know. I mean, I was there twice
9  because I left to get her a cable and came back.
10  Could have been altogether an hour maybe. I
11  don't -- I'm just guessing.
12       Q.   Okay. So when you say you left twice --
13  well, you left and you came back. Well, you left
14  twice in a sense?
15       A.   Yeah.
16       Q.   Was that in a daytime span or is that like
17  you came one day and then you came another day?
18       A.   Oh, no. It was -- this incident was I
19  believe in the evening, and I left. She asked me
20  to get her a cable, and I left. I got the cable.
21  I came back which must have taken 15 minutes or so,
22  and it was all one evening.
23       Q.   Okay. And so I just want to be clear of
24  what you said earlier about her indicating that she



1 was kind of upset. You said that she was moving
2 around a lot making a lot of inquiries. Was that
3 when you first were there before you went to get
4 the charger or was that after you came back with
5 the charger to Northwestern?
6     A.  I can't distinguish between the two time
7 periods.
8     Q.  In total, as far as total, I know you said
9 it might have took you 15 minutes to come back over
10 there, whatever the case may be. So I just want a
11 total as to how long you were at Northwestern
12 Hospital Emergency on the day of the incident.
13     MS. GIZZI:  Objection, asked and answered.
14 BY MS. MOORE:
15     Q.  You can answer.
16     A.  I would suppose about an hour, but I
17 don't -- that's just really kind of an estimate.
18     Q.  So it could have been less than an hour?
19     A.  Yes.
20     Q.  Could it have been more than an hour?
21     A.  It could have been, yes.
22     Q.  Do you know if plaintiff was taken to
23 another hospital or another facility? Are you
24 aware of that?

41

1 up securing other transportation, but did she ever
2 call you while she was staying at the facility?
3     A.  If she did, I don't remember.
4     Q.  Have you ever spoken to plaintiff about
5 her experience at the other facility?
6     A.  Not that I recall, no.
7     Q.  Did plaintiff ever tell you what happened
8 while she was at the other facility which is
9 Methodist Hospital?
10     A.  If she did, I don't remember that.
11     Q.  All right. Going back to when you first
12 arrived at the hospital at Northwestern, what did
13 plaintiff say to you when you first arrived at
14 Northwestern Emergency Room?
15     A.  I don't remember anything that she said to
16 me other than making the request for me to get a
17 cable.
18     Q.  Okay. Was anyone with her when you first
19 arrived at Northwestern?
20     A.  I don't think so. I mean, there were
21 emergency room staff going in and out. So there
22 could have been somebody, but I -- I don't remember
23 that. I don't remember someone being there.
24     Q.  Okay. Was she in a room in the

43

1     A.  Yes, she was.
2     Q.  And what facility is that, if you know?
3     A.  I don't remember.
4     Q.  Does Methodist Hospital ring a bell?
5     A.  It might have been. I'm not sure.
6     Q.  Okay. Did you visit plaintiff or go see
7 plaintiff while she was at the other facility or
8 the other hospital?
9     A.  No. She called me to pick her up there
10 which I agreed to do, but then she got some other
11 transportation home. I didn't -- I didn't go
12 there.
13     Q.  Do you know how long plaintiff was at the
14 other facility?
15     A.  I don't remember. I mean, I knew at the
16 time, but I don't -- I don't remember.
17     Q.  Going back to Northwestern, Northwestern
18 Emergency, did you see plaintiff, in essence, get
19 transported to the other facility? Were you there
20 or had you left?
21     A.  I had left.
22     Q.  And while plaintiff was at the other
23 facility, did she ever -- I know you told me she
24 called you to ask you to pick her up, and she ended

42

1 Northwestern Emergency Hospital?
2     A.  It was a room. The walls were fabric.
3 You know, it was an area that was designated by
4 curtains.
5     Q.  Okay. And when you first saw her, was she
6 laying down in a bed? Was she standing up? What
7 was she doing?
8     A.  I believe she was in the bed.
9     Q.  Did you ever ask her at Northwestern
10 Emergency when you were there what happened?
11     A.  I don't remember our conversations, no.
12     Q.  Did you ever ask her about -- well, strike
13 that.
14         While you were at Northwestern Emergency
15 Hospital, do you know if plaintiff had any
16 injuries?
17     A.  I can't distinguish when I -- as to when I
18 learned of her injuries. I mean, she may have told
19 me then. She definitely told me later. So I don't
20 know.
21     Q.  So as you sit here today, you don't know
22 if plaintiff told you about her injuries at
23 Northwestern Hospital when you were there?
24     A.  No, I don't remember our conversations

44



1  when she was in there -- when we were at
2  Northwestern.
3     Q.   While you were at Northwestern Hospital
4  did you see physical injuries on plaintiff?
5     A.   No.  She was wearing a hospital gown.  I
6  don't know that I would have seen any injuries.
7     Q.   Do you know if plaintiff ever complained
8  about injuries while you were in the emergency room
9  at Northwestern?
10    A.   I don't remember.
11    Q.   Do you know if plaintiff had a job in June
12 of 2019?
13    A.   Insofar as I know, she did not have a job.
14    Q.   Do you know if she currently has a job?
15    A.   No, she does not.
16    Q.   Do you know if plaintiff has ever had a
17 lawsuit against Apple?
18    A.   I don't know.  I don't know if she's filed
19 a complaint against Apple.
20    MS. MOORE:  I'm gonna take a break.  Can we go
21 off the record?
22    MS. GIZZI:  Okay.
23            (WHEREUPON, a short recess was
24             taken.)

