UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEANETTE BASS, ) | |
| ) | Case No. 19 CV 7557 |
| Plaintiff, ) | |
| v. ) | Judge John Kness |
| ) | |
| SGT. ANDREW DAKURAS, ) | |
| individually, and THE CITY OF ) | |
| CHICAGO, a Municipal Corporation, ) | JURY DEMAND |
| ) | |
| Defendants. ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT

The Plaintiff, Janette Bass,[1] pursuant to the Federal Rule of Civil Procedure 56 and Local Rule 56.1 hereby submits this memorandum of law in support of her motion for partial summary judgment.

**Table of Contents**

I. DAKURAS SEIZED MS. BASS WITHOUT PROBABLE CAUSE. .................................. 2

  A. Dakuras Seized Ms. Bass When he Refused to Leave Her Residence and When he Physically Restrained her. ........................................................................................................ 2

  B. Dakuras Did Not Have Probable Cause to Detain Ms. Bass. ............................................. 3

    1. Ms. Bass did not qualify for involuntary admission on an inpatient basis under MHDDC. ......... 4

    2. No reasonable person would have believed that Ms. Bass needed to be immediately hospitalized to prevent her from harming herself or others. .............................................. 5

II. DAKURAS IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR HIS ACTIONS AGAINST MS. BASS. ....................................................................................................... 9

  A. As of June 2019, the Law was Clearly Established that Detaining Ms. Bass, Without Reasonable Grounds to Believe that she was Subject to Involuntary Admission Under MHDDC, Violated her Constitutional Rights. .................................................................. 10

  B. Dakuras knowingly and plainly violated the law when he seized Ms. Bass without clear indications that she was a danger to herself or others and failed to comply with the procedural requirements of the MHDDC .................................................................................. 13

---

[1] For clarification and accuracy, Plaintiff's first name is incorrectly spelled in the case caption. The correct spelling of Plaintiff's first name is "Janette."

1

## STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Estate of Suskovich v. Anthem Health Plans of Va., Inc.,* 553 F.2d 559 (7th Cir. 2009). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party establishes they are entitled to summary judgment, the burden shifts to the non-moving party to offer specific evidence establishing a triable issue of fact. *Eberts v. Goderstad*, 569 F.3d 757, 766-67 (7th Cir. 2009). In cases where the incident is caught on videotape, the reviewing court should view the facts "in the light depicted in the videotape," even if it would contradict the non-movant's version of events. *Scott v. Harris*, 550 U.S. 372, 380-381 (2007).

## I. DAKURAS SEIZED MS. BASS WITHOUT PROBABLE CAUSE.

### A. Dakuras Seized Ms. Bass When he Refused to Leave Her Residence and When he Physically Restrained her.

Although Defendants have contended that Dakuras did not "arrest" Ms. Bass, the law is clear that Dakuras's actions constitute a detention under the Fourth Amendment.

A Fourth Amendment "seizure" of a person occurs "whenever a police officer by means of physical force or show of authority…in some way restrain[s] the liberty of a citizen." *Acevedo v. Canterbury*, 457 F.3d 721, 725 (7th Cir. 2006). In other words, a person is seized by authorities when a reasonable, innocent person would not feel free to leave. *U.S. v. Drayton*, 536 U.S. 194, 200-02 (2002).

Moreover, while law enforcement can enter a person's home when they have the resident's consent, a person may limit or withdraw their consent, and the police must honor such limitations. *See United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986). Society recognizes a person's right to choose to close their door on and exclude people that they do not want within their home. *See United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991); *see also*, *Hawkins v. Mitchell*, 756 F.3d 983, 993 (7th Cir. 2014).

In the present case, Dakuras's seizure of Ms. Bass can be viewed as twofold—when Ms. Bass revoked her consent to Dakuras's presence in her residence, but he refused to leave, and when Dakuras physically grabbed Ms. Bass, pushed her onto the ground, and utilized physical force to restrain her. For the purposes of this dispositive motion, Dakuras's seizure will be examined as a whole.

