UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEANETTE BASS, ) | |
| ) | Case No. 2019 CV 7557 |
| Plaintiff, ) | |
| v. ) | District Judge John F. Kness |
| ) | |
| SGT. A. DAKURAS, Individually, and the ) | |
| CITY OF CHICAGO, a Municipal ) | |
| Corporation, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' JOINT LOCAL RULE 56.1(a)(3) STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants, City of Chicago and Andrew Dakuras, (collectively "Defendants"), by and through their undersigned attorneys, pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1(a)(3), submit the following statement of undisputed material facts in support of their joint motion for summary judgment. The pleadings, deposition transcripts, and exhibits cited to in this statement are attached hereto.[1]

## THE PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Jeanette Bass (hereinafter "Bass"), brought this action pursuant to 42 USC § 1983 and Illinois State Law, making claims of false arrest, excessive force, intentional infliction of emotional distress, and indemnification.[2] Plaintiff alleges generally that Defendant Chicago Police Sergeant Andrew Dakuras (hereinafter "Dakuras") arrested Bass without probable cause by having her involuntarily committed to a psychiatric ward; subjected her to excessive

---

[1] These facts are undisputed only for purposes of Defendants' Motion for Summary Judgment. Defendants reserve the right to dispute these facts for all other purposes, including trial.

[2] Plaintiff's *Monell* claim was dismissed by Judge Lee without prejudice on February 6, 2020. ECF No. 26. On July 9, 2021, the Court denied Plaintiff's Motion to Amend Complaint to revive the *Monell* claim. ECF No. 85.

1

force by physically attacking her; and subjected her to emotional distress by aggravating her pre-existing mental disorder. *See* Complaint (ECF No.1), attached hereto as Exhibit A, at ¶¶ 13-21, and *generally*.

2. The Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331, § 1343. Exh. A, ¶ 2.

3. Venue is proper as the events giving rise to the alleged claims occurred within the Northern District of Illinois, namely Chicago. Exh. A, at ¶ 5.

4. Dakuras was, at all relevant times, a duly appointed police officer of the City of Chicago and acting within the scope of his employment and under color of law. *See* Dakuras' Amended Answer to Plaintiff's Complaint (ECF No. 46), attached hereto as Exhibit B, at ¶ 5.

## **INCIDENT**

5. On June 20, 2019, Bass filed a police report, taken by unnamed Chicago police officers, against the management of her condominium ("condo") unit for allegedly entering her unit without permission and videotaping Bass in her unit when she was undressed from the waist down. *See* Deposition of Jeanette Bass, "Bass Dep.," attached hereto as Exhibit C, at 60:15-61:18, 61:23-62:7, 63: 20-24; 64: 15-18.

6. On June 23, 2019, in the early evening hours, Bass called 9-1-1 to request an officer come out to amend the classification of her June 20, 2019 report from noncriminal to criminal. *See* Bass Dep., Exh. C, at 63: 20-24; 64: 15-18.

7. On June 23, 2019, Dakuras was on duty as a Chicago police sergeant in the 018 District, dressed in full uniform, including a department issued body worn camera. *See* Deposition of Andrew Dakuras, "Dakuras Dep.," attached hereto as Exhibit D at 27: 3-6, 28:13-16.

8. On June 23, 2019, in the early evening hours, Dakuras was dispatched to 260 E. Chestnut St. for a request for a supervisor at that location Dakuras Dep., Exh. D., at 27:22-28:6.

9. Upon arrival to 260 E. Chestnut, Dakuras activated his body worn camera ("BWC") so that the entire event would be recorded. Dakuras Dep., Exh. D at 28: 13-16; *see also* Dakuras Body Worn Camera Video, "Dakuras BWC," attached as Exhibit E, *generally*; Bass Dep., Exh. C, at 272:13-18, 277:21-23.

10. Dakuras entered the building at 260 E. Chestnut, proceeded to unit 3103, and knocked on the door. Dakuras BWC, Exh. E, at 02:00-03:38.

11. After knocking a second time, Bass stated through the door, "One second I'm getting dressed." Dakuras Dep., Exh. D at 31:5-9; Dakuras BWC, Exh. E, at 03:59-04:04.

12. Bass eventually opened the door and Dakuras introduced himself and informed Bass that she was being audio and video recorded. Bass responded that she also wanted to record Dakuras. Dakuras BWC, Exh. E, 05:04-05:17; Dakuras Dep., Exh. D, at 31:10-18.

