EXHIBIT D

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3

 4

 5   JEANETTE BASS,              )
                                 )
 6            Plaintiff,         )
                                 )
 7        vs.                    ) No. 19 CV 7557
                                 )
 8   SGT. A. DAKURAS,            )
     Individually, and THE       )
 9   CITY OF CHICAGO, a          )
     Municipal Corporation,      )
10                               )
              Defendants.        )
11

12

13              The deposition of ANDREW DAKURAS, called

14   by the Plaintiff for examination, pursuant to notice

15   and pursuant to the Federal Rules of Civil Procedure

16   for the United States District Courts pertaining to

17   the taking of depositions, taken before JODI ANNE

18   FEIGN, Certified Shorthand Reporter and Notary

19   Public within and for the County of Cook and State

20   of Illinois remotely via Zoom Videoconference,

21   Illinois, on the 10th day of December, 2020.

22

23

24
```

```
1       PRESENT:

2
            GREGORY E. KULIS & ASSOCIATES, LTD.
3
                (30 North LaSalle Street
4                Suite 2140
                 Chicago, Illinois 60602
5                312-580-1830
                 gkulis@kulislawltd.com)
6

7       By:  MR. GREGORY E. KULIS,
                Appearing on behalf of the Plaintiff;
8

9       CORPORATION COUNSEL-CITY OF CHICAGO

10              (30 North LaSalle Street
                 Suite 900
11               Chicago, Illinois 60602
                 emily.dory@cityofchicago.org)
12
        By:  MS. EMILY DORY,
13           MS. STEPHANIE SOTOMAYOR and
             MS. LANIYA MOORE,
14            Appearing on behalf of the Defendants.

15

16                    *   *   *   *   *   *   *   *   *

17

18

19

20

21

22

23

24
```

1                        I N D E X
     Witness:
2
     ANDREW DAKURAS,
3
     Direct Examination by Mr. Kulis          5-111
4
     Cross Examination by Ms. Dory           112-113
5
     Redirect Examination by Mr. Kulis      114-117
6
7               *   *   *   *   *   *   *   *   *   *

8
                    E X H I B I T S
9
10   Exhibit No. 1                              20

11   Exhibit No. 2                              26

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    (Witness duly sworn)
 2              THE COURT REPORTER.  Before we proceed, I
 3     will ask counsel to agree on the record that under
 4     the current national emergency pursuant to
 5     Section 319 of the Public Health Service Act, there
 6     is no objection to this deposition officer
 7     administering a binding oath to the witness by video
 8     conference.
 9                    Please state your agreement on the
10     record.
11              MR. KULIS:  Plaintiff Gregory Kulis, no
12     objection.
13              MS. DORY:  No objection.
14              MS. SOTOMAYOR:  Defendant City, no
15     objection.
16                    (Witness duly sworn.)
17              MR. KULIS:  Sir, will you please state your
18     full name and spell your last name for the record?
19              THE WITNESS:  Andrew Dakuras,
20     D-A-K-U-R-A-S.
21              MR. KULIS:  For the record, this is the
22     deposition of Andrew Dakuras taken in the case of
23     Bass versus Dakuras, 19 C 7557.
24                    This deposition is taken pursuant to
```

1    notice and continued to today's date by agreement.

2    This deposition is also taken pursuant to all

3    applicable rules of the Federal Rules of Civil

4    Procedure and the local rules of the Northern

5    District of Illinois.

6                    ANDREW DAKURAS,

7    called as a witness on behalf of the Plaintiff

8    having been first duly sworn on oath, was examined

9    and testified as follows:

10                  DIRECT EXAMINATION

11                  BY:  MR. KULIS

12       Q.   First of all, Officer Dakuras, are you

13    being represented by counsel?

14       A.   Yes, I am.

15       Q.   Okay.  Have you ever given a deposition

16    before?

17       A.   Yes, I have.

18       Q.   Okay.  I'm going to go over a few grounds

19    rules so you and I are on the same page.  I'm sure

20    your counsel has prepared you accordingly, but let

21    me go over a few things that I always like to do

22    with everybody so there is no misunderstanding and

23    we can get through this as quickly and smoothly as

24    possible.

1            This is my opportunity to ask you some

2    questions regarding some allegations that my client,

3    Jeanette Bass, has made against you.

4            I'm not here you trick you.  I'm not

5    here to corner you.  I just want to know your

6    version of the facts, what you did, what you said,

7    what actions you took, and what knowledge you have

8    regarding her allegations.

9            If at any time I ask a question that

10   calls for a yes or no answer, you must voice your

11   answer yes or no.

12            Is that understood?

13   A.    Yes, sir.

14   Q.    Okay.  Because the court reporter can't

15   take down a grunt, uh-huh, a nod.  She has to hear

16   yes or no.

17            If at any time -- this is like you are

18   in a court of law.  This is a Federal deposition, so

19   this is as if you are on the witness stand.

20            As you know, when you take a witness

21   stand, you can't really talk to anybody about your

22   testimony once you have taken the stand.

23            Do you understand that?

24   A.    I do.

1      Q.   However, there is no judge here.  And in a

2   court of law, the only one of course that calls time

3   out is a judge.

4            In a deposition, you can call time out

5   any time you need to, if you need to get a drink of

6   water, use the bathroom, just take a breather, and

7   we can -- we can do that.

8            However, we can't take a break while a

9   question is pending.  By that I mean, if there is a

10   question hanging out there, you must answer my

11   question and then we can take a break.

12            Is that understood?

13      A.   Yes, it is.

14      Q.   Also, as you become accustom to my stellar

15   personality, you are going to start anticipating

16   what my question is going to be as it is rolling off

17   my tongue.

18            I would ask that you would wait until I

19   complete the question before you answer the

20   question.

21            Okay?

22      A.   Yes.

23      Q.   Because you may -- if you answer the

24   question before I've completed it, you may be

```
 1    answering the wrong question, that's one.
 2                 Two, if you answer the question before
 3    your counsel has a chance to digest it and raise an
 4    objection, that may cause an issues.
 5                 And thirdly, and most importantly, Jodi
 6    can't take two people talking at once.
 7                 Okay?
 8    A.    I understand.
 9    Q.    Again, I am not here to trick you.  I am
10    not here to corner you.  If at any time I ask you a
11    question that you do not understand or you want me
12    to repeat or you want me to rephrase, just say,
13    counsel, Greg, whatever you want to call me, just
14    tell me that, you know, you don't understand the
15    question or you want me to repeat it and we will
16    have either Jodi read it back or I will reask the
17    question.
18                 Okay?
19    A.    Yes, sir.
20    Q.    Okay.  Sir, where were you raised?  Where
21    were you born?
22    A.    I was born in the City of Chicago.
23    Q.    Okay.  Where did you go to high school?
24    A.    Morton West in Berwyn, Illinois.
```

1          Q.    Okay.  When did -- after graduating from

2    Morton West, what did you do?

3          A.    I enrolled in Southern Illinois University

4    in Carbondale.

5          Q.    Okay.  Did you get a degree from Southern

6    Illinois?

7          A.    I did.

8          Q.    What year was that?

9          A.    I graduated from SIU in 1991.

10         Q.    And upon graduation -- I mean, what was

11   your degree in?

12         A.    Criminal justice.

13         Q.    And upon graduation from SIU, what did you

14   do?

15         A.    My first job was as an emergency medical

16   technician for the Berwyn Fire Department.

17         Q.    And how long did you do that?

18         A.    Until I was hired by the Naperville Police

19   Department in 1993.

20         Q.    And so in 1993, you became a law

21   enforcement officer?

22         A.    That is correct.

23         Q.    And how long did you stay with Naperville

24   as a police officer?

1       A.   Until August of '93.

2       Q.   Oh, so a short time?

3       A.   That is correct.

4       Q.   And then where did you go?

5       A.   I went to the Village of Oak Park.

6       Q.   Okay.  How long did you act as a police

7  officer for Oak Park?

8       A.   Until January 3rd of 1995.

9       Q.   Then where did you go?

10      A.   City of Chicago.

11      Q.   Okay.  Before you left Naperville -- let me

12  ask you, was that a voluntarily -- voluntary

13  resignation?

14      A.   Yes.

15      Q.   And was there any pending personnel actions

16  against you at that time in Naperville?

17      A.   Not to my knowledge.

18      Q.   And were you ever sued while you were a

19  Naperville police officer or even subsequent to

20  being a Naperville police officer, were you ever

21  sued as a Naperville Police Officer?

22      A.   Not to my knowledge.

23      Q.   Has anyone in Naperville ever filed a

24  citizen complaint against you for excessive force or

```
 1      any type of actions that you conducted as a

 2      Naperville Police Officer?

 3          A.    Not to my knowledge.

 4          Q.    I'm going to ask you the same questions

 5      regarding Oak Park.

 6                      Was your Oak Park resignation

 7      voluntary?

 8          A.    Yes, it was.

 9          Q.    And was there any personnel matters pending

10      against you in Oak Park?

11          A.    Not to my knowledge.

12          Q.    And were you ever sued as an Oak Park

13      Police Officer?

14          A.    Not to my knowledge.

15          Q.    Okay.  So you joined CPD in '95 did you

16      say?

17          A.    January 3rd, 1995, yes, sir.

18          Q.    Okay.  Where was your first assignment

19      after -- did you have to go to the academy at all?

20          A.    Yes.  Chicago's requirement is that you

21      re-take the entire police academy even though you

22      are already certified in the State of Illinois.

23          Q.    That's what I thought.

24                      After you finished the academy, where
```

1    did you -- what was your first district?

2         A.    I picked the Harrison District with --

3    Harrison and Kedzie, the Eleventh District.

4         Q.    And how long -- how long were you an

5    officer at Eleven?

6         A.    Until approximately June of 2003.

7         Q.    And then where did you go?

8         A.    I went to the Area Narcotics Enforcement

9    Team as a police officer.

10        Q.    And from what year to what year?

11        A.    From 2003 until I made sergeant in 2006.

12        Q.    Okay.  And then in 2006, where did you go?

13    Where were you assigned as a sergeant?

14        A.    I was assigned to the Tenth District, the

15    Ogden District which is -- I don't know the exact

16    address, but it's at Ogden and Holman.

17        Q.    And how -- how long did you stay at Ten?

18        A.    For approximately two years.

19        Q.    And then where did you go?

20        A.    I went to 35th and Michigan and headed up a

21    unit called the Troubled Building Unit.

22        Q.    Okay.  And that -- that was buildings that

23    had some issues with gangs and stuff?

24        A.    Gangs, drugs and guns, yes, sir.

1      Q.   Okay.  And how long did you operate in that

2   unit?

3      A.   Until going into narcotics, so January of

4   2009.  I was there until January of 2009.

5      Q.   And then you went into narcotics?

6      A.   As a sergeant, yes, sir.

7      Q.   And what district or what area?

8      A.   I was the search warrant team.  I did

9   Title 3 Wire Investigations.  I was made the long

10   team.  I stayed there until 2017, October 2017.

11      Q.   And why did you leave there?

12      A.   There was a disagreement about me taking a

13   team to Indianapolis while working on a Title 3

14   investigation.

15      Q.   Okay.  And so were you -- you were

16   transferred out of that?

17      A.   Yes, sir.

18      Q.   Okay.  And then where did you go?

19      A.   I was in the Third District for a period of

20   three weeks.  And then I bid to the Eighteenth

21   District which is downtown.

22      Q.   Okay.  So when you were assigned the Third

23   District, you were assigned as a street sergeant?

24      A.   That is correct.

```
 1        Q.    And then you bid Eighteen, and you got
 2   Eighteen?
 3        A.    That is correct.
 4        Q.    And then you were a street sergeant in
 5   Eighteen, correct?
 6        A.    That is correct.
 7        Q.    And again, tell me when you made sergeant.
 8        A.    March of 2006.
 9        Q.    And now you're currently a lieutenant I
10   understand?
11        A.    Yes, sir.  I made lieutenant on April 16th
12   of this year.
13        Q.    Okay.  Before you joined the Chicago Police
14   Department, do you have any relatives that are
15   Chicago Police Officers?
16        A.    No.  I'm the first one.
17        Q.    Okay.  Do you have any relatives that are
18   in law enforcement?
19        A.    I have an uncle, Peter, who was a West
20   Chicago copper and a Round Lake Beach Police
21   Officer.
22        Q.    Okay.  Since you've been a Chicago Police
23   Officer, either as a patrol officer, a sergeant or
24   as a lieutenant, how many times have you been sued?
```

1        A.   I don't recall the exact number.

2        Q.   Ball park, more than five, less than five?

3        A.   Again, I don't recall.  It would just be a

4   guess on my part.

5        Q.   Give me your best guess.

6        A.   My best guess would be approximately 12

7   times.

8        Q.   Okay.  And of those 12 times, how many of

9   those were for excessive force?

10       A.   Wow, to the best of my recollection, I

11   don't recall -- maybe one would be my guess.  I'm

12   not really sure.

13       Q.   Okay.  And how many were for false arrest?

14       A.   I don't recall.

15       Q.   How many were for an unlawful search?

16       A.   I would -- if I had to guess, I would say

17   that the majority of them were for unlawful search.

18       Q.   I understand.

19            Okay.  And of the -- of those 12

20   lawsuits, approximately how many went to trial if

21   you know?

22       A.   I only recall, to the best of my

23   recollection, one of them going to trial.

24       Q.   And do you recall the name of that case?

1  A. I -- it was the -- I don't recall the name

2 of it. I remember that it was a class action from

3 when the United States invaded Iraq in 2003 with the

4 mass arrest situation downtown.

5  Q. That was by the Peoples Law Office?

6  A. I don't believe the -- it could have been,

7 but I don't recall.

8  Q. Okay. So since you've been a Chicago

9 Police Officer, have you ever been disciplined?

10  A. Yes, I have.

11  Q. And let's start with has there ever been

12 any termination proceedings filed against you?

13  A. No, sir.

14  Q. Have you ever been given time off?

15  A. Yes.

16  Q. Approximately, how many times?

17  A. One time.

18  Q. And what was -- and how many days did you

19 get?

20  A. One day.

21  Q. And what was that for?

22  A. An accidental discharge in my residence

23 with my firearm.

24  Q. Okay. How many -- what -- have you ever

```
1       been reprimanded?

2              A.    Not to my knowledge.

3              Q.    Okay.  How many CRs do you believe have

4       been filed against you by citizens?  Not by other

5       law enforcement officers?

6                    MS. DORY:  We'll object to form.

7                    MR. KULIS:  Q.  If you know.

8              A.    I don't know.

9              Q.    Can you give me a ball park?

10             A.    It would be more than ten.

11             Q.    Okay.  How many CRs have been sustained?

12             A.    Only the one.

13             Q.    And that's the discharge?

14             A.    Yes, that I self-reported.

15             Q.    All right.  Let me ask you, brothers,

16      sisters?

17             A.    I have a sister.

18             Q.    Okay.  Does she live in the Chicago area?

19             A.    Depends on your definition of area.

20             Q.    Well, in the surrounding counties.

21             A.    Then, no.

22             Q.    Okay.  Are you married?

23             A.    I am.

24             Q.    First marriage?
```

```
1        A.    Yes.

2        Q.    And how long have you been married?

3        A.    Since 1998.

4        Q.    Congratulations.

5              Children?

6        A.    Three.

7        Q.    I don't want their names, just give me

8   their ages.

9        A.    The oldest one is 21, the middle guy is 18

10  and the little guy is 16.

11       Q.    Okay.  Other than your position as a

12  lieutenant in the Chicago Police Department, do you

13  have any outside employment?

14       A.    Not at this time.

15       Q.    So at one point, you did?

16       A.    Off and on through the years I've done

17  various side jobs, yes.

18       Q.    What about during the time of this

19  incident?

20       A.    No, I had no other -- I mean, nothing

21  steady or consistent.

22       Q.    Okay.  And I'm going to delve into some

23  questions regarding finances.  And I always tell

24  officers I do apologize, but I've got an obligation
```

1    to my client since we are asking for punitive

2    damages.

3                    I have a right to ask certain questions

4    regarding your financial where with all.

5            MS. DORY:  Greg, would you be willing to

6    accept an affidavit off the record instead of going

7    through this on the record?

8            MR. KULIS:  Yeah.  I'll be a nice guy.

9            MS. DORY:  Thank you, Greg.

10           MR. KULIS:  What goes around comes around.

11                   Q.  So how many years do you have on

12   the job?

13           A.  It will be 26 years on Chicago in

14   January -- on January the 3rd.

15           Q.  So when are you retiring?

16           A.  Well, I just turned 51, so I have four more

17   to go to get the insurance, so that's what I got to

18   stick for.

19           Q.  Yes, I don't know what the age thing was.

20   Okay.

21                   So as a street sergeant, why don't you

22   tell me what your duties are?

23           A.  To supervise the officers that are on the

24   street, to monitor them, give them a advice, respond

```
 1    to their calls when necessary and back them up in
 2    responding to 911 calls.
 3        Q.   Okay.  Did your counsel give you copies of
 4    the exhibits that we were going to use?
 5        A.   I did not receive any copies of exhibits.
 6        Q.   Okay.
 7             MS. DORY:  I can print them if you want me
 8    to, Greg.  I just didn't know if you were going to
 9    share the screen or if you wanted him to have a
10    physical copy.
11             MR. KULIS:  I can try to share the screen.
12    Actually, I did my first Zoom trial last week and
13    had to share the screen.
14             MS. DORY:  That's impressive.
15             MR. KULIS:  Let's go off the record.
16                       (WHEREUPON, a discussion was held
17                        off the record.)
18             MR. KULIS:  Q.  Okay.  I'm going to show
19    you what is marked as Dakuras Exhibit Number 1.
20               Do you see that?
21        A.   Yes, I do.
22        Q.   Okay.  And I will try to go through this as
23    quickly as possible.  This purports to be Defendant
24    Sergeant Dakuras's Amended Answer to the Complaint
```

```
1    which is -- which purports to be an answer to the

2    allegations we have made.

3                 Is this your answer?

4    A.    Is there a signature on this page?

5    Q.    No, there is not.

6                 If you want to take a look at it and

7    read it over and I'm going to ask you a few

8    questions regarding that.

9    A.    Okay.  I believe this is a document that my

10   attorney completed for me.

11   Q.    I understand.  But this also is a document

12   that is filed on your behalf as a defendant in this

13   case.

14                So I'm going to ask you:  Do you adopt

15   these answers as being true and accurate?

16                And you can take the time out and read

17   it.

18   A.    Okay.  Am I allowed -- it's not allowing me

19   to scroll down or manipulate the document.  Do you

20   have to manipulate it for me?

21   Q.    Yes, I'm trying to do that now.

22        MR. KULIS:  I know how to manipulate it

23   down, but I don't know if he can.

24        MS. DORY:  No, he can't.
```

1            THE WITNESS:  Okay.

2            MR. KULIS:  Q.  Why don't you read it and

3     tell me when to go to the next page?

4        A.    Okay.  You want me to read it out loud?

5        Q.    No.  I just want to know if you adopt this

6     answer as being true and accurate?  And if you want

7     to read it, you have the right to read it if you

8     have not seen it.

9        A.    Okay.  Well, like I said, I've seen it.

10    This just -- this is something that the attorney

11    prepared for me.

12       Q.    Well, and again, I'm not going to attorney

13    client privilege, but, you know, your attorney, I

14    assume has drafted this based on conversations and

15    meetings with them.

16            So I just want to make sure that it is

17    true and accurate to the best of your knowledge.

18    And if it is not, you will tell me.

19       A.    Okay.  Sounds good.

20       Q.    So --

21            MS. DORY:  So we're on the second page and

22    let me know when you want us to scroll.

23            THE WITNESS:  You are going to have to do

24    me a huge favor and make the font a little bit

```
1      bigger.
2                MS. DORY:  Okay.
3                THE WITNESS:  That's perfect.  Thank you.
4                     (WHEREUPON, witness peruses
5                      document.)
6                MR. KULIS:  Q.  Just tell me when you want
7      me to scroll down.
8           A.   Okay.  I'm at six right now, so --
9                     (WHEREUPON, witness peruses
10                     document.)
11               THE WITNESS:  Okay.  You can go down.  I'm
12     past ten.
13                    (WHEREUPON, witness peruses
14                     document.)
15               THE WITNESS:  Okay.  I'm past 16.
16                    (WHEREUPON, witness peruses
17                     document.)
18               THE WITNESS:  Past 19.
19                    (WHEREUPON, witness peruses
20                     document.)
21               MR. KULIS:  Q.  Are you okay there?
22          A.   I am good.  So far it looks good.  Okay
23     I'm --
24          Q.   I've got you.
```

1          A.    Excellent, right there.

2                      (WHEREUPON, witness peruses

3                       document.)

4          THE WITNESS:  Okay.  Past nine.

5                      (WHEREUPON, witness peruses

6                       document.)

7          THE WITNESS:  Past 13.

8                      (WHEREUPON, witness peruses

9                       document.)

10         THE WITNESS:  Okay.  Past Count 3.

11                     (WHEREUPON, witness peruses

12                      document.)

13         THE WITNESS:  Past 20.

14                     (WHEREUPON, witness peruses

15                      document.)

16         THE WITNESS:  Past 16.

17         MR. KULIS:  We're almost finished I

18    believe.

19                     (WHEREUPON, witness peruses

20                      document.)

21         THE WITNESS:  Okay.  Past 20.

22         MR. KULIS:  Q.  This goes to the City of

23    Chicago, so it really doesn't matter.

24                     But I'll go to the affirmative defenses

```
 1      if you want to --
 2           A.   Okay.
 3                          (WHEREUPON, witness peruses
 4                           document.)
 5                THE WITNESS:  Past paragraph 2.
 6                          (WHEREUPON, witness peruses
 7                           document.)
 8                THE WITNESS:  Past Paragraph 4.
 9                MR. KULIS:  Q.  All right.  Almost
10      finished.
11                          (WHEREUPON, witness peruses
12                           document.)
13                THE WITNESS:  Okay.  Past 7.
14                          (WHEREUPON, witness peruses
15                           document.)
16                THE WITNESS:  Okay.  I'm all the way
17      through it then.
18                MR. KULIS:  Q.  Okay.  So once again, this
19      is what purports to be your Amended Answer to the
20      Complaint.
21                     Does this truly and accurately reflect
22      your answer to the allegations that my client has
23      made?
24           A.   Yes, it does.
```

1      Q.   And you verify this answer as being true

2  and accurate?

3      A.   Yes.

4      Q.   Okay.  I'm going to go to -- I'm going to

5  show you what is marked as Dakuras Deposition

6  Exhibit Number 2 which purports to be Lieutenant

7  Dakuras's Response to Plaintiff's First Set of

8  Interrogatories.  That is an 19 page document.

9              And if you could look at -- let me get

10  down to it, it should be the last page -- there is

11  no verification.

12              Okay.  Did you ever -- I'm going to

13  show you -- have you ever seen this document I've

14  got in front of you?

15     A.   Yes.  Yes, sir.

16     Q.   Okay.  And those are the written questions

17  that we have posed to you to answer and you have

18  provided answers to us; correct?

19     A.   That is correct.

20     Q.   And you signed the verification which I can

21  show you in a minute --

22     A.   I remember signing a verification.

23     Q.   Okay.  Okay.  And those answers are true

24  and accurate; correct?

1      A.    Yes, they were.

2      Q.    Okay.  Let's stop share.

3          So drawing your attention to June 23rd,

4 2019, you were working as a street sergeant in

5 Eighteen; correct?

6      A.    Yes, sir.

7      Q.    And that -- that includes the address that

8 Jeanette Bass lived at on East Chestnut; correct?

9      A.    That is correct.

10     Q.    And what is were your shift hours that day?

11     A.    I believe I was 1820, which at that time it

12 would have started at 3:00 in the afternoon and gone

13 to 12:30 at night.

14     Q.    Okay.  Prior to that -- this date, had you

15 ever met Jeanette Bass?

16     A.    No, I had not.

17     Q.    Did you know anything of Jeanette Bass?

18     A.    I did not.

19     Q.    Had you ever been to her building before

20 for any call for assistance?

21     A.    Not to my recollection.

22     Q.    Okay.  So on that date, there was a time

23 where you actually went to her address which was 260

24 East Chestnut; correct?

1     A.    I was dispatched to that address, yes.

2     Q.    Okay.  And that was my next question.

3           Why did you go there?

4     A.    I received a 911 call from a dispatcher

5     advising me that there was a request for a

6     supervisor at that location.

7     Q.    Did that -- did dispatch tell you anything

8     other than that?

9     A.    Nope, that's all they told me.

10    Q.    Okay.  And when you got there, did you know

11    what unit you were to go to?

12    A.    Yes, I did.

13    Q.    And when you arrived at the building, what

14    action did you take?

15    A.    I activated by body worn camera so that the

16    entire event would be record.

17           Do you want me to fast forward to

18    knocking on Mrs. Bass's door or do you want me

19    to --

20    Q.    Okay.  Did you have to check in at the door

21    in the building?

22    A.    I believe I had to give a head nod to the

23    doorman because those buildings, you -- he has to

24    open that outer door for me to get in.

1          So I needed to give him a head nod or I

2     might have even told him what apartment number I was

3     going up to.

4          Q.   Okay.  Did you tell him you were going to

5     see Jeanette Bass?

6          A.   I don't recall.

7          Q.   Okay.  And when you went there, were you

8     alone?

9          A.   Yes, because the Chicago Police Department

10     has a sergeant -- as a field sergeant, you work

11     alone.

12          Q.   Okay.  But since you are going into a

13     strange building and a strange apartment, did you

14     call for any back up?

15          A.   That's not typical in this case.  It was

16     just a request for a supervisor.  It's not -- it's

17     supposed to be a minor question usually in my

18     experience these types of call.

19          There was no indication that this was

20     an in-progress call or anything other than answering

21     a question type call.

22          Q.   Okay.  So you went up to her apartment, you

23     knocked on the door; correct?

24          A.   That is correct.

1       Q.   Let me -- before we get into the incident,

2   prior to coming here today, you met with your

3   counsel?

4       A.   Yes, I did.

5       Q.   Approximately how many times to prepare for

6   your dep?

7       A.   To the best of my recollection, two or

8   three times.

9       Q.   Okay.  And approximately how much time in

10   total did you spend with your counsel preparing for

11   this deposition today?

12       A.   Again to the best of my recollection,

13   approximately two, three hours.

14       Q.   Okay.  And could you tell us what if

15   anything you reviewed to prepare yourself for this

16   deposition?

17       A.   I reviewed the body worn camera.

18       Q.   Anything else?

19       A.   That's all I recall.

20       Q.   Did you do any reports regarding this

21   incident?

22       A.   I did not, no.

23       Q.   No supplemental report?

24       A.   Not that I did, no.

```
 1          Q.   No to/from to any supervisor?

 2          A.   No.

 3          Q.   Okay.  So you knocked on Jeanette Bass's

 4     door.

 5                    And tell us what occurred at that

 6     point?

 7          A.   She responded -- well, I shouldn't say she

 8     responded.  A voice through the door responded that

 9     she was getting dressed.

10          Q.   Okay.  What occurred next?

11          A.   At some point, I'm greeted by Mrs. Bass or

12     Ms. Bass.  I advised her that I was -- had my body

13     camera activated and that all our conversations

14     would be audio and video recorded.

15          Q.   And what was her response if anything to

16     that?

17          A.   She requested that she audio and video

18     record me also.

19          Q.   And did you have any problem with that?

20          A.   Not at all.

21          Q.   Well, what occurred then?

22          A.   She invited me in.  I asked her if she

23     wanted me to shut the door.  I don't remember what

24     her response was to that.  I ended up shutting the
```

1    door behind me, though.

2         Q.   Okay.  And what occurred -- what was said

3    or done at that point?

4         A.   She showed me a water stain on the ceiling

5    and alleged that she had a broken water main in her

6    apartment.

7         Q.   Okay.  And what was your response to that?

8         A.   All I did is listen and I observed and let

9    her continue with what exactly she was requesting me

10   to do.

11        Q.   Okay.  And what did you learn that she was

12   requesting you to do?

13        A.   She wanted me to write an additional report

14   for her after she already had a report that was

15   authored for her.

16        Q.   So she told you that the police had been

17   there previously?

18        A.   She told me a lot of things.  She kept

19   jumping around.  She was taking four or five

20   instances and kept telling me different parts of a

21   story.

22              There was no time frame that I was

23   readily available to follow.  She was like taking

24   several stories and combining them together.  It was

1   very confusing in my mind.

2       Q.    And you said four or five stories, what do

3   you mean by that?

4       A.    She talks about an incident where the

5   police came and gave her the wrong report.  She gave

6   me an incident where a lady came into her apartment

7   and was video tapping her while she was naked.

8             Then she went on to say that she had a

9   broken water main.  She just kept jumping around and

10  playing different recordings for me instead of

11  consistently going with the story from beginning to

12  end.

13      Q.    Well, did you tell her you couldn't follow

14  her?

15      A.    I just let her talk and tried to have her

16  explain things the way she wants to explain them.

17      Q.    Okay.  But you're telling us today that you

18  were -- that you had problems following the time

19  line?

20      A.    I'm sorry, you timed out or something.  I

21  can't hear you.  You're like frozen.  I didn't hear

22  what you said, sir.

23      Q.    Okay.  I think you just told us that you

24  had a problem following her with the time line.

1     A.   Yes, with all of her stories that she kept

2    jumping around with them, yes.

3     Q.   Did you tell her you couldn't follow her

4    time line?

5     A.   No, I never told her that.

6     Q.   Okay.  Why not?

7     A.   I don't know.  I just didn't.

8     Q.   Okay.  So you just listened to her,

9    correct?

10     A.   That is correct.

11     Q.   And she told you that she had filed the

12   report, but the report was inaccurate or incorrect?

13     A.   That is correct.  But she have did not have

14   the report.

15     Q.   Did you ask her for the report?

16     A.   I did.

17     Q.   Did you ask her for the report number?

18     A.   I did not ask her for the report number.

19   She held up a sheet of paper which is known as a

20   Victim Information sheet which had the RD number on

21   the report.

22     Q.   Okay.  And did you make any effort to pull

23   that report up on your phone?

24     A.   We do not have that capability.

1          Q.    Okay.

2          A.    At least we didn't in Eighteen at that

3     time.

4          Q.    Did you ask her what she wanted you to do

5     regarding the that report?

6          A.    No, I did not.

7          Q.    Okay.  So what was your intent at that time

8     in communicating with Ms. Bass?

9          A.    My intent was to explain to her that a

10    report had been made and the policy and procedure of

11    the Chicago Police Department is to contact the

12    Detective Division and have them amend the

13    classification or add something to the report.

14         Q.    And isn't it a fact that she told you she

15    was specifically instructed to call 911 to amend

16    that report?

17         A.    That's what she alleged.

18         Q.    And did she actually tell you that she

19    spoke to a Sergeant Seng, S-E-N-G, who instructed

20    her to do so?

21         A.    Again, that is what she alleged.

22         Q.    And did you know who Officer Seng was --

23    Sergeant Seng was at the time?

24         A.    I do.

1      Q.   And he works in Eighteen?

2      A.   He does.

3      Q.   Are you and he friends?

4      A.   We're acquaintances, work friends, I guess.

5      Q.   Okay.  Have you ever socialized with him

6   outside the job?

7      A.   I've never been to his house.  And he's

8   never been to my house.

9      Q.   Okay.  Well, beyond that, have you ever

10  socialized with him outside the job?

11     A.   I guess at the -- the only exception would

12  be at the District Christmas party or retirement

13  party.  Other than that, no.

14     Q.   Okay.  You've never gone out for a beer

15  with him after work or something?

16     A.   Unless it was a social gathering through

17  work, no.

18     Q.   Okay.  So did you somehow speak to Officer

19  Seng from Ms. Bass's apartment?

20     A.   I called him on the department phone.

21     Q.   And when you say department phone, was that

22  a phone issued by the Chicago Police Department?

23     A.   Yes.  We would -- so the policy is at that

24  time, you would sign out a phone at the beginning of

1    your tour every day from the radio room.  You sign

2    out a taser, a radio and a phone.

3        Q.    Every officer or just sergeants?

4        A.    No, every officer.

5        Q.    Okay.  So you called the district and spoke

6    to Seng?

7        A.    That is correct.

8        Q.    And what did you say to Seng and what did

9    Seng say to you?

10       A.    Well, I attempted to get through what

11   exactly Sergeant Seng had told Ms. Bass, and she

12   kept interrupting me.

13             And it was, in my opinion, futile to

14   keep the conversation going.  So I ended the

15   conversation and told Ms. Bass that my decision had

16   been made, she needs to call the detectives.

17       Q.    What did Seng say to you?

18       A.    He couldn't even explain it to me because

19   Ms. Bass kept overriding my conversation, wasn't

20   allowing me to concentrate on asking him specific

21   questions.

22       Q.    Are these conversations taped by the

23   Chicago Police Department?

24       A.    On my body camera, yes.  But otherwise --

```
1      if the phone line is recorded, not to my knowledge.
2           Q.   Okay.  So we can hear -- so I know we can
3      hear what you are saying, but we obviously can't
4      hear what Seng was saying, correct?
5           A.   I don't believe you can on the body cam at
6      all.
7           Q.   Unless it's on a speaker phone, correct?
8           A.   Again, I have no knowledge of that
9      capability.
10          Q.   Did Seng tell you that he had instructed
11     her to call 911?
12          A.   No, he did not.
13          Q.   Did Seng tell you to tell her to call a
14     detective?
15          A.   No, he had not.
16          Q.   Did you tell her to call a detective?
17          A.   I did.
18          Q.   Okay.  So after you did that, since you
19     weren't going to do any report, did you leave?
20          A.   I attempted to.
21          Q.   Okay.  So you told her have a nice day and
22     did you walk out?
23          A.   I was on my way out in the door.
24          Q.   All right.  And what occurred?
```

1      A.    She demanded that I come back and identify

2    myself with my name, so that's what I did.

3      Q.    She wanted your name.  So this is when

4    you -- after you were about ready to leave is when

5    she first asked you for your time?

6      A.    She asked me for my name several times.

7    But when I was in the process of leaving, she called

8    me back into the -- I would characterize that on the

9    body camera as the, like front room, dining room

10    area where she's sitting at.

11      Q.    Okay.

12      A.    So she called me back into that area, and

13    then she took a photo of me so she would have my

14    name.

15      Q.    Okay.  So at that point after she did that,

16    did you say, ma'am, have a nice day and walk out and

17    leave?

18      A.    I did not.

19      Q.    Why not?

20      A.    Because based upon that time with the

21    condition of the apartment, her raising her voice,

22    she seemed very agitated.

23            At this point, it began dawning on me

24    that she was in need of mental health intervention.

```
 1          Q.   Okay.  So -- and I -- that answers the
 2     question I was going to ask you later.
 3                    So at what point did you determine that
 4     she needed some type of mental health intervention?
 5          A.   At the end there where she asks me for my
 6     name, which I had already given to her, she had
 7     already established that she was already video
 8     taping me.
 9                    So when she calls me back for that,
10     based upon the totality of all the situation, that's
11     when I realized that she needed somebody else with
12     more training than me to evaluate her.
13          Q.   So she was upset, right?
14          A.   Yes, she was.
15          Q.   This is -- is this the first time as a
16     Chicago Police Officer you've ever confronted anyone
17     that was upset?
18          A.   No, it's not.
19          Q.   Is this the first time that you ever had
20     anyone committed in a -- in a psychological ward of
21     a hospital?
22               MS. DORY:  Objection to form.
23               MR. KULIS:  Q.  Go ahead and answer.
24          A.   I've done it in the past, but I don't
```

1    remember how many times.

2        Q.  Well, thank you because that was my next

3    question.

4            How many times have you ever had

5    somebody committed into a psychological institution?

6        MS. DORY:  I'm going to object to form

7    again.

8        THE WITNESS:  And I have to answer?

9        MR. KULIS:  Q.  Yes.

10     A.  And then my answer is I do not recall.

11     Q.  More than five times?

12     A.  Again, I don't recall.

13     Q.  More than ten times?

14     A.  And again my answer is going to stand with

15    I don't recall.

16     Q.  More than 15 times?

17     A.  Again, my answer is going to stand that I

18    do not recall.

19     Q.  So when people are acting upset, is your

20    answer to have them committed into a psychological

21    institution?

22        MS. DORY:  Objection to form, speculation

23    and -- that's it.

24        MR. KULIS:  Q.  Psychiatric institution

1    rather, sorry.

2         A.   So to answer that question, the process is

3    not a psychiatric institution.  It would be to the

4    emergency room of the hospital where they would be

5    evaluated and then the medical professionals would

6    make that determination.

7         Q.   Okay.  But is that your procedure that when

8    someone is upset, you have them admitted into a

9    hospital for a psychiatric evaluation?

10        MS. DORY:  Objection to form, incomplete

11   hypothetical.

12        MR. KULIS:  Q.  Is it, Officer?

13        A.   I haven't -- I've dealt with many people

14   who were upset, and I did not have them taken to the

15   hospital for a psychological evaluation.

16        Q.   But you've also admitted to me that on

17   occasions -- we don't know the number -- you've had

18   people admitted into a hospitals for psychiatric

19   evaluation?

20        A.   Correct.  People who are in mental health

21   crisis that needed the help, I would like to feel

22   that I gave them the help that they needed.

23        Q.   Okay.  And what training do you have in a

24   psychiatric evaluation?

1      A.   In a psychiatric evaluation, none.

2      Q.   Okay.  Has the police department ever

3  offered you any type of seminar or anything on

4  psychiatric -- recognizing psychiatric issues?

5      A.   I've had.

6           MS. DORY:  Objection to form.

7                Sorry.  Go ahead, Lieutenant Dakuras.

8           THE WITNESS:  I've had suicide prevention

9  training.  I've also had autism awareness training.

10          MR. KULIS:  Q.  Did you believe she was

11  autistic?

12     A.   I have no basis to diagnosis anybody.  I --

13  I don't know if she's autistic or not autistic.

14     Q.   Did you believe she was suicidal?

15     A.   Yes, I did.

16     Q.   So tell me what gives you -- what basis --

17  you determined -- what facts support your basis to

18  believe that she was suicidal?

19     A.   I asked her if she was in crisis, and she

20  told me she was.

21     Q.   Okay.  And when did you ask her if she was

22  in crisis?

23     A.   I would have to look at the exact moment in

24  the body camera to get the time.  It was on the body

1    cam video.

2        Q.    And when you said, are you in crisis, what

3    did you mean by that?

4        A.    Based upon my training, that is a question

5    that you ask, and that if someone is going to harm

6    themselves or they are in need of mental health that

7    they would usually tell you that they needed it.

8              And she responded in the affirmative

9    which left me no choice but to get her the medical

10   attention she deserves.

11       Q.    Well, your definition and someone else's

12   definition of crisis may be different; correct?

13             MS. DORY:  Objection, speculation.

14             MR. KULIS:  Q.  I mean, don't you agree

15   with that?

16       A.    I'm sorry, can you are please repeat the

17   question?

18       Q.    Sure.  Your definition and someone else's

19   definition of crisis may be different; correct?

20             MS. DORY:  Same objection.

21             THE WITNESS:  I guess it could be.

22             MR. KULIS:  Q.  Well, if you go on to a

23   scene and someone is about ready to deliver a baby,

24   they are in crisis, but they don't need psychiatric

1    evaluation; do they?

2           MS. DORY:  Objection, speculation,

3    incomplete hypothetical, form.

4           MR. KULIS:  Q.  Go ahead and answer, if you

5    can.

6        A.    In that hypothetical situation without

7    knowing all the facts from what you're telling me,

8    it wouldn't appear in that scenario that that mother

9    delivering a baby would need a psychiatric

10   evaluation.

11       Q.    But she's in crisis because she's about

12   ready to have a baby, right?

13          MS. DORY:  Same objections.

14             Go ahead, Lieutenant.

15          MR. KULIS:  Q.  Right?

16       A.    That would not be my definition of having a

17   crisis.

18       Q.    Okay.

19       A.    My wife had three kids and when she had

20   them, she didn't appear to be in crisis on the birth

21   of any of the three of them.

22       Q.    Well, I assume she was at the hospital when

23   she delivered them; right?

24       A.    Yes.

1  Q.  Okay.  What's your definition of the word

2  crisis?

3  A.  My definition of the word crisis is

4  somebody that's in need of medical or mental health

5  intervention.

6  Q.  Okay.  But did you explain that to Jeanette

7  Bass that that was what your understanding of the

8  word crisis is when you used that word?

9  A.  I did not.

10  Q.  Okay.  And when you asked her if she was in

11  crisis, she said yes?

12  A.  She did.

13  Q.  People that are upset believe they are in

14  crisis; correct?

15  MS. DORY:  Objection, speculation.

16  THE WITNESS:  In my experience, every

17  person that I've asked that was in crisis that

18  answered, was in need of medical help.

19  MR. KULIS:  Q.  And who made that

20  determination that they were in need of medical

21  help?

22  A.  The doctors at the emergency room.

23  MS. DORY:  Objection, speculation and form.

24  MR. KULIS:  Q.  And how many times was

1      that?

2              A.    Again, I don't recall.

3              Q.    Under the Chicago Police Department rules

4      and regulations and procedure and general orders,

5      when you decide to have someone admitted into the

6      hospital for a psychiatric evaluation, is there any

7      type of procedure or checklist that you have to go

8      through?

9              A.    First all, I'm not an expert in the general

10     orders or the rules and regulations of the police

11     department.

12                   I can attempt to answer it to the best

13     of my understanding of it.

14             Q.    Well, you are a lieutenant now, so you are

15     not a rookie patrol officer; correct?

16             A.    I am a lieutenant.  I am not a rookie

17     police officer.

18             Q.    Okay.  So I -- so what -- go ahead and

19     answer that question.

20             A.    To my knowledge, the -- there is no

21     checklist.  It is a -- if someone tells you that

22     they are in need of anything, it is our duty and

23     responsibility to provide that for them especially

24     in a mental health crisis situation.

1          Q.    And is there any type of report that you

2     should be filling out to indicate to the department

3     that you had someone involuntarily taken to a

4     hospital?

5          A.    A report was done, just not by me.

6          Q.    Okay.  Why didn't you do the report?  You

7     are the one that made that decision.

8          A.    Because I'm the supervisor.

9          Q.    So you passed that off to somebody else?

10         A.    That is correct.

11         Q.    Okay.  But the person that did the report,

12    did not have the knowledge that you did; correct?

13         A.    I related it to Officer Palos.

14         Q.    Officer who?

15         A.    Palos, P-A-L-O-S.

16              MS. DORY:  Hey, Greg, can we take a quick

17    break?

18                   (WHEREUPON, a short recess was

19                    taken.)

20              MR. KULIS:  Jodi, what was my last

21    question?

22                   (WHEREUPON, the last question and

23                    answer were read back.)

24              MR. KULIS:  Okay.

1                    Q.  Did you ask Jeanette Bass if she

2    wanted medical help?

3         A.    I don't recall.

4         Q.    Did you -- did you ask her if she needed

5    psychiatric help?

6         A.    I wouldn't -- I didn't use that direct

7    term.

8         Q.    Did -- was she bleeding?

9         A.    No, she was not.

10        Q.    Well, did you see any injuries on her body?

11        A.    I did not.

12        Q.    Did she have weapons in her hand?

13        A.    No, she did not.

14        Q.    Did she ever --

15        MS. DORY:  Objection to form.

16        MR. KULIS:  Q.  Did she ever threaten to

17   kill herself?

18        A.    No, she did not.

19        Q.    Did she ever threaten to harm herself?

20        A.    Well, running up and down stairs with no

21   shoes on could be deemed a harm to herself.

22        Q.    Okay.  So based on running up and down the

23   stairs with no shoes, you believed that she was

24   suicidal as a result of that action?

1      A.    Based upon the totality of the entire --

2            MS. DORY:  Objection to form.

3            Go ahead, Lieutenant.

4            THE WITNESS:  Based on the totality of the

5      entire 20 minutes that I spent with her, the

6      disarray of her apartment, her telling me that she

7      was in crisis, her telling me that she suffered from

8      PTSD, from her pushing me and running out of her

9      apartment, the way she was yelling at me, her voice

10     inflection, based upon all those facts, I felt that

11     she needed an intervention and she needed medical

12     attention.

13           MR. KULIS:  Q.  Well, let me back up

14     on that because you said you believed she was

15     suicidal.

16           So what facts do you -- what facts can

17     you give me to make you believe -- that made you

18     believe she was suicidal?

19     A.    All of the facts, all -- everything that I

20     just alleged.  In my heart, I believed that if I

21     left her, God forbid, she would have harmed herself.

22           Whether that means jumping out a window

23     or harming herself with a knife in the kitchen or

24     whatever it was, she appeared that distraught.

1              And as a Christian and if it was one of

2    my family members, I had to get her the medical help

3    that she needed.

4         Q.   What does being a Christian have to do with

5    it?

6         A.   It's a fear of God.  You do what's right.

7    It's the golden rule.  You treat others as you would

8    want to be treated in that situation.

9         Q.   Okay.  Was she crying?

10        A.   No, she was not.

11        Q.   Did she use any foul language against you?

12        A.   Not that I recall.

13        Q.   Where there any weapons on the counter that

14   you noticed that you felt that she was going to grab

15   and either attack you or attack herself?

16        A.   There were knives.  She had knives on the

17   counter, there were -- when she went to the kitchen

18   area.  Based on my training and experience, that was

19   a fear of mine.

20             She obviously didn't attempt to go for

21   any of those items.  But again based upon my

22   training, I have to protect myself and keep her from

23   harming herself.

24        Q.   Okay.  And you said her apartment was

1    messy?

2        A.   From the video, I think it's fairly clear

3    that there is papers strewn all over the floor.

4        Q.   Let me show you my office.

5             So there were papers on the floor,

6    right?

7        A.   Yes.

8        Q.   So that means that she needs to go in for a

9    psychiatric evaluation?

10       A.   Again, it's not --

11           MS. DORY:  Objection to form.

12           Go ahead, Lieutenant.

13           THE WITNESS:  Again, it's not the papers on

14   the floor or the dirty dishes in the sink or the

15   fact that she wants to see me, request a supervisor

16   and then she's not dressed when I get there, it's

17   her telling me she's in crisis.  It's everything.

18           When you take everything the entire

19   time that I'm there with her, that's what gave me

20   the determination that she needed help.

21           MR. KULIS:  Q.  So where did you get this

22   education that you are relying on to make that

23   determination?

24       A.   It would just be upon my experience and

1    training as a police officer and as a human being.

2        Q.   Have you had any intervention type

3    training?

4        MS. DORY:  Objection to form.

5        THE WITNESS:  I have -- I do not have --

6    there is a class that I have not received it's

7    called Crisis Intervention Training.  I have not had

8    that training.

9          So I guess my answer would be I have no

10    formal intervention training.

11        MR. KULIS:  Q.  Now, after you decided that

12    you weren't going to do a report, why -- she asked

13    you to leave the apartment; right?

14        MS. DORY:  Object to form.

15        THE WITNESS:  Yeah, I don't understand the

16    question.

17        MR. KULIS:  Q.  Well, she wanted a

18    supplemental report, correct, that she previously

19    made with the police department?

20        A.   If that's what you are telling me now she

21    wanted, I was unable to get that out of her at that

22    time.

23          And then the other thing would be which

24    incident specifically would she want a supplemental

1    report for.

2         Q.   Did you ask her?

3         A.   I was just listening to her.  I was --

4         Q.   Again, Officer, when you interview -- when

5    you stop people on the street when you interject --

6    interact with people, again, you -- I understand you

7    need to listen, but don't you believe you need to

8    ask the question?

9              MS. DORY:  Objection to form.

10             THE WITNESS:  I attempted to ask her

11   questions to clarify and her jumping around from

12   different stories, she wasn't making any sense to

13   me.

14             I attempted to further clarify by

15   contacting Sergeant Seng, and that just only

16   agitated her and had her to continue to yell at me

17   and not allow me to get to the bottom of what

18   exactly she was trying to explain to me.

19             MR. KULIS:  Q.  What was she yelling when

20   you were --

21        A.   I don't remember the exact words.  But

22   again, it's all recorded on the body worn camera.

23        Q.   I understand that.

24             But why didn't you just inquire -- if

```
 1    you knew Seng, so you knew -- I'm sorry.  I'm

 2    retract that.

 3              At this point, she mentions a sergeant

 4    that you personally know and work with; correct?

 5         MS. DORY:  Objection to the form.  That's a

 6    misrepresentation of the testimony.

 7         MR. KULIS:  Q.  On the date of this

 8    incident, you knew who Sergeant Seng was; right?

 9         A.   Yes.

10         Q.   And you knew him, right?

11         A.   Yes.

12         Q.   And when she mentioned Sergeant Seng, you

13    felt that you -- she was probably -- you were

14    probably -- she was probably talking about the same

15    person you know at the Chicago Police Department;

16    correct?

17         A.   That is correct.

18         Q.   And you called Sergeant Seng and he

19    acknowledged that he had spoken to her; correct?

20         A.   I don't know if we got that far into the

21    conversation.

22         Q.   And you hung up on him or did he hang up on

23    you?

24         A.   I don't recall.
```

1      Q.    And did you ask her why she called 911 for
2    a supervisor?
3      A.    I believe I did when I first walked into
4    her apartment.
5      Q.    Okay.  And you indicated she started
6    talking about a bunch of different topics; correct?
7      A.    And playing a bunch of various phone
8    recordings, yes.
9      Q.    And did you ask her any questions regarding
10   the phone recordings or what report she was speaking
11   of?
12     A.    My recollection is every time I attempted
13   to contact her, she would talk over me and wouldn't
14   allow me to get a word in or ask any questions.
15     Q.    So when people talk over you, you send them
16   to the psych ward?
17          MS. DORY:  Objection, form.
18          MR. KULIS:  Q.  I'm asking you.
19     A.    Can you please -- I don't understand the
20   question.
21     Q.    Sure.  You said she was talking over you.
22          So when people talk over you when you
23   interact with them as a police officer, is that when
24   you decide that they are in crisis and they need to

1    go to a psych ward?

2         MS. DORY:  Objection to form.

3         THE WITNESS:  And based upon the way you

4    are asking the question, the answer to that would be

5    no.

6         MR. KULIS:  Q.  Okay.  So she asked you to

7    leave, and you told her you are not going to leave;

8    right?

9    A.    Because she had already informed me she was

10   in crisis, so I have an obligation where I can't

11   leave her.

12   Q.    But did you ask her if she wanted to be --

13   seek counsel from a medical doctor?

14   A.    No.

15   Q.    Did you ask her if she wanted to go to the

16   hospital?

17   A.    No.

18   Q.    Under the Mental Health Act, isn't it an

19   obligation to ask people first do you want to be --

20   to seek psychiatric help at a hospital or do you

21   want me to take you to the hospital?

22   A.    Again, I'm by no means an expert or have

23   formalized training in mental health.

24         However, my understanding is when

1    someone identifies that they are in crisis, I have

2    an obligation to get them the medical help that they

3    need.

4        Q.   Okay.  And then you acted as the doctor and

5    had her involuntarily committed over at

6    Northwestern; correct?

7            MS. DORY:  Objection to form.

8            THE WITNESS:  I am not a doctor, and I

9    didn't act in that manner at all.

10          MR. KULIS:  Q.  Do you seek out any help by

11    asking any people for some advice as to what to do?

12        A.   I don't understand the question.

13        Q.   Did you call your department and say, you

14    know, hey, what should I do with this gal?

15        A.   No.  I deferred to the Chicago Fire

16    Department ambulance personnel and to the emergency

17    room staff at Northwestern Hospital.

18        Q.   So before you called -- before you called

19    other police department -- other police officers,

20    did you call Northwestern Hospital?

21        A.   I did not call Northwestern Hospital.

22        Q.   Oh.  So you didn't seek out any advice from

23    any medical staff at Northwestern Hospital; correct?

24            MS. DORY:  Objection to form.

```
 1                    MR. KULIS:  Q.  It calls for a yes or no.
 2           A.    Me personally, no, I did not call them.
 3           Q.    Okay.  And since you knew that somebody
 4      from the police department had already had some
 5      interaction with her, you didn't follow up with
 6      Sergeant Seng; did you?
 7           A.    I attempted to follow up with Sergeant
 8      Seng.  Ms. Bass did not allow me to.
 9           Q.    Well, she didn't take the phone out of your
10      hand, did she?
11           A.    No, she did not take the phone out of my
12      hand.
13           Q.    She never said don't talk to Seng; did she?
14           A.    She never said don't talk to Seng.  She
15      just talked offer me and became loud and irate and
16      wouldn't allow me to have a coherent conversation so
17      I could comprehend what Sergeant Seng was telling
18      me.
19           Q.    Well, what do you mean she was loud and
20      irate?
21           A.    Again, on the body camera, I wasn't able to
22      ask Sergeant Seng questions or get to the bottom
23      exactly of what she was trying to do.
24           Q.    Why weren't you?
```

1     A.   Because Ms. Bass was irate and yelling and

2    talking over me.

3     Q.   I think I looked at the body -- I think I

4    watched the tape once or twice.  And at any point in

5    time, did you go to Ms. Bass and say, Ms. Bass, will

6    you just hold on one second, I am talking to

7    Sergeant Seng right now time?

8     A.   To the best of my recollection I believe my

9    words were, I called her by her first name,

10   Jeanette, and I said I'm on the phone trying to talk

11   and she refused to allow me to continue that

12   conversation.

13    Q.   Did you say to her, Jeanette, could you

14   just be quiet a second, I'm trying to listen to

15   Sergeant Seng right now or something to that effect?

16    A.   I never used the words, please be quiet,

17   I'm trying to talk to Sergeant Seng, no.

18    Q.   Or anything to that effect?

19    A.   I believe I said I'm trying to have a

20   conversation, Jeanette, let me have a phone

21   conversation or something to that effect.

22          So I didn't use your exact words.  But

23   I used very similar words to try to convey that I

24   was attempting to help her situation and get to the

1    bottom of it.

2        Q.   Okay.  So I want to ask you:  At what point

3    in time did you determine -- wait one second.

4              Why didn't you step out of the -- why

5    didn't you step out of the unit and talk to Seng?

6        A.   My fear was had I left the unit, the door

7    would have been locked behind me.  And now if I have

8    to go in and give her aid, I'm going to have to

9    force entry and it would have created more problems.

10        Q.   Did you offer to Jeanette to speak to

11   Sergeant Seng?

12        A.   No, I did not.

13        Q.   So at what point in time did you determine

14   that you were going to have her committed at

15   Northwestern?

16        A.   Well, I hadn't made a determination that

17   she was going to be comitted.  I just made a

18   determination that she needed an evaluation which is

19   the point that she tells me she's in crisis.

20        Q.   So the minute she said I'm in crisis --

21   what was her response when you asked her are you in

22   crisis?

23        A.   I asked her if she -- I was trying to very

24   kindly ask her if she was under the treatment of a

1     doctor or if she was under any -- on any medication.

2          Q.    And what was her response?

3          A.    She told me she does not take any

4     medication and she was not under the treatment of a

5     doctor.

6          Q.    Okay.  Did you ask her if she wanted to see

7     a doctor?

8          A.    I did not.

9          Q.    Did you ask her if she wanted to go to the

10    emergency room?

11         A.    I did not.

12         Q.    Did you ask her if she -- if you can call a

13    friend or a relative?

14         A.    I did not.

15         Q.    Did you try to calm her down?

16         A.    To the best of my ability.

17         Q.    Did you say, Jeanette, what is the problem

18    here?

19         A.    I did not use those words.

20         Q.    Anything like those words?

21         A.    I believe I did.

22         Q.    Okay.  What words do you believe you used

23    to calm her down?

24         A.    I believe I told her repeatedly, Jeanette,

1    calm down.  I attempted to use my calmest voice that

2    was available to me.

3        Q.    Okay.  Well, you're pretty calm right now,

4    but I don't think those -- you -- are you saying

5    that your voice right now is the same voice that you

6    used in her apartment?

7        A.    I don't believe it was much different.  I

8    mean, I -- you know, this -- obviously, I don't have

9    the fear of somebody trying to kill themselves or

10   harm themselves, so -- I'm talking into a computer

11   screen.  That's a lot different than being in a real

12   life situation.

13             But I believe I was as calm as I

14   possibly could be based upon the situation.

15       Q.    Okay.  So did you call for an ambulance

16   first, back up first, because you didn't call

17   Northwestern; correct?

18       A.    Again, I don't understand -- I believe

19   that's two questions.  I don't understand.

20       Q.    Okay.  I'll break it up.

21             Who did you call first after you hung

22   up on Sergeant Seng?

23       A.    Okay.  Again, I don't understand the

24   question.

1      Q.   Who is the next person you spoke to on the

2  phone after you spoke to Seng?

3      A.   I never talked to anybody on the phone

4  after Sergeant Seng.

5      Q.   Okay.  So on the radio?

6      A.   I waited for a break in the radio traffic,

7  and then I calmly got on the air and asked for an

8  ambulance and for the paddy wagon.

9      Q.   And why did you call for a paddy wagon?

10      A.   In mental health transport issues, if the

11  patient could not be escorted into an ambulance,

12  then we take them in the paddy wagon.

13      Q.   You didn't want -- did you ask her if she

14  wanted an ambulance?

15      A.   She didn't want -- she repeatedly told me

16  based upon my recollection of the body camera that

17  she did not want an ambulance, that she did not want

18  to go to the hospital.

19      Q.   Okay.  I'm talking about when you are

20  standing in her apartment.  I'm not talking about

21  after you had her handcuffed and on a dolly.

22          I'm talking about when you were in her

23  apartment, did you ask her if she wanted an

24  ambulance?

```
 1         A.    I don't recall.

 2         Q.    So after you do -- let me ask you this --

 3    let me back up.

 4                So you don't have to write anything

 5    down when you respond to a 911 call?

 6         A.    I -- there is nothing that I'm aware of

 7    that says I have to write anything down.

 8         Q.    So if someone calls 911, there is report of

 9    it other than the call and the dispatch call to you

10    going to go to an address?

11                MS. DORY:  Objection to form.

12                MS. MOORE:  And foundation.

13                MS. DORY:  Go ahead, Lieutenant, answer.

14                THE WITNESS:  Based upon my experience,

15    I've gone on thousands of calls and no report or

16    documentation is ever used.  It's what's known as

17    the code, so we just code the job.

18                If -- in this case, it would have been

19    a 19 call other than her having to go to the

20    hospital.

21                MR. KULIS:  Q.  Okay.  Did you fill out a

22    use of force report?

23         A.    I did not.

24         Q.    Why not?
```

```
 1          A.   Well, because I believed that she wasn't
 2     injured by me.  And additionally, she didn't --
 3     her -- when she touched me, I didn't believe that
 4     she had the mental capacity or intent to harm me.
 5               So the pushing and the shoving wasn't a
 6     criminal offense where she would be arrested for
 7     aggravated battery.
 8          Q.   So you indicated at one point that she had
 9     touched you or committed a battery?
10          A.   She had touched me.  It's articulated in
11     the body worn camera.  She grabs my arm.  She
12     attempts to push me forcibly out of her apartment.
13     I told her to stop touching me.  But again --
14          Q.   And then she responds that she's not
15     touching you?
16          A.   I don't believe that she responded she's
17     not touching me.  Not in the camera, she does not.
18          Q.   Okay.
19          A.   She tells me she wants me out.
20          Q.   And did you tell her if you touch me again,
21     ma'am, I'm going to arrest you?
22          A.   She is in mental crisis so I would not use
23     that term.  I would not agitate her or tell her that
24     she's going to jail.
```

```
 1                      That would be -- I don't believe that,
 2       again, in her mental condition, I don't believe her
 3       intent was to harm me or hurt me.
 4            Q.   You are saying that at no time you were
 5       trying -- you weren't trying to agitate her?
 6            A.   I was not trying to agitate her at any
 7       time.
 8            Q.   Okay.  You didn't arrest her for assault,
 9       correct?
10            A.   I -- maybe I'm misunderstanding the
11       definition of the term assault.  But it would have
12       been an aggravated battery.  My definition of a
13       battery --
14            Q.   The touching -- 0did you ever feel like
15       that she was going to attack you and you were in
16       danger?
17            A.   You said assault, sir.  That's what I'm
18       trying to -- assault is verbal.  That's -- she never
19       verbally threatened me or placed me in fear of
20       receiving a battery.
21            Q.   Okay.  That answers my question.  Thank
22       you.
23                      Did you inform her in her apartment
24       that you had called an ambulance and a -- and back
```

1    up that you were going to have her taken --

2        A.    You're frozen again.  I can't hear you.  I

3    didn't hear your question.

4                All I heard was did you ever inform her

5    and then you froze.

6        Q.    Okay.  When you were standing in her

7    apartment, did you inform her and say, Jeanette, I

8    just -- I feel like you need some -- to speak to

9    some medical doctor, and I've called an ambulance to

10   have you taken into custody -- taken into the

11   hospital?

12                Did you tell her that?

13       A.    No, I did not.

14       Q.    Why not?

15       A.    I didn't -- I just didn't.

16       Q.    Okay.  You didn't tell her or say,

17   Jeanette, I think you need to speak to a doctor or

18   some medical personnel?

19       A.    No, I did not.

20       Q.    And you didn't say, Jeanette, can I call a

21   relative or a friend to help us figure out what's

22   going on or, you know, to alleviate some of your

23   distress?

24       A.    No, I did not.

1       Q.   Now, you've dealt with people over your

2   career that are angry, upset; correct?

3       A.   Yes.

4       MS. DORY:  I'll object to the form of that.

5           Go ahead, Lieutenant.

6       THE WITNESS:  Yes, I have.

7       MR. KULIS:  Q.  And in this case, this is

8   not someone that you came upon, this is someone that

9   called 911 because they were told that they should

10   call 911 to supplement a report; correct?

11           And that's what she told you; correct?

12       A.   I don't know why she was told to call 911.

13   I have no knowledge of that.  I can only tell you

14   what she tells me when I come to the door.

15       Q.   And she told you she was told to call 911?

16       A.   I believe she says it's by Sergeant Seng

17   which is why I was calling Seng to figure out why he

18   would tell her that.

19       Q.   And you never -- you decided never to find

20   out; right?

21       MS. DORY:  Objection to form.

22           Go ahead, Lieutenant.

23       THE WITNESS:  I believe that I was

24   attempting to, and she kept interrupting me and

1    wouldn't allow me to have that phone conversation.

2              MR. KULIS:  Q.  So you abandoned that

3    conversation -- you abandoned that effort to

4    alleviate the situation?

5              MS. DORY:  Objection to form.

6                   Go ahead, Lieutenant, if you understand

7    the question.

8              THE WITNESS:  Again, you would say -- you

9    use the word abandon.  I would say that I was unable

10   to complete it.

11             MR. KULIS:  Q.  Did she grab the phone out

12   of your hand?

13        A.   No, she did not grab the phone out of my

14   hand.

15        Q.   She was just talking, right?

16        A.   I would characterize it as yelling.

17        Q.   And did you raise your voice?

18        A.   Not that I believe.

19        Q.   And she asked you -- and she ultimately --

20   I'm sorry.

21                   What portion of your arm did she grab

22   or touch?

23        A.   I don't understand the question.

24        Q.   Well, you indicated earlier that she

1      touched your arm; right?

2           A.    She repeatedly pushed me and grabbed my

3      arm.  So I don't know which specific incidence in

4      the body camera that you are talking about.

5           Q.    So she reached out and pushed you back?

6           A.    With her body, yes.

7           Q.    She bumped -- she body bumped you?

8                MS. DORY:  Objection to form.

9                     Go ahead, Lieutenant.

10                THE WITNESS:  There is contact between her

11     body and my body.  If you want to characterize it as

12     a body bump, that's not my terminology.  I will just

13     tell you that she made contact.

14                MR. KULIS:  Q.  And was that initiated by

15     you or was it initiated by she?

16          A.    It wasn't initiated by me.

17          Q.    And you indicated that she grabbed your arm

18     or touched your arm.  I'm trying to figure out what

19     she did.

20          A.    I believe, I would characterize it as a

21     grab as she's trying to escort me out of her

22     apartment.

23          Q.    Did she squeeze your arm?

24          A.    Again, I believe she did.

1    Q.   And did you have a bruise?

2    A.   No.

3    Q.   What portion of your arm did she grab?

4    A.   I believe my forearm.

5    Q.   Okay.  And that was your left arm or right

6    arm?

7    A.   I don't recall.

8    Q.   And did it hurt?

9    A.   Not to my knowledge.

10   Q.   Okay.  Was it a touching as people do to

11   guide someone out of the apartment or was it a

12   shove?

13        MS. DORY:  Objection to form.

14        Go ahead, Lieutenant.

15        MR. KULIS:  No, I'm going to strike that

16   question.

17        Q.  Describe the touching.

18   A.   It would be a grab, an attempt to

19   forcefully remove me from her apartment.  That's how

20   I would characterize it.

21   Q.   And did she yank your arm or give you a

22   shove when she grabbed your arm?

23        MS. DORY:  Objection to form.

24        Go ahead, Lieutenant, if you can answer

1       the question.

2                   THE WITNESS:  Yeah, I don't understand the

3       question.

4                   MR. KULIS:  Q.  Okay.  Did she grab -- did

5       she touch your arm and give you a nudge or did she

6       actually grab your forearm and squeeze it?

7           A.   I don't understand what your definition of

8       the word nudge is.

9                       If you can explain that to me?

10          Q.   Did she grab you with an open hand or did

11      she lock her fingers around your forearm?

12          A.   My recollection is that she locked her

13      fingers around my forearms.

14          Q.   And when she locked her fingers around your

15      forearm, what did she do?  Did she just squeeze or

16      did she push, pull?  What did she do?

17          A.   I believe she was yelling for me to get

18      out.

19          Q.   And at this point, what right, legally, did

20      you have to be standing in her apartment?

21          A.   At that point, the ambulance had already

22      been called and a determination was made that she

23      had been in crisis.

24                      And I believe at that point she had

1       also told me that she suffered from PTSD.  So at

2       that point, I had an obligation like I said to

3       ensure that she had the medical help she needed.

4            Q.   So you called the ambulance after she told

5       you she had PTSD?

6            A.   No.  I believe that was -- I think the

7       ambulance was already called when she told me that

8       she suffered from PTSD.  I'm not a hundred percent

9       sure on that, though.

10           Q.   Okay.  When you called the ambulance, had

11      she already touched you or did she touch you after

12      you called for the ambulance?

13           A.   It was after I told her that the ambulance

14      was on the way.  That seemed to agitate her more.

15           Q.   So before she touched you, before she told

16      you that she had PTSD, you already determined that

17      you were calling an ambulance?

18           A.   Based upon the condition of her apartment,

19      her interactions with me and her telling me that she

20      was in crisis, correct.

21           Q.   Was there food laying all over the floor?

22      Were there rats running through the place or was it

23      just a disheveled apartment?

24           A.   No, because in the kitchen area, there was

1      dirty pots and pans in the kitchen and disarray in

2      the kitchen.

3          Q.   Okay.

4          A.   But there was no food -- I didn't see any

5      exposed food.  And I didn't see any rats running

6      around.

7          Q.   Okay.  But there were papers on the floor?

8          A.   Several papers, yes, overflowing from the

9      counter tops, strewn about the floor way.

10           So that -- and to make -- it was in

11     such a manner that if you walk, you would have the

12     inability to walk past a certain point without

13     actually walking on top of these papers.

14         Q.   Did you ask her about that?

15         A.   No, I did not.

16         Q.   Did you -- you didn't think that was

17     necessary to figure out what -- why papers were

18     strewn on the floor?

19         A.   Again, I wasn't trying to upset her.

20         Q.   But you didn't -- but you didn't ask any

21     questions?

22         A.   I believe I did.  I believe in the body

23     camera footage, I asked lots of questions.

24         Q.   When did you -- when did you learn that she

1    was instructed to call 911?

2              MS. DORY:  Objection to form.

3              MR. KULIS:  Q.  When -- I'll say it again.

4              Where were you -- when did you gain the

5    knowledge that she was told by Sergeant Seng to call

6    911?

7         A.    I don't believe I ever was able to verify

8    that.

9         Q.    I'm not asking you when you verified it.

10   When did you -- when did you learn that she was --

11   from any source, that she was instructed to call

12   911?

13        A.    The only source I ever got was for her

14   directly.  So when she tells me on the body camera

15   footage that she was instructed to do that, that's

16   the first and only time that I ever heard that.

17        Q.    Then why didn't you believe her?

18        A.    Because she kept talking about different

19   stories.  She talked about a broken water main in

20   her apartment, that was not the case.  And --

21        Q.    She actually showed you the stain in the

22   ceiling, right?

23        A.    But that's based upon my -- I'm not a

24   plumber.  I'm not a professional bumper.

1    Q.    You're not a psychiatrist either, are you?

2    A.    No, I am not a psychiatrist.

3    Q.    Okay.  So you decided you were going to

4    stand firm and not leave her apartment despite the

5    fact that she had asked you to leave her residence;

6    correct?

7    A.    For her safety and wellbeing, I had an

8    obligation to stay there until medical personnel had

9    arrived on the scene.

10    Q.    Okay.  And then she walked by you and she

11    left the premises; correct?

12    A.    She ran out, yes.

13    Q.    Okay.  And she was calling 911 on the

14    phone, right?

15    A.    While she was out of the apartment?

16    Q.    Yes.

17    A.    No, sir.

18    Q.    Did -- well, did she try to make any calls?

19    A.    She made calls inside the apartment to 911.

20    It was not outside the apartment.

21    Q.    Okay.  And then she left the apartment, and

22    what did you do?

23    A.    I secured her door so she wouldn't circle

24    back around and lock me out.  And then I followed

```
 1      her at a safe distance hoping that she wouldn't harm
 2      herself as she's running downstairs barefoot.
 3           Q.   And you kept calling -- how many times did
 4      she ask you to leave her apartment before you exited
 5      her apartment?
 6           A.   I don't recall the number.
 7           Q.   Five times?
 8           A.   I don't recall.
 9           Q.   Do you believe it was more than five times?
10           A.   Again, I don't recall.  I would have to
11      watch the body camera to count how many.
12           Q.   Well, you've watched it a few times, right?
13           A.   Again, I don't recall.
14           Q.   How many times have you watched the body
15      cam?
16           A.   I believe two.
17           Q.   And did you ask -- did she ask you more
18      than ten times?
19           A.   Again, I don't recall.
20           Q.   Did she ask you more than 20 times?
21           A.   I don't recall.
22           Q.   Did she ask you more than 30 times?
23           A.   I don't recall.
24           Q.   And you refused to leave her apartment,
```

1     correct?

2          A.   I believe I had an obligation to make sure

3     she received the medical attention that she needed,

4     so I refused to leave her alone.

5          Q.   After you -- after she asked you in excess

6     of 20 times to leave the apartment, at any point in

7     time did you tell her, Jeanette, I just called an

8     ambulance so we can have you checked out?

9          A.   I don't understand your question.

10         Q.   Did you at any point in time after you --

11    I'm sorry.  Let me rephrase that.

12              So you -- she asked you to leave

13    numerous times from the apartment and you refused;

14    correct?

15         A.   Yes.

16         Q.   Did you tell her why you wouldn't leave her

17    apartment?

18         A.   I believe I did.

19         Q.   What did you tell her?

20         A.   I told her that an ambulance is on the way.

21         Q.   And did you tell her why you called an

22    ambulance?

23         A.   She was in front of me when I ordered the

24    ambulance, so she knew why I had ordered an

1    ambulance or she should have known why I ordered an

2    ambulance.

3        Q.   Well, you didn't -- did you tell her why

4    you called an ambulance?

5        A.   I did not specifically tell her, no.

6        Q.   And your Christian heart wouldn't let you

7    do that, would it?

8             MS. DORY:  Object to form.

9             THE WITNESS:  I don't understand.

10            MR. KULIS:  Q.  Well, you --

11       A.   I don't understand your question.

12            MS. DORY:  Go ahead.

13            MR. KULIS:  Q.  Well, you would say, as you

14   said to us, do unto others as they do unto you.  So

15   wouldn't it be nice of you to explain to her what

16   you were doing and why you were doing it?

17       A.   I don't believe I said that.  I said I

18   believe the golden rule is treat others as you would

19   want to be treated.

20            I don't think I said what you allege

21   that I said.

22       Q.   Okay.  I'm sorry.  I used the wrong phrase.

23            So wouldn't it have been nice and

24   Christian to just explain to her why you were doing

1      this?

2                  MS. DORY:  Go ahead, Lieutenant.

3                        Objection to form.

4                  THE WITNESS:  I believe as a good Christian

5      I explained it to the best way I could.

6                  MR. KULIS:  Q.  Okay.  And then you

7      followed her outside -- out her apartment, correct?

8          A.   Yes.

9          Q.   And you kept calling her name, Jeanette,

10     Jeanette; right?

11         A.   Yes.

12         Q.   Did you -- when you were calling her name

13     and following her down the hall and down the stairs,

14     did you explain to her, Jeanette, will you please

15     stop, this is what I'm -- what we're trying to do

16     and accomplish?

17         A.   I believe my words were, Jeanette, rational

18     people don't behave in this manner if I remember

19     my -- what I said on the body cam.

20         Q.   And she was able to walk down the hall by

21     herself, correct?

22         A.   I don't understand the --

23         Q.   When she left the apartment, you -- she did

24     not need any assistance walking down the hall;

1     right?

2          A.    I would characterize her running down the

3     hall.  But that is correct, she didn't need any help

4     running down the hall.

5          Q.    And you saw her go down the stairs,

6     correct?

7          A.    That is correct.

8          Q.    And she was able to travel down the stairs

9     relatively easily; correct?

10         A.    It would appear that way, yes.

11         Q.    And at any time when you were running down

12    the hall behind her or down -- going down the stairs

13    behind her, did you say, Jeanette, please stop, this

14    is what we're trying to accomplish, I'm just trying

15    to get you some help, anything to that effect?

16         A.    Again, I believe that my words were

17    rational people don't behave this way, Jeanette,

18    calm down.  I repeatedly to asked her to calm down I

19    believe.

20         Q.    And were you calm at all times?

21         A.    I believe I was.

22         Q.    Okay.  But you don't believe she was?

23         A.    My opinion is she was not calm or rational.

24         Q.    And then there came a point in time where

1    you confronted her in the hallway on another floor;

2    correct?

3          A.    Yes.  On the 27th floor, she attempted to

4    push past me and then that's when I grabbed her.

5          Q.    So at that point, you didn't -- you don't

6    believe that she intended on pushing you?

7          A.    That was just her -- in that part, she was

8    just trying to get past me.

9          Q.    Okay.  And like in her apartment, she was

10   just trying to get you out of her apartment,

11   correct, by just asking you to leave?

12         A.    Correct.  Well, she didn't ask me to leave.

13   She physically grabbed me and tried to forcibly

14   remove me from her apartment.

15         Q.    So prior to her touching you, she didn't

16   ask you to leave?

17         A.    I don't understand your question.

18         Q.    Yeah.  Well, you said she never asked me to

19   leave.  She tried to push out me to leave -- out of

20   the apartment.

21               Prior to her touching you, are you

22   telling us that she didn't ask you to leave?

23         A.    I'm not saying.

24         Q.    Huh?

1       A.   I'm not saying.

2       Q.   Okay.

3       A.   She asked me first.  I'm saying the first

4   time when she -- you're asking me about the physical

5   contact on the 27th floor, and then I'm going to

6   back to talk about the physical contact in the

7   apartment to show you the difference between the two

8   touches that she gave me.

9       Q.   Okay.

10      MS. DORY:  (Inaudible).

11          Go ahead, Lieutenant.

12      MR. KULIS:  Q.  So when you grabbed -- when

13  she was on the 26th floor, are you saying that she

14  pushed you?

15      A.   It was the 27th floor.  And I said she

16  tried to push was me.  She never physically pushed

17  me.

18      Q.   Because you wouldn't let her travel down

19  the hall way, correct?

20      A.   After chasing her --

21      MS. DORY:  Object to form.

22          Go ahead, Lieutenant.

23      THE WITNESS:  After chasing her down five

24  flights of stairs and being with her for

1    approximately 20 minutes when she tried to push by

2    me, I figured that was my best place or chance to

3    restrain her to keep her from harming herself.

4         MR. KULIS:  Q.  Up to that point, tell me

5    what actions she exhibited which made you believe

6    she was going to harm herself.

7         A.    Telling me that she suffers from PTSD,

8    running out of the apartment and running down five,

9    six flights of stairs, circling back around, telling

10   me she was in crisis.

11            So based upon all those things, I

12   believed that she was a harm to herself.

13        Q.    And when you -- where did you first grab

14   her?

15        A.    I'm sorry?

16        Q.    Where did you first grab her?

17        A.    I believe it was simultaneous with my -- my

18   left arm and my right arm, one on her wrist and one

19   on her shoulder blade area.

20        Q.    And you took her down to the ground?

21        A.    I did not take her to the ground.

22        Q.    Did she end up on the ground?

23        A.    She dropped her body weight to the ground,

24   but I did not take her to the ground.

1      Q.   And you handcuffed her?

2      A.   I handcuffed her in the front, correct.

3      Q.   Why?

4      A.   Because I didn't want to harm her.  I

5   didn't want to hurt her.  I didn't want to have

6   to -- if I would have attempted to force her behind

7   her back with her age, I was afraid that I would

8   break an arm or cause her injury.

9      Q.   Because people are handcuffed in the back

10   so they don't attack people, correct?

11      A.   That's incorrect.  That's --

12          MS. DORY:  Objection.  Sorry.  Objection to

13   form.

14               Go ahead, Lieutenant.

15          THE WITNESS:  Actually, based upon my

16   training, unless somebody has a physical ailment,

17   you never handcuff them in the front.

18               They are -- everyone is supposed to be

19   handcuffed in the back.

20          MR. KULIS:  Q.  Yeah, right.  It

21   immobilizes them; right?

22      A.   That is correct.

23      Q.   Maybe I misspoke.  That's what I meant to

24   say.

```
 1                    You never handcuff people in the front,
 2      you handcuff them in the back for their own safety
 3      and your own safety; correct?
 4          A.   That is correct.
 5          Q.   But in this case, you handcuffed her in the
 6      front?
 7          A.   To immobilize her and to keep her from
 8      harming herself.
 9          Q.   But this was seizure; correct?
10          A.   A seizure?
11          Q.   You seized her?
12          A.   I -- I don't understand your definition of
13      a seizure.  Are you talking about a medical seizure
14      or a legal --
15          Q.   No.  You seized her and placed her in
16      handcuffs.  You grabbed ahold of her and placed her
17      in handcuffs; correct?
18          A.   Oh, yes.  Yes, I did.
19              MS. DORY:  Objection to form.
20              MR. KULIS:  Q.  And she was not free to
21      leave, correct?
22          A.   That is correct.
23          Q.   And she was not free to go down and go on
24      her merry way or go to see one of her neighbors in
```

1      the building, correct?

2          A.    I don't understand the question.

3          Q.    Well, she couldn't get up and go to one of

4      her neighbors, correct, because you had her in

5      custody; right?

6          A.    In protective custody, yes.

7          Q.    At any point in time, was Jeanette

8      committing a crime or breaking any laws?

9          A.    Not to my knowledge.

10         Q.    Did you ever find out that she called 911

11     to correct the report?

12         A.    Other than her telling me, no.

13         Q.    So you -- are you telling me you never

14     talked to Sergeant Seng after this incident?

15         A.    Not that I recall.

16         Q.    Did you ever discuss this with Sergeant

17     Seng at all?

18         A.    Not that I remember.

19         Q.    So after you had her in handcuffs, how long

20     did it take for the ambulance to arrive?

21         A.    Again, it's on the body camera, but I would

22     characterize it as less than a minute.

23         Q.    Okay.  And she was placed on the dolly,

24     correct?

1          A.    I -- you mean the stair -- the stretcher,

2     the stair stretcher, is that what you're talking

3     about?

4          Q.    Yeah.  Yes.

5          A.    Yes.  My recollection of it is, yes, she

6     was put on the stair chair.

7          Q.    She didn't fight or resist anybody

8     physically, did she?

9          A.    Not to my knowledge.

10         Q.    At any given time did -- other than

11    those -- the touching of your forearm and the

12    touching of you when she was trying to get by you in

13    the hallway, did she ever strike out at you?

14         A.    I believe she pushes me --

15              MS. DORY:  Objection to form.

16              THE WITNESS:  I believe she pushes me in

17    the apartment if I remember the body worn camera

18    footage correctly.

19              MR. KULIS:  Q.  Did she ever reach out and

20    smack you in the face or slap you?

21         A.    She never smacked me in my face.

22         Q.    Did she ever punch you?

23         A.    She never punched me.

24         Q.    Kick you?

1          A.    Again, she never kicked me.

2          Q.    Or attempt to punch you, slap you, strike

3     at you, kick you?

4          A.    Again, I don't recall her at all attempting

5     to strike me, hit me or slap me.

6          Q.    When you had her on the ground in

7     handcuffs, she didn't reach out and lash out at you

8     physically, did she?

9          A.    Not to my recollection.

10         Q.    And when other officers arrived and the

11    ambulance arrived, you never saw her lash out

12    physically at any of the officers; correct?

13         A.    To my knowledge, that is correct.

14         Q.    And she never lashed out at the ambulance

15    people physically, did she?

16         A.    I didn't go -- I -- as soon as she was in

17    the care of the paramedics, I removed myself from

18    the situation.

19              So I can't tell you what happened after

20    she was in the care of the paramedics.

21         Q.    Did the paramedics take her from the 27th

22    floor or did the paramedics take over downstairs?

23         A.    They took over on the 27th floor.

24         Q.    Okay.  Did you ride in the elevator down

1    with her?

2         A.    I don't think I did.  I don't recall that I

3    did.

4         Q.    And when you got downstairs, was she in the

5    lobby or was she already outside?

6         A.    Again, I believe she was going into the

7    ambulance the next time I see.

8         Q.    Okay.  Was her phone taken from her?

9         A.    Not by me it wasn't.

10        Q.    Was her phone taken from her?

11        A.    And my answer is not by me.

12        Q.    I didn't ask you if it was taken by you.

13        A.    But I have no knowledge, sir, if anyone

14   else took her cell phone.  I can just tell you that

15   I did not.

16        Q.    Okay.  Were you present when her phone was

17   taken from her?

18        A.    To my recollection, no, I was not.

19        Q.    Now, you said that you didn't do a report,

20   but said Officer Palos did the report?

21        A.    Yes.

22        Q.    And did you review -- did you review it or

23   approve it?

24        A.    I did not.

1      Q.   Okay. So where did that information come

2 from in that report?

3      A.   I don't understand the question.

4      Q.   Yeah, it wasn't a good question. I'll

5 rephrase it.

6          What did you tell Officer Palos?

7      A.   I summarized my interactions with Ms. Bass

8 and why I felt that she would need an evaluation at

9 the emergency room.

10      Q.   What did you say to Officer Palos?

11      A.   I specifically don't remember the exact

12 words.

13      Q.   Did you -- when she was transported to

14 Northwestern, did you go to Northwestern?

15      A.   I did not.

16      Q.   Where did you go?

17      A.   I would have resumed my regular supervisory

18 duties in the Eighteenth District. I don't recall

19 specifically what I had to do or what I would have

20 done, but I know I did not go to Northwestern.

21      Q.   After you left the scene, where did you go?

22      A.   I think I would have went into maybe the

23 Eighteenth. I don't recall -- the answer is I don't

24 recall.

```
1          Q.   After you left the scene, who's the first
2     person you spoke to regarding this incident?
3          A.   I don't believe I talked to anybody
4     regarding this incident other than Officer Palos.
5          Q.   Okay.  Did you have any conversations with
6     anyone after this incident calling her a crazy,
7     fucking bitch?
8               MS. DORY:  Objection, form.
9                    Go ahead, Lieutenant.
10              THE WITNESS:  I don't believe I did.
11              MR. KULIS:  Q.  So you never referred to
12    Jeanette Bass as a crazy, fucking bitch?
13         A.   Not to my knowledge.
14         Q.   Did you refer her to her as a crazy bitch?
15         A.   Again, not to my knowledge.
16         Q.   Who is the first person you told about this
17    incident other than Officer Palos at the scene?
18         A.   All I remember is telling Officer Palos,
19    that's it.
20         Q.   You never laughed about the situation with
21    anyone else subsequent to this?
22              MS. DORY:  Lieutenant, if you understand.
23                   Objection, form.
24              THE WITNESS:  Not to my recollection.
```

1          MR. KULIS:  Q.  When you left the scene,

2     did you leave the scene alone in your squad car?

3          A.   To the best of my recollection, yes.

4          Q.   Did you ever go back to her -- did you ever

5     go back to her apartment?

6          A.   On that day?

7          Q.   That day or any other day?

8          A.   Yes.  There was one other call after that

9     incident where she requested the police.  I don't --

10    it was -- it was after that day.  I don't remember

11    the exact date.

12         Q.   And did you know it was Jeanette Bass that

13    had called?

14         A.   Yes, I did.

15         Q.   And who did you go there with?

16         A.   I -- a beat car, but I don't remember who

17    it was.

18         Q.   And did you go into her apartment?

19         A.   No, I did not.

20         Q.   Why not?

21         A.   She saw me in the hallway, ran in her

22    apartment and shut the done door and refused to open

23    the door and tell me what she needed.

24         Q.   And what did you do after that?

1          A.    I coded the job with no paper.

2          Q.    Well, I'm little confused, Lieutenant,

3     because you've been in her apartment one time and

4     you were afraid that she was going to close the door

5     and harm herself and hurt herself and commit suicide

6     so you had her taken to the hospital involuntarily

7     to Northwestern.

8                On this occasion, you weren't concerned

9     that she was going -- after seeing you and -- that

10    she was going to go into her apartment and harm

11    herself or throw herself out the window as you

12    previously mentioned?

13               MS. DORY:  Objection to form.

14               THE WITNESS:  Yeah, I don't understand the

15    question.

16               MR. KULIS:  Q.  Weren't you concerned about

17    her safety --

18         A.    On the second occasion?

19         Q.    -- on the second occasion?

20         A.    On the second occasion, she showed me no

21    signs or made any statements that she was in crisis.

22    So at that point, there was nothing to lead me to

23    believe that she was in need of medical help at that

24    time.

1      Q.   Did you ask her if she was in crisis on the
2   second situation?
3      A.   She wouldn't give me -- she didn't give me
4   the opportunity to.
5      Q.   She saw you, and ran into her apartment;
6   correct?
7      A.   That is my recollection of it, yes.
8      Q.   And at that point in time, are you telling
9   me that you didn't fear for her safety because
10   you've already had her hospitalized once?
11      A.   I had no knowledge that she -- at that
12   time, I believed she was medicated and all well.
13      Q.   How did you know she was medicated?
14      A.   I don't.  I'm telling you what I believed.
15      Q.   Okay.  Well, what made you believe she was
16   medicated?
17      A.   Because she didn't tell me she was in
18   crisis.  She didn't tell me that she suffered from
19   PTSD.  She wasn't yelling at me.  She wasn't telling
20   me about how the condo association filmed her naked.
21      Q.   And at the second occasion, isn't it a fact
22   that you were standing in her hall saying something
23   to the effect, Jeanette, Jeanette, don't you want to
24   see me, don't you want to see me?

1          MS. DORY:  Go ahead, Lieutenant, if you

2    understand.

3          THE WITNESS:  I don't recall it that way.

4          MR. KULIS:  Q.  So when you went there, why

5    did you go there with a second unit?

6     A.    The second unit got the call.  I'm their

7    supervisor.  So I went there to support them.

8     Q.    Oh, gotcha.  And you didn't let them do

9    their job.  Did you have them -- did they -- did you

10   have them -- I'm sorry.

11          Did they go speak to Jeanette?

12     A.    I don't recall.

13     Q.    In fact, you took over the call when you

14   arrived with them; correct?

15          MS. DORY:  Objection to form.  Objection to

16   form.

17          Go ahead.

18          THE WITNESS:  Again, I don't recall.

19          MR. KULIS:  Q.  And you knew that you --

20   I'm sorry.

21          You saw that she recognized you,

22   correct?

23     A.    I don't know what she recognized or didn't

24   recognize.  I don't know what she was thinking.

1          Q.    Okay.  But when she saw you and the police,

2     you told us that she ran into her apartment;

3     correct?

4          A.    I believe that she looked in my direction

5     and then ran in her apartment, that is correct.

6          Q.    And locked the door, correct?

7          A.    I never tried the door, so I can't tell you

8     if it was locked or not.

9          Q.    And neither of the other officers tried the

10    door, did they?

11              MS. DORY:  Objection to form.

12              THE WITNESS:  Again, I don't know what the

13    other officers did.

14              MR. KULIS:  Q.  Well, you're their

15    supervisor.

16                   Were you supervising?

17              MS. DORY:  Objection to form.

18                   Go ahead, Lieutenant.

19              THE WITNESS:  I don't understand the

20    question.

21              MR. KULIS:  Q.  Well, what did you -- the

22    officers that you were supervising, what did they

23    do?

24          A.    I don't recall.

1     Q.   And in fact, they never went and knocked on
2     the door, did they?

3     A.   Again, I'd have to look at the body worn
4     camera footage.  I don't recall.

5     Q.   But in fact, you took over the call and
6     started -- I don't want to say yelling -- talking,
7     Jeanette, Jeanette, don't you want to see me,
8     something to that effect; right?

9          MS. DORY:  Objection to form.

10          THE WITNESS:  Again, without seeing the
11     body worn camera video, I -- I don't recall that.

12          MR. KULIS:  Q.  And on this second
13     occasion, once again, you didn't knock on the door
14     and say, Jeanette, you called 911 or called for
15     police, what can we do for you; did you?

16     A.   Again, without seeing the body worn camera
17     video, I wouldn't be able to answer that question.

18     Q.   And would it be fair to say that do you
19     believe that standing out in the hall saying
20     something to the effect, Jeanette, Jeanette, don't
21     you want to see me would cause her some emotional
22     distress?

23     A.   Again, without seeing the body worn camera,
24     I can't answer that question.

1          MR. KULIS:  Could we take like a five or

2    ten minute break?

3          MS. DORY:  Yes, absolutely.

4          MR. KULIS:  Okay.

5          MS. DORY:  Thank you.

6               (WHEREUPON, a short recess was

7                taken.)

8          MR. KULIS:  Q.  Officer, are we ready?

9    A.   I'm ready.

10   Q.   I'm going to jump around a little because

11   I'm almost finished.

12             Let me ask you:  In your personal life,

13   have you ever had a friend or family who was in some

14   psychiatric crisis?

15         MS. DORY:  Objection to form.

16             Go ahead, Lieutenant.

17         THE WITNESS:  Yes, I have.

18         MR. KULIS:  Q.  Who?

19   A.   My dad and my sister.

20   Q.   And have you ever had them involuntarily

21   committed?

22         MS. DORY:  Objection to relevance and form.

23         MS. SOTOMAYOR:  I'm going to object to the

24   extent this impedes on the officer's safety and

 1     privacy.

 2              MR. KULIS:  Well, this goes to the state of

 3     his reference, so I think it is permissible.

 4              Q.  So go ahead.

 5      A.   I never personally did.  I don't have the

 6     legal authority over them to do that or didn't have

 7     the legal authority over them to do that.

 8      Q.   And again I don't want to go into a lot of

 9     details, but was your sister ever committed in a

10     psychiatric institution or ward at a hospital?

11              MS. DORY:  I'm going to object again to

12     relevance.

13              Go ahead, Lieutenant.

14              THE WITNESS:  Yes, she was.

15              MR. KULIS:  Q.  Okay.  And was your father?

16              MS. DORY:  Same objection to relevance.

17              THE WITNESS:  Yes, he was.

18              MR. KULIS:  Q.  How many times?

19              MS. DORY:  I'm going to object again to

20     relevance.

21              Go ahead, Lieutenant.

22              THE WITNESS:  I don't --

23              MS. MOORE:  This is a standing violation of

24     HIPAA.

```
1              MS. DORY:  Go ahead, Lieutenant.

2              THE WITNESS:  I don't recall.

3              MR. KULIS:  Q.  Okay.  And how many times

4       has your sister?

5              MS. DORY:  Same objection to relevance.

6              MR. KULIS:  Q.  Go ahead.

7         A.   Again, I don't recall.

8         Q.   I'm going to go back to the hallway when

9       you took her in custody and handcuffed her,

10      handcuffed Jeanette Bass.

11              You indicated that you grabbed ahold of

12      her.  And what type -- describe what you did to take

13      her in custody.

14        A.   I don't understand the question.

15        Q.   When you grabbed her to handcuff her, what

16      did you do?

17             MS. DORY:  Objection, form.

18             THE WITNESS:  My recollection is that I

19      grabbed her both --

20             MS. DORY:  Go ahead, Lieutenant.

21             THE WITNESS:  I thought you were trying to

22      say something.

23             MS. DORY:  I said objection, form.

24              Go ahead.
```

1          THE WITNESS:  Okay.  You were like breaking

2     up there.

3               So basically, I grabbed her

4     simultaneously in my recollection with both my left

5     and right hand to grab her to keep her from

6     continuing to run down the stairs.

7          MR. KULIS:  Q.  And did you squeeze her

8     arm?

9     A.   I wouldn't characterize it as a squeeze.  I

10    would just describe it as grab.

11    Q.   Okay.  What physical tactics did you use to

12    place her on the ground?

13    A.   My recollection is I did not place her on

14    the ground.  She dropped her own body weight and she

15    sat down on the ground on her own.

16    Q.   Okay.  Did you handcuff her and let her sit

17    there?

18         MS. DORY:  Objection to form.

19              Go ahead, Lieutenant.

20         THE WITNESS:  My answer is yes, I did let

21    her sit there.

22         MR. KULIS:  Q.  But you -- you grabbed her

23    shoulder and her arm and put pressure on her as she

24    was on the ground; correct?

1          MS. DORY:  Objection, form.

2          THE WITNESS:  I don't understand the

3    question.

4          MR. KULIS:  Q.  You said you don't

5    understand?  I'm sorry, I didn't hear your answer.

6      A.    Yeah, I don't understand your question.

7      Q.    Did you grab -- after -- once she was on

8    the ground, did you let her sit there handcuffed or

9    did you have ahold of her?

10     A.    I didn't grab her -- I wasn't grabbing her.

11   All I was doing was taking one arm and keeping her

12   on the ground so that she wouldn't pop up and run

13   again.

14     Q.    Did she try and pop up and run again?

15     A.    Not to my knowledge, no.

16     Q.    Did she attempt to pop up and run again?

17     A.    No, because I had a hand on her.

18     Q.    Because you kept -- you held her down;

19   correct?

20     A.    I wouldn't characterize it as holding her

21   down.  I kept a hand on her.

22     Q.    And was she complaining that she was in

23   pain when you had your hands on her?

24     A.    She didn't say she was in pain.  She said

```
 1    she was hurt, but yet she didn't want to go to the
 2    hospital.
 3         Q.   Now, you indicated that you did not go to
 4    Northwestern Hospital with her; correct?
 5         A.   Yes.
 6         Q.   Did you go to the hospital afterwards?
 7         A.   No.
 8         Q.   Did you go to any hospital regarding
 9    Jeanette Bass?
10              MS. DORY:  Objection to form.
11                   Go ahead, Lieutenant.
12              THE WITNESS:  No.
13              MR. KULIS:  Q.  Did you speak to anybody at
14    the hospital over the phone?
15         A.   I did not.
16         Q.   When you were in her apartment, did she
17    ever tell you that she was hallucinating?
18         A.   Not to my knowledge.
19         Q.   And did she -- did you have any -- did you
20    believe she was under the influence of any drugs or
21    alcohol?
22         A.   I didn't smell alcohol.  But I could just
23    tell you that the way she was acting, I didn't know
24    why she was acting that way.
```

1       Q.  Now, you will admit that you initiated an

2   involuntary commitment (sic) of Jeanette Bass to

3   Northwestern, correct?

4       MS. DORY:  Objection to form.

5          Go ahead, Lieutenant.

6       THE WITNESS:  Well, I -- it wasn't -- I

7   didn't initiate an involuntary committal.  I

8   initiated a psychiatric evaluation.

9       MR. KULIS:  Q.  And you understand that

10  under the -- that you have to follow Illinois law

11  and procedures to do such things; correct?

12      MS. DORY:  Objection to form.

13         Go ahead, Lieutenant.

14      THE WITNESS:  To have her evaluated?

15      MR. KULIS:  Q.  Yes.

16    A.  I believe I did follow applicable State

17  law.

18    Q.  Okay.  During the time that you were in her

19  condo, did she ever use her hands or arms in a

20  threatening manner toward you?

21      MS. DORY:  Objection to form.

22      THE WITNESS:  She pushed me and touched me

23  against my will, so according to the law, that would

24  be conceived as a threatening manner.

1          MR. KULIS:  Q.  But you never documented

2     that in any report, did you?

3          A.   It's on the body camera.  So, no, I did not

4     document it in any reports.

5          Q.   And she never threatened to hurt herself,

6     did she?

7          A.   She specifically never stated the words

8     that she was going to harm herself, that's correct.

9          Q.   And she never threatened to hurt you?

10          MS. DORY:  Objection to form.

11          THE WITNESS:  She never stated any words to

12     the effect that she was going to harm me.

13          MR. KULIS:  Q.  Or anyone, correct?

14          A.   That is correct.

15          Q.   Did she display any behavior that reflected

16     that she was homicidal?

17          MS. DORY:  Objection to form.

18              Go ahead, Lieutenant.

19          THE WITNESS:  I'm not understanding what a

20     person in a homicidal state would look like.

21          MR. KULIS:  Q.  Okay.  Did she evidence any

22     acts which suggested she was suicidal?

23          A.   In my opinion, yes.

24          Q.   And what were -- tell me what that was.

1      A.   The totality of all her irrational actions,

2   running, pushing me, trying to get me out, unwilling

3   to let the paramedics look at her, running out of

4   her apartment with no shoes on, running down the

5   different stairs.

6      Q.   But all of that was -- you told me that you

7   believed she was suicidal before all that; right?

8      A.   Well, I -- when she tells me she's in

9   crisis, I take crisis to mean that she is a harm to

10  herself.

11     Q.   Okay.

12     A.   That's what I believed when she told me

13  that.

14     Q.   Did you ask her if she was suicidal?

15     A.   I never specifically asked her if she was

16  suicidal.

17     Q.   And did -- I may have asked you this, but

18  did you ever ask her if she wanted to voluntarily

19  admit herself to the hospital?

20          MS. DORY:  Objection, asked and answered.

21          MR. KULIS:  Q.  Go ahead.

22     A.   I believe on the body cam video, I

23  explained the difference between a voluntary and an

24  involuntary evaluation.  That's my recollection of

1    the situation.  So I did attempt to explain it to

2    her.

3        Q.    My question is:  Did you ever ask her if

4    she wanted to voluntarily admit herself to the

5    hospital?

6        A.    No, I did not.

7        Q.    Now, you also indicated that she was

8    talking about that somebody from the condo

9    management -- no, I'm sorry.

10              Somebody from the management company

11    had taken some pictures of her when she was naked;

12    correct?

13        A.    I don't understand the question.

14        Q.    Didn't you tell us earlier that she was

15    talking about how somebody from the management

16    company had taken her picture when she was not

17    clothed, naked?

18        A.    I believe in the body worn camera, that is

19    one of the allegations that she makes, yes.

20        Q.    Did you ever go back and talk to anybody at

21    the management company to determine if that

22    complaint actually occurred?

23        A.    As a preliminary investigator, that

24    wouldn't have been my responsibility.  That

```
1    responsibility would have been with the detective or
2    who would have done the follow up investigation.
3         Q.   Well, subsequent to this incident on that
4    date, did you ever talk to management company about
5    it?
6         A.   Again, that was not my area of
7    responsibility, so I would have had no reason to.
8         Q.   Okay.  But did you?
9         A.   No, I did not.
10        Q.   Okay.  At any point in time when she was at
11   the apartment, was -- did you ever -- did she -- did
12   you ever observe her talking to herself or having a
13   conversation with herself?
14        A.   I don't understand the question.
15        Q.   Well, you've seen people having
16   conversations with themselves, talking to
17   themselves, correct?
18             MS. DORY:  Objection to form.
19                  Go ahead, Lieutenant.
20             THE WITNESS:  I've seen people talk to
21   themselves.  And not all the people that talk to
22   themselves are in need of mental health.
23             MR. KULIS:  Q.  Did you believe she was at
24   risk of hurting herself or others?
```

1     A.   Yes, I did, that's why I called the

2   ambulance.

3     Q.   Did you know what the term Tardive,

4   T-A-R-D-I-V-E, Dyskinesia, D-Y-S-K-I-N-E-S-I-A, is?

5     A.   I'm sorry, I do not.

6     Q.   I have -- when you -- back in the hallway

7   what you had her in handcuffs -- I don't know if I

8   asked you this -- she was not free to leave;

9   correct?

10     A.   That is correct.

11     Q.   Because at that point in time, you -- she

12   was going to the hospital, right?

13     A.   She was going to be evaluated by the

14   paramedics, that is correct.

15     Q.   Okay.  And were those Chicago Fire

16   Department paramedics?

17     A.   To the best of my knowledge, they were.

18     MR. KULIS:  I have nothing else at this

19   point.

20     MS. DORY:  Can we have just a quick break,

21   Greg, five minutes?

22     MR. KULIS:  Sure.

23     MS. DORY:  Okay.  Thank you.

24              (WHEREUPON, a short recess was

1                              taken.)

2                    MS. DORY:   Okay.

3                      CROSS EXAMINATION

4                    BY:  MS. DORY

5       Q.    Lieutenant, did you ever arrest Ms. Bass?

6       A.    No, I did not.

7       Q.    Did you ever charge Ms. Bass with any

8  crimes?

9       A.    No, I did not.

10      Q.    Was Ms. Bass ever taken down to a police

11  department lock up following your interaction with

12  her on June 23rd?

13      A.    She was never taken to any Chicago Police

14  facility.

15      Q.    The -- was June 23rd the first time that

16  you ever learned that -- of Ms. Bass to your

17  knowledge?

18      A.    Yes, it is.

19      Q.    And prior to this day, did you have any

20  knowledge that Ms. Bass suffered from PTSD according

21  to her?

22      A.    I did not.

23      Q.    So is it fair to say that the first time

24  you learned that Ms. Bass according to her suffered

1    from PTSD was when she told you inside her

2    apartment?

3         A.   Yes, that is correct.

4         Q.   And based on your experience and training

5    as an officer and a sergeant and your years of

6    service, when you encounter someone -- an individual

7    who's acting irate, yelling, cannot tell a coherent

8    story, continues to jump around in what they are

9    saying, is not answering your questions, flees their

10   apartment without any shoes on and tells that you

11   that they are in crisis, do you think that person

12   needs medical attention?

13        MR. KULIS:  First of all -- hold on.

14             Objection, compound question, calls for

15   speculation, calls for expert testimony, and is

16   quite leading because he's your client.

17             Go ahead.  You can answer it.

18        THE WITNESS:  Yes.  Based upon all the

19   facts that you stated, in my opinion, Ms. Bass was

20   definitely in need of a medical evaluation.

21        MS. DORY:  And that's all the questions I

22   have.

23        MR. KULIS:  I have a couple.

24

<u>REDIRECT EXAMINATION</u>

BY:  MR. KULIS

Q.   You indicated that you did not go to the
hospital, but there were -- her handcuffs were on
her -- your handcuffs were on her; correct?

A.   That is correct.

Q.   How did you get the handcuffs back?

A.   I -- I don't remember.  I know I got my
handcuffs back.  But I don't know if they were taken
off in the ambulance or if they were swapped out.  I
don't recall.

Q.   Did any officers go to the hospital with
her?

A.   Yes.  I know Officer Palos did because
Palos did the involuntary committal and he would
have been the one that did the report.

Q.   Okay.  And Jeanette Bass was not comitting
any crime or breaking any law, correct?

A.   Not to my knowledge.

Q.   So if that's the case, then why your in
your answer to the Complaint when I stated in
Paragraph 10 the plaintiff was not committing a
crime or breaking any laws, your answer was that the
defendant lacks knowledge or information sufficient

1    to form or believe this to be the truth or falsity

2    of the allegations contained in this paragraph?

3         A.    Because to my knowledge, which I believe is

4    how on it's answered there, I have no knowledge of

5    what she was doing before I got there.

6         Q.    Well, your answer is always based on your

7    knowledge.

8               So what you know at the time that you

9    confronted her, the plaintiff -- the allegation is

10   that the plaintiff was not committing any crime or

11   breaking any laws.  And you state that you don't

12   have any knowledge.

13              But when I asked you that a few minutes

14   ago, you said she was not breaking any laws.  So

15   either she was not or you don't have knowledge of

16   whether she was?

17              MS. DORY:  Objection to form.

18              MR. KULIS:  Q.  Which is it?

19              MS. MOORE:  Mischaracterizes.

20              MR. KULIS:  I read it right from the

21   answer.

22              MS. DORY:  Go ahead, Lieutenant.

23              THE WITNESS:  Again, I don't believe I said

24   no.  I never answered you no.  I believe every one

1       of my answers have been not to my knowledge.

2                   MR. KULIS:  Q.  Thank you.

3                   What did you tell Palos to do when you

4       sent him off with her to the hospital?

5                   MS. DORY:  Objection to form,

6       mischaracterizes his previous testimony.

7                       Go ahead, Lieutenant.

8                   THE WITNESS:  I don't recall.

9                   MR. KULIS:  Q.  Because you are the one

10      that sent him with Jeanette to the hospital,

11      correct?

12          A.   I don't recall if I sent him.  I know he's

13      the one that went to the hospital.

14          Q.   Okay.  And did he go in the hospital -- did

15      he go in the ambulance with her to the hospital?

16          A.   I have no knowledge.

17          Q.   And did you go back to the station or did

18      you go back on the street?

19                  MS. DORY:  Objection, asked and answered.

20                      Go ahead, Lieutenant.

21                  THE WITNESS:  I don't recall where exactly

22      I went after I left Ms. Bass's apartment on

23      Chestnut.

24                  MR. KULIS:  Q.  Was there any emergencies

```
1    right after that incident --
2              MS. DORY:  Objection to form.
3              MR. KULIS:  Q -- that you recall or that
4    you -- let me finish the question.
5              MS. DORY:  Sorry, Greg.  Go ahead.
6              MR. KULIS:  Q.  Was there any emergency
7    that you had to tend to as a police officer after
8    this incident -- directly after this incident?
9              MS. DORY:  Objection to form.
10             Go ahead, Lieutenant.
11             THE WITNESS:  Not that I recall.
12             MR. KULIS:  I have nothing else.
13             MS. DORY:  I have nothing further based on
14   that.  We will reserve signature.
15             MR. KULIS:  Okay.
16             I do not need a copy at this point
17   argument.
18             MS. REPORTER:  Emily, do you need this
19   written?
20             MS. DORY:  Yes, we will get a copy.
21             MS. REPORTER:  Well, you'll be taking the
22   original.
23             MS. DORY:  Yes.
24                       (Witness excused.)
```

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
      JEANETTE BASS,                    )
 4                                      )
                 Plaintiff,             )
 5                                      )
           vs.                          ) No. 19 CV 7557
 6                                      )
      SGT. A. DAKURAS, Individually,)
 7    and THE CITY OF CHICAGO, a        )
      Municipal Corporation,            )
 8                                      )
                 Defendants.            )
 9


10


11                    I, ANDREW DAKURAS, hereby certify that

12    I have read the foregoing transcript of my

13    deposition taken on December 10, 2020, consisting of

14    pages 1 through 121, and that to the best of my

15    knowledge it is a true and correct transcript of

16    said deposition, except as I have changed it on the

17    attached sheets in accordance with the rules

18    provided by the said Court.

19

20                       _____
                                    Deponent
21
      SUBSCRIBED AND SWORN TO
22    before me this _____day
      of _____, 2021
23
      _____
24             Notary Public
```

```
1    UNITED STATES OF AMERICA       )
     NORTHERN DISTRICT OF ILLINOIS  )
2    EASTERN DIVISION               )    SS.
     STATE OF ILLINOIS              )
3    COUNTY OF COOK                 )

4

5                    I, JODI ANNE FEIGN, Certified Shorthand

6    Reporter and Notary Public in and for the County of

7    Cook and State of Illinois, do hereby certify that

8    ANDREW DAKURAS was first duly sworn by me to testify

9    the whole truth and that the above deposition was

10   reported stenographically by me and reduced to

11   typewriting under my personal direction.

12                    I further certify that the said

13   deposition was taken remotely via Zoom

14   Videoconference at the time specified and that the

15   taking of said deposition commenced on the 10th day

16   of December, 2020, at 10:30 o'clock a.m.

17                    I further certify that I am not a

18   relative or employee or attorney or counsel of any

19   of the parties, nor a relative or employee of such

20   attorney or counsel or financially interested

21   directly or indirectly in this action.

22

23

24
```

1                        In witness whereof, I have hereunto set

2       my hand and affixed my seal of office at Chicago,

3       Illinois, this 13th day of January, A.D., 2021.

4

5

6

7

8

9                       _____
                              JODI ANNE FEIGN, CSR
10                            111 West Washington Street
                              Suite 1259
11                            Chicago, IL 60602
                              Phone:  630-605-1257
12
        License No. 084-003375
13

14

15

16

17

18

19

20

21

22

23

24

```
 1                          JAF Reporting
        111 West Washington, Suite 1259, Chicago, IL 60602
 2                   630-605-1257/FRANKIENB@AOL.COM

 3                                        January 13, 2021

 4      Assistant Corporation Counsel
        Ms. Emily Dory
 5      30 North LaSalle Street, Suite 900
        Chicago, IL 60602
 6
        In Re:  Jeanette Bass vs. SGT. A. Dakuras, et al.
 7      Case No. 19 CV 7557

 8      Dear Ms. Dory:

 9      Enclosed please find one copy of the original
        deposition transcript of Mr. Andrew Dakuras, taken
10      in the above-captioned cause on the 10th day of
        December, 2020 along with the original of the
11      signature page and errata sheets for the witness to
        sign.
12
        Please have the witness review his transcript,
13      making whatever corrections he may have only on the
        errata sheets I have provided, not on the deposition
14      transcript.

15      After he has reviewed his deposition, please have
        him sign each correction sheet, if any, at the
16      bottom of the page, sign the signature pages, and
        have them notarized by any notary public.  Then,
17      within 30 days of today, return the original and one
        copy of the signature page and errata sheets, if
18      any, to my office, keeping a copy for yourself.  If
        they are not returned by said date, an affidavit
19      will be attached to the transcript pursuant to the
        procedure outlined in Rule 30 (e) of the Rules of
20      Civil Procedure for the United States District
        Courts and the deposition will be completed and will
21      be "used as fully as though signed."

22      Thank you for your cooperation in this matter.  If
        you have any questions, please do not hesitate to
23      call me.
                                     Sincerely,
24                                   Jodi Anne Feign, CSR
        cc Mr. Kulis
```