# EXHIBIT F

1     IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2        EASTERN DIVISION

3  JEANETTE BASS,

4  Plaintiff,

5  vs.          No. 19-CV-7557

6  SGT. A. DAKURAS,
  Individually, and the CITY
7  OF CHICAGO, a Municipal
  Corporation,

8

  Defendants.
9  _____/

10

11     DEPOSITION OF MATTHEW PIROTTE, M.D.

12

13

14   The Deposition of MATTHEW PIROTTE, M.D. taken by the

15  Defendants, pursuant to Notice, before Elizabeth A. Tubbert,

16  RPR, (CSR-4248), a Notary Public within and for the County of

17  Oakland, State of Michigan, via Zoom videoconference, on

18  Friday, May 7, 2021.

19

20

21

22

23

24

```
                                    Page 2
 1  APPEARANCES:
 2      KULIS LAW, LTD.
        BY:  GIANNA GIZZI, Esq.
 3      30 North LaSalle Street, Suite 2140
        Chicago, Illinois  60602
 4      (312) 580-1830
        ggizzi@kulislawltd.com
 5
            Appearing via videoconference on behalf of the
 6      Plaintiff
 7  CITY OF CHICAGO DEPARTMENT OF LAW
    MARK A. FLESSNER CORPORATION
 8  BY:  EMILY DORY, Esq.
    2 North LaSalle Street, Suite 420
 9  Chicago, Illinois  60602
    (312) 744-9010
10  emily.dory@cityofchicago.org
11      Appearing via videoconference on behalf of
    Defendant Dakuras
12
    CITY OF CHICAGO DEPARTMENT OF LAW
13  MARK A. FLESSNER CORPORATION
    BY:  STEPHANIE SOTOMAYOR, Esq.
14  2 North LaSalle Street, Suite 420
    Chicago, Illinois  60602
15  (312) 744-9010
    stephanie.sotomayor@cityofchicago.org
16
        Appearing via videoconference on behalf of Defendant
17  City of Chicago
18
19
20                          - - -
21
22
23
24
```

```
                                    Page 3
 1                    I N D E X
 2  WITNESS            EXAMINER            PAGE
 3  MATTHEW PIROTTE, M.D.    DORY             5
 4                      GIZZI             45
 5
 6
                        - - -
 7
    EXHIBIT NO.                           PAGE
 8
    Dfd. Exhibit 1   Medical Records       17
 9                   Bates Nos. 439 to 502
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                    Page 4
 1              Friday, May 7, 2021
 2          At or about 11:03 (CST) a.m.
 3              - - -
 4          COURT REPORTER:  This is the court
 5  reporter.  My name is Elizabeth Tubbert.  I'm with
 6  Urlaub Bowen & Associates.  I will be swearing in the
 7  witness remotely today pursuant to Executive Order
 8  2020-14 signed by Governor Pritzker on March 26, 2020,
 9  in response to COVID-19.
10          Would counsel please identify themselves
11  for the record, state whom they represent, and
12  identify if there is anyone else in the room with
13  them?
14          MS. DORY:  Emily Dory, D-O-R-Y, on behalf
15  of the Defendant Dakuras, and no one else in the room.
16          MS. SOTOMAYOR:  Stephanie Sotomayor on
17  behalf of Defendant City of Chicago, and no one else
18  is in the room with me.
19          MS. GIZZI:  Gianna Gizzi, G-I-Z-Z-I, on
20  behalf of the plaintiff Jeanette Bass, and no one else
21  is in the room.
22              - - -
23          MATTHEW PIROTTE, M.D.,
24  a witness herein, having been duly sworn by the
```

```
                                    Page 5
 1  Reporter/Notary Public, testified as follows:
 2              - - -
 3          MS. DORY:  Please let the record reflect
 4  that this is the deposition of Dr. Matthew Pirotte
 5  taken pursuant to subpoena in the matter of Jeanette
 6  Bass versus City of Chicago, pending in the Northern
 7  District of Illinois, Case No. 19-CV-7557.  This
 8  deposition is taken pursuant to the Federal Rules of
 9  Civil Procedure, the Federal Rules of Evidence, the
10  subpoena, and all applicable local rules of the United
11  States District Court for the Northern District of
12  Illinois.
13              - - -
14              EXAMINATION
15  BY MS. DORY:
16  Q    My name is Emily Dory.  I represent Lieutenant Dakuras
17       in this case.
18          Good morning, Doctor.  Can you hear me
19  okay?
20  A    Yes.
21  Q    I'm going to go over some ground rules with you.
22       First, if you do not understand a question, please let
23       me know and I will try to rephrase it.  Okay?
24  A    Yes.
```

MATTHEW PIROTTE, MD, 05/07/2021                                    Page 6..9

Page 6

1  Q    If you answer my question I'm going to assume that you
2       understood what I was saying.  Okay?
3  A    Yes.
4  Q    If you don't hear me, especially because we're on
5       Zoom, please let me know and I will absolutely repeat
6       myself.  Okay?
7  A    Yes.
8  Q    And then, also, answer every question out loud and
9       please let me finish speaking before you speak, and
10      I'll do the same for you.  Okay?
11 A    Yes.
12 Q    And then as we said briefly before we got on the
13      record, you can absolutely take a break.  Just let me
14      know.  I ask that you answer any pending questions
15      before we break.  Okay?
16 A    Yes.
17 Q    I have preliminary questions I have to ask everybody.
18      Are you under the influence of any medications, drugs,
19      alcohol or any substance that would affect your
20      ability to give truthful and accurate testimony today?
21 A    No.
22 Q    And you're able to answer my questions truthfully and
23      accurately today; correct?
24 A    Yes.

Page 7

1  Q    Doctor, where do you currently work?
2  A    Vanderbilt University Medical Center in Nashville,
3       Tennessee.
4  Q    And how long have you worked at Vanderbilt?
5  A    One and a half years.
6  Q    And what is your position at Vanderbilt?
7  A    I'm an assistant professor of emergency medicine and
8       I'm the residency program director.
9  Q    And what does the residency program director do?
10 A    I administer the emergency medicine residency.  It's
11      39 residents over three years.
12 Q    And what do you do on a daily basis in this role?
13 A    My current job is a combination of 50 percent clinical
14      work and 50 percent of administrative time that is
15      spent either in administrative meetings or formal
16      educational activity.
17 Q    And do you work anywhere else currently?
18 A    I work at the Tennessee Valley Veterans Affairs
19      Hospital in Nashville.
20 Q    And where do you work more frequently, at Vanderbilt
21      or the Tennessee Valley Veterans Affairs?
22 A    Vanderbilt by far.
23 Q    And have you ever worked at any other hospital?
24 A    Yes.

Page 8

1  Q    Have you ever worked in a hospital in Chicago,
2       Illinois?
3  A    Yes.
4  Q    In what hospital did you work at?
5  A    Northwestern Memorial.
6  Q    And what was your role when you worked at Northwestern
7       Memorial?
8  A    I was an assistant professor of emergency medicine and
9       I was the assistant residency director.
10 Q    Did you have similar responsibilities as you do
11      currently in your role at Vanderbilt that you did at
12      Northwestern?
13 A    Yes.
14 Q    And did any of those responsibilities require you to
15      work on the floor in the emergency room at
16      Northwestern?
17 A    Yes.
18 Q    Have you ever worked at any doctors' offices?
19 A    No.
20 Q    Do you hold a bachelor's degree?
21 A    Yes.
22 Q    Where is your bachelor's degree from?
23 A    University of Kansas.
24 Q    And in what is your bachelor's degree?

Page 9

1  A    History.
2  Q    When did you graduate?
3  A    2004.
4  Q    Did you graduate with any honors?
5  A    Yeah.  Summa cum laude, I think.
6  Q    And did you receive any awards with your bachelor's
7       degree?
8  A    Several.
9  Q    What were these rewards, that you remember?
10 A    The Chancellor's Club Scholar as a national merit
11      scholar.  I had departmental honors from the
12      Department of History, honors from the university.
13      There may have been some others.  I mean, I was Phi
14      Beta Kappa.
15 Q    Do you hold a medical degree?
16 A    Yes.
17 Q    Where did you earn your medical degree?
18 A    Loyola University Medical Center in Maywood, Illinois.
19 Q    When did you receive your medical degree?
20 A    2008.
21 Q    Did you receive any honors or awards with that degree?
22 A    Not really.
23 Q    Did you complete any internships?
24 A    I did a combined intern/residency.  It wasn't a

MATTHEW PIROTTE, MD, 05/07/2021                                        Page 10..13

Page 10

1     separate internship.
2  Q  And where did you do your combined
3     internship/residency?
4  A  Northwestern Memorial.
5  Q  And when was this?
6  A  2008 to 2012.
7  Q  Did you have a specialty that you focused on?
8  A  Emergency medicine.
9  Q  Did you participate in any fellowships?
10 A  No.
11 Q  Are you licensed in the state of Tennessee?
12 A  Yes.
13 Q  And when did you get licensed in Tennessee?
14 A  2019.
15 Q  And were you ever licensed in the state of Illinois?
16 A  Yes.
17 Q  Are you still licensed in the state of Illinois?
18 A  It's lapsed.
19 Q  Why has it lapsed?
20 A  I don't live in Illinois anymore and I don't practice
21    there.
22 Q  Was your license ever suspended in the state of
23    Illinois?
24 A  No.

Page 11

1  Q  Was it ever revoked in the state of Illinois?
2  A  No.
3  Q  Has your license ever been suspended in any state?
4  A  No.
5  Q  And has it ever been revoked in any state?
6  A  Yes.
7  Q  Are you board certified?
8  A  Yes.
9  Q  And what are you board certified in?
10 A  Emergency medicine.
11 Q  And when were you originally board certified?
12 A  2013.
13 Q  And when was the last time you were recertified?
14 A  I haven't recertified yet.
15 Q  Besides emergency medicine do you practice in any
16    other area of medicine?
17 A  No.
18 Q  Have you ever practiced in any other area of medicine?
19 A  No.
20 Q  You hold a -- we talked about it. How long have you
21    held your teaching position for your current position?
22 A  September of 2020 was when I was named the residency
23    director. I was just the assistant professor prior to
24    that.

Page 12

1  Q  And at Northwestern when did you first attain your
2     teaching position there?
3  A  It was part of my initial employment, which started in
4     May of 2015.
5  Q  When you were at Northwestern were you an associate
6     professor or a full professor?
7  A  I was assistant professor.
8  Q  And what about now at Vanderbilt?
9  A  I'm technically still an assistant but I just got
10    promoted to associate, but it's not totally signed
11    off.
12 Q  Well, congratulations.
13 A  Thank you.
14 Q  And I think you said now you have 39 students you
15    oversee; is that correct?
16 A  Can you repeat the question?
17 Q  Did you say that you will oversee 39 students now?
18 A  Thirty-nine residents.
19 Q  And what about when you were at Northwestern, how many
20    residents did you oversee?
21 A  Sixty.
22 Q  Have you ever published any articles on any medical
23    topics?
24 A  Multiple.

Page 13

1  Q  And were these in peer-reviewed publications?
2  A  Many times.
3  Q  Were they focused on emergency medicine?
4  A  Always.
5  Q  Have you ever testified prior to today?
6  A  Many times.
7  Q  How many times would you say?
8  A  Ten.
9  Q  Were you testifying as an expert in any of those
10    cases?
11 A  Yes.
12 Q  How many times have you testified as an expert?
13 A  Three.
14 Q  Do you recall the nature of these cases, what they
15    were regarding?
16 A  They were medical malpractice cases where I was the
17    defense who was produced -- excuse me -- I was an
18    expert who was produced by the defense in each case.
19 Q  Have you ever testified as a treating physician?
20 A  Yes.
21 Q  How many times would you say?
22 A  This is probably my sixth or seventh time.
23 Q  Have you ever testified at trial?
24 A  Yes.

MATTHEW PIROTTE, MD, 05/07/2021                              Page 14..17

Page 14

1  Q    How many times have you testified at trial?
2  A    Once.
3  Q    Were you testifying as an expert at trial in that
4       case?
5  A    Expert, yes.
6  Q    Did the court qualify you as an expert in that case?
7  A    Yes.
8  Q    Have you ever testified at trial as a treating
9       physician?
10 A    No.
11 Q    Have you ever been asked to serve as an expert in this
12      case that we're here for today?
13 A    No.
14 Q    Have you ever been retained for this case for a
15      consultation?
16 A    No.
17 Q    Have you ever been hired by the Kulis law firm as an
18      expert?
19 A    What's the law firm's name?
20 Q    Kulis, K-U-L-I-S.
21 A    No.
22 Q    Have you ever been hired by the Kulis law firm as a
23      consultant?
24 A    No.

Page 15

1  Q    Did you do anything to prepare for your deposition
2       today?
3  A    No.
4  Q    And you and I had communication but it was just
5       regarding scheduling; correct?
6  A    Correct.
7  Q    I didn't tell you what I was going to ask you and you
8       didn't talk about the records; is that fair?
9  A    That's correct.
10 Q    And I did send you the medical records but you just
11      got them a little bit ago so you probably didn't
12      review them.  Is that fair?
13 A    I very briefly reviewed them.
14 Q    Did you speak with anyone else about your deposition
15      today?
16 A    No.
17 Q    How did you first become aware of this lawsuit?
18 A    Your e-mail.
19 Q    And that was my e-mail asking you about when you were
20      available; correct?
21 A    Correct.
22 Q    Have you had any discussion with anyone besides myself
23      for scheduling about this deposition?
24 A    No.

Page 16

1  Q    Has anyone told you anything about this case?
2  A    No.
3  Q    All right.  So we're going to get into this case now.
4       Do you understand that you're being deposed here today
5       because Jeanette Bass has sued the City of Chicago and
6       a Chicago police lieutenant?
7  A    Yes.
8  Q    As you sit here today, do you have any independent
9       knowledge of who Jeanette Bass is?
10 A    No.
11 Q    So I will represent to you that based on records from
12      Northwestern Hospital Jeanette Bass was evaluated by
13      you in the emergency room on June 24, 2019.  Do you
14      have any reason to dispute that you were not (sic)
15      working on June 24, 2019 at Northwestern Hospital?
16 A    No.
17 Q    Do you independently recall any interactions you had
18      with Ms. Bass on that day without looking at your
19      records?
20 A    No.
21 Q    Do you independently recall any conversations you had
22      with Ms. Bass that day?
23 A    No.
24 Q    Do you independently recall any diagnosis, treatment,

Page 17

1       or medical advice rendered to Ms. Bass without looking
2       at your records?
3  A    No.
4  Q    Is it fair to say that you will need to rely on
5       records to testify about any diagnosis, treatment or
6       medical advice rendered to Ms. Bass?
7  A    Yes.
8  Q    All right.  So I'm going to pull those up now.
9           MS. DORY:  For the record, I'm going to
10      mark these medical records as Exhibit 1 and I'll send
11      them to you, Ms. Elizabeth, after the deposition so
12      that you have them.  They are Plaintiff's Bates 439 to
13      502.
14 BY MS. DORY:
15 Q    Can you see my screen, Doctor?
16 A    Yes.
17 Q    I'm going to kind of scroll through the document.
18          My question is, do you recognize these
19      documents?
20 A    I recognize that they're right out of general
21      emergency medicine documentation with Northwestern.
22 Q    And if you'll see here -- we'll start with the first
23      one.  On page 439, at the top -- sorry.  No.  On page
24      439, it says attending provider here in the middle and

MATTHEW PIROTTE, MD, 05/07/2021                          Page 18..21

Page 18

1   then it has the last name -- I'm sorry.  Say it for me

2   again.  I don't want to mispronounce it.

3  A    Pirotte.

4  Q    Pirotte -- and then Matthew J., M.D.  Do you see where

5   it says that?

6  A    Yes.

7  Q    Is this you?

8  A    Yes.

9  Q    Did you author, based on this, portions of these

10   documents?

11  A    Yes.

12  Q    And how do you fill out these kind of medical

13   documents?

14  A    On the electronic health record, which at that time

15   was EPIC.  Just type it out.

16  Q    So you would sit at a computer and fill these out?

17  A    Correct.

18  Q    Did you have some iPads back then?

19  A    No.

20  Q    Was it your regular practice to draft reports like

21   this one contained in Exhibit 1 as your job as a

22   doctor in the emergency room at Northwestern Hospital?

23  A    Yes.

24  Q    And is this report made in the ordinary course of

Page 19

1   business in your role as a doctor in the ER -- in the

2   emergency room at Northwestern Hospital?

3  A    Yes.

4  Q    So unless I specify, I'm going to be using these

5   records only which were provided by Northwestern

6   Hospital in response to a subpoena in this civil

7   litigation.  Please let me know, Doctor, if you

8   believe a document is not complete or if you think I'm

9   missing something or if you think I'm not referring to

10   the correct document.  Okay?

11  A    Okay.

12  Q    On page 439, which I have pulled up here, there is a

13   section that says, "Visit Diagnosis."  Do you see

14   that?

15  A    Yes.

16  Q    And it says, "Last edited by Pirotte, Matthew J., M.D.

17   on 6/23/2019 1956."  Is that you?

18  A    Yes.

19  Q    What is the purpose of this section of the document?

20  A    That's where we enter the final diagnosis for our

21   questions from our evaluation --

22       COURT REPORTER:  I'm sorry.  You're going

23   to have to repeat that.  I didn't hear that.  "That's

24   where we enter our final diagnosis for" --

Page 20

1       THE WITNESS:  -- or impressions based on

2   our evaluation in the emergency department.

3  BY MS. DORY:

4  Q    And based on this document, what was your final

5   evaluation of this patient?

6  A    Psychiatric problem and agitation.

7  Q    And can you describe to me what you mean by agitation?

8  A    Agitation is, from a medical standpoint, reflects a

9   patient is unable to control their own emotions at

10   such a level that they are aggressive or essentially

11   out of control of themselves --

12  Q    And --

13  A    -- specifically in an amped up or hostile manner.

14  Q    And where it is psychiatric problem, primary, what

15   does that mean, in your own words?

16  A    It's a very, very large diagnostic category.  I often

17   put it on charts just because it's easier than trying

18   to make a final psychiatric diagnosis when you already

19   know that a psychiatrist is going to evaluate that

20   patient.  So rather than saying someone is acutely

21   manic or psychotic or having major depression, I'll

22   just say psychiatric problem, mostly for simplicity in

23   my own documentation.

24  Q    And if a patient had any physical ailments such as,

Page 21

1   like, a broken arm or any contusions, would you have

2   noted that here in your diagnosis section?

3  A    That would be my typical practice.

4  Q    And there's nothing noted about any physical injuries

5   here; correct?

6  A    Correct.

7  Q    So is it safe to assume that based on your records

8   that the patient likely had no physical injuries that

9   you observed during your treatment of them?

10       MS. GIZZI:  Objection.  Lack of

11   foundation.

12  A    It's safe to assume that I didn't document any

13   injuries.

14  BY MS. DORY:

15  Q    So I'm going to turn now to what's been Bates labeled

16   441.  So we're going to go down two pages.  Do you see

17   at the top it says, "ED Provider Note (continued),"

18   and again it has your name?  Do you see that section?

19  A    Yes.

20  Q    So this is a continuation of your notes.  Is that an

21   accurate statement?

22  A    Yes.

23  Q    And then there's a section under that that says,

24   "Chief Complaint."  Can you describe what the Chief

MATTHEW PIROTTE, MD, 05/07/2021                                    Page 22..25

Page 22

1    Complaint section is for?

2  A    The chief complaint indicates the primary words often

3       -- the primary reason -- excuse me -- often in the

4       patient's own words, although not always, as in this

5       case.  The reason for their visit to the emergency

6       department, common chief complaints, chest pain,

7       headache, abdominal pain, laceration.

8  Q    So is this what the patient is telling you their issue

9       is?

10 A    Not in this case, but generally.

11 Q    And why do you say not in this case?

12 A    Further review of the notes would indicate that the

13      patient didn't choose to come to the emergency

14      department, so she didn't have a reason to be there

15      that she was stating on her own.

16 Q    And by further review you're referring to the next

17      section of typed text.  Is that fair?

18 A    Correct.

19 Q    So we can get to that now.  Well, first, it says,

20      "Patient presents with psych problem."  And that is

21      consistent with your diagnosis on the first page;

22      correct?

23 A    Correct.  That's just a copied section from the

24      nursing chief complaint.

Page 23

1  Q    And then it says, "59 y.o.," which is year old --

2       correct?

3  A    Correct.

4  Q    -- "female presenting with agitation and possible

5       psychosis."  Can you describe what psychosis is when

6       you write that here?

7  A    It's a psychiatric condition whereby a patient is

8       suffering from delusions.  That's pretty much it.

9  Q    And when you write "presenting with agitation and

10      possible psychosis," that means that you are observing

11      her show symptoms of these two things; correct?

12 A    It means that I am definitely observing agitation and

13      that I -- in this case I considered psychosis as a

14      possible etiology of the agitation.

15 Q    And what are symptoms of someone who is suffering from

16      possible psychosis?

17 A    Delusions, paranoia, inability to care for themselves.

18      Sometimes patients have what are called negative

19      symptoms, meaning that they become withdrawn and

20      noncommunicative.  Sometimes they have positive

21      symptoms, like they become agitated or violent or

22      hallucinate.

23 Q    So then the next line says, "Apparently patient called

24      CPD" -- and is it fair to represent that CPD is the

Page 24

1    Chicago Police Department?

2  A    Yes.

3  Q    -- "to her apartment because she stated that her

4       apartment building was entering to record her naked."

5       Did I read that correctly?

6  A    Yes.

7  Q    Where did you get this information from?

8  A    I don't recall.

9  Q    Is it likely the information came from the patient

10      herself?

11 A    Based on the way I wrote it it's more likely to be

12      information that came from the police officers who

13      accompanied the patient.

14 Q    And your next sentence says, "The apartment was in

15      considerable disarray and she attempted to flee from

16      the police.  She was apprehended by them and

17      transported here by EMS."  And EMS is emergency

18      services; right?

19 A    Correct.  So I probably got some information from them

20      as well.  That would have been my customary practice.

21      Although I have no recollection.

22 Q    Then the next line is "Patient is extremely angry and

23      hostile, attempting to play recordings on her phone of

24      her yelling at various people as evidence that she was

Page 25

1       being mistreated."  Did I read that correctly?

2  A    You did.

3  Q    And would this information have come from the patient

4       herself based on how you wrote it?

5  A    I'm not sure.  I'm really just referring to my general

6       practice, having seen thousands of psychiatric

7       patients over the years.  I probably composed that

8       line with a combination of information gleaned from

9       the police officers, the medics that were available,

10      and then my observations and potentially a brief

11      discussion with the patient.  That would have been my

12      customary practice.  I don't have any recollection.

13 Q    Do you have any reason to believe that what you wrote

14      here was false?

15 A    It's not false.

16 Q    And the next line is "Definitely has a perception that

17      she has been persecuted by many people over the last

18      few days."  Is that accurate?

19 A    It's accurate.  That line would have come from some

20      degree of discussion with the patient.

21 Q    And then it says, "Denies physical complaints."  And

22      what does that mean?

23 A    My customary practice with psychiatric patients,

24      because this is such an important part of your job in

Urlaub Bowen & Associates, Inc.   312-781-9586

MATTHEW PIROTTE, MD, 05/07/2021                                    Page 26..29

---

Page 26

1    the emergency department, is to ask them if they feel
2    ill or injured in any way beyond their psychiatric
3    issues, because one of the most important jobs for us
4    in the emergency department before we clear a patient
5    to see the psychiatrist is to verify that they don't
6    have anything physical going on, that they haven't
7    ingested any substances that might cause them
8    permanent or lasting harm.  It's really incumbent upon
9    us to make sure that we document if there's any injury
10   or any medical issue that needs to be evaluated,
11   because that puts them on a very, very different
12   pathway.
13 Q    And so here where you write "Denies physical
14   complaints," would you have asked the patient "Do you
15   have any physical complaint"?
16 A    Yeah.  I usually -- my customary practice is to ask
17   them "Is there anything physically bothering you right
18   now?"  That's my general question.
19 Q    And since you wrote "denies," it's likely, based on
20   your notes, that she said no.  Is that fair?
21 A    That would reflect my customary practice.
22 Q    The next one is "Denied psychiatric history."  And the
23   same thought -- you would have asked her and she
24   denied that she had any history of psychiatric issues?

---

Page 27

1 A    That's fair.
2 Q    The next one is "Denies medical history."  You more
3    than likely asked her, based on your notes, if she had
4    any medical history and she denied any type of medical
5    history.  Is that accurate?
6 A    That's fair.
7 Q    And the last one is "Denies medications."  Again, you
8    likely asked her, based on your notes, if she was
9    taking any medications and she denied taking any
10   medication; is that accurate?
11 A    Accurate.
12 Q    Do you have any reason to doubt that anything you put
13   here is false?
14 A    It's not false.  I don't document things that are
15   false.
16 Q    And if a Chicago police officer asked you to document
17   something that was false, would you have done it?
18 A    Absolutely not.
19 Q    And -- hold on.  I had another question on this
20   section.
21 A    And I would report them to their supervisor
22   immediately.
23 Q    So you have no reason to think that you were persuaded
24   by anyone to write anything false in this section;

---

Page 28

1    right?
2 A    I've never done that before.
3 Q    And in treating the patient in the emergency room you
4    interact with her; correct?
5 A    I interact with the patient.
6 Q    And these notes probably reflect to some extent your
7    interaction with her.  Is that fair?
8 A    Fair.
9 Q    So we're going to go down to the next page.  We're now
10   on Bates stamped 442.  So there's a section at the top
11   that says, "ED provider note."  This would be your
12   notes continued; correct?
13 A    Correct.
14 Q    So this is your physical evaluation that you did of
15   the patient; is that accurate?
16 A    Yes.
17 Q    This is when you go in there and actually, you know,
18   evaluate different portions of the patient's body to
19   confirm her saying about any physical issues that she
20   doesn't think she has is true; correct?
21 A    Correct.
22 Q    So you go through the different sections.  We have
23   eyes, nose, neck, and for all three of those it's no
24   discharge or redness, no discharge, bleeding, no

---

Page 29

1    stiffness, pain.  Is that accurate?
2 A    Accurate.
3 Q    What do these records tell us about the patient's
4    eyes, nose and neck?
5 A    This is a review of systems.  As physicians frequently
6    -- in addition to asking about general maladies, we'll
7    ask about specific organ systems.  So this just
8    reflects that there weren't any specific complaints
9    related to those organ systems.  The rest of the
10   systems is all the same.  Specific questions about
11   individual parts of the body or organ systems, and
12   they're all negative.
13 Q    So based on your evaluation of the patient, there were
14   no physical ailments that you evaluated when she was
15   in your care.  Is that fair?
16 A    That's correct.
17 Q    In particular, GI.  Can you tell me what GI means?
18 A    Gastrointestinal.
19 Q    And "N/V/diarrhea," can you tell me what that means?
20 A    Nausea, vomiting, diarrhea.
21 Q    And so when you observed the patient, she was not
22   vomiting; correct?
23 A    Correct.
24 Q    And she didn't exhibit any reason for you to believe

---

MATTHEW PIROTTE, MD, 05/07/2021                                     Page 30..33

Page 30

1    that she would begin vomiting; correct?

2  A   Kind of a strange question, but no.  Correct.

3  Q   And if the patient -- if you had any reason to think

4    that she had severe GI issues, would you have noted

5    that here?

6  A   I would have.

7  Q   And there's no note referencing any GI issues; is that

8    correct?

9  A   Correct.

10  Q   So we're going to go down -- about halfway down the

11    page under -- to the section that starts with Vitals.

12    And that's where you take her blood pressure, pulse,

13    temperature; right?

14  A   Correct.

15  Q   And for -- it says, "BP."  Is that blood pressure?

16  A   It is.

17  Q   And it has an exclamation point and then it's 152 over

18    107.  Can you explain to me why there's an exclamation

19    point there?

20  A   It's a flag in the electronic health record that

21    indicates that it's very abnormal.

22  Q   What is very abnormal about that blood pressure?

23  A   It's very elevated.  Particularly the diastolic, or

24    bottom number.

Page 31

1  Q   What would you expect to see for a 59-year-old female

2    patient's diastolic number?

3  A   It depends on their medical history.  Normal is less

4    than 130 over 80.

5  Q   And for pulse, there's also -- what is pulse?  Can you

6    explain in your own words?

7  A   Heart rate.

8  Q   And there's also an exclamation mark and it says 133.

9    Can you explain the exclamation mark?

10  A   Same thing.  This is an auto-generated flag by the

11    electronic health system to indicate a very abnormal

12    pulse rate.

13  Q   So based on these BP and pulse rates with the

14    exclamation marks, what would be your evaluation of

15    the patient's BP and pulse?

16  A   They were both very elevated.

17  Q   So we come down here and then underneath the next

18    section the last line says, "Psychiatric" -- it says,

19    "Agitated, attempting to record staff, attempting to

20    call friends to come get her."  Do you see that line?

21  A   Yes.

22  Q   And you wrote this in your notes; correct?

23  A   Yes.

24  Q   And why did you write this?

Page 32

1  A   This is my psychiatric assessment that I did of her.

2    It's not my standard practice to specifically evaluate

3    for things like mania or specific manic symptoms,

4    specific psychotic symptoms.  I view my role in the

5    emergency department as verifying that a patient needs

6    to see a psychiatrist and be held against their will

7    if needed, and if so, that they don't have any other

8    issues that I need to address from a medical

9    standpoint.

10        So, again, in the absence of any

11    independent recollection, I can tell you that based on

12    my standard practice, if I wrote that the patient was

13    agitated, they were very, very worked up to a point

14    that even a layperson would have noticed that this was

15    someone who was quite angry or agitated, frankly.

16        And then I documented that she was

17    attempting to record staff, using her phone,

18    attempting to call friends to come and get her.

19    That's the way I document just when someone is being

20    very uncooperative, document their specific behaviors

21    in case then they would later come and say, "Well, you

22    shouldn't have held me against my will.  You shouldn't

23    have put me on a psychiatric hold."  I'm trying to --

24    my standard practice in a case like this would be to

Page 33

1    have some evidence that this patient was extremely

2    agitated.

3        In my experience, patients who are

4    attempting to record staff with their device, they're

5    generally pretty worked up.

6  Q   And can you walk us through what you do to complete a

7    psychiatric evaluation in the emergency department?

8  A   It's -- our job in the emergency room, it's fairly

9    binary, and this was true in Illinois and it's true in

10    Tennessee.  We're really trying to figure out if the

11    patient needs to be held against their will, so that

12    they have an involuntarily evaluation by a

13    psychiatrist and potentially an involuntary admission

14    for involuntary treatment.

15        So, for example, if someone comes in

16    complaining of depression, you really have to sort out

17    are they just having some very minor mood issues,

18    like, maybe a little bit sad versus are they suicidal.

19    In the first case you might refer them to their

20    primary care doctor after you try to provide some

21    support.  In the second case you actually have

22    statutory power to hold them against their will and

23    have them evaluated by a psychiatric physician.

24        So at Northwestern we have a large volume

MATTHEW PIROTTE, MD, 05/07/2021                      Page 34..37

Page 34

1   of psychiatric patients and frequently evaluate them
2   just to make sure that we were going to hold them for
3   what we call a crisis at Northwestern.
4          Without independent recollection, I can
5   tell you that this was a lady who was brought in --
6   based on my notes, I can tell you this is a lady who
7   was brought in by the fire department and the police
8   department who was agitated and who I determined
9   needed to be on a psychiatric hold and needed to have
10  a full psychiatric evaluation, and did not seem to
11  have anything else going on from a medical standpoint.
12  Q   And I think you said in there -- you can correct me if
13  I'm wrong -- that Northwestern had a large amount of
14  psychiatric patients that you saw?
15  A   Correct.
16  Q   So would you say at Northwestern you had more exposure
17  and experience with psychiatric patients than you have
18  right now at Vanderbilt?
19  A   Much more.
20  Q   So we're going to go to the next page, page Bates 443.
21  Again, "ED Provider Note (continued)." So these are
22  your notes continued; is that fair?
23  A   Yes.
24  Q   And it says, "Likely acute on chronic psych problem.

Page 35

1   Does not acutely appear ill, injured, or suffering
2   from ingestion." Did I read that correctly?
3   A   Yes.
4   Q   So starting with the first sentence, I'm sure this is
5   repetitive but, again, what did you mean -- based on
6   your notes, what does it mean when you write "Likely
7   acute on chronic psych problem"?
8   A   That line indicates that I felt -- again, referring to
9   custom and practice -- customary practice, I should
10  say -- that line indicates that my best judgment was
11  that this patient likely had chronic psychiatric
12  issues and was in an acute flare or acute exacerbation
13  of a chronic psychiatric problem.
14  Q   And by a flare, do you mean that it was -- what do you
15  mean when you say flare?
16  A   Well, I apologize. Flare is a pretty imprecise term.
17  Many patients with psychiatric conditions have good
18  days and bad days and I assessed she had some acute
19  issues on top of what I assessed to be probably
20  longstanding psychiatric -- I shouldn't say
21  longstanding, but there was something about this case
22  that made me think this woman was chronically mentally
23  ill as well. Again, referring to practice experience
24  there. And that on top of that chronic mental

Page 36

1   illness, she had called the police and then fled from
2   the police and had to be restrained and brought to the
3   hospital by medics against her will. This is all just
4   years of practice experience.
5   Q   And the next line, "Does not appear to be acutely ill,
6   injured, or suffering from an ingestion." Based on
7   that line is it fair to say she was not suffering from
8   any gastric issues that you observed?
9   A   Correct.
10  Q   Is there any reason that you would have written this
11  falsely if she was suffering from any ingestion?
12  A   No. Like I said, it does not appear. You always have
13  to be a little bit careful with agitated psychiatric
14  patients that the agitation and the psychiatric
15  problem -- injury to significant barriers to her
16  ability to gather information. So you're always doing
17  your best on these cases and that's why it's in the
18  document pretty carefully. I don't say she is not
19  ill, she is not injured. I say at this moment she
20  does not appear to be ill, injured or suffering from
21  any ingestion.
22  Q   So then we go to the next section. It says,
23  "Impression and Plan." What is this section?
24  A   My final thoughts on the patient's condition and what

Page 37

1   we're going to do about it.
2   Q   And what were your final thoughts on this patient's
3   condition based on the records?
4   A   As we noted earlier, that she clearly had a
5   psychiatric problem. She was clearly suffering from
6   an agitated state. When I wrote medication was
7   needed, that means that I had judged that she might
8   require antipsychotics or benzodiazepine to safely
9   control her behavior and that we were going to have
10  the psychiatric team see her.
11         The next line which was discussed, the
12  incidental findings, was an autopopulated check that I
13  use for myself just to make sure that if we did a CT
14  on the spot that I had talked to the patient about it.
15  It doesn't apply in this case. It was part of my
16  automatically-generated note.
17  Q   So you did not discuss that with the patient because
18  there was nothing to discuss. Is that accurate?
19  A   Yes.
20  Q   And then, of course, we have your signature there and
21  you signed this on 6/23/2019 at 7:58 p.m. Is that
22  accurate?
23  A   Yes.
24  Q   And you have no reason to doubt that anyone else wrote

MATTHEW PIROTTE, MD, 05/07/2021                    Page 38..41

Page 38

1    this; correct?
2  A    They did not.
3  Q    So we're going to turn to what's been Bates labeled
4    448.  So we're going to go down a little bit.  And a
5    lot of this is not your notes, which is why I'm
6    skipping ahead.  Okay.  So on 447 it -- I'm sorry --
7    448, at the top it says, "ED Care Timeline
8    (continued)."  Can you tell me what the ED Care
9    Timeline is?
10  A    It's a nice feature of EPIC that allows you when you
11    print out records to have things in a completely
12    sequential manner.
13  Q    So it kind of puts everything in a chronological order
14    of what every doctor or nurse ordered or did on the
15    case; is that fair?
16  A    That's generally fair.  I don't know all the details
17    of how EPIC has constructed this timeline.
18  Q    So down here at 19:28:25, order placed, "Consult to
19    psych ED," and it has your name.  Is that accurate?
20  A    Yes.
21  Q    So would this have been the time, based on what the
22    system says, that you placed the order for the patient
23    to be consulted with psych?
24  A    Yes.

Page 39

1  Q    And then we go down a little bit further and it says,
2    "19:29, Orders Placed, Basic Metabolic Panel," and
3    again it has your name.  Can you describe to me what
4    the basic metabolic panel is?
5  A    Yeah.  It's a panel of lab tests to check the
6    patient's really important electrolytes, their blood
7    sugar and their kidney function.
8  Q    And here it looks like you placed that at 19:29; is
9    that fair?
10  A    Yes, along with the other state mandated labs for
11    psychiatric patients.
12  Q    And you said state mandated labs?
13  A    Yes.
14  Q    So these are -- when you have a psychiatric patient,
15    you have to order these?
16  A    No.  They're required for admission to psychiatric
17    facilities.  So it was the customary practice at
18    Northwestern to order a BMP, a CBC, which is a blood
19    count, white blood cells, red cells, et cetera, and
20    then blood alcohol level on every psychiatric patient.
21    This is a very standard order.
22  Q    And what does extra blue top tube mean?
23  A    It's just lab stuff telling the nurses to draw blood
24    tubes in case we have to add stuff on.  It's inside

Page 40

1    laboratory baseball.  I wouldn't worry about it.
2  Q    I'm just clarifying.
3        So you placed this order because you had
4    recommended the patient for a psych evaluation; is
5    that accurate?
6  A    Yes.
7  Q    Then we're going to go down to what is Bates labeled
8    453.  Again, we're continuing the Emergency Department
9    timeline.  So on 453 at the top we have "ED Care
10    Timeline (continued), and down here we have two -- we
11    have at 22:32:27 "Orders Placed, acetaminophen
12    (Tylenol) tablet 650 mg, Pirotte, Matthew J., M.D."
13    Is that you?
14  A    Yes.
15  Q    And based on this, according to the computer, around
16    22:32:27 you placed an order for acetaminophen; is
17    that accurate?
18  A    Yes.  Someone -- a nurse may have entered the order
19    under my name.
20  Q    But would you have given the nurse the order?
21  A    Probably.
22  Q    Can you tell me why you typically in your practice
23    prescribe Tylenol 650 mg to a patient?
24  A    Pain management.

Page 41

1  Q    And there are other options for pain management that
2    you can give in a hospital; right?
3  A    Yes.
4  Q    And would you say Tylenol is one of the less intense
5    options that you have?
6  A    That's kind of a strange way to frame it.  It's
7    considered an appropriate medication for mild to
8    moderate pain as opposed to severe pain, in which case
9    you might choose an opiate.
10  Q    If there were -- if a patient had worse pain, say, for
11    ingestion, can you prescribe an opiate for that?
12  A    More typically.
13  Q    And then it also has down here, 22:51:49 "Orders
14    Placed" -- I'm going to butcher this -- "OLANZapine
15    zydis (ZyPREXA) disintegrating tablet at 10 mg," then
16    your name again.  Do you see that?
17  A    Yes.
18  Q    Can you tell us what that medication is?
19  A    OLANZapine is a new antipsychotic that is -- it's
20    actually nice.  You can give it in a dissolving pill
21    form.  We often used it for agitation in the Emergency
22    Department.
23  Q    Does it -- is 10 milligrams considered an average dose
24    for that medication?

MATTHEW PIROTTE, MD, 05/07/2021                    Page 42..45

Page 42

1  A    Yes.

2  Q    And you said this is something that you commonly gave

3       to psychiatric patients?

4  A    Yes.

5  Q    And based on this record you ordered this medication

6       to be given to the patient; is that accurate?

7  A    Yes.

8  Q    So we're going to go down to page 454.  At 23:03:11 a

9       lab was ordered for "OP UA W/MICROSCOPIC RFX CULT" and

10      it has your name.  Do you see that?

11 A    Yes.

12 Q    Can you describe what that is?

13 A    It's a urinalysis looking for infection or other

14      complications.  RFX culture means that with certain

15      parameters you can generate a urine culture, like if

16      it looked like the urine was bacterially infected.

17 Q    And then finally at 23:03:31 it says, "Medically

18      Cleared," and it has your name.  Do you know what that

19      means or why that's there?

20 A    That means that we completed our medical evaluation

21      and felt that the patient was stable to see the crisis

22      workers.

23 Q    You used all of these notes to form your opinion that

24      we talked about at the very beginning underneath the

Page 43

1       Diagnosis section; correct?

2  A    Correct.

3  Q    So all these labs that you ordered and everything

4       would factor into your ultimate diagnosis where you

5       wrote on 439 "Psychiatric problem (primary)" and

6       "Agitation."  Is that accurate?

7  A    Yes.

8  Q    So if any of those labs that you ordered that we -- if

9       any of those labs you ordered showed any signs or

10      issues having to do with the GI or ingestion, would

11      you have included that underneath your diagnosis?

12 A    Typically.

13 Q    And so in your experience what happens after you

14      medically clear someone who's on the psych evaluation

15      hold?

16 A    They are evaluated by a resident psychiatrist or a

17      social worker and then eventually by an attending

18      psychiatrist, and they make the determination as to

19      what would happen with the patient, including whether

20      or not they would go to a psych facility.

21 Q    And you have no involvement in that; correct?

22 A    No.

23 Q    And you don't have any influence over what happens to

24      the patient after they leave the Emergency Department;

Page 44

1       correct?

2  A    No.

3  Q    Do you recall anything, now that we've looked at the

4       records, about the patient Jeanette Bass?

5  A    No.

6  Q    Is there anything else that we haven't talked about

7       about Ms. Bass that you think that we should talk

8       about?

9  A    No.

10 Q    To the best of your knowledge did you ever care for

11      Ms. Bass again after you saw her on this day?

12 A    I don't recall.

13 Q    And have you ever seen Ms. Bass, to the best of your

14      knowledge or memory at this time, since June 24, 2019?

15 A    No.

16 Q    And do you have any -- have you ever spoken with

17      Ms. Bass since this day that you're aware of?

18 A    No.

19 Q    And are all of your opinions today given within a

20      reasonable degree of medical certainty?

21 A    Yes.

22          MS. DORY:  Doctor, I have nothing

23      further.  I'm going to give it over to Ms. Gizzi now

24      to ask her questions.  Thank you so much.

Page 45

1          MS. GIZZI:  Thanks, Emily.

2       Do you need to take a break or anything?

3          THE WITNESS:  No, I'm fine.

4              - - -

5              EXAMINATION

6  BY MS. GIZZI:

7  Q    My first question is, did you work with a doctor named

8       Danielle Jackson when you were at Northwestern in June

9       2019?

10 A    I think I remember her but I don't recall

11      specifically.

12 Q    And at one point you sent Ms. Bass's blood work to

13      pathology, based on the records.  Do you remember

14      doing that?

15 A    No.

16 Q    Typically in your practice in the emergency room, why

17      would you send blood work to pathology?  Is that

18      standard?

19 A    No.  I think in this case it was some abnormal things

20      on a complete blood count will trigger a review by a

21      tech.  I think that that's what happened here.  I

22      basically never, like, order blood sent to pathology.

23      I mean, there is, like, one or two scenarios that

24      don't apply here.  So it was probably an automatic lab

MATTHEW PIROTTE, MD, 05/07/2021                               Page 46..49

Page 46

1    process.  In fact, I would back up and say it was an
2    automatic lab process.
3  Q    Okay.  And do you remember how many times you examined
4    or observed Jeanette Bass on June 23rd and 24th, 2019?
5  A    No.
6  Q    Typically in your practice at Northwestern how many
7    times were you meeting with patients to evaluate or
8    examine them when they came in to the Emergency
9    Department?
10 A    Two to three.
11 Q    Earlier, opposing counsel asked you about the
12   categories on the medical record for, like, skin and
13   the different assessments you make.  Did you actually
14   personally ask Ms. Bass about whether she had any
15   gastrointestinal complaints or something along those
16   lines?
17 A    I don't recall.
18 Q    Do you normally as a doctor ask personally or do
19   nurses ask?
20 A    I'm sorry.  I didn't hear the last part of your
21   question.
22 Q    Was it your practice at Northwestern to ask personally
23   of the patient questions about physical complaints, et
24   cetera?

Page 47

1  A    It would depend upon their presentation.  If relevant
2    to the presentation, yes.
3  Q    Okay.  And earlier you stated that you did place
4    Ms. Bass on a psychiatric hold.
5  A    Correct.
6  Q    Do you remember at any point Ms. Bass threatening you
7    verbally or physically?
8  A    No.
9  Q    Sorry.  That was a bad question.  No, you don't
10   remember or no, she didn't?
11 A    I don't have any independent recollection in this
12   case.
13 Q    Would you have put that in the records if she did
14   threaten you?
15 A    Generally not.  It would depend on how the threat was
16   worded.
17 Q    Is a patient presenting possible psychiatric -- or
18   psychosis threatening, like, their medical staff or
19   provider, is that not something that's relevant to the
20   diagnosis?
21 A    I mean, it happens.  I think what I would say is that
22   psychiatric patients threaten us so frequently that a
23   lot of times I don't even document it.  Maybe it would
24   be better if I did, but I don't -- psychiatric

Page 48

1    patients threaten me all the time and I generally just
2    document that they need to see a psychiatrist.  As
3    long as there is nothing medical going on, I don't
4    necessarily document that specific behavior.  If I was
5    going to involve -- you know, if I was going to file a
6    police report or something like that or suggest that
7    the hospital use that threat to create a specific care
8    plan for that patient -- you know, occasionally we
9    have patients that are so threatening to the staff
10   that they're no longer -- they have special care
11   plans.  But generally it wouldn't be my usual practice
12   to document such a threat.
13 Q    Okay.  Understood.
14         As a physician in an Emergency Department
15   how do you assess a person for suicidality?
16 A    Well, usually we're remarkably straightforward about
17   that.  You just ask them if they're thinking about
18   harming themself.  We'll generally ask "Do you think
19   about harming yourself or other people?"  And then in
20   specific cases -- again, it depends on the case -- you
21   can also do a suicide risk assessment by noting the
22   factors about the patient that make them a higher risk
23   for suicide -- male, sex, older age, lack of social
24   support, gun in the house, history of impulsive

Page 49

1    behavior are the big ones.
2  Q    And is that something that's documented in -- or was
3    documented in the course of the evaluation by you or
4    the nurses when you're examining someone?
5  A    Typically.
6  Q    Earlier you described the phrase psychiatric problem,
7    primary in parenthesis, as a general diagnosis.  Is
8    that because you have no training as a psychiatric
9    professional or is that just standard practice?
10 A    That's my standard practice.  I wouldn't say it's
11   standard practice for emergency physicians across the
12   board.
13 Q    Was there always, in your experience, a doctor
14   available for a psychiatric consult while -- for
15   emergency admissions?
16 A    Always.
17 Q    I know you mentioned earlier that you didn't know if
18   you ordered the Tylenol for the patient, Ms. Bass --
19   or you don't remember independently.  Why would you
20   order Tylenol for a person who presented as Ms. Bass
21   did?
22         MS. DORY:  Objection to form.
23 A    Very frequently during the course of caring for
24   psychiatric patients they would request medication for

MATTHEW PIROTTE, MD, 05/07/2021                    Page 50..53

Page 50

1    mild pain.  Headaches, mild musculoskeletal pain.  I
2    didn't document why I was ordering it in this case.
3    Or at least I didn't see that documentation when we
4    reviewed the records.
5  BY MS. GIZZI:
6  Q    **Just to clarify, you testified that after you refer a**
7       **patient to a psych consult you are -- that your part**
8       **in the evaluation is done.  Is that a fair**
9       **representation of what you testified?**
10  A   That's a fair representation of my testimony.  I mean,
11      they're still under our care until they leave the
12      emergency room.
13  Q    **Okay.  So they're still -- even though you put in a**
14      **referral for a psych consult, they're still part of**
15      **the emergency department's care?**
16  A   Very much so.
17  Q    **At what point, then, are they no longer in the**
18      **emergency department's care?**
19  A   When they're discharged or transferred.
20  Q    **I have one more question.  In the records it states --**
21      **there's a question about whether the patient is a no**
22      **exit patient.  Do you have any knowledge about what**
23      **that means as a no exit patient?**
24  A   It was a track or a flag on the emergency department

Page 51

1    tracking board that just indicated that patients were
2    not -- that security was on standby.  Again, this was
3    like a very frequent thing at Northwestern, to have
4    many patients who would be psychiatric holds.
5  Q    **And I apologize.  I said that was the last question**
6       **but I do have one more.  Do you remember talking to**
7       **any police officers throughout that shift in June of**
8       **2019?**
9  A   No.
10          MS. GIZZI:  Nothing further.
11          MS. DORY:  I don't think I have anything
12      further.
13          Stephanie, do you have anything?
14          MS. SOTOMAYOR:  No, I have nothing for
15      the City.
16          MS. DORY:  Okay.  Then we are done.
17          Doctor, thank you so much.  You have the
18      opportunity to reserve or waive your signature in this
19      case.  I'm sure you're familiar with that.  If you
20      reserve, the court reporter will contact you and let
21      you know when the transcript is ready, you can review.
22      You can't change -- just dates and times if they're
23      wrong, basically.  Waive, you trust that she took down
24      everything correctly and you don't need to review the

Page 52

1    transcript.
2          THE WITNESS:  Waive.
3          MS. DORY:  Okay.  Perfect.  Thank you so
4    much, Doctor.  Appreciate it.  Feel better.
5          THE WITNESS:  Thank you, guys.
6          COURT REPORTER:  Can I get -- before you
7    all leave, Ms. Dory, did you want that transcribed?
8          MS. DORY:  Yeah.  No rush.  Just regular
9    order.  PDF, please.
10          COURT REPORTER:  And, Ms. Gizzi, did you
11      want it transcribed?
12          MS. GIZZI:  No, thank you.  Not now.
13          COURT REPORTER:  And Ms. Sotomayor is
14      with the same office as you, right, Ms. Dory?
15          MS. DORY:  Stephanie is, yes.
16          COURT REPORTER:  All right.  Thank you,
17      ladies.
18          (At approximately 11:57 (CST) a.m., the
19      deposition was concluded.)
20                   - - -
21
22
23
24

Page 53

1              CERTIFICATE OF NOTARY PUBLIC
2    STATE OF MICHIGAN )
                        )    SS.
3    COUNTY OF OAKLAND )

4       I, Elizabeth A. Tubbert, do hereby certify that the
5    witness whose attached testimony was taken before me in the
6    above-entitled matter, was by me first duly sworn to testify
7    to the truth, the whole truth; that the testimony contained
8    herein was by me reduced to writing in the presence of the
9    witness by means of stenography; afterward transcribed; and
10   that this is the true and complete transcript of the
11   testimony given by the witness.
12      I further certify I am not connected by blood or
13   marriage with any of the parties, their attorneys or agents;
14   and that I am not interested, directly or indirectly, in the
15   matter of controversy.
16      IN WITNESS WHEREOF, I have hereunto set my hand and
17   affixed my notarial seal.
18
19
20
21
22          Elizabeth A. Tubbert, CSR-4248
            Notary Public, Oakland County, Michigan
23          My Commission Expires:  October 25, 2023
24
25

Index: 1-applicable

MATTHEW PIROTTE, MD, 05/07/2021

### Exhibits

**1 Pirotte 050721-1** 3:8 17:10 18:21
**1** 17:10 18:21
**10** 41:15,23
**107** 30:18
**11:03** 4:2
**11:57** 52:18
**130** 31:4
**133** 31:8
**152** 30:17
**19-CV-7557** 5:7
**1956** 19:17
**19:28:25** 38:18
**19:29** 39:2,8

### 2

**2004** 9:3
**2008** 9:20 10:6
**2012** 10:6
**2013** 11:12
**2015** 12:4
**2019** 10:14 16:13,15 44:14 45:9 46:4 51:8
**2020** 4:8 11:22
**2020-14** 4:8
**2021** 4:1
**22:32:27** 40:11,16
**22:51:49** 41:13
**23:03:11** 42:8
**23:03:31** 42:17
**23rd** 46:4
**24** 16:13,15 44:14
**24th** 46:4
**26** 4:8

### 3

**39** 7:11 12:14,17

### 4

**439** 17:12,23,24 19:12 43:5
**441** 21:16
**442** 28:10
**443** 34:20
**447** 38:6
**448** 38:4,7
**453** 40:8,9
**454** 42:8

### 5

**50** 7:13,14
**502** 17:13
**59** 23:1
**59-year-old** 31:1

### 6

**6/23/2019** 19:17 37:21
**650** 40:12,23

### 7

**7** 4:1
**7:58** 37:21

### 8

**80** 31:4

### A

**a.m.** 4:2 52:18
**abdominal** 22:7
**ability** 6:20 36:16
**abnormal** 30:21,22 31:11 45:19
**absence** 32:10

**absolutely** 6:5,13 27:18
**accompanied** 24:13
**accurate** 6:20 21:21 25:18,19 27:5,10,11 28:15 29:1,2 37:18,22 38:19 40:5,17 42:6 43:6
**accurately** 6:23
**acetaminophen** 40:11,16
**activity** 7:16
**acute** 34:24 35:7,12,18
**acutely** 20:20 35:1 36:5
**add** 39:24
**addition** 29:6
**address** 32:8
**administer** 7:10
**administrative** 7:14,15
**admission** 33:13 39:16
**admissions** 49:15
**advice** 17:1,6
**Affairs** 7:18,21
**affect** 6:19
**age** 48:23
**aggressive** 20:10
**agitated** 23:21 31:19 32:13,15 33:2 34:8 36:13 37:6
**agitation** 20:6,7,8 23:4,9,12,14 36:14 41:21 43:6
**ahead** 38:6
**ailments** 20:24 29:14
**alcohol** 6:19 39:20
**amount** 34:13
**amped** 20:13
**angry** 24:22 32:15
**antipsychotic** 41:19
**antipsychotics** 37:8
**anymore** 10:20
**apartment** 24:3,4,14
**apologize** 35:16 51:5
**Apparently** 23:23
**applicable** 5:10

MATTHEW PIROTTE, MD, 05/07/2021

**apply** 37:15 45:24

**apprehended** 24:16

**approximately** 52:18

**area** 11:16,18

**arm** 21:1

**articles** 12:22

**assess** 48:15

**assessed** 35:18,19

**assessment** 32:1 48:21

**assessments** 46:13

**assistant** 7:7 8:8,9 11:23 12:7,9

**associate** 12:5,10

**Associates** 4:6

**assume** 6:1 21:7,12

**attain** 12:1

**attempted** 24:15

**attempting** 24:23 31:19 32:17,18 33:4

**attending** 17:24 43:17

**author** 18:9

**auto-generated** 31:10

**automatic** 45:24 46:2

**automatically-generated** 37:16

**autopopulated** 37:12

**average** 41:23

**awards** 9:6,21

**aware** 15:17 44:17

**B**

**bachelor's** 8:20,22,24 9:6

**back** 18:18 46:1

**bacterially** 42:16

**bad** 35:18 47:9

**barriers** 36:15

**baseball** 40:1

**based** 16:11 18:9 20:1,4 21:7 24:11 25:4 26:19 27:3,8 29:13 31:13 32:11 34:6 35:5 36:6 37:3 38:21 40:15 42:5 45:13

**basic** 39:2,4

**basically** 45:22 51:23

**basis** 7:12

**Bass** 4:20 5:6 16:5,9,12,18,22 17:1,6 44:4,7,11,13,17 46:4,14 47:4,6 49:18,20

**Bass's** 45:12

**Bates** 17:12 21:15 28:10 34:20 38:3 40:7

**begin** 30:1

**beginning** 42:24

**behalf** 4:14,17,20

**behavior** 37:9 48:4 49:1

**behaviors** 32:20

**benzodiazepine** 37:8

**Beta** 9:14

**big** 49:1

**binary** 33:9

**bit** 15:11 33:18 36:13 38:4 39:1

**bleeding** 28:24

**blood** 30:12,15,22 39:6,18,19,20, 23 45:12,17,20,22

**blue** 39:22

**BMP** 39:18

**board** 11:7,9,11 49:12 51:1

**body** 28:18 29:11

**bothering** 26:17

**bottom** 30:24

**Bowen** 4:6

**BP** 30:15 31:13,15

**break** 6:13,15 45:2

**briefly** 6:12 15:13

**broken** 21:1

**brought** 34:5,7 36:2

**building** 24:4

**business** 19:1

**butcher** 41:14

**C**

**call** 31:20 32:18 34:3

**called** 23:18,23 36:1

**care** 23:17 29:15 33:20 38:7,8 40:9 44:10 48:7,10 50:11,15,18

**careful** 36:13

**carefully** 36:18

**caring** 49:23

**case** 5:7,17 13:18 14:4,6,12,14 16:1,3 22:5,10,11 23:13 32:21,24 33:19,21 35:21 37:15 38:15 39:24 41:8 45:19 47:12 48:20 50:2 51:19

**cases** 13:10,14,16 36:17 48:20

**categories** 46:12

**category** 20:16

**CBC** 39:18

**cells** 39:19

**Center** 7:2 9:18

**certainty** 44:20

**certified** 11:7,9,11

**cetera** 39:19 46:24

**Chancellor's** 9:10

**change** 51:22

**charts** 20:17

**check** 37:12 39:5

**chest** 22:6

**Chicago** 4:17 5:6 8:1 16:5,6 24:1 27:16

**chief** 21:24 22:2,6,24

**choose** 22:13 41:9

**chronic** 34:24 35:7,11,13,24

**chronically** 35:22

**chronological** 38:13

**City** 4:17 5:6 16:5 51:15

**civil** 5:9 19:6

**clarify** 50:6

**clarifying** 40:2

**clear** 26:4 43:14

MATTHEW PIROTTE, MD, 05/07/2021

**Cleared** 42:18

**clinical** 7:13

**Club** 9:10

**combination** 7:13 25:8

**combined** 9:24 10:2

**common** 22:6

**commonly** 42:2

**communication** 15:4

**complaining** 33:16

**complaint** 21:24 22:1,2,24 26:15

**complaints** 22:6 25:21 26:14 29:8 46:15,23

**complete** 9:23 19:8 33:6 45:20

**completed** 42:20

**completely** 38:11

**complications** 42:14

**composed** 25:7

**computer** 18:16 40:15

**concluded** 52:19

**condition** 23:7 36:24 37:3

**conditions** 35:17

**confirm** 28:19

**congratulations** 12:12

**considerable** 24:15

**considered** 23:13 41:7,23

**consistent** 22:21

**constructed** 38:17

**consult** 38:18 49:14 50:7,14

**consultant** 14:23

**consultation** 14:15

**consulted** 38:23

**contact** 51:20

**contained** 18:21

**continuation** 21:20

**continued** 21:17 28:12 34:21,22 38:8 40:10

**continuing** 40:8

**control** 20:9,11 37:9

**contusions** 21:1

**conversations** 16:21

**copied** 22:23

**correct** 6:23 12:15 15:5,6,9,20,21 18:17 19:10 21:5,6 22:18,22,23 23:2,3,11 24:19 28:4,12,13,20,21 29:16,22,23 30:1,2,8,9,14 31:22 34:12,15 36:9 38:1 43:1,2,21 44:1 47:5

**correctly** 24:5 25:1 35:2 51:24

**counsel** 4:10 46:11

**count** 39:19 45:20

**court** 4:4 5:11 14:6 19:22 51:20 52:6,10,13,16

**COVID-19** 4:9

**CPD** 23:24

**create** 48:7

**crisis** 34:3 42:21

**CST** 4:2 52:18

**CT** 37:13

**CULT** 42:9

**culture** 42:14,15

**cum** 9:5

**current** 7:13 11:21

**custom** 35:9

**customary** 24:20 25:12,23 26:16, 21 35:9 39:17

**D**

**D-O-R-Y** 4:14

**daily** 7:12

**Dakuras** 4:15 5:16

**Danielle** 45:8

**dates** 51:22

**day** 16:18,22 44:11,17

**days** 25:18 35:18

**Defendant** 4:15,17

**defense** 13:17,18

**degree** 8:20,22,24 9:7,15,17,19,21 25:20 44:20

**delusions** 23:8,17

**denied** 26:22,24 27:4,9

**denies** 25:21 26:13,19 27:2,7

**department** 9:12 20:2 22:6,14 24:1 26:1,4 32:5 33:7 34:7,8 40:8 41:22 43:24 46:9 48:14 50:24

**department's** 50:15,18

**departmental** 9:11

**depend** 47:1,15

**depends** 31:3 48:20

**deposed** 16:4

**deposition** 5:4,8 15:1,14,23 17:11 52:19

**depression** 20:21 33:16

**describe** 20:7 21:24 23:5 39:3 42:12

**details** 38:16

**determination** 43:18

**determined** 34:8

**device** 33:4

**diagnosis** 16:24 17:5 19:13,20,24 20:18 21:2 22:21 43:1,4,11 47:20 49:7

**diagnostic** 20:16

**diarrhea** 29:20

**diastolic** 30:23 31:2

**director** 7:8,9 8:9 11:23

**disarray** 24:15

**discharge** 28:24

**discharged** 50:19

**discuss** 37:17,18

**discussed** 37:11

**discussion** 15:22 25:11,20

**disintegrating** 41:15

**dispute** 16:14

**dissolving** 41:20

**District** 5:7,11

**doctor** 5:18 7:1 17:15 18:22 19:1,7 33:20 38:14 44:22 45:7 46:18 49:13 51:17 52:4

**doctors'** 8:18

MATTHEW PIROTTE, MD, 05/07/2021

**document** 17:17 19:8,10,19 20:4 21:12 26:9 27:14,16 32:19,20 36:18 47:23 48:2,4,12 50:2

**documentation** 17:21 20:23 50:3

**documented** 32:16 49:2,3

**documents** 17:19 18:10,13

**Dory** 4:14 5:3,15,16 17:9,14 20:3 21:14 44:22 49:22 51:11,16 52:3,7, 8,14,15

**dose** 41:23

**doubt** 27:12 37:24

**draft** 18:20

**draw** 39:23

**drugs** 6:18

**duly** 4:24

**E**

**e-mail** 15:18,19

**earlier** 37:4 46:11 47:3 49:6,17

**earn** 9:17

**easier** 20:17

**ED** 21:17 28:11 34:21 38:7,8,19 40:9

**edited** 19:16

**educational** 7:16

**electrolytes** 39:6

**electronic** 18:14 30:20 31:11

**elevated** 30:23 31:16

**Elizabeth** 4:5 17:11

**emergency** 7:7,10 8:8,15 10:8 11:10,15 13:3 16:13 17:21 18:22 19:2 20:2 22:5,13 24:17 26:1,4 28:3 32:5 33:7,8 40:8 41:21 43:24 45:16 46:8 48:14 49:11,15 50:12, 15,18,24

**Emily** 4:14 5:16 45:1

**emotions** 20:9

**employment** 12:3

**EMS** 24:17

**enter** 19:20,24

**entered** 40:18

**entering** 24:4

**EPIC** 18:15 38:10,17

**ER** 19:1

**essentially** 20:10

**etiology** 23:14

**evaluate** 20:19 28:18 32:2 34:1 46:7

**evaluated** 16:12 26:10 29:14 33:23 43:16

**evaluation** 19:21 20:2,5 28:14 29:13 31:14 33:7,12 34:10 40:4 42:20 43:14 49:3 50:8

**eventually** 43:17

**evidence** 5:9 24:24 33:1

**exacerbation** 35:12

**EXAMINATION** 5:14 45:5

**examine** 46:8

**examined** 46:3

**examining** 49:4

**exclamation** 30:17,18 31:8,9,14

**excuse** 13:17 22:3

**Executive** 4:7

**exhibit** 17:10 18:21 29:24

**exit** 50:22,23

**expect** 31:1

**experience** 33:3 34:17 35:23 36:4 43:13 49:13

**expert** 13:9,12,18 14:3,5,6,11,18

**explain** 30:18 31:6,9

**exposure** 34:16

**extent** 28:6

**extra** 39:22

**extremely** 24:22 33:1

**eyes** 28:23 29:4

**F**

**facilities** 39:17

**facility** 43:20

**fact** 46:1

**factor** 43:4

**factors** 48:22

**fair** 15:8,12 17:4 22:17 23:24 26:20 27:1,6 28:7,8 29:15 34:22 36:7 38:15,16 39:9 50:8,10

**fairly** 33:8

**false** 25:14,15 27:13,14,15,17,24

**falsely** 36:11

**familiar** 51:19

**feature** 38:10

**Federal** 5:8,9

**feel** 26:1 52:4

**fellowships** 10:9

**felt** 35:8 42:21

**female** 23:4 31:1

**figure** 33:10

**file** 48:5

**fill** 18:12,16

**final** 19:20,24 20:4,18 36:24 37:2

**finally** 42:17

**findings** 37:12

**fine** 45:3

**finish** 6:9

**fire** 34:7

**firm** 14:17,22

**firm's** 14:19

**flag** 30:20 31:10 50:24

**flare** 35:12,14,15,16

**fled** 36:1

**flee** 24:15

**floor** 8:15

**focused** 10:7 13:3

**form** 41:21 42:23 49:22

**formal** 7:15

**foundation** 21:11

**frame** 41:6

**frankly** 32:15

**frequent** 51:3

Index: frequently-judgment

MATTHEW PIROTTE, MD, 05/07/2021

**frequently** 7:20 29:5 34:1 47:22 49:23

**Friday** 4:1

**friends** 31:20 32:18

**full** 12:6 34:10

**function** 39:7

**G**

**G-I-Z-Z-I** 4:19

**gastric** 36:8

**gastrointestinal** 29:18 46:15

**gather** 36:16

**gave** 42:2

**general** 17:20 25:5 26:18 29:6 49:7

**generally** 22:10 33:5 38:16 47:15 48:1,11,18

**generate** 42:15

**GI** 29:17 30:4,7 43:10

**Gianna** 4:19

**give** 6:20 41:2,20 44:23

**Gizzi** 4:19 21:10 44:23 45:1,6 50:5 51:10 52:10,12

**gleaned** 25:8

**good** 5:18 35:17

**Governor** 4:8

**graduate** 9:2,4

**ground** 5:21

**gun** 48:24

**guys** 52:5

**H**

**half** 7:5

**halfway** 30:10

**hallucinate** 23:22

**happen** 43:19

**happened** 45:21

**harm** 26:8

**harming** 48:18,19

**headache** 22:7

**Headaches** 50:1

**health** 18:14 30:20 31:11

**hear** 5:18 6:4 19:23 46:20

**Heart** 31:7

**held** 11:21 32:6,22 33:11

**higher** 48:22

**hired** 14:17,22

**history** 9:1,12 26:22,24 27:2,4,5 31:3 48:24

**hold** 8:20 9:15 11:20 27:19 32:23 33:22 34:2,9 43:15 47:4

**holds** 51:4

**honors** 9:4,11,12,21

**hospital** 7:19,23 8:1,4 16:12,15 18:22 19:2,6 36:3 41:2 48:7

**hostile** 20:13 24:23

**house** 48:24

**I**

**identify** 4:10,12

**ill** 26:2 35:1,23 36:5,19,20

**Illinois** 5:7,12 8:2 9:18 10:15,17, 20,23 11:1 33:9

**illness** 36:1

**immediately** 27:22

**important** 25:24 26:3 39:6

**imprecise** 35:16

**Impression** 36:23

**impressions** 20:1

**impulsive** 48:24

**inability** 23:17

**incidental** 37:12

**included** 43:11

**including** 43:19

**incumbent** 26:8

**independent** 16:8 32:11 34:4 47:11

**independently** 16:17,21,24 49:19

**individual** 29:11

**infected** 42:16

**infection** 42:13

**influence** 6:18 43:23

**information** 24:7,9,12,19 25:3,8 36:16

**ingested** 26:7

**ingestion** 35:2 36:6,11,21 41:11 43:10

**initial** 12:3

**injured** 26:2 35:1 36:6,19,20

**injuries** 21:4,8,13

**injury** 26:9 36:15

**inside** 39:24

**intense** 41:4

**interact** 28:4,5

**interaction** 28:7

**interactions** 16:17

**intern/residency** 9:24

**internship** 10:1

**internship/residency** 10:3

**internships** 9:23

**involuntarily** 33:12

**involuntary** 33:13,14

**involve** 48:5

**involvement** 43:21

**ipads** 18:18

**issue** 22:8 26:10

**issues** 26:3,24 28:19 30:4,7 32:8 33:17 35:12,19 36:8 43:10

**J**

**Jackson** 45:8

**Jeanette** 4:20 5:5 16:5,9,12 44:4 46:4

**job** 7:13 18:21 25:24 33:8

**jobs** 26:3

**judged** 37:7

**judgment** 35:10

MATTHEW PIROTTE, MD, 05/07/2021

**June** 16:13,15 44:14 45:8 46:4
   51:7

**K**

**K-U-L-I-S** 14:20
**Kansas** 8:23
**Kappa** 9:14
**kidney** 39:7
**kind** 17:17 18:12 30:2 38:13 41:6
**knowledge** 16:9 44:10,14 50:22
**Kulis** 14:17,20,22

**L**

**lab** 39:5,23 42:9 45:24 46:2
**labeled** 21:15 38:3 40:7
**laboratory** 40:1
**labs** 39:10,12 43:3,8,9
**laceration** 22:7
**lack** 21:10 48:23
**ladies** 52:17
**lady** 34:5,6
**lapsed** 10:18,19
**large** 20:16 33:24 34:13
**lasting** 26:8
**laude** 9:5
**law** 14:17,19,22
**lawsuit** 15:17
**layperson** 32:14
**leave** 43:24 50:11 52:7
**level** 20:10 39:20
**license** 10:22 11:3
**licensed** 10:11,13,15,17
**lieutenant** 5:16 16:6
**lines** 46:16
**litigation** 19:7
**live** 10:20
**local** 5:10
**long** 7:4 11:20 48:3

**longer** 48:10 50:17
**longstanding** 35:20,21
**looked** 42:16 44:3
**lot** 38:5 47:23
**loud** 6:8
**Loyola** 9:18

**M**

**M.D.** 4:23 18:4 19:16 40:12
**made** 18:24 35:22
**major** 20:21
**make** 20:18 26:9 34:2 37:13 43:18
   46:13 48:22
**maladies** 29:6
**male** 48:23
**malpractice** 13:16
**management** 40:24 41:1
**mandated** 39:10,12
**mania** 32:3
**manic** 20:21 32:3
**manner** 20:13 38:12
**March** 4:8
**mark** 17:10 31:8,9
**marks** 31:14
**matter** 5:5
**Matthew** 4:23 5:4 18:4 19:16
   40:12
**Maywood** 9:18
**meaning** 23:19
**means** 23:10,12 29:17,19 37:7
   42:14,19,20 50:23
**medical** 7:2 9:15,17,18,19 12:22
   13:16 15:10 17:1,6,10 18:12 20:8
   26:10 27:2,4 31:3 32:8 34:11 42:20
   44:20 46:12 47:18 48:3
**medically** 42:17 43:14
**medication** 27:10 37:6 41:7,18,24
   42:5 49:24
**medications** 6:18 27:7,9
**medicine** 7:7,10 8:8 10:8 11:10,
   15,16,18 13:3 17:21

**medics** 25:9 36:3
**meeting** 46:7
**meetings** 7:15
**Memorial** 8:5,7 10:4
**memory** 44:14
**mental** 35:24
**mentally** 35:22
**mentioned** 49:17
**merit** 9:10
**metabolic** 39:2,4
**mg** 40:12,23 41:15
**middle** 17:24
**mild** 41:7 50:1
**milligrams** 41:23
**minor** 33:17
**mispronounce** 18:2
**missing** 19:9
**mistreated** 25:1
**moderate** 41:8
**moment** 36:19
**mood** 33:17
**morning** 5:18
**Multiple** 12:24
**musculoskeletal** 50:1

**N**

**N/v/diarrhea** 29:19
**naked** 24:4
**named** 11:22 45:7
**Nashville** 7:2,19
**national** 9:10
**nature** 13:14
**Nausea** 29:20
**necessarily** 48:4
**neck** 28:23 29:4
**needed** 32:7 34:9 37:7
**negative** 23:18 29:12
**nice** 38:10 41:20

MATTHEW PIROTTE, MD, 05/07/2021

**noncommunicative** 23:20

**Normal** 31:3

**Northern** 5:6,11

**Northwestern** 8:5,6,12,16 10:4 12:1,5,19 16:12,15 17:21 18:22 19:2,5 33:24 34:3,13,16 39:18 45:8 46:6,22 51:3

**nose** 28:23 29:4

**note** 21:17 28:11 30:7 34:21 37:16

**noted** 21:2,4 30:4 37:4

**notes** 21:20 22:12 26:20 27:3,8 28:6,12 31:22 34:6,22 35:6 38:5 42:23

**noticed** 32:14

**noting** 48:21

**number** 30:24 31:2

**nurse** 38:14 40:18,20

**nurses** 39:23 46:19 49:4

**nursing** 22:24

**O**

**Objection** 21:10 49:22

**observations** 25:10

**observed** 21:9 29:21 36:8 46:4

**observing** 23:10,12

**occasionally** 48:8

**office** 52:14

**officer** 27:16

**officers** 24:12 25:9 51:7

**offices** 8:18

**OLANZAPINE** 41:14,19

**older** 48:23

**OP** 42:9

**opiate** 41:9,11

**opinion** 42:23

**opinions** 44:19

**opportunity** 51:18

**opposed** 41:8

**opposing** 46:11

**options** 41:1,5

**order** 4:7 38:13,18,22 39:15,18,21 40:3,16,18,20 45:22 49:20 52:9

**ordered** 38:14 42:5,9 43:3,8,9 49:18

**ordering** 50:2

**Orders** 39:2 40:11 41:13

**ordinary** 18:24

**organ** 29:7,9,11

**originally** 11:11

**oversee** 12:15,17,20

**P**

**p.m.** 37:21

**pages** 21:16

**pain** 22:6,7 29:1 40:24 41:1,8,10 50:1

**panel** 39:2,4,5

**parameters** 42:15

**paranoia** 23:17

**parenthesis** 49:7

**part** 12:3 25:24 37:15 46:20 50:7,14

**participate** 10:9

**parts** 29:11

**pathology** 45:13,17,22

**pathway** 26:12

**patient** 20:5,9,20,24 21:8 22:8,13,20 23:7,23 24:9,13,22 25:3,11,20 26:4,14 28:3,5,15 29:13,21 30:3 32:5,12 33:1,11 35:11 37:14,17 38:22 39:14,20 40:4,23 41:10 42:6,21 43:19,24 44:4 46:23 47:17 48:8,22 49:18 50:7,21,22,23

**patient's** 22:4 28:18 29:3 31:2,15 36:24 37:2 39:6

**patients** 23:18 25:7,23 33:3 34:1,14,17 35:17 36:14 39:11 42:3 46:7 47:22 48:1,9 49:24 51:1,4

**PDF** 52:9

**peer-reviewed** 13:1

**pending** 5:6 6:14

**people** 24:24 25:17 48:19

**percent** 7:13,14

**perception** 25:16

**Perfect** 52:3

**permanent** 26:8

**persecuted** 25:17

**person** 48:15 49:20

**personally** 46:14,18,22

**persuaded** 27:23

**Phi** 9:13

**phone** 24:23 32:17

**phrase** 49:6

**physical** 20:24 21:4,8 25:21 26:6,13,15 28:14,19 29:14 46:23

**physically** 26:17 47:7

**physician** 13:19 14:9 33:23 48:14

**physicians** 29:5 49:11

**pill** 41:20

**Pirotte** 4:23 5:4 18:3,4 19:16 40:12

**place** 47:3

**plaintiff** 4:20

**Plaintiff's** 17:12

**plan** 36:23 48:8

**plans** 48:11

**play** 24:23

**point** 30:17,19 32:13 45:12 47:6 50:17

**police** 16:6 24:1,12,16 25:9 27:16 34:7 36:1,2 48:6 51:7

**portions** 18:9 28:18

**position** 7:6 11:21 12:2

**positive** 23:20

**potentially** 25:10 33:13

**power** 33:22

**practice** 10:20 11:15 18:20 21:3 24:20 25:6,12,23 26:16,21 32:2,12,24 35:9,23 36:4 39:17 40:22 45:16 46:6,22 48:11 49:9,10,11

**practiced** 11:18

**preliminary** 6:17

MATTHEW PIROTTE, MD, 05/07/2021

**prepare** 15:1

**prescribe** 40:23 41:11

**presentation** 47:1,2

**presented** 49:20

**presenting** 23:4,9 47:17

**presents** 22:20

**pressure** 30:12,15,22

**pretty** 23:8 33:5 35:16 36:18

**primary** 20:14 22:2,3 33:20 43:5 49:7

**print** 38:11

**prior** 11:23 13:5

**Pritzker** 4:8

**problem** 20:6,14,22 22:20 34:24 35:7,13 36:15 37:5 43:5 49:6

**Procedure** 5:9

**process** 46:1,2

**produced** 13:17,18

**professional** 49:9

**professor** 7:7 8:8 11:23 12:6,7

**program** 7:8,9

**promoted** 12:10

**provide** 33:20

**provided** 19:5

**provider** 17:24 21:17 28:11 34:21 47:19

**psych** 22:20 34:24 35:7 38:19,23 40:4 43:14,20 50:7,14

**psychiatric** 20:6,14,18,22 23:7 25:6,23 26:2,22,24 31:18 32:1,23 33:7,23 34:1,9,10,14,17 35:11,13, 17,20 36:13,14 37:5,10 39:11,14, 16,20 42:3 43:5 47:4,17,22,24 49:6,8,14,24 51:4

**psychiatrist** 20:19 26:5 32:6 33:13 43:16,18 48:2

**psychosis** 23:5,10,13,16 47:18

**psychotic** 20:21 32:4

**Public** 5:1

**publications** 13:1

**published** 12:22

**pull** 17:8

**pulled** 19:12

**pulse** 30:12 31:5,12,13,15

**purpose** 19:19

**pursuant** 4:7 5:5,8

**put** 20:17 27:12 32:23 47:13 50:13

**puts** 26:11 38:13

---

## Q

**qualify** 14:6

**question** 5:22 6:1,8 12:16 17:18 26:18 27:19 30:2 45:7 46:21 47:9 50:20,21 51:5

**questions** 6:14,17,22 19:21 29:10 44:24 46:23

---

## R

**rate** 31:7,12

**rates** 31:13

**read** 24:5 25:1 35:2

**ready** 51:21

**reason** 16:14 22:3,5,14 25:13 27:12,23 29:24 30:3 36:10 37:24

**reasonable** 44:20

**recall** 13:14 16:17,21,24 24:8 44:3, 12 45:10 46:17

**receive** 9:6,19,21

**recertified** 11:13,14

**recognize** 17:18,20

**recollection** 24:21 25:12 32:11 34:4 47:11

**recommended** 40:4

**record** 4:11 5:3 6:13 17:9 18:14 24:4 30:20 31:19 32:17 33:4 42:5 46:12

**recordings** 24:23

**records** 15:8,10 16:11,19 17:2,5, 10 19:5 21:7 29:3 37:3 38:11 44:4 45:13 47:13 50:4,20

**red** 39:19

**redness** 28:24

**refer** 33:19 50:6

**referencing** 30:7

**referral** 50:14

**referring** 19:9 22:16 25:5 35:8,23

**reflect** 5:3 26:21 28:6

**reflects** 20:8 29:8

**regular** 18:20 52:8

**related** 29:9

**relevant** 47:1,19

**rely** 17:4

**remarkably** 48:16

**remember** 9:9 45:10,13 46:3 47:6, 10 49:19 51:6

**remotely** 4:7

**rendered** 17:1,6

**repeat** 6:5 12:16 19:23

**repetitive** 35:5

**rephrase** 5:23

**report** 18:24 27:21 48:6

**reporter** 4:4,5 19:22 51:20 52:6, 10,13,16

**Reporter/notary** 5:1

**reports** 18:20

**represent** 4:11 5:16 16:11 23:24

**representation** 50:9,10

**request** 49:24

**require** 8:14 37:8

**required** 39:16

**reserve** 51:18,20

**residency** 7:8,9,10 8:9 11:22

**resident** 43:16

**residents** 7:11 12:18,20

**response** 4:9 19:6

**responsibilities** 8:10,14

**rest** 29:9

**restrained** 36:2

**retained** 14:14

**review** 15:12 22:12,16 29:5 45:20 51:21,24

Index: reviewed–team

MATTHEW PIROTTE, MD, 05/07/2021

**reviewed** 15:13 50:4

**revoked** 11:1,5

**rewards** 9:9

**RFX** 42:9,14

**risk** 48:21,22

**role** 7:12 8:6,11 19:1 32:4

**room** 4:12,15,18,21 8:15 16:13 18:22 19:2 28:3 33:8 45:16 50:12

**rules** 5:8,9,10,21

**rush** 52:8

**S**

**sad** 33:18

**safe** 21:7,12

**safely** 37:8

**scenarios** 45:23

**scheduling** 15:5,23

**scholar** 9:10,11

**screen** 17:15

**scroll** 17:17

**section** 19:13,19 21:2,18,23 22:1, 17,23 27:20,24 28:10 30:11 31:18 36:22,23 43:1

**sections** 28:22

**security** 51:2

**send** 15:10 17:10 45:17

**sentence** 24:14 35:4

**separate** 10:1

**September** 11:22

**sequential** 38:12

**serve** 14:11

**services** 24:18

**seventh** 13:22

**severe** 30:4 41:8

**sex** 48:23

**shift** 51:7

**show** 23:11

**showed** 43:9

**sic** 16:14

**signature** 37:20 51:18

**signed** 4:8 12:10 37:21

**significant** 36:15

**signs** 43:9

**similar** 8:10

**simplicity** 20:22

**sit** 16:8 18:16

**sixth** 13:22

**Sixty** 12:21

**skin** 46:12

**skipping** 38:6

**social** 43:17 48:23

**sort** 33:16

**Sotomayor** 4:16 51:14 52:13

**speak** 6:9 15:14

**speaking** 6:9

**special** 48:10

**specialty** 10:7

**specific** 29:7,8,10 32:3,4,20 48:4, 7,20

**specifically** 20:13 32:2 45:11

**spent** 7:15

**spoken** 44:16

**spot** 37:14

**stable** 42:21

**staff** 31:19 32:17 33:4 47:18 48:9

**stamped** 28:10

**standard** 32:2,12,24 39:21 45:18 49:9,10,11

**standby** 51:2

**standpoint** 20:8 32:9 34:11

**start** 17:22

**started** 12:3

**starting** 35:4

**starts** 30:11

**state** 4:11 10:11,15,17,22 11:1,3,5 37:6 39:10,12

**stated** 24:3 47:3

**statement** 21:21

**states** 5:11 50:20

**stating** 22:15

**statutory** 33:22

**Stephanie** 4:16 51:13 52:15

**stiffness** 29:1

**straightforward** 48:16

**strange** 30:2 41:6

**students** 12:14,17

**stuff** 39:23,24

**subpoena** 5:5,10 19:6

**substance** 6:19

**substances** 26:7

**sued** 16:5

**suffering** 23:8,15 35:1 36:6,7,11, 20 37:5

**sugar** 39:7

**suggest** 48:6

**suicidal** 33:18

**suicidality** 48:15

**suicide** 48:21,23

**Summa** 9:5

**supervisor** 27:21

**support** 33:21 48:24

**suspended** 10:22 11:3

**swearing** 4:6

**sworn** 4:24

**symptoms** 23:11,15,19,21 32:3,4

**system** 31:11 38:22

**systems** 29:5,7,9,10,11

**T**

**tablet** 40:12 41:15

**taking** 27:9

**talk** 15:8 44:7

**talked** 11:20 37:14 42:24 44:6

**talking** 51:6

**teaching** 11:21 12:2

**team** 37:10

Index: tech–wrong

MATTHEW PIROTTE, MD, 05/07/2021

tech 45:21

technically 12:9

telling 22:8 39:23

temperature 30:13

Ten 13:8

Tennessee 7:3,18,21 10:11,13 33:10

term 35:16

testified 5:1 13:5,12,19,23 14:1,8 50:6,9

testify 17:5

testifying 13:9 14:3

testimony 6:20 50:10

tests 39:5

text 22:17

themself 48:18

thing 31:10 51:3

things 23:11 27:14 32:3 38:11 45:19

thinking 48:17

Thirty-nine 12:18

thought 26:23

thoughts 36:24 37:2

thousands 25:6

threat 47:15 48:7,12

threaten 47:14,22 48:1

threatening 47:6,18 48:9

time 7:14 11:13 13:22 18:14 38:21 44:14 48:1

timeline 38:7,9,17 40:9,10

times 13:2,6,7,12,21 14:1 46:3,7 47:23 51:22

today 4:7 6:20,23 13:5 14:12 15:2, 15 16:4,8 44:19

told 16:1

top 17:23 21:17 28:10 35:19,24 38:7 39:22 40:9

topics 12:23

totally 12:10

track 50:24

tracking 51:1

training 49:8

transcribed 52:7,11

transcript 51:21 52:1

transferred 50:19

transported 24:17

treating 13:19 14:8 28:3

treatment 16:24 17:5 21:9 33:14

trial 13:23 14:1,3,8

trigger 45:20

true 28:20 33:9

trust 51:23

truthful 6:20

truthfully 6:22

Tubbert 4:5

tube 39:22

tubes 39:24

turn 21:15 38:3

Tylenol 40:12,23 41:4 49:18,20

type 18:15 27:4

typed 22:17

typical 21:3

typically 40:22 41:12 43:12 45:16 46:6 49:5

U

UA 42:9

ultimate 43:4

unable 20:9

uncooperative 32:20

underneath 31:17 42:24 43:11

understand 5:22 16:4

understood 6:2 48:13

United 5:10

university 7:2 8:23 9:12,18

urinalysis 42:13

urine 42:15,16

Urlaub 4:6

usual 48:11

V

Valley 7:18,21

Vanderbilt 7:2,4,6,20,22 8:11 12:8 34:18

verbally 47:7

verify 26:5

verifying 32:5

versus 5:6 33:18

Veterans 7:18,21

view 32:4

violent 23:21

visit 19:13 22:5

Vitals 30:11

volume 33:24

vomiting 29:20,22 30:1

W

W/microscopic 42:9

waive 51:18,23 52:2

walk 33:6

white 39:19

withdrawn 23:19

woman 35:22

worded 47:16

words 20:15 22:2,4 31:6

work 7:1,14,17,18,20 8:4,15 45:7, 12,17

worked 7:4,23 8:1,6,18 32:13 33:5

worker 43:17

workers 42:22

working 16:15

worry 40:1

worse 41:10

write 23:6,9 26:13 27:24 31:24 35:6

written 36:10

wrong 34:13 51:23

MATTHEW PIROTTE, MD, 05/07/2021

**wrote**  24:11 25:4,13 26:19 31:22
32:12 37:6,24 43:5

---
**Y**
---

**y.o**  23:1

**year**  23:1

**years**  7:5,11 25:7 36:4

**yelling**  24:24

---
**Z**
---

**Zoom**  6:5

**zydis**  41:15

**Zyprexa**  41:15