45

1     Q.   And when did she show you her wrist?
2     A.   I don't know.  Sometime after the date of
3  the incident and before the end of 2019, I guess.
4     Q.   And what did you observe on her wrist that
5  made you -- strike that.
6          What did you observe that indicated that
7  she had a wrist injury?
8     A.   Well, she told me that her wrist was
9  injured, but she -- I saw that something looked
10 displaced or like something was out of order.  I
11 can't be more specific.
12    Q.   I guess I was just trying -- I was just
13 gonna ask you as far as when you say something is
14 out of order, what do you mean by that?
15    A.   I don't -- I have an image of like a plate
16 in her wrist or something, but I don't know -- I
17 don't know if that's, you know, right or if
18 anything -- you know, if that reflects some
19 treatment for her wrist or it was just her wrist
20 was bent or something.  I just remember something
21 looking wrong about it.
22    Q.   So just so I'm clear, you remember
23 something looking wrong about it, but you're not
24 quite sure what it was that indicated that

47

1  MS. MOORE:  All right.  Back on the record,
2  everybody.
3  BY MS. MOORE:
4     Q.   Mr. Litt, are you aware of any physical
5  injuries that plaintiff sustained as a result of
6  this incident?
7     A.   Yes, I am.
8     Q.   And what physical injuries are you aware
9  of?
10    A.   She has a back injury, I believe a wrist
11 injury, some injury to her esophagus or her throat.
12 And I don't -- I don't know if this is an injury,
13 but she ascribes -- she has diabetes which she
14 ascribes to the inactivity and isolation that she's
15 suffered as a result of the incident.
16    Q.   As far as the back injury, how are you
17 aware?  Did the plaintiff tell you that or did you
18 see something physically?
19    A.   No.  She -- that -- in all cases she's
20 told me that.
21    Q.   So you say in all cases.  You didn't see
22 any injury on her wrist?
23    A.   No.  I would like to correct that.  I did
24 see -- she did show me her wrist.

46

1  something was wrong with the wrist?
2     A.   That's right.
3     Q.   And as far as I know you said the injury
4  to the esophagus and the throat, are you aware of
5  that because plaintiff told you?
6     A.   Yes.
7     Q.   And the last thing that you said as far as
8  the diabetes due to the inactivity and isolation,
9  this is something that plaintiff has told you,
10 correct?
11    A.   Yes.  There was also the back injury she
12 mentioned.
13    Q.   Correct.  And that's something that she
14 told you, correct?
15    A.   That's right.
16    Q.   What is your understanding of plaintiff's
17 emotional injuries?
18    A.   Well, she -- she's -- since the incident
19 she's been more fearful about going outside.  And
20 she's -- I mean, sometimes she had to ask me to
21 walk her to somewhere, to a doctor's appointment or
22 someplace that she had to go.  And she's been
23 inside, you know, has not -- more than she used to
24 be.

48

1    Q.   Anything else other than what you just
2  mentioned?
3    A.   She has seemed -- when I did walk her
4  outside, she seemed fearful of police when she
5  would see a police car or a policeman.
6    Q.   And what do you mean by that?  What
7  indicators did she give to make you think that
8  she's fearful of police when you walk her outside?
9    A.   She would request that we walk in a
10 different direction away from the police.
11   Q.   Anything else other than requesting that
12 you walk in a different direction?
13   A.   No, I don't think so.
14   Q.   And you mentioned that she's fearful about
15 going outside since the incident, right?
16   A.   Yes.
17   Q.   And have you -- I guess how do you know
18 she's fearful about going outside since the
19 incident?
20   A.   I'm sorry?
21   Q.   No.  I said how do you know that she's
22 fearful about going outside since the incident?
23   A.   She has said so, and she's remained
24 isolated.  She hasn't -- my understanding is that
49

1  she remains in her apartment most of the time.
2    Q.   And you know that because she's told you
3  that or are you assuming that she stays in her
4  apartment all the time?
5    A.   She's mentioned that a number of times, I
6  think.
7    Q.   Have you ever tried to get her to come out
8  of her apartment?
9    A.   I suggested that we could go for a walk.
10 I suggested that a number of times, and if she
11 wanted to do that.  And she would indicate she'd
12 like to do that, but then she would -- she was
13 never -- she would never go out.
14   Q.   And how many times did she indicate that
15 she would like to do that and never came around?
16   A.   I don't remember, several times.
17   Q.   When you say several, are we talking about
18 more than ten times?
19   A.   No.  Probably -- I mentioned it probably
20 three or four or five times that if she wanted to
21 go for a walk, I would meet her outside.  And she
22 would be positive about it, but she would never be
23 willing to do it.
24   Q.   Do you know if plaintiff had ever had a
50

1  mental health problem prior to the incident?
2    MS. GIZZI:  Objection, form.
3    THE WITNESS:  I missed a word of it.  I didn't
4  hear the question entirely.
5  BY MS. MOORE:
6    Q.   I was saying to the best of your knowledge
7  do you know if plaintiff has ever been diagnosed
8  with a mental health issue?
9    A.   Not that I know of, no.
10   Q.   And after this incident that transpired,
11 are you aware or do you know if plaintiff has been
12 diagnosed with a mental health issue?
13   A.   Not to my knowledge.
14   Q.   Do you know if plaintiff has ever been
15 committed to a mental health institution?
16   A.   No.  I don't -- I don't think so.
17   Q.   You don't think so that she hasn't been?
18 What do you mean by that?
19   A.   She's been in a hospital before.  I
20 don't -- but I don't believe insofar as I know she
21 was not committed to the hospital.
22   Q.   Are you familiar with the Civilian Office
23 Police Accountability Department?
24   A.   I've heard the name of it, not more than
51

1  that.
2    Q.   So just to be clear since you said you
3  just heard the name, I'm assuming you've never made
4  a complaint to the Civilian Office Police
5  Accountability Department?
6    A.   That's right.
7    Q.   Are you aware of the Independent Police
8  Review Authority Department?
9    A.   More or less, I suppose.
10   Q.   And have you ever made a complaint to the
11 Independent Police Review Authority Department?
12   A.   No, no.
13   Q.   Are you aware of the Internal Affairs
14 Division within the Chicago Police Department?
15   A.   No, I wasn't, but . . .
16   Q.   Okay.  So safe to say you've never made a
17 complaint --
18   A.   No.
19   Q.   -- to them?
20   A.   No.
21   Q.   Have you ever been convicted of a felony?
22 I'm assuming the answer is no.
23   A.   No.
24   Q.   Have you ever been convicted of a
52



1  misdemeanor involving dishonesty such as theft?
2      A.  No.
3      Q.  Have you ever filed a complaint against
4  the police at any point?
5      A.  No, no.
6      MS. MOORE:  All right.  I'm gonna take a
7  three-minute break, and I am wrapping up.  I should
8  be done shortly.
9      MS. GIZZI:  Okay.
10     MS. SOTOMAYOR:  Okay.
11            (WHEREUPON, a short recess was
12            taken.)
13 BY MS. MOORE:
14     Q.  I realized I didn't ask you this.
15         Are you a member of any social media sites
16 like Facebook, Instagram?  What's out there these
17 days?  Snapchat?
18     A.  I'm on Facebook.
19     Q.  Okay.  And is your Facebook user name your
20 government name, Michael Litt?
21     A.  Probably, yeah.  I don't -- I wouldn't
22 have used any other name, but I don't remember what
23 I use.  I never post anything, so . . .
24     Q.  Okay.  Well, that was my next question.  I

                                              53

1  was gonna ask you, have you ever posted on Facebook
2  about this incident or about anything or about this
3  lawsuit?  Not about anything, but about this
4  lawsuit or this incident that transpired between
5  plaintiff and Lieutenant Dakuras?
6      A.  No, I don't believe I've ever posted
7  anything on Facebook.
8      Q.  Do you know who picked up plaintiff from
9  the other facility, from Methodist Hospital?
10     A.  I don't -- I think she used a rideshare or
11 a cab or something like that, not a -- not somebody
12 she knew, I don't think.
13     Q.  Okay.  And going back to your experience
14 when you were at the Northwestern Hospital in the
15 emergency room with plaintiff on the day of the
16 incident, I know you told me that you recall having
17 a conversation with her about going to get the
18 charger.
19         You went to go get the charger, and you
20 don't recall the remainder of the conversation that
21 transpired at Northwestern Emergency Hospital,
22 correct?
23     A.  Yeah, that's right.
24     Q.  So it's safe to say that, and correct me

                                              54

1  if I'm wrong, that you've told me everything that
2  you can remember that transpired at Northwestern
3  Emergency Hospital with plaintiff on the day of the
4  incident?
5      A.  Yes.  I don't remember anything that was
6  said between us except for the request for me to
7  get a cable.
8      Q.  Okay.  And you don't remember any --
9  having any other conversation with any medical
10 staff or anyone else present at Northwestern
11 Emergency Hospital?
12     A.  Yeah.  If I talked to anybody there, I
13 don't remember it.
14     Q.  Okay.  And did plaintiff ever tell you
15 that she put her hands on an officer on the day of
16 the incident?
17     A.  I -- there was a conflict between them.  I
18 don't think she ever used that language that she
19 put her hands on him.
20     Q.  When you say there was a conflict between
21 them, what do you mean by that?
22     A.  She said, and I don't remember the
23 language that she used, but that he hurt her.  He
24 attacked her.

                                              55

1      Q.  Okay.  So my question is, did she tell you
2  that she pushed the officer or Lieutenant Dakuras?
3      A.  I don't -- not that I recall.  I don't --
4  I don't think so.
5      Q.  And did she ever say that she attacked
6  Lieutenant Dakuras?
7      A.  No.
8      MS. MOORE:  All right.  I will pass it to my
9  co-counsel.  I don't know how you all want to do
10 it.  I don't know if you want to next, Gianna, or
11 let Stephanie to go.
12     MS. GIZZI:  Stephanie, do you have questions or
13 a lot of questions?
14     MS. SOTOMAYOR:  Just a few, not too many.
15     MS. GIZZI:  I think it probably makes sense for
16 you to go first.
17     MS. SOTOMAYOR:  Okay.
18            EXAMINATION
19 BY MS. SOTOMAYOR:
20     Q.  Mr. Litt, you first learned of this
21 lawsuit from Jeanette herself, correct?
22     A.  Yes.
23     Q.  And do you remember at all any specific
24 details of the incident itself that she gave you in

                                              56

1  that first conversation?
2      A.  I don't remember specific conversations
3  about the lawsuit, no.
4      Q.  In that conversation or any
5  conversation -- well, strike that.
6          Did Jeanette herself tell you about this
7  lawsuit?
8      A.  Yes.
9      Q.  And what did she tell you about the
10  lawsuit?
11      A.  I have no --
12  MS. GIZZI:  Objection, asked and answered.
13  THE WITNESS:  I have no recollection of what
14  she might have said about it.
15  BY MS. SOTOMAYOR:
16      Q.  Okay.  Do you remember what date or time
17  frame it was when Jeanette told you that she was
18  going to be suing the police?
19      A.  No, I don't know.
20      Q.  Okay.  When she told you that she was
21  going to be suing the police, did you offer any
22  advice to her?
23      A.  No, I don't think so.  The only element
24  that I recall being told was she would talk about

57

1  her counsel, who was representing her.  I just
2  remember she gave me those names, but --
3      Q.  Okay.
4      A.  -- nothing -- I'm sorry, nothing about the
5  substance of it.
6      Q.  Okay.  Did she ask you for any advice
7  about the lawsuit at all?
8      A.  Not that I recall, no, I don't think so.
9      Q.  Did you tell her that you had any feelings
10  in particular about her suing the police?
11      A.  Not that I remember, I don't think so.
12      Q.  Okay.  Did she ever tell you what she
13  wanted to gain from this lawsuit?
14      A.  No, not that I remember.
15      Q.  As you sit here today, what is your
16  opinion on Jeanette suing the police?
17  MS. GIZZI:  Objection, form.
18  THE WITNESS:  I don't know that I have any
19  opinion.  I didn't see the incident.  I mean, she's
20  injured.  I don't know the extent to the
21  responsibility of the policeman.  That's the best I
22  can do, I think.
23  BY MS. SOTOMAYOR:
24      Q.  Okay.  You mentioned that she had told you

58

1  about who her attorneys were.  Did she -- are there
2  any specific details on what happened in that
3  conversation between you and her where she
4  discussed who her attorneys were?
5      A.  No.  She just mentioned -- as I recall,
6  she just mentioned their names.
7          If I could correct an earlier answer that
8  I gave you about what she wanted from the
9  litigation, she had mentioned that she wanted the
10  policeman defendant off the force or something to
11  that effect.
12      Q.  Okay.  Prior to Jeanette's lawsuit, had
13  you ever heard of Kulis or the Kulis Law Firm
14  before?
15      A.  No.
16      Q.  Okay.  So is it fair to say that you did
17  not refer Jeanette to this law firm or these
18  attorneys?
19      A.  That's right.
20  MS. SOTOMAYOR:  Okay.  That's all I have.
21  Thank you so much for your time.
22  THE WITNESS:  Thank you.
23
24

59

1              EXAMINATION
2  BY MS. GIZZI:
3      Q.  Mr. Litt, my name is Gianna Gizzi.  We
4  spoke yesterday as you mentioned.  And I have a
5  couple questions and then hopefully we'll be
6  completely done.  But I want to clarify a few
7  points for the record.
8          Has Miss Bass ever mentioned to you that
9  she's had trouble sleeping since the incident with
10  the police officer, if you remember?
11      A.  Yes.  I don't remember specific
12  conversation, but she has mentioned that.  Yes.
13      Q.  And have -- before June 2019, did you know
14  Miss Bass to be afraid of the police?
15      A.  No.
16      Q.  And in your approximately 16 to 17 years
17  that you've known Miss Bass, have you ever known
18  her to suffer from psychosis?
19      A.  Not that I know of, but it's -- I mean,
20  it's not my field.  It's not something I would
21  recognize.  I don't know.
22      Q.  But from your observation that's not
23  something you've observed?
24      A.  No.

60

1    Q.   Have you ever heard Miss Bass express
2    wanting to hurt herself?
3    A.   No, I haven't.
4    Q.   And have you ever known Miss Bass or heard
5    her express any suicidal ideations or thoughts
6    throughout your relationship?
7    A.   No, I don't think so.
8    MS. GIZZI:   That's all the questions I have.
9    Thank you.
10              FURTHER EXAMINATION
11   BY MS. MOORE:
12   Q.   I do have a follow-up question behind
13   Gina.
14       As far as the sleeping, how often did
15   plaintiff tell you she had trouble sleeping?
16   A.   I don't -- I don't know.  She has
17   mentioned it, but I don't -- it's just -- I just
18   have a vague recollection of that complaint.
19   Q.   Do you know when she mentioned that?
20   A.   No, I don't.
21   MS. MOORE:   All right.  Well, I don't have any
22   further questions, so we are done.  You may be
23   familiar with this aspect of when a deposition is
24   ended.  You have a right to review your transcript

61

1    or waive your signature.  So you can reserve your
2    signature or waive your signature.
3          If you reserve your signature, the court
4    reporter will send you a copy of the transcript,
5    and you can read it and you can correct things as
6    far as typos or commas or something of that nature,
7    but you will not be able to correct any substance
8    in the transcript.
9          If you waive, you trust that the court
10   reporter has done her job and done her job well.
11   Most people do waive because they don't want to go
12   through that whole song and dance of looking for
13   typos and things of that nature.  But it is your
14   right, and you do have the right to determine
15   whether you want the court reporter to send you the
16   transcript so you can review it or that you're
17   gonna trust that the court reporter was accurate
18   and took everything down accurately.
19   THE WITNESS:   I'll waive my right.  Thank you.
20   MS. MOORE:   All right.  Thank you.
21          FURTHER DEPONENT SAITH NAUGHT.
22             (WHEREUPON, the deposition
23             concluded at 2:50 p.m.)
24

62

1    STATE OF ILLINOIS  )
2                       )  SS:
3    COUNTY OF C O O K  )
4         I, RAELENE STAMM, Certified Shorthand
5    Reporter, licensed by the State of Illinois, do
6    hereby certify that heretofore, to-wit, on the
7    3rd day of March 2021, remotely appeared before me
8    MICHAEL LITT, a witness in a certain cause now
9    pending and undetermined in the United States
10   District Court, Northern District of Illinois,
11   Eastern Division, wherein JEANETTE BASS is the
12   Plaintiff and CITY OF CHICAGO, et al., are the
13   Defendants.
14        I further certify that the said
15   MICHAEL LITT was by me first duly sworn to testify
16   the truth, the whole truth, and nothing but the
17   truth in the cause aforesaid; that the testimony
18   then given by said witness was reported
19   stenographically by me in the presence of said
20   witness and afterwards reduced to typewriting by
21   Computer-Aided Transcription, and the foregoing is
22   a true and correct transcript of the testimony so
23   given by said witness as aforesaid.
24        I further certify that the signature to

63

1    the foregoing deposition was waived by counsel for
2    the respective parties.
3         I further certify that the taking of this
4    deposition was pursuant to Subpoena and that there
5    were present at the deposition the attorneys
6    hereinbefore mentioned.
7         I further certify that I am not counsel
8    for nor in any way related to the parties to this
9    suit, nor am I in any way interested in the outcome
10   thereof.
11        IN TESTIMONY WHEREOF:  I have hereunto set
12   my hand this 21st day of March, 2021.
13
14
15          Raelene Stamm
16   _____
17        CERTIFIED SHORTHAND REPORTER
18
19
20
21
22
23
24

64

**1**

**15**
11:10 40:21 41:9
**16**
17:4 60:16
**17**
17:4 60:16
**19**
6:12
**1944**
18:10

**2**

**2000**
10:12
**2001**
10:12
**201**
18:14,18
**2018**
26:16
**2019**
25:12,14 31:2 45:12
47:3 60:13
**2020**
21:9,16 23:4,6 25:12
31:1
**2021**
26:7 30:20
**260**
31:15,19

**3**

**30**
18:20

**6**

**6**
18:10

**7**

**7557**
6:12
**76**
18:8

**9**

**9**
26:16

**A**

**ability**
9:19
**Accountability**
51:23 52:5
**accurate**
9:20
**acknowledge**
5:5
**acquaintance**
14:2
**address**
18:12
**administered**
5:7
**adolescent**
30:12
**adult**
19:4,7,9,12
**advanced**
33:15 34:7

**advice**
57:22 58:6
**Affairs**
52:13
**affect**
9:19
**afraid**
60:14
**afternoon**
11:8
**aggressive**
20:8,11,14
**agree**
5:16,18,20
**agreed**
42:10
**agreement**
5:13
**ahead**
21:11 34:4,23
**alcohol**
9:18
**alcove**
37:12 39:17
**altogether**
40:10
**answering**
7:12
**apartment**
13:4,5 18:16 24:1
26:21 28:1 33:7,15,
16,20 34:1,6,9 38:10
50:1,4,8
**apparently**
23:8
**appeared**
39:23
**Apple**
45:17,19
**applicable**
6:17
**appointment**
25:17 48:21
**approximately**
60:16
**area**
37:13 44:3
**argue**
28:23 29:1,4
**argument**
28:16 29:9,14
**arguments**
28:7,17 29:17,18
30:2
**arrangement**
5:9 17:24
**arrest**
15:19
**arrested**
13:7 34:1
**arrived**
37:9 43:12,13,19
**ascribes**
46:13,14
**aspect**
38:12
**assessment**
28:1
**association**
33:2
**assume**
8:14
**assuming**
50:3 52:3,22
**attacked**
55:24 56:5
**attempt**
35:10
**attorney**
10:17

**attorneys**
5:4 11:4,7 12:10
15:22 59:1,4,18
**audio**
13:15
**authority**
24:8 52:8,11
**aware**
14:17 15:8 26:17
31:23 32:21 33:5
34:17 35:2 36:1
41:24 46:4,8,17 48:4
51:11 52:7,13

**B**

**back**
23:1 25:10 30:16
37:15 38:11 40:9,13,
21 41:4,9 42:17
43:11 46:1,10,16
48:11 54:13
**backtrack**
34:3
**based**
20:22 22:1 29:15
39:21
**basing**
23:3,5
**basis**
12:1
**Bass**
5:20 6:11 7:3 17:1,3
60:8,14,17
**bed**
44:6,8
**begin**
9:13
**behalf**
5:17,19 6:24 7:2
**bell**
42:4
**bent**
47:20
**birthday**
18:9
**bit**
34:3,23
**borrowed**
27:16
**bought**
37:15
**break**
9:8,11 45:20 53:7
**briefly**
12:11 37:20
**bring**
25:6
**bringing**
16:24 17:1
**brother**
26:21,24 27:24
28:21,23 29:10
**brought**
38:16
**building**
13:4 31:18 32:6,11
33:14,19 34:6,19

**C**

**cab**
54:11
**cable**
37:13,14,15 38:22
40:9,20 43:17 55:7
**call**
33:23 35:10,12,16
43:2

**called**
6:23 33:21 34:7,9,12
36:1,3 37:4 42:9,24
**calls**
34:15
**car**
49:5
**case**
5:15 6:12 7:18,21,23
8:1 11:13 14:1,12
41:10
**cases**
46:19,21
**ceiling**
32:3
**changeable**
20:10,12,15,16
**charger**
37:14 41:4,5 54:18,
19
**Chestnut**
18:14,19 31:15,19
**Chicago**
6:12 18:14 39:1
52:14
**circumstances**
31:4
**city**
5:18 6:11 7:1 15:18
**Civil**
6:16
**Civilian**
51:22 52:4
**claiming**
15:17
**clarify**
60:6
**class**
19:12
**classes**
19:4,7,9
**clear**
8:22 9:22 15:7 16:4
30:18,19 34:5 35:1,
6,23 37:22 40:23
47:22 52:2
**close**
17:11,12
**co-counsel**
56:9
**Coffman**
13:22 16:5
**committed**
51:15,21
**company**
32:22 33:7
**complained**
31:20,22 32:2,6 45:7
**complaint**
31:12,14,18 32:9,10,
13,19 45:19 52:4,10,
17 53:3
**completed**
19:15
**completely**
9:23 60:6
**condition**
39:6
**condo**
18:15,17 27:4 33:2
34:7
**conduct**
11:14,16
**conference**
5:3 11:5
**conferring**
17:24
**conflict**
55:17,20

**connection**
12:1 14:1 15:19 31:6
**consent**
5:8
**considerable**
21:4,6
**conversation**
11:9,11 12:21 14:4
15:13 18:2 36:8,16,
20 37:23,24 38:15,
21 54:17,20 55:9
57:1,4,5 59:3 60:12
**conversations**
44:11,24 57:2
**convicted**
52:21,24
**correct**
7:5 14:18 16:5,13,22
24:22 35:4 46:23
48:10,13,14 54:22,
24 56:21 59:7
**counsel**
5:8,11 6:22 10:21,22
18:1 58:1
**couple**
13:19 60:5
**court**
5:1 6:18 8:18,24
10:4
**COVID**
23:13,15
**curiosity**
19:17
**curtains**
44:4

**D**

**Dakuras**
5:15 6:21 14:17 33:4
54:5 56:2,6
**damages**
15:17
**date**
13:6,8 47:2 57:16
**dates**
12:23 13:2,9 26:8
**day**
17:19,22 33:3,12
39:3 40:17 41:12
54:15 55:3,15
**days**
33:8,12 53:17
**daytime**
40:16
**decided**
8:3
**defendant**
5:18 7:1 10:14 59:10
**degree**
19:5
**Department**
51:23 52:5,8,11,14
**depose**
9:15
**deposed**
7:14,19 8:4 10:2,10
16:2
**deposition**
5:2,5,6 6:10,15 7:8
8:11 10:18 12:6,9
13:12,18 14:1,5,9,16
16:6,9,11
**describe**
17:9 20:5,11,14
37:12
**designated**
44:3
**details**
56:24 59:2

**diabetes**
46:13 48:8
**diagnosed**
51:7,12
**died**
26:10
**dinner**
25:5,21,22,23,24
26:2 29:22
**direction**
49:10,12
**disagreed**
28:13
**disagreement**
29:21
**discussed**
59:4
**dishonesty**
53:1
**displaced**
47:10
**display**
22:4
**disposition**
39:9
**distinguish**
41:6 44:17
**District**
6:13,18,19
**Division**
52:14
**doctor**
19:16
**doctor's**
25:16 48:21
**doctors**
38:1
**documents**
13:11
**dog**
17:16 26:14
**dogs**
17:17 25:5,6 26:9,10
**drugs**
9:18 24:16
**due**
23:13,15 48:8
**duly**
5:23 6:2

**E**

**earlier**
29:13 34:22 35:19
40:24 59:7
**early**
31:1
**East**
18:14,18 31:15,19
**education**
19:4,7,9,12,14
**effect**
23:19 39:24 40:4
59:11
**element**
57:23
**emergency**
31:10 35:24 36:2,4,
9,12,15,17,19 37:5,
6,10,17,19 38:1,5,
14,24 39:2,10 40:7
41:12 42:18 43:1,14,
21 44:1,10,14 45:8
54:15,21 55:3,11
**emotional**
48:17
**employed**
19:20
**enclosed**
37:12



end
47:3
ended
42:24
enrolled
19:2,5,11
escapes
27:2
esophagus
46:11 48:4
essence
26:8 42:18
estimate
41:17
et al
6:12
evening
40:19,22
events
12:24 13:3
Evidence
6:17
EXAMINATION
6:4 56:18 60:1
examined
6:3
exchanges
37:21 39:20,22
excuse
10:24
experience
43:5 54:13
extent
58:20

**F**

fabric
44:2
Facebook
53:16,18,19 54:1,7
facility
41:23 42:2,7,14,19,
23 43:2,5,8 54:9
fair
8:15 59:16
familiar
51:22
family
28:16,18,19
fearful
48:19 49:4,8,14,18,
22
Federal
6:16
feel
9:8
feelings
58:9
felony
52:21
field
60:20
figure
30:21
filed
15:3 31:11,14,17
45:18 53:3
financially
27:20,23
firm
59:13,17
force
59:10
form
20:2 51:2 58:17
frame
57:17
free
9:8

frequently
20:13
friendly
20:7,10,13,18,20
friends
13:19,20 17:7,12

**G**

gain
58:13
gave
56:24 58:2 59:8
gearing
38:11
Gianna
5:19 7:2 10:24 12:4
56:10 60:3
Gina
14:8,12
give
9:19 49:7
Gizzi
5:19 7:2 10:24 11:1
20:2 41:13 45:22
51:2 53:9 56:12,15
57:12 58:17 60:2,3
good
22:10,14,16
government
53:20
gown
45:5
Grammar
19:8
Greg
10:23 12:4 14:8,12
groceries
27:7,8,13
ground
8:5
guardian
18:3,5
guess
23:21 24:13,24 26:5,
7 30:20 33:16 37:3
47:3,12 49:17
guessing
40:11

**H**

half
37:3
hands
55:15,19
hang
25:1,4
happen
8:19
happened
8:1 21:8 33:11 36:7,
11 37:9 38:4 43:7
44:10 59:2
happy
8:12 22:19,23 23:3
hardest
9:2
head
8:18
health
51:1,8,12,15
hear
26:12 51:4
heard
6:21 51:24 52:3
59:13
highest
19:14

hit
30:5,8,15
holes
32:3
home
23:23 30:13 42:11
Honorable
6:14
hospital
13:7 31:5,9 34:2,14
35:20,22,24 40:7
41:12,23 42:4,8
43:9,12 44:1,15,23
45:3,5 51:19,21
54:9,14,21 55:3,11
hour
40:10 41:16,18,20
house
18:15
hurt
55:23

**I**

idea
32:17
illegal
24:15
Illinois
6:13,19
image
47:15
imply
9:16
inactivity
46:14 48:8
incident
33:11 34:11,19,24
35:2,7 39:3 40:18
41:12 46:6,15 47:3
48:18 49:15,19,22
52:11,10 54:2,4,16
55:4,16 56:24 58:19
60:9
incidents
12:1
inconsistent
21:21
Independent
52:7,11
indicating
40:24
indicators
39:14 49:7
infer
27:24
inference
28:2
influence
9:17
injured
34:1 47:9 58:20
injuries
15:19 23:8,17,18
34:12 44:16,18,22
45:4,6,8 46:5,8
48:17
injury
7:20,23 10:3,9
46:10,11,12,16,22
47:7 48:3,11
inquired
12:24
inquiries
39:17 41:2
inside
48:23
insinuate
9:16

Instagram
53:16
instances
24:6,10 25:18
institution
51:15
interaction
33:3 35:11
interactions
23:5
Internal
52:13
introduce
6:23
involving
14:1 53:1
isolated
23:16,22 49:24
isolation
23:9,12 46:14 48:8
issue
33:1 51:8,12
issues
32:22

**J**

Jeanette
5:20 6:11 7:3 14:22
15:9 26:17 27:3,6
56:21 57:6,17 58:16
59:17
Jeanette's
59:12
job
45:11,13,14
Judge
6:14
June
45:11 60:13
Juris
19:16

**K**

kind
7:18 19:24 24:23
41:1,17
knew
11:19 22:9 42:15
54:12
knowledge
18:6 51:6,13
Kulis
10:23 12:5 59:13

**L**

L-I-T-T
6:8
lack
26:8
language
55:18,23
Laniya
5:14 6:20
law
19:18 59:13,17
lawsuit
10:4,9,15 11:20,21
12:2 14:18,21 15:1,
8,12,16,22,24 16:5,
7,9,13,16 17:1 45:17
54:3,4 56:21 57:3,7,
10 58:7,13 59:12
laying
44:6
learn
14:20

learned
44:18 56:20
leave
39:18
leaving
39:17
left
37:15 40:9,12,13,19,
20 42:20,21
length
28:9
level
19:14
Lieutenant
5:15 6:21 14:17 33:4
54:5 56:2,6
life
23:10
listen
13:15
litigation
31:7 59:9
Litt
6:1,8,10 7:5 13:22
16:8 18:7,23,24 46:4
53:20 56:20 60:3
live
18:11,21
lived
18:18 28:4
lives
32:23
living
30:12
locals
6:17
long
8:7 11:9 17:3 18:18
19:23 20:24 21:13
28:12 36:20 40:6
41:11 42:13
looked
47:9
lot
17:16 39:16 41:2
56:13
loud
8:17
Lucky
19:22

**M**

M-I-C-H-A-E-L
6:8
made
23:2,10 26:2 32:10,
14,18 47:5 52:3,10,
16
make
8:5,7 15:6 25:5,21,
24 26:6 30:18 49:7
makes
56:15
making
39:17 41:2 43:16
management
13:5 31:18,20,23
32:6,11,14,19,22
33:7,14,19 34:6,19
manner
5:10
March
21:8 26:16
Marilyn
13:22 16:8 18:23,24
matter
6:11 31:6
meaning
7:11

means
5:2
meant
22:18
mechanics
11:12
media
53:15
medical
39:5 55:9
medication
9:18
meet
17:14 50:21
meeting
1:14,23
member
53:15
members
28:16,18,19
mental
51:1,8,12,15
mentioned
16:1,19 17:23 22:3
24:21,23 28:17
29:13 32:17 35:19
48:12 49:2,14 50:5,
19 58:24 59:5,6,9
60:4,8,12
met
17:15,16
Methodist
42:4 43:9 54:9
Michael
6:1,8,10 53:20
mine
13:19 14:2 28:2
minute
37:3
minutes
11:10 36:24 37:1
40:21 41:9
misdemeanor
53:1
missed
51:3
model
22:11,17,21
mom
29:5
money
27:16
month
12:14
months
15:1,2 21:22
Moore
5:14 6:5,20 7:4 20:3
41:14 45:20 46:1,3
51:5 53:6,13 56:8
mortgage
26:17,23
mother
28:21 30:3,5,8,16
moving
39:16 41:1

**N**

names
13:21 28:20 58:2
59:6
nature
32:4
needed
8:12 36:12
neighborhood
25:1
Ness
6:14



Newberry
19:8
nods
8:18
Northern
6:13,19
Northwestern
13:7 31:10 34:2,14
35:24 36:18 37:7,10,
17 38:1,6,12,14,24
39:2 40:6 41:5,11
42:17 43:12,14,19
44:1,9,14,23 45:2,3,
9 54:14,21 55:2,10
notice
33:15,20 34:7
number
6:12 50:5,10

**O**

oath
5:6 7:10
Objection
20:2 41:13 51:2
57:12 58:17
objections
5:9
observation
60:22
observe
47:4,6
observed
60:23
occasionally
24:1 25:4
occurred
34:12
offend
9:15
offense
8:20
offer
19:8 57:21
Office
51:22 52:4
officer
15:18 34:13 38:9,17,
23 39:1 55:15 56:2
60:10
online
19:9
opinion
20:1,22 24:12 39:8
58:16,19
order
47:10,14
outcome
32:13 33:22
outgoing
20:18,20 22:4,6
owns
28:1

**P**

paid
27:12
pandemic
21:5,7,14,17 23:24
25:11
paranoid
24:12
park
17:15,17
part
23:15
participating
5:4

parties
5:8
pass
26:15 56:8
passing
24:24
paying
28:1
pays
26:17 27:3,6,8
pending
6:12 9:10
people
16:1 17:17 22:14
periods
41:7
person
9:1 12:18 15:20
21:15,16,20 30:22
31:4
personal
7:20,23 10:3,7,9
personality
19:24 20:6,8,9 23:19
personaly
22:3
phone
12:19,20 35:15
37:14 38:22
photographed
33:16
physical
29:9,19 30:3 45:4
46:4,8
physically
5:5 35:7 46:18
pick
42:9,24
picked
54:8
pills
24:19
pipe
32:15,19
pipes
32:3,10
plaintiff
5:20 7:3,20,22 10:3,
21,23 12:11,22
14:22 15:9 16:12,24
17:5,7,10 20:1,7
22:10 24:3,7,11,15,
18,22,23 25:8,13,21
26:9 27:16,19,23
28:5,8,15 29:15,19
30:1,2,20,22 31:4,
11,13,17 32:21 33:2
34:5 35:3,8,10,19
36:1,17,21 38:4 39:3
41:22 42:6,7,13,18,
22 43:4,7,13 44:15,
22 45:4,7,11,16
46:5,17 48:5,9 50:24
51:7,11,14 54:5,8,15
55:3,14
plaintiff's
18:3 33:3 39:6,9
48:16
plate
47:15
play
25:6 26:8
point
29:15 53:4
points
60:7
police
33:21,23 34:8,9,12,
13,15,18,20,24 35:3,
8,11 39:1 49:4,5,8,
10 51:23 52:4,7,11,

14 53:4 57:18,21
58:10,16 60:10,14
policeman
49:5 58:21 59:10
policemen
33:24
positive
50:22
Possibly
17:19
post
53:23
post-covid
23:4
post-march
23:4
posted
54:1,6
precise
27:15
preliminary
9:14
preparation
10:18 12:5,9 13:12
14:9
prescription
24:19
present
5:6,11 11:3,4 35:7
55:10
pretty
17:12
previous
23:5
prior
51:1 59:12
prior-covid
23:6
problem
24:8 51:1
Procedure
6:16
program
19:5
pronouncing
10:24 11:1
provide
13:24
psychosis
60:18
public
20:24 21:3,13 22:7
pursuant
6:10,15
pushed
56:2
put
55:15,19

**Q**

question
8:12,13,14 9:9,10
14:10,14 23:21
39:19 51:4 53:24
56:1
questions
7:12 8:9 9:14,23
56:12,13 60:5

**R**

Rarely
25:9
real
13:8
realized
53:14
reason
38:13

recall
15:11,13 16:20,21
21:12 28:14 30:4
31:3,8 32:24 35:15
36:13,22 37:18
38:12,15,19,20 40:2
43:6 54:16,20 56:3
57:24 58:8 59:5
recalled
11:24
received
34:18,20
recently
25:24 26:1
recess
45:23 53:11
recognize
60:21
recollection
13:8 15:14 26:4
30:14 57:13
recollections
12:3
record
5:1,13 6:7,9,22 8:22
15:7 30:19 35:1
45:21 46:1 60:7
refer
59:17
referenced
34:24
referred
28:21
referring
10:23
reflect
6:9
reflects
47:18
related
17:5 18:23
relationship
17:10
remainder
54:20
remained
49:23
remains
50:1
remember
8:2 10:5,10 12:17
18:1 21:18 25:8,9,
15,18 28:10,20,24
29:7 31:3 32:2,5
35:17,18 36:16
37:16,20,22 39:19
40:1,5 42:3,15,16
43:3,10,15,22,23
44:11,24 45:10
47:20,22 50:16
53:22 55:2,5,8,13,22
56:23 57:2,16 58:2,
11,14 60:10,11
remotely
5:7
rephrase
8:12
report
34:18,20
reporter
5:1 8:18,24
reporting
5:10
represent
5:12,15 6:21 14:17
representatives
33:6,13
representing
58:1
request
43:16 49:9 55:6

requested
38:21
requesting
49:11
reserved
20:17,19 22:5
reside
18:11
resided
31:14
resides
31:19
respects
22:12
responsibility
58:21
restricted
23:10
result
33:19 46:5,15
resulted
34:11
retired
19:21
review
13:11 52:8,11
rideshare
54:10
ring
42:4
role
22:11,17
room
31:10 35:24 36:2,4,
9,12,15,17,19 37:5,
6,10,17 38:2,5 39:2,
10 43:14,21,24 44:2
45:8 54:15
rules
6:16,17 8:5

**S**

safe
52:16 54:24
school
19:3,8,18
securing
43:1
seizure
15:20
sense
23:7 40:14 56:15
she'd
25:16 39:18 50:11
short
45:23 53:11
shortly
53:8
shoulders
8:19
show
46:24 47:1
shrugs
8:19
sir
6:6 18:13
sister
28:21 29:2
sit
38:18 40:2 44:21
58:15
sites
53:15
sitting
13:18 14:4
situated
39:18
sleeping
60:9

Snapchat
53:17
social
53:15
someplace
48:22
son
27:8,12
sort
12:23 13:2 24:24
Sotomayor
5:17 6:24 53:10
56:14,17,19 57:15
58:23 59:20
span
29:15 40:16
speak
10:17 11:6 12:8
17:21
specific
24:5,10 25:18 47:11
56:23 57:2 59:2
60:11
spell
6:7
spoke
12:4,11 14:8 16:17
17:18 60:4
spoken
14:12 15:21,23 16:4,
12,15 43:4
spouse
19:1
staff
37:19 39:5,17,19
43:21 55:10
standing
44:6
Stanford
19:19
start
21:4,7 26:5
started
21:14
state
5:11 6:6,21
stated
34:22
statement
23:1
States
6:18
stayed
23:23
staying
43:2
stays
50:3
step
34:4
Stephanie
5:17 6:24 56:11,12
Stewart
13:22 16:5
stop
8:11
story
30:14
Street
18:14
strike
10:7 22:23 31:12
37:23 38:24 44:12
47:5 57:5
subject
31:6
subpoena
6:11
subpoenaed
13:24



Michael Litt 03/03/2021

**substance**
9:18 16:7 18:2 35:17
39:20,21 58:5
**suffer**
60:18
**suffered**
23:9,13 46:15
**suggested**
50:9,10
**suggestions**
11:13,15
**suing**
57:18,21 58:10,16
**support**
27:19,22
**suppose**
15:2 22:12 23:15
28:9,11 29:14 36:22
41:16 52:9
**sustained**
15:19 23:8,17 46:5
**sworn**
5:23 6:3 7:11

---

**T**

**taking**
7:8
**talk**
9:3,4 11:18 16:8
57:24
**talked**
16:3 55:12
**talking**
29:20 30:9,10 50:17
**telephone**
11:5,7
**telling**
15:11 36:14
**temper**
24:4
**ten**
37:1 50:18
**terms**
5:16,18,21
**testified**
6:3 10:4,6
**testifying**
11:12
**testimony**
9:20
**theft**
53:1
**thing**
9:9 22:14 36:15 48:7
**things**
28:13
**thought**
33:8
**three-minute**
53:7
**throat**
46:11 48:4
**time**
8:11 9:1,2 12:5
14:10,11,23 17:16,
18 19:23 20:24 21:2,
4,6,13 22:5 26:2
27:9,11 28:10,13
29:15,21 30:21 38:7,
13 41:6 42:16 50:1,4
57:16 59:21
**times**
7:16 16:15 22:1,16
31:22 50:5,10,14,16,
18,20
**title**
26:21
**today**
7:8,12 9:20,23 10:18

13:18 38:18 40:2
44:21 58:15
**told**
10:2,9 12:2,10
13:19,21 14:7,11,23
15:6,9,22 16:2
26:20,23 28:24 29:6,
8 32:8 38:7,8,13,16,
19 42:23 44:18,19,
22 46:20 47:8 48:5,
9,14 50:2 54:16 55:1
57:17,20,24 58:24
**toll**
19:18
**total**
41:8,11
**transpired**
35:3 51:10 54:4,21
55:2
**transportation**
42:11 43:1
**transported**
42:19
**treatment**
47:19
**trouble**
60:9
**truth**
7:11
**truthful**
9:19
**truthfully**
9:23 11:17
**turned**
30:3
**type**
22:3

---

**U**

**uh-huh**
8:19
**understand**
7:7,10 8:10 15:17
**understanding**
15:15 34:10 48:16
49:24
**understood**
8:14
**unhappy**
23:11
**United**
6:18
**upset**
35:18 39:11,13,15,
22,23 40:4 41:1
**user**
53:19
**utilities**
27:3

---

**V**

**vaguely**
30:4
**vaguest**
30:13
**varied**
21:24
**video**
5:3
**videoed**
33:17
**videotapes**
13:14
**visit**
42:6
**volunteer**
11:17

**W**

**waive**
5:9
**walk**
25:4,7,13,16 48:21
49:3,8,9,12 50:9,21
**walls**
44:2
**wanted**
50:11,20 58:13 59:8,
9
**wearing**
45:5
**week**
12:14,16,22 21:23
22:2
**weeks**
12:16 16:18,22
21:22
**when's**
18:9 21:2 26:1
**word**
51:3
**words**
26:8
**wrapping**
53:7
**wrist**
46:10,22,24 47:1,4,
7,8,16,19 48:1
**wrong**
11:1 24:22 47:21,23
48:1 55:1

---

**Y**

**year**
10:11 21:8 25:2
26:3,7 27:11 30:22
32:18
**years**
14:24 17:4 18:20
25:23 27:14 30:9
60:16
**yelling**
39:14
**yesterday**
11:8 14:8 17:19,20,
22 60:4
**young**
30:6,9

---

**Z**

**Zoom**
5:3

---