B.  <u>Dakuras Did Not Have Probable Cause to Detain Ms. Bass.</u>

Because there were no reasonable grounds to believe that Ms. Bass was subject to seizure under Illinois law, Dakuras lacked probable cause to detain and transport Ms. Bass to the hospital against her will.

The Fourth Amendment governs mental-health seizures. *Bruce v. Guernsey*, 777 F.3d 872, 875 (7th Cir. 2015). Like ordinary seizures, mental-health seizures comply with the Fourth Amendment when officers have probable cause, which only exists if there are reasonable grounds for believing that the person is subject to seizure under the governing legal standard. *Id.* Generally, a mental-health seizure is lawful if there is probable cause to believe that the person seized is a danger to herself or others. *Id.* at 876.

Police officers have probable cause to commit a person only if, "at the moment the decision [was] made, the facts and circumstances within [their] knowledge and of which [they

had] reasonably trustworthy information would warrant a prudent person in believing" that a plaintiff met the standard for commitment. *Xing Qian v. Kautz,* 168 F.3d 949, 953 (7th Cir. 1999).

In Illinois, the governing legal standard for mental health seizures is codified in the Illinois Mental Health and Developmental Disabilities Code ("MHDDC"). *See* 405 ILCS 5/1-100. The Illinois Mental Health Code created a liberty interest in being free from confinement in that it prevents the state from involuntarily admitting a person who is not a danger to herself or others. *Wilson v. Formigoni*, 42 F.3d 1060, 1994 U.S. App. LEXIS 35132 (7th Cir. 1994).

The MHDDC provides that a "peace officer may take a person into custody and transport her to a mental health facility when the peace officer has reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm." 405 ILCS 5/3-606.

In the present case, the record demonstrates that Dakuras did not have reasonable grounds to believe that Ms. Bass was subject to involuntary admission for inpatient care or in need of immediate hospitalization to protect herself or others from harm.

   1. *Ms. Bass did not qualify for involuntary admission on an inpatient basis under MHDDC.*

Under Illinois law, a person can be subject to involuntary admission on an inpatient basis when that person is mentally ill and because of their mental illness is either: (1) reasonably expected, unless treated on an inpatient basis, to engage in conduct placing them or another in physical harm or being physically harmed; or (2) unable to provide for their basic physical needs so as to guard themselves from serious harm without the assistance of family or others, unless treated on an inpatient basis. *See* 405 ILCS 5/1-119. Law enforcement violates a person's Fourth Amendment rights if they have them committed without probable cause to believe that they were

4

an immediate danger to themselves or others. *Chapala v. Hoffman Estates Police Dep't*, 2004 U.S. Dist. LEXIS 110 (N.D. Ill. Jan. 6, 2004).

In *People v. Robin C.*, a police officer petitioned for the emergency involuntary admission of a woman who he found at a motel throwing rocks at the building while naked. 385 Ill. App. 3d 523, 529 (4th Dist. 2008). When the woman challenged her commitment, the court concluded that, even considering that the woman was standing outside during winter naked, there was no direct or substantive evidence that she had engaged in dangerous or violent acts that placed her or others in jeopardy of serious physical harm in the near future.[2] *Id.* at 526, 530.

Here, like in *Robin C.*, the record is devoid of any direct or circumstantial evidence that Ms. Bass was exhibiting dangerous or aggressive behaviors leading up to, or during, her interaction with Dakuras. Dakuras had no basis to "reasonably expect" that Ms. Bass was going to engage in conduct that would cause harm to others or herself.

> 2. *No reasonable person would have believed that Ms. Bass needed to be immediately hospitalized to prevent her from harming herself or others.*

For mental health seizures, probable cause requires that the individual subject to such seizure is in need of *immediate* hospitalization to prevent her from harming herself. *Dobrzeniecki v. Vela-Sailsbery*, 2014 U.S. Dist. LEXIS 141698, at *17 (N.D. Ill. Oct. 6, 2014) (emphasis in original).

In *Fitzgerald v. Santoro*, the plaintiff called a local police department's non-emergency line and spoke with an officer at the desk. 707 F.3d 725, 728 (7th Cir. 2013). This desk officer contacted another local police department and reported a depressed, possibly suicidal, intoxicated female caller. *Id.* Subsequently, police officers and paramedics were dispatched to the plaintiff's residence for a wellness check. *Id.* As the officers approached the plaintiff's

---

[2] There was no direct evidence that the woman was in fact throwing rocks.

residence, she abruptly hung up on the desk officer. *Id.* Upon entering the plaintiff's apartment, the officers observed that she was seemingly intoxicated. *Id.* The officers and paramedics spoke with the plaintiff for about a half hour during which time she denied wanting to harm herself but admitted that she was upset and taking antidepressants. *Id.* at 729.

At one point during their encounter, one of the officers left the apartment and called the dispatcher to verify information about the plaintiff. *Id.* The dispatcher confirmed that the plaintiff had made suicidal statements while on the phone with the desk officer. *Id.* At this point, the officers and paramedics concluded that the plaintiff was a potential harm to herself so they attempted to contact several of the plaintiff's friends to see if any of them could come stay with her for the night. *Id.* When these attempts were unsuccessful, the officers decided to take the plaintiff to the hospital over her protests. *Id.* In its decision, the court found that it was reasonable for the officers to conclude that the plaintiff required immediate hospitalization to protect her from self-harm. *Id.* at 733.

In *Chapala*, the plaintiff was a patrol officer for a suburban police department. 2004 U.S. Dist. LEXIS at *2. The plaintiff had assaulted a fellow officer in the locker room while making nonsensical statements like, "The end is near" and "The giant is coming." *Id*. This fellow officer reported the incident to his supervisor, who in turn relayed it to the police chief. *Id.* Upon learning of this incident, the police chief held a meeting with the village attorney and village director, who decided to place the plaintiff on paid administrative leave pending a fitness evaluation. *Id.* at *2-3. After the locker room incident, the plaintiff had brought a concealed and unauthorized firearm to a meeting with a fellow officer and told that officer that the other department members were plotting against him. *Id.* at *11.

Then, the plaintiff went to meet with the police chief, who asked the plaintiff to go to the hospital for an evaluation, to which he refused. *Id.* The police chief told the plaintiff that if he did not voluntarily submit himself to an evaluation, he would order the plaintiff to do so and discipline him if he refused to comply with the order. *Id.* at *4. With that, the plaintiff acquiesced to going to the hospital for an evaluation. *Id.* While at the hospital, another officer had found 145 rounds of bullets in the plaintiff's backpack. *Id.* at *12. Based on these facts, the court ruled that the defendants had probable cause to believe that the plaintiff was mentally ill and a danger to himself or others when they had him committed. *Id.* at *11.

In *Ellwood v. City of Chicago*, local police suspected the plaintiff of sending anonymous letters containing explicit threats of shooting up an elementary school. 2014 U.S. Dist. LEXIS 29077 at *6-7 (N.D. Ill. Mar. 6, 2014). Although the plaintiff was not charged with crimes related to those letters, the police detained the plaintiff and transported him to the V.A. hospital for a mental health assessment. *Id.* at *2, 11-12. When the plaintiff challenged his detention by the officers, the court ruled that the police had probable cause to believe that the plaintiff needed to be immediately hospitalized to protect himself and others from harm. *Id.* at *24. In its reasoning, the court concluded that the officers acted reasonably based on several facts: (1) the plaintiff had a known history of leaving threatening, anonymous notes to neighbors, (2) the letters referenced wanting retribution for an incident involving the police that occurred in the plaintiff's backyard, (3) the plaintiff had the means to carry out those threats because he owned 17 guns, at least one of which was a high-powered assault rifle, and (4) the plaintiff had recently threatened to kill his father. *Id.* at *24-25.

In the present case, unlike the caller in *Fitzgerald*, Ms. Bass did not make any suicidal statements to a 911 operator, Dakuras, or anyone else. Also distinct from *Fitzgerald*, Ms. Bass

7

was not intoxicated or even suspected to be intoxicated. (Pl.'s Statement of Material Facts ("SOMF") ¶69). And unlike the plaintiff in *Chapala*, Ms. Bass did not explicitly or implicitly threaten anyone, nor was she accused of assaulting anyone prior to Dakuras's determination to detain her. (Pl.'s SOMF ¶¶8-30, ¶¶62-68). And no one called the police to report Ms. Bass as expressing suicidal or self-harming thoughts.[3]

In essence, Ms. Bass did not exhibit any behaviors that a reasonable officer would view as necessitating immediate hospitalization. By contrast to the plaintiff in *Ellwood*, Ms. Bass did not threaten anyone with violence or harm. (Pl.'s SOMF ¶67). In fact, Ms. Bass never made any threatening comments at all. (Pl.'s SOMF ¶¶62, 64, 67). And further distancing Dakuras's actions from those of the officers in *Ellwood*, Dakuras did not see or believe that Ms. Bass had any firearms or weapons. (Pl.'s SOMF ¶61).

In short, Ms. Bass did not act in a way that could be reasonably interpretated as suicidal, violent, or unable to care for herself. Ms. Bass was nothing more than a frustrated civilian seeking the assistance of law enforcement. But instead of receiving the aid she sought, Dakuras instrumented her involuntary commitment, causing Ms. Bass to be unlawfully detained at the hospital for several days.

Further establishing the unreasonableness of Dakuras's actions, the defendant-officers who conducted the plaintiffs' mental health detentions in both *Fitzgerald* and *Chapala* took several steps before resorting to involuntary commitment. Contrary to the defendants in those cases, Dakuras did not even attempt to take any less extreme action before deciding to seize Ms. Bass for a mental health transport against her will. (Pl.'s SOMF ¶¶ 30-36). Although some may view Ms. Bass's behavior as eccentric or strange, neither signal the need for immediate hospitalization. Dakuras's body-worn camera demonstrates that Ms. Bass did not engage in any

---
[3] As demonstrated throughout the entirety of the record.

conduct that could be reasonably interpreted as dangerous.[4] A person may be annoyed, uncooperative, and irrational without presenting a danger to herself or of violence to others. *Myers v. Patterson*, 819 F.3d 625, 634 (2d Cir. 2016).

The record lacks evidence that Dakuras reasonably could have expected Ms. Bass to hurt herself or someone else, or that she needed to be hospitalized immediately to prevent any such harm. Therefore, Dakuras did not have probable cause to seize Ms. Bass under the veil of a mental health commitment.

## II. DAKURAS IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR HIS ACTIONS AGAINST MS. BASS.

Qualified immunity shields a defendant when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects all but the plainly incompetent or those who knowingly violate the law." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021).

When the constitutionality of an action depends on the existence of probable cause, the officer must have had "arguable probable cause" for qualified immunity to attach. *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998).

General statements of the law are capable of giving fair and clear warning to government officials. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In some instances, a broad constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful." *Id.*

---

[4] See Pl.'s Ex. 4, Dakuras's Body-Worn Camera, June 23, 2019.

A. <u>As of June 2019, the Law was Clearly Established that Detaining Ms. Bass, Without Reasonable Grounds to Believe that she was Subject to Involuntary Admission Under MHDDC, Violated her Constitutional Rights.</u>

In the context of a qualified immunity analysis, for a right to be clearly established, it is not necessary that there be earlier cases with materially similar facts. *Sallenger v. City of Springfield*, No. 03-3093, 2005 U.S. Dist. LEXIS 18202, at *1 (C.D. Ill. Aug. 4, 2005). Rather, officials can still be on notice that their conduct violates established law even in novel factual circumstances. *Id.* An officer would not be entitled to qualified immunity when various courts have agreed that certain conduct violates one's constitutional rights under facts that are not substantively distinct from the facts presented in the case at hand. *See id.*

In *Bruce*, the court denied an officer the protection of qualified immunity and concluded that the officer could not have reasonably believed that he had probable cause to transport the minor plaintiff to the hospital against her will. 777 F.3d at 879. In its reasoning, the court found that the *only* indication that the plaintiff might commit suicide was another classmate's comment that the plaintiff was potentially suicidal. *Id.* Additionally, the officer made misrepresentations on the petition for the minor's involuntary commitment. *Id.* Therefore, the court held that the officer was not entitled to qualified immunity. *Id.*

Law enforcement officers have reasonable grounds to believe that a person needs immediate hospitalization when that person has expressed threats to harm himself or others. *See, e.g.*, *Simenson v. City of Joliet*, No. 18-cv-00608, 2019 U.S. Dist. LEXIS 132273 (N.D. Ill. Aug. 7, 2019)(the plaintiff, who was visibly intoxicated, told a security guard that he planned on jumping off the nearby bridge, which was known as a "suicide hot spot"); *Mucha v. Jackson*, 786 F.3d 1064 (7th Cir. 2015)(the plaintiff, who owned over 10 guns, admitted to the police that he had dreams and thoughts of killing his fellow officers and himself); *Fitzgerald*, 707 F.3d at 725,

(intoxicated female made suicidal statements to a desk police officer); *Burnell v. Glassner*, 2014 U.S. Dist. LEXIS 203937 (N.D. Ill. Feb. 25, 2014) (a mental health provider of the plaintiff called the police and reported that the plaintiff had threatened to hurt himself with a gun); *Dunne v. Reda*, No. 12 C 872, 2013 U.S. Dist. LEXIS 21927, at *8 (N.D. Ill. Feb. 19, 2013) (the plaintiff had made a suicide attempt two months prior, and stated to the officer, "No one f***ing cares about me; if I put a gun to my head, it wouldn't even matter," immediately before the officer called paramedics).

However, courts also consider the context of statements. *See, e.g., Dobrzeniecki*, 2014 U.S. Dist. LEXIS 141698 at *4-6. For instance, in *Dobrzeniecki*, a police officer facilitated the involuntary commitment of her colleague who had told the officer that "she wanted to die" while crying. *Id.* When the colleague brought suit against the police officer, the record revealed that the colleague had made that statement moments after learning that her son was shot and gravely injured. *Id.* at *4. In its decision, the court considered the colleague's statements in that context and held that her behavior did not establish reasonable grounds for the officer to believe she would harm herself. *Id.* at *16-17.

Based on the relevant jurisprudence, police also have a reasonable basis to believe that a person is in need of immediate hospitalization for their own and others' safety when that person is displaying threatening or dangerous behavior. *See, e.g.*, *Turner v. City of Champaign*, 979 F.3d 563 (7th Cir. 2020) (the plaintiff, who was a homeless individual, was rolling around on a sidewalk with his pants down, walking into the street, speaking unintelligibly, and rummaging through trash); *McKinney v. George*, 726 F.2d 1183 (7th Cir. 1984) (the plaintiff was wielding knives as he walked the hallways of his apartment building); *Price v. Wrencher,* No. 13-cv-1785, 2016 U.S. Dist. LEXIS 66357, at *11-12 (N.D. Ill. May 20, 2016) (the plaintiff was swinging a

leather belt like a lasso in a fast food restaurant with several customers nearby and speaking "gibberish").

And naturally, when a person is both making verbal threats and behaving in a dangerous manner, officers have reasonable grounds to conclude that that person needs immediate medical attention. *See, e.g.*, *Rusinowski v. Vill. of Hillside*, 19 F. Supp. 3d 798, 804-05 (N.D. Ill. 2014) (the plaintiff was livestreaming a video of himself drinking alcohol, waving a gun around, and threatening himself and others).[5]

On June 23, 2019, Ms. Bass's behavior and statements were that of a person feeling defeated and exasperated. As discussed in the previous section, Ms. Bass never threatened to hurt herself or anyone else prior to or during her interaction with Dakuras or any other Defendant employee. Nor did she express any passively suicidal thoughts like the plaintiff in *Dunne*. (Pl.'s SOMF ¶¶66, 68).

Unlike the plaintiffs in *Simenson*, *Fitzgerald,* and *Rusinowski*, Ms. Bass was not under the influence of alcohol or drugs, nor did Dakuras claim that she was. And in contrast with the plaintiffs in *McKinney, Price, Chapala,* and *Rusinowski*, Ms. Bass did not wield a weapon nor was she accused of doing such.

Where an individual has threatened to harm themselves or others like the plaintiffs in *Mucha* and *Fitzgerald* did, officers have probable cause to detain the individual under Illinois law. Similarly, when an individual exhibits violent or dangerous behavior like the plaintiffs in *McKinney* and *Price*, police officers also have probable cause to seize that person.

However, where a person has neither made threatening comments or acted in a manner that suggests they are likely to harm themselves or others, officers do not have probable cause to

---

[5] Each of the aforementioned cases involve law enforcement who initiated or facilitated an individual's involuntary commitment or mental health detention.

12

subject that person to involuntary commitment. Thus, when a person has not acted in a threatening or dangerous manner or made express threats of harm, the law is clearly established that law enforcement does not have reasonable grounds to subject that person to a mental health seizure.

Based on the above-described cases, Dakuras was on notice that Ms. Bass's behavior did not justify involuntarily committing her. Thus, as of June 2019, the law was clearly established that seizing Ms. Bass to her involuntary admit her to a hospital, based on her observed conduct, was a violation of her constitutional rights.

> B. <u>Dakuras knowingly and plainly violated the law when he seized Ms. Bass without a reasonable basis that she was a danger to herself or others and failed to comply with the procedural requirements of the MHDDC.</u>

Even if the court is persuaded that the clearly established law was not sufficiently on point to the present facts, Dakuras is still not entitled to qualified immunity.

Because Ms. Bass did not demonstrate any behavior that suggested she was a danger to herself or others, Dakuras plainly violated Ms. Bass's Fourth Amendment rights when he detained her and orchestrated her involuntary commitment; and did so without complying with the procedural safeguards of the applicable Illinois law.

Qualified immunity does not protect knowingly unlawful or plainly incompetent acts. *Dunn v. City of Elgin*, 347 F.3d 641, 647 (7th Cir. 2003). The relevant statute states that if the person who is the subject of involuntary admission is taken into custody by a peace officer, the officer shall complete the petition. *People v. John N. (In re John N.)*, 364 Ill. App. 3d 996, 997-98 (3d Dist. 2006). Under such circumstances, the failure of the officer to complete the petition is reversible error. *Id.* While the constitutionality of a mental-health seizure does not depend on if the officer met each requirement spelled out by Illinois state law, whether or not an officer

complied with these state law conditions does provide evidentiary value when determining the reasonableness of the officer's conduct. *Bruce*, 777 F.3d at 876.

However, because involuntary commitment "disrupts one's freedom from unwarranted interference by the state, and violates her person, entailing a massive curtailment of liberty," it can only be justified by a recognized and substantial government interest. *People v. Reliford*, 65 Ill. App. 3d 177 (1st Dist. 1978). Thus, the involuntary commitment procedures represent a balance between an individual's liberty interests and the government's interests in public safety. *See In re James*, 191 Ill. App. 3d 352, 356 (4th Dist. 1989). The procedures set forth in the MHDDC are a legislative recognition that civil commitment is a deprivation of personal liberty. *Id.* In mental health detention cases, strict compliance with the statutory provisions is compelling because a liberty interest is involved. *In re Wiessing*, 229 Ill. App. 3d 737 (4th Dist. 1992). The purpose of the procedures is to provide adequate safeguards against unreasonable commitment. *In re James*, 191 Ill. App. 3d at 356.

As summarized in the previous section, in *Dobrzeniecki*, the court denied the police officer qualified immunity for initiating her colleague's involuntary commitment when she misrepresented the colleague's statements and provided false information on the petition for involuntary commitment. 2014 U.S. Dist. LEXIS 141698 at *19.

Here, similarly as the defendant in *Dobrzeniecki*, Dakuras knowingly violated the law by misleading other responding officers, and subsequently, medical personnel, about Ms. Bass's conduct and demeanor. Although Dakuras testified that he thought Ms. Bass was suicidal, Dakuras did not provide any sincere bases for that belief. (Pl.'s SOMF ¶65). For example, when asked if Ms. Bass ever threatened to harm herself, Dakuras testified, "Well, running up and down stairs with no shoes on could be deemed a harm to herself." (Pl.'s SOMF ¶64). However,

Dakuras requested an ambulance for a mental health transport before Ms. Bass ran out of her residence and down the stairs. (Pl.'s SOMF ¶36, ¶50).

Additionally, Dakuras never heard Ms. Bass threaten anyone or herself, nor did anyone report Ms. Bass to have made such threats. (Pl.'s SOMF ¶62). Dakuras also did not even ask Ms. Bass if she had thoughts of wanting to hurt herself or anyone else. (Pl.'s SOMF ¶63). Rather, Dakuras attempted to defend his actions by citing to Ms. Bass's response to his repeated questioning of her as to whether she was "in crisis." According to Dakuras, when he asked Ms. Bass if she was in crisis, her response—"Because of you!"—singlehandedly warranted her involuntary commitment. This is not the law. As the court did in *Dobrzeniecki*, Ms. Bass's statement should be considered in the context of the surrounding circumstances and other behavioral cues.

Here, the timing of Dakuras's seizure of Ms. Bass requires additional scrutiny as the defendant's timing did in *Dobrzeniecki*. Dakuras started to exit Ms. Bass's residence when she asked him for his name, and he provides his name. (Pl.'s SOMF ¶28). As Dakuras continues toward the front door to leave, Ms. Bass commented, "They can come into my unit ….and tape me naked and you're not going to put that down on the report?" (Pl.'s SOMF ¶30). It was only then that Dakuras asked Ms. Bass if she was "in crisis." (Pl.'s SOMF ¶31). Before Ms. Bass's comment, Dakuras was seemingly not concerned with Ms. Bass being suicidal or a potential harm to others because he was about to leave her residence.

Moreover, like the defendant in *In re John N.*, Dakuras unequivocally ignored the procedural safeguards of the MHDDC by not filling out the involuntary commitment petition, even in part. (Pl.'s SOMF ¶59). Instead, Dakuras's blatant disregard of the MHDDC's

requirements undermine any determination that he was acting in good faith. Based on the record, Dakuras made no attempt to comply with the MHDDC's provisions on involuntary commitment.

Thus, Dakuras plainly violated both statutory and constitutional law when he seized Ms. Bass and initiated her involuntary commitment in June 2019. Given that, qualified immunity cannot insulate Dakuras from his actions that set in motion Ms. Bass's involuntary commitment.

### CONCLUSION

For all the foregoing reasons, the Plaintiff, Janette Bass, respectfully requests that this Honorable Court grant her Motion for Partial Summary Judgment, and any other relief it deems necessary and proper. Additionally, Plaintiff requests the opportunity to present her position, by her counsel, through oral arguments, if permitted by this Court.

Respectfully Submitted,

/s/ Gianna Gizzi

One of Plaintiff's Attorneys

Gianna Gizzi, No. 6332727
Gregory E. Kulis & Associates, Ltd.
30 N. LaSalle Street, Suite 2140
Chicago, IL 60602
p: (312) 580-1830 / f: (312) 580-1839
e: ggizzi@kulislawltd.com