13. When Dakuras entered Bass's residence, the condo unit was in disarray and there were papers strewn about the floor. Dakuras Dep., Exh. D at 50: 5-6; 52: 2-3, 74:21-75:13; Dakuras BWC, Exh. E, 05:18-05:35.







14. Bass begins telling Dakuras that she had to change her locks, and pointed to a wet mark on the ceiling indicating that the main water line was broken. Dakuras Dep., Exh. D, at 32: 2-6; Dakuras BWC, Exh. E, 05:35-5:42.

15. Bass further stated that she was banned from the condominium's management office because

she has requested they fix the broken water main, and the management office threatened to call the police on her. Dakuras BWC, Exh. E, 05:43-05:55.

16. Bass continued telling Dakuras that the Thursday prior, a "bunch" of men entered Bass's unit while she was naked and they would not leave for 5 minutes, and instead stared at her. Dakuras BWC, Exh. E, 05:58-06:22.

17. A back and forth ensued between Bass and Dakuras about what constituted criminal trespass. During this time, Bass cut Dakuras off when he was speaking. Dakuras BWC, Exh. E, 06:22-06:55.

18. At that point, Bass proceeded to read a text message she sent to the management company, and showed Dakuras pictures she took of management. Dakuras BWC, Exh. E, 06:55-07:52.

19. Bass then played a recording of a 9-1-1 OEMC call, which Dakuras informed her is already recorded; at which time Bass indicated she was aware OEMC recorded 9-1-1 calls, but she recorded it for her own records. Dakuras BWC, Exh. E, at 8:12-8:19.

20. In addition, she played a subsequent recording which she claimed was an interaction between her and management. Bass claimed the interaction was not included in her prior police report. Dakuras BWC, Exh. E, at 08:51-9:04.

21. Dakuras in response inquired about a copy of the prior police report. Bass showed Dakuras a victim information sheet, which is not a police report. Dakuras BWC, Exh. E, at 09:05-09:10; Dakuras Dep, Exh. D at 34:15-21.

22. Bass then stated she had spoken to the detective who informed her the information was not in the report. Dakuras informed Bass that if she talked to the detective he could amend the report. Dakuras BWC, Exh. E, at 09:16-09:19; Dakuras Dep., Exh D at 35:9-16.

23. At this point Bass indicated Dakuras is wrong; and informed Dakuras that she was previously told by Sergeant Erik Seng ("Sgt. Seng"), another sergeant in the 018 District, that she had to

5

call 9-1-1 to have an officer come out and amend the report. Dakuras BWC, Exh. E, 9:19-9:33; Bass Dep., Exh. C, at 81:19-22; Dakuras Dep., Exh. D, at 35:14-21.

24. Bass played another recording from her phone which she claimed was her conversation with Sgt. Seng. Dakuras BWC, Exh. E, 9:33-10:13. In the recording of her conversation with Sgt. Seng, Bass is heard playing Sgt. Seng recordings of her interaction with the condo management company and telling Sgt. Seng the same story of the management company filming her naked. *Id.*

25. Dakuras called Sgt. Seng from his department issued cell phone and attempted to figure out what was going on. Dakuras Dep., Exh. D at 36: 18-19, 37:5-12; Dakuras BWC, Exh. E, at 10:13-10:27.

26. While Dakuras attempted to speak with Sgt. Seng, Bass continued playing recordings on her phone and interrupted Dakuras. Dakuras BWC, Exh. E, at 10:27-10:51; Dakuras Dep., Exh. D, at 37:17-21.

27. Dakuras is unable to finish his conversation with Seng due to Bass's continued interruptions, and therefore ended his conversation with Sgt. Seng. Dakuras BWC, Exh. E, 10:27-10:51; Dakuras Dep., Exh. D, at 37:8-21.

28. At this point, Dakuras informed Bass that a report was already made, he would not be providing a supplemental report, and he provided his name to Bass, including spelling his name for her. Dakuras BWC, Exh. E, 10:51-11:10.

29. As Dakuras attempted to leave, Bass requested his name. Dakuras walked back and provided his information for the third time to Bass. Dakuras BWC, Exh. E, 11:10-11:27.

30. At this point, Dakruas believed Bass may need mental health intervention. Dakuras Dep., Exh. D, at 40: 3-14.

31. Bass repeated phrases stated by Dakuras, including, "no ma'am," and "that's not going to

happen." Dakura BWC, Exh. E, at 11:29-11:33.

32. Bass raised her voice exclaiming, "They can break into my unit, tape me naked, and you're not going to put that down on the report." Dakuras BWC, Exh. E, 11:27-11:41.

33. Dakuras then asked Bass twice if she is in crisis. After the second time, Bass responded, "Because of you." Dakuras BWC, Exh. E, 11:42-11:52.

34. Dakuras believed Bass could be a harm to herself based on the fact that she was not dressed on his arrival, the disorganization of her unit, her rapid and disorganized speech, she appeared agitated, appeared paranoid in recording all her interactions, requested his information after she already had it, and affirmatively stated she was in crisis. Dakuras Dep., Exh. D at 32:16-33:12, 39:15-24, 40:3-14, 43: 14-15, 50: 4--24, 52:8-20, 59:14-23, 107: 21-24, 108: 1-10, 112:19-113:20; *see also* Dakuras COPA Statement, "Dakuras Stmt.", attached hereto as Exhibit H, at 07:29-11:06.

35. Dakuras asked Bass if she is under the treatment of any doctors, to which Bass responds, "No I am not, you're a liar." Dakuras BWC, Exh. E, 11:53-11:57.

36. Dakuras radioed dispatch to send and ambulance and wagon for a mental health transport. Dakuras BWC, Exh. E, 12:23-12:28.

37. Bass admitted she was in crisis mode at the point when Dakuras requested medical care for her and refused to leave her unit. Bass Dep., Exh. C, at 105:13-17, 119:21-120:9.

38. Bass repeatedly told Dakuras to leave and Dakuras refused because he felt he could not leave her alone and she needed medical care. Dakuras BWC, Exh. E, 12:28-13:00, Dakuras Dep., Exh. D, at 79:2-4.

39. Bass stated she has "post traumatic syndrome from the police." Dakuras BWC, Exh. E, at 13:00-13:10.

40. Dakuras informed Bass he believed her to be in need of a doctor's help. Bass responded, "I

7

am not, I want you to hear all the tapes, look at the building, look what they've done to me." (Dakuras BWC, Exh. E, 13:25-13:31).

41. Bass called Michael Litt and claimed Dakuras was attempting to arrest her. Dakuras BWC, Exh. E, at 13:34-13:37.

42. Dakuras repeatedly responded that she was not under arrest. Dakuras BWC, Exh. E, 13:37-13:49.

43. Bass at one point grabbed Dakuras's arm and pushed him. Dakuras BWC, Exh. E., at 13:55-14:12, 16:30-16:42.

44. Bass called 9-1-1 multiple times and complained Dakuras refused to leave her condo. Dakuras BWC, Exh. E., 14:12-16.32.

45. Bass paced around her condo unit, including proceeding into her bedroom and back into the kitchen. Dakuras BWC, Exh. E., 16:30-16:42.

46. Bass fled from Dakuras; she left her apartment unit with no socks or shoes on, and ran down the hallway and up and down multiple flights of stairs. Dakuras BWC, Exh. E, 16:45-18:33.

47. While on the 27th Floor, Bass attempted to run again and Dakuras grabbed onto her left arm and shirt. Dakuras BWC, Exh. E., 18:24-18:33.

48. Dakuras placed a handcuff on Bass's left wrist, and Bass dropped her body to the ground. Dakuras BWC, Exh. E., 18:32-18:35; Dakuras Dep., Exh. D, at 85:22-86:2.

49. In an attempt to gain control of Bass, Dakuras grabbed Bass's neck, and attempted to cuff Bass behind her back, but was unable to due to Bass's resistance and age. Dakuras BWC, Exh. E., 18:36-18:46; Dakuras Dep., Exh. D., at 86:1-8, 87:5-8; Dakuras Stmt, Exh. H, at 13:17-13:50, 27:28-28:15.

50. Unable to cuff Bass behind her back, Dakuras cuffed Bass's wrists in the front of her body. Dakuras BWC, Exh. E., 18:36-18:46; Dakuras Stmt, Exh. H, at 27:28-28:15.

51. Dakuras placed his hands on Bass's left arm at various points to keep her on the ground until additional officers arrived. Dakuras BWC., Exh. E., 18:46-22:00; Dakuras Dep., Exh. D, at 104:7-21.

52. While on the ground, Bass called Michael again and stated, "I tried to run away from him so he couldn't get me, but he got me anyway." Dakuras BWC, Exh. E., 21:53-21:56.

53. Bass was subsequently taken by ambulance to Northwestern Hospital. Dakuras BWC, Exh. E., 22:14-22:28; Bass Dep., Exh. C, at 144:3-6.

54. Dakuras did not complete the involuntary admission for Bass, it was completed by a doctor and signed by a licensed social worker, Fred Cabras. Dakuras Dep., Exh. D, at 42:2-6, 106:6-8; Dakuras Stmt, Exh. H, at 20:39-20:52; *see also* Petition for Involuntary Admission, attached hereto as Exhibit I.

## BASS'S HOSPITAL EVALUATION

55. While at Northwestern, Bass was treated in the emergency room by numerous doctors, including Dr. Matthew Pirotte. *See* Deposition of Matthew Pirotte, "Pirotte Dep.," attached hereto as Exhibit F, at 17:18-20:6.

56. Dr. Pirotte did not note any physical injuries to Bass, did not find any physical injuries on examination, and Bass did not complain of any physical injuries. Pirotte Dep., Exh. F, at 21:4-6, 25:21-26:21, 28:14-29:16.

57. Upon his initial evaluation, Dr. Pirotte determined Bass suffered from longstanding mental illness with a flare-up, and needed to be placed on a psychiatric hold to have a full psychiatric evaluation. Pirotte Dep., Exh. F at 34: 4-11, 35: 4-13; 35:16-36:4, 40:3-6.

58. Bass was subsequently transferred to Methodist Hospital and a psychiatric evaluation was performed by Dr. Ronald Gordineer on June 24, 2022. *See* Deposition of Ronald Gordineer, "Gordineer Dep.," attached hereto as Exhibit G, at 44:17-20, 46:12-16.

59. Upon evaluation, Bass was determined to have a previous diagnosis of schizophrenia and/or schizoaffective disorder with an exacerbation of her symptoms. Gordineer Dep., Exh. G, at 50: 4-23.

60. Dr. Gordineer's found that, based on his evaluation, Bass's impaired judgment, mood symptoms and impulsivity created a potential of danger of harm to Bass. Gordineer Dep., Exh. G, at 72: 21-73:2, 74:11-16, 75: 2-3.

61. Dr. Gordineer made the decision to admit Bass. Gordineer Dep., Exh. G, at 76: 10-18, 78:19-79:7.

62. Dr. Gordineer made this decision because Bass was psychotic, unpredictable, impulsive, exhibited poor insight and judgment, and was a danger to herself and possibly others. Gordineer Dep., Exh. H, at 76: 20-77:2.

63. Dr. Gordineer never spoke with any Chicago police offers when determining whether to admit Bass. Gordineer Dep., Exh. H, at 97:21-24. He did not admit her to the hospital based on a paranoia of police brutality, rather he based his determination on other symptoms she displayed. *Id.* at 86:8-13, 90:12-24.

Dated:  June 29, 2022                                      Respectfully Submitted,

                                              By:     /s/ *Allison L. Romelfanger*
                                                      Allison L. Romelfanger
                                                      Assistant Corporation Counsel Supervisor
                                                      Attorney No. 6310033

Nicholas J. Perrone
Assistant Corporation Counsel
City of Chicago, Dept. of Law
2 North LaSalle Street, Suite 420
Chicago, IL 60602
(312) 744- 5890 (Attorney Romelfanger)
(312) 744-6566 (fax)
**Attorneys for Defendant Dakuras**

                                                      /s/ *Marion Moore*
                                                      Marion Moore

Chief Assistant Corporation Counsel
Attorney No. 6302566

Mitchell Paglia
Assistant Corporation Counsel
City of Chicago, Dept. of Law
2 North LaSalle Street, Suite 420
Chicago, IL 60602
(312) 744-5170 (Attorney Moore)
(312) 744-6566 (fax)
**Attorneys for Defendant City of Chicago**

## CERTIFICATE OF SERVICE

I hereby certify that I filed a copy of the foregoing Defendants' Local Rule 56.3(a)(3) Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, with the Clerk of the Northern District of Illinois through the ECF system, a copy of which was served to all counsel of record, on June 29, 2022.

*/s/ Allison L. Romelfanger*
Allison L. Romelfanger
Assistant Corporation Counsel Supervisor