# EXHIBIT G

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   JEANETTE BASS,                )
                                   )
 4              Plaintiff,         )
                                   )
 5          vs.                    )   No. 19 CV 7557
                                   )
 6   SGT. A. DAKURAS,              )
     Individually, and the CITY    )
 7   OF CHICAGO, a Municipal       )
     Corporation,                  )
 8                                 )
                Defendants.        )
 9
              VOLUME II - PAGES 34 through 102
10

11            The continued deposition of

12   RONALD GORDINEER, MD, taken pursuant to the Federal

13   Rules of Civil Procedure, before Katie K. Elliott,

14   Certified Shorthand Reporter No. 084-004537, via

15   Zoom Video Teleconference, on Tuesday,

16   March 30, 2021, commencing at 1:00 o'clock p.m.

17   pursuant to subpoena.

18         APPEARANCES:

19            KULIS LAW, LTD., by
              MS. GIANNA GIZZI
20            (30 North LaSalle Street, Suite 2140
               Chicago, Illinois  60602
21             312.580.1830
               ggizzi@kulislawltd.com)
22               appeared on behalf of the plaintiff;

23

24
```

```
 1          APPEARANCES:   (Cont'd)

 2              HONORABLE CELIA MEZA
                ACTING CORPORATION COUNSEL, by
 3              MS. LANIYA MOORE
                Assistant Corporation Counsel
 4              (2 North LaSalle Street, Suite 420
                 Chicago, Illinois 60602-2502
 5               312.744.9010
                 laniya.moore@cityofchicago.org)
 6                 appeared on behalf of the defendant
                   Dakuras;
 7
                HONORABLE CELIA MEZA
 8              ACTING CORPORATION COUNSEL, by
                MS. STEPHANIE SOTOMAYOR
 9              Assistant Corporation Counsel
                (2 North LaSalle Street, Suite 420
10               Chicago, Illinois 60602-2502
                 312.744.9010
11               stephanie.sotomayor@cityofchicago.org)
                   appeared on behalf of the defendant
12                 City of Chicago.

13                   *   *   *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24
```

```
1                        I N D E X

2
   Witness:                                    Page
3
          RONALD GORDINEER, MD
4
               Examination by:
5
                  Ms. Moore...................    37
6                 Ms. Gizzi...................    84
                  Ms. Moore...................    95
7                 Ms. Gizzi...................    97
                  Ms. Moore...................    98
8

9

10
                     E X H I B I T S
11

12  No.   Description            Marked/Referenced

13    A   Initial Psychiatric Evaluation -
          Bates 0000242-244.....................  45
14    B   Methodist Hospital Nursing - Bates
          0000205-206...........................  82
15

16           (Exhibits attached/scanned.)

17
                        - - -
18

19

20

21

22

23

24
```

```
 1                    (Witness sworn.)

 2                 RONALD GORDINEER, MD

 3  called as a witness herein, having been first duly

 4  sworn, was examined and testified as follows:

 5                    EXAMINATION

 6  BY MS. MOORE:

 7      Q.   All right.  Mr. Gordineer, can you

 8  state your name and spell it for the record.

 9      A.   Ron Gordineer:  R-o-n, last name --

10      Q.   I'm sorry.  You're kind of low.  I

11  can't -- speak up.  Maybe it's my computer.

12      A.    Last name is G-o-r-d-i-n-e-e-r.

13      MS. MOORE:  Let the record reflect this is

14  the deposition of Dr. Ronald Gordineer taken

15  pursuant to subpoena in the matter of

16  Janette Bass v. City of Chicago, et al., Case

17  No. 19 CV 7557 pending in the Northern District of

18  Illinois before the Honorable Judge Kness.

19              This deposition is being taken

20  pursuant to the Federal Rules of Civil Procedure,

21  the Federal Rules of Evidence, and all applicable

22  local rules of the United States District Court for

23  the Northern District of Illinois.

24              My name is Laniya Moore.  I
```

 1  represent Lieutenant Dakuras in this case.

 2                  Can I have all counsel who is

 3  present via Zoom introduce themselves and the

 4  parties that they're representing.

 5      MS. SOTOMAYOR:  Stephanie Sotomayor on behalf

 6  of the defendant City.

 7      MS. GIZZI:  Gianna Gizzi on behalf of the

 8  plaintiff Janette Bass.

 9  BY MS. MOORE:

10      Q.    Okay, thank you.

11                  And these questions may be a little

12  bit redundant from our last encounter, but I just

13  want to make sure we're still on the same page.

14  Okay, Dr. Gordineer?

15      A.    Okay.

16      Q.    All right.  You understand that I'm

17  taking your deposition today, correct?

18      A.    Correct.

19      Q.    You understand that you're under oath,

20  meaning you're sworn to tell the truth when you're

21  answering my questions today, correct?

22      A.    Yes.

23      Q.    And I'm going to go into a little bit

24  of ground rules just to make sure we're still on

 1  the same page as far as with the ground rules with

 2  depositions.

 3                  So if you have any questions or if

 4  there's anything you don't understand during the

 5  deposition, please stop me at any time, tell me

 6  that you don't understand it.  I'm happy to

 7  rephrase the question if needed.  Otherwise, if you

 8  answer my question, I'm going to assume you

 9  understood my question.  Is that fair?

10       A.    Yes.

11       Q.    And just like last time, please answer

12  out loud.  You've been doing pretty good with

13  saying yes, no.  A lot of people have a tendency of

14  saying uh-hmm, uh-uh, or moving their head, but the

15  court reporter cannot take that down.  So if you

16  happen to do that, please don't get offended if I

17  say if that's a yes, that's a no.  Just trying to

18  get some clarity for the record, okay?

19       A.    Okay.

20       Q.    Also, the court reporter can only take

21  one person down at a time, so I am not going to

22  speak over you and I ask that you do the same, okay?

23       A.    Okay.

24       Q.    Okay, sorry.

```
 1                 And lastly, if you ever need to take
 2   a break for any reason, that is perfectly fine.
 3   Just please let me know.  The only thing that I ask
 4   of you is if there's a question pending, please
 5   answer that question before you take the break,
 6   okay?
 7        A.    Okay.
 8        Q.    And like I asked you last time, like I
 9   say, I'm not trying to offend you or anything of
10   this nature.  This is something that I ask of all
11   deponents.  I just want to make sure we're clear.
12                 Are you currently under the
13   influence of any medications, drugs, alcohol, or
14   substances that may affect your ability to give
15   truthful and accurate testimony here today?
16        A.    No.
17        Q.    So before I jump in, we -- this is the
18   continuing part of the deposition.  I guess I'll
19   say part 2.  We postponed this deposition due to
20   the fact that you -- so that you can make an
21   informed decision as to whether you wanted to have
22   counsel represented.
23                 You have had time to make an
24   informed decision regarding that, correct?
```

```
 1        A.    Yes.

 2        Q.    And what was your decision?

 3        A.    I couldn't get a response from the

 4   hospital, so I decided to proceed without counsel.

 5        Q.    Okay.  And I'm probably going to be

 6   jumping around a little bit, so if I confuse you,

 7   like I said, please let me know.

 8              So in our last deposition, you spoke

 9   about giving testimony in Ohio in regards to -- and

10   correct me if I'm wrong -- like mental health

11   treatment with patients, so forth and so on.

12              You remember that, correct?

13        A.    Yes.

14        Q.    And when you testified at those

15   hearings, were you considered an expert, or were

16   you considered a doctor during the testimony, or

17   both?

18        A.    I don't know.  The situation was the

19   patient was found to need to be committed to

20   long-term treatment for the hospital, and I was

21   presenting evidence in favor of commitment to

22   treatment.

23        Q.    Okay.  And is that the only time that

24   you gave testimony is the one that you just told me
```

1   about, or are there other times you gave testimony

2   in regards to mental health treatment with patients?

3        A.    Well, yeah.  About a hundred times.

4        Q.    Okay.  And each and every time out of

5   those hundred times you were just giving testimony,

6   do you know if you were giving it as an expert or a

7   doctor any of those times?  I know you've given it

8   as a doctor, but were you tendered as an expert as

9   well in those cases?

10       A.    I don't remember what they called it.

11  I'm not clear on what an expert witness is, so I

12  don't know.  I'm not familiar with the legal terms.

13       Q.    Okay.  Well, we -- it's safe to say

14  that you were testifying as a doctor, correct?

15       A.    Oh, yes, yes.

16       Q.    What did you do to prepare for today's

17  deposition?

18       A.    Nothing.

19       Q.    Okay.  Did you talk to anybody about

20  today's deposition?

21       A.    I talked to two lawyers.

22       Q.    Okay.  And what -- well, who are the

23  lawyers that you talked to?

24       A.    Alan Spitz and then Ed Green.

```
 1        Q.    You said Alan -- can you spell that for
 2   me?  Alan Spitz, I think that's what you said.
 3        A.    A-l-a-n, S-p-i-t-z.
 4        Q.    Okay.  And Ed, you said, Green?
 5        A.    Yes.
 6        Q.    How many times did you talk to Alan
 7   Spitz --
 8        A.    Once.
 9        Q.    -- about this deposition?
10        A.    One, one time.
11        Q.    And how many times did you talk to
12   Ed Green about this deposition?
13        A.    One time.
14        Q.    And what did you talk to Alan Spitz
15   about in regards to this deposition?
16        A.    Should I have a lawyer?  What does it
17   mean, a deposition?
18              Those are the two questions that I
19   had.
20        Q.    Did you ask Ed Green the same questions?
21        A.    The same thing, yes.
22        Q.    Other than trying to figure out if you
23   need an attorney, did you talk to anyone else about
24   the deposition that you're sitting for today?
```

```
 1        A.    Yeah.  The administrator at Thorek
 2   Hospital.
 3        Q.    And was this also to inquire about
 4   whether if they were going to provide you counsel
 5   for today's deposition?
 6        A.    Yes.
 7        Q.    Did you speak with anyone else about
 8   today's deposition?
 9        A.    No.
10        Q.    Okay.  So again, these may be a little
11   bit redundant, but I just want to make sure we're
12   on the same page.
13              As you sit here today, you still do
14   not know who Janette Bass is, correct?
15        A.    Well, I don't recall who she is, but I
16   met her and interacted with her.
17        Q.    Okay.  And when you say "interacted,"
18   just to make sure it's clear, you evaluated her on
19   June 24, 2019, correct?
20        A.    Yes.
21        Q.    And just to make sure we're on the same
22   page, you still don't independently recall any
23   conversations that you had with Janette Bass,
24   correct?
```

```
 1        A.    I don't.

 2        Q.    Okay.  And you still don't

 3   independently recall any treatment, diagnosis, or

 4   medical advice rendered to Janette Bass without

 5   looking at the medical records, correct?

 6        A.    That's correct.

 7        Q.    So it's fair to say that you would need

 8   to rely on the medical records to testify about the

 9   diagnosis, treatment, or medical advice rendered to

10   Janette Bass, correct?

11        A.    Correct.

12        MS. MOORE:  Give me one second, guys.  I'm

13   going to try to share my screen so give me a second.

14             Can we take a 2-minute break real

15   quick?  I need to fix something on my end.

16                    (Recess taken.)

17        MS. MOORE:  All right.  We can go back on the

18   record.

19   BY MS. MOORE:

20        Q.    So this is what I previously marked as

21   Exhibit A in our last deposition.

22             So just for clarity's sake,

23   Exhibit A was plaintiff's 242 through plaintiff's

24   244, and I know I'm scrolling very fast, so I'm
```

1  going to go back up and go a little bit slow so you

2  can see this.

3              But can you see this, Dr. Gordineer?

4      A.    Yes.

5      Q.    All right.  So I'm just going to scroll

6  a little bit.  I'm going to ask you questions about

7  this, but I just want you to be able to see it

8  first.

9              If I'm going too fast, let me know.

10 I just want you to look at it real quick.

11     A.    Okay.

12     Q.    All right.  Do you recognize this

13 document?

14     A.    Yes.

15     Q.    And what is this document?

16     A.    It's a psychiatric evaluation.

17     Q.    I don't know if it's my computer, but I

18 think you're kind of low for me, so if you can

19 speak up a little bit.

20              You said it's a --

21     A.    A psychiatric evaluation.

22     Q.    Okay.  And previously I remember in our

23 last encounter you said that you reviewed this

24 before you sat for the first deposition, correct?

1        A.    Briefly, yes.

2        Q.    Okay.  And this initial psychiatric

3   evaluation, this is something that you authored,

4   correct?

5        A.    Yes.

6        Q.    And it says Initiated By, and it has

7   your name.

8              That just means that you authored

9   the document, correct?

10       A.    I've never seen it, but that sounds

11  reasonable, yes.

12       Q.    Okay.  And the date and time, the time

13  is in military time, 1900, correct?

14       A.    It appears so.  I've never noticed that

15  before, but that's what it appears to be, yes.

16       Q.    Okay.  So in regards to this initial

17  psychiatric evaluation, can you explain to me how

18  you would go about filling out this form?

19       A.    Well, I would either dictate it or type

20  it.

21       Q.    Okay.  So is it like something that

22  populates?  Like would it have like a history

23  section?

24       A.    No, no, no.

1        Q.    So all of this would have been
2   something you typed up?
3        A.    That's correct.
4        Q.    And was it your regular practice to
5   draft, I guess, reports like this?  The one that's
6   contained in Exhibit A.
7        A.    Yes.
8        Q.    And this report or initial psychiatric
9   evaluation, this is something that would have been
10  made in the ordinary course of business in your job
11  as a doctor at the Methodist Hospital, right?
12       A.    Yes.
13       Q.    So what is the purpose of the initial
14  psychiatric evaluation?  Can you explain that to me?
15       A.    To document the presenting symptoms
16  that the patient comes to the hospital for as well
17  as to document a plan for treatment.
18       Q.    So I'm going to scroll down where it
19  says Chief Complaint.
20             What is the purpose of this section?
21  What -- yeah, what's the purpose?
22       A.    It is -- the purpose is to document the
23  reason for presentation to the emergency room.
24       Q.    And it says psychosis, correct?

```
 1        A.    Yes.

 2        Q.    And I'm apologizing in advance.  I'm

 3  probably going to butcher some medical terms, so

 4  please correct me when I do.

 5              So what exactly is psychosis?

 6        A.    Well, it is a symptom of mental illness

 7  that most commonly presents as hallucinations

 8  and/or delusions.

 9        Q.    And when it says chief complaint, where

10  would you have gotten the chief complaint from?

11  Like is it a report you would have reviewed, or

12  where would you have gotten the information to put

13  what the chief complaint was?

14        A.    Observation of the patient and reading

15  the previous documentation from the emergency room.

16        Q.    And you said reading the previous

17  documentation from the emergency room.

18              So in this case, would it have been

19  the emergency room records from Northwestern?

20        A.    Most likely.  Occasionally they will

21  transfer from one ER at a different hospital to

22  another emergency room, but usually it's the

23  documentation from the original emergency room.

24        Q.    Okay.  So going to History of Present
```

1   Illness, what is the purpose of that section?

2          A.    It is to describe and document the

3   presenting signs and symptoms of the illness.

4          Q.    Okay.  So it says, Onset of Illness:

5   Patient presents as a 59-year-old female previously

6   diagnosed with schizophrenia/schizoaffective

7   disorder, presented to the ER after exacerbation of

8   mood and psychotic symptoms.

9                   I guess my question is:  When you

10  say, previously diagnosed with

11  schizophrenia/schizoaffective disorder presented to

12  the ER, where would you have gotten that

13  information from?

14         A.    I would have gotten it by asking the

15  patient, Have you ever been diagnosed with a mental

16  illness?

17         Q.    Okay.  So is it safe to say because you

18  have that written that Ms. Bass told you that she

19  was previously diagnosed with schizophrenia or

20  schizoaffective disorder?

21         MS. GIZZI:  Objection, misstates the

22  testimony.

23         THE WITNESS:  It's safe to say that.

24

1   BY MS. MOORE:

2        Q.    Okay.  So can you I guess explain for

3   me like schizophrenia, slash, schizoaffective

4   disorder?  Like what does that mean?  Is that

5   interchangeable?  What does that mean?

6        A.    The reason both are there and there's a

7   slash, it's because it's a provisional diagnosis.

8   At that point it could have been either one.  I'm

9   taking the information from the patient, and she --

10  you know, she wasn't able to for certain state what

11  she was previously diagnosed with.  So it's

12  somewhere in the -- she could remember -- I suspect

13  she could remember that word, and so it was one or

14  the other of those.

15       Q.    Okay.  And this one down here says the

16  ER record states, 59-year-old Caucasian female

17  direct from Northwestern Hospital.

18             You see all of that, correct?

19       A.    Yes.

20       Q.    And this is something that you -- well,

21  let me ask:  Did you get this from the Northwestern

22  ER record?

23       A.    I don't recall.  But that's a copy and

24  paste, so I would have taken that from another

1  record, whether it was the Northwestern ER or the

2  Methodist ER.

3       Q.    Okay.  And is this something you would

4  have taken into consideration I guess prior to

5  evaluating Ms. Bass?

6       A.    Yes.  I would have read the ER note

7  prior to -- I may have read the ER note prior to.

8  Probably would.  Probably would have read the ER

9  note, but sometimes I don't.  It just kind of

10 depends on the circumstance.

11      Q.    Okay.  So do you recall in this

12 instance whether you read the ER note or that

13 verbiage that you have right here that says, The ER

14 records states?  Do you recall?

15      A.    I don't.  I don't recall.

16      Q.    Okay.  And is it your general practice

17 to read I guess records from the ER before you

18 evaluate a patient?

19      A.    It depends on the circumstances.

20      Q.    Okay.  So I'm going to scroll around a

21 little bit where it says, medical HX, does HX stand

22 for history?

23      A.    Yes.

24      Q.    And it said reviewed in meditech?  You

1   see that?

2          A.     Yeah.

3          Q.     And what is meditech or meditech, or

4   however you pronounce it?

5          A.     It's the electronic medical records

6   used by that particular hospital; in this case,

7   Methodist.

8          Q.     Okay.  So it's basically a system where

9   you would review whatever notes -- whatever medical

10  records that the hospital had at the time

11  associated with the patient.  That's safe to say?

12         A.     That's correct.

13         Q.     So going back up where it says, Upon

14  evaluation, the patient is cooperative.

15                PT stands for patient, right?

16         A.     That's correct.

17         Q.     So upon evaluation, the patient is

18  cooperative.  Patient exhibits psychotic,

19  disorganized thought process.

20                I'm going to stop there where it

21  says, Patient exhibits psychotic, disorganized

22  thought process.

23                What does that mean?

24         A.     That means that when they engage in

1  verbal interaction, they are unable to organize

2  their sentences in a way that makes sense or leads

3  to a point, and so we call that disorganized

4  thought process.

5         Q.   Okay.  And moving on to, loose

6  associations and tangentiality, she is hyperverbal

7  and with pressured speech.

8              So loose associations and

9  tangentiality, what does that mean?

10        A.   Loose associations mean that you can

11 ask the patient a question, or the patient starts

12 talking to themselves about a particular subject,

13 but it's only loosely or peripherally related to

14 the subject in question.

15             You want me to give you an example?

16        Q.   Yes, please.

17        A.   So you just asked me, What is loose

18 associations?

19             And if I answered that by saying,

20 Well, loose associations are when you have --

21 someone has a loose noose around their neck and the

22 knot is not tied very well, and I saw that on

23 Gunsmoke one time.

24        Q.   Okay.

```
 1        A.    So that's a loose association.  So it's

 2   kind of associated, a little bit associated with

 3   the point, but not enough to have any meaning.

 4        Q.    Okay.

 5        A.    And then tangentiality is when someone

 6   responds to a question with an answer that is

 7   tangent or outside of what would be considered

 8   relevant to the question.

 9              So if I were to ask her about her

10   neighbors in her apartment complex, she would

11   answer with something about her family or something

12   about the City of Chicago, something that's just

13   outside of the point or the subject.

14        Q.    Okay.  So it's fair to say when you

15   were evaluating Ms. Bass that when you were asking

16   her questions she did not completely answer your

17   question or the answer that she gave was not --

18        A.    Relevant.

19        Q.    -- relevant to the question at hand

20   that you were asking her?

21        A.    Yes.

22        Q.    Okay.  Now, you said she is hyperverbal

23   with pressured speech.

24              What does that mean, or is that
```

 1   like --

 2        A.     Pressured --

 3        Q.     Go ahead.  I'm sorry.

 4        A.     Pressured speech is a mood symptom.

 5   When someone exhibits a manic mood, they speak

 6   with, you know, increased velocity and increased

 7   intensity, and they can't be interrupted.  They

 8   continue speaking over, and it's like verbal

 9   diarrhea.  They just can't control the words that

10   are coming out.  And it has a sense of like they're

11   being pushed, something's pushing them from the

12   inside to keep talking.

13                    That's the pressured speech.

14        Q.     Okay.  And it's safe to say that what

15   you just described to me was something that Janette

16   Bass displayed as well when you were evaluating her.

17        A.     Yes.

18        Q.     Okay.  And paranoid ideation, insisting

19   that others are attempting to film her naked.

20                    I think I know what paranoia

21   ideation is, but I just want to be clear for the

22   record in case someone else doesn't know what it

23   means.

24                    So can you break that down or

 1  explain to me what paranoid ideation is or means.

 2        A.    Paranoid ideation is believe -- is the

 3  false belief that someone, or something in the case

 4  of aliens or technology, is aware of you and is

 5  harassing you and has harmful intentions towards

 6  you.

 7        Q.    Okay.  And obviously you have this

 8  written down, so this is something or something

 9  that Ms. Bass exhibited while you were evaluating

10  her as well, correct?

11        A.    Correct.

12        Q.    And do you recall anything that she --

13  strike that.

14              Where it says, behavior appears

15  impulsive and unpredictable, what do you mean by

16  that?

17        A.    When someone is impulsive and

18  unpredictable, they are restless, fidgety.  They

19  lack focus in their attention.  So they're looking

20  around the room.  They're responding to -- they may

21  be responding to internal stimuli, or they may be

22  overresponding to things that they see in their

23  environment.

24              And that -- unpredictable is an

1  accurate way to characterize that behavior, because

2  they're not sitting like all of us are having a

3  predictable conversation.  They may get up and walk

4  up.  They may do anything so it's unpredictable.

5       Q.    Okay.  Do you recall any of the

6  behavior that Janette Bass distributed that would

7  appear impulsive and unpredictable?

8       A.    I don't recall her specifically, no.

9       Q.    But because it is stated here, that is

10  something that when you evaluated her that she

11  indicated to have as far as her behavior, correct?

12      A.    She was exhibiting that behavior, yes.

13      Q.    Okay.  And going to past "psychotic"

14  history, what is the purpose of this section?

15      A.    It's to document any psychiatric

16  history that the patient has had.

17      Q.    Okay.  And you have here, multiple

18  previous "psychotic" hospitalizations.

19            Is this something that you would

20  have gotten from the patient or --

21      A.    Yes, yes.

22            Yes, I would have gotten it from the

23  patient.

24      Q.    I'm sorry.  Can you repeat that?

1        A.    I would have gotten it from the

2   patient.  I would have asked her.

3        Q.    Okay.  So for this particular section

4   when you receive that information from Janette Bass

5   as far as the previous psychotic hospitalizations,

6   is that something that you would consider

7   significant or important when you're evaluating her?

8        A.    Yes.

9        Q.    And how does that affect your -- how

10  would that affect your diagnosis?  Like what role

11  does that play in your evaluation?

12       A.    What role does that play?  It would --

13  it would play a role as far as if she's ever been

14  on any medication that was helpful.

15       Q.    Okay.  Going to Substance abuse, what

16  is the purpose of this section?

17       A.    The purpose of substance abuse is just

18  to document a thorough history.

19       Q.    I'm sorry.  You said just to

20  document ...

21       A.    A thorough history.

22       Q.    Oh, okay.

23             And it said, patient endorses

24  previous history of polysubstance abuse.

```
 1                  What is polysubstance abuse?
 2          A.    It's more than one substance or, you
 3   know, recreation -- recreational substance use.  So
 4   if they've only drank alcohol, then you would say
 5   it's a history of alcohol abuse.  If they've used
 6   multiple things, like alcohol and marijuana, then
 7   it would be polysubstance abuse.
 8          Q.    Okay.  So in this particular instance
 9   where it says substance abuse, because it says
10   polysubstance abuse where it indicates
11   polysubstance abuse, that means that it is a
12   combination of recreational --
13          A.    She --
14          Q.    Go ahead.  I'm sorry.
15          A.    Yeah, she would have -- she would have
16   said, yeah -- she would have said something like,
17   yes, I've used alcohol and marijuana and cocaine.
18          Q.    Okay.  And does that -- I guess when a
19   patient says that they use alcohol or recreational
20   use, does that affect I guess -- strike that.
21                Okay.  So when the patient indicates
22   that they have polysubstance abuse, does that
23   affect your diagnosis or your evaluation of the
24   person?
```

```
 1        A.    No.
 2        Q.    Okay.  So I'm moving to page 243 --
 3   hold on.
 4              Starting with this first paragraph,
 5   I'm going to give you a chance to read it.  I'm
 6   going to read it along with you and ask you some
 7   questions.
 8              So sorry, I'm going to go back a
 9   little bit, so I apologize.  I'm going to go to 242.
10              And as far as polysubstance abuse, I
11   know you indicated to me earlier that polysubstance
12   abuse is basically an indicator of alcohol, some
13   recreational use of drugs.
14              I guess I'm just trying to get a
15   clearer understanding of what makes it abuse.
16   Like --
17        A.    Well, it's abuse if it's using any
18   illegal substance.  It's classified as abuse.
19        Q.    Okay.  Do you recall -- you said so if
20   it's one instance, it would still be considered
21   polysubstance abuse.  Like for instance, if a
22   person did alcohol and marijuana at some point,
23   would that be considered polysubstance abuse, or
24   does it have to be multiple times to be considered
```

```
 1  polysubstance abuse?
 2        A.    No, that would -- yes, that would be
 3  a -- that would be considered polysubstance abuse,
 4  a history of polysubstance abuse if they have used
 5  any illegal substance.  So even one time.
 6        Q.    Okay.  Do you recall how many times
 7  Janette Bass used polysubstance or used alcohol or
 8  recreational?
 9        A.    I don't.  I don't recall.
10        Q.    Okay.  But you know it was at least one
11  time because it's written in the report, correct?
12        A.    Yes.  She would have said, you know,
13  what she had used.
14        Q.    Okay.  So it could have been multiple
15  times.  It could have been once --
16        A.    Yes, it could have been.
17        Q.    And it could have been one time.  You
18  just don't recall.
19        A.    Well, if it's polysubstance abuse, it
20  would have -- her answer would have been more than
21  one time.
22        Q.    Okay.  So it's safe to say that when
23  you were evaluating Janette Bass, she at least
24  indicated that she used some recreational drug more
```

 1  than one time.

 2          A.     Yes.

 3          Q.     Which is why you labeled it

 4  polysubstance abuse in this initial psychiatric

 5  evaluation, right, correct?

 6          A.     Yes, that's correct.

 7          Q.     Okay.  Now, going back to page 243

 8  where it talks about reviewing with the patient as

 9  much as possible with regard to clinical condition,

10  psychiatric symptoms such as depressed mood -- I

11  don't even know how to pronounce that -- anhedonia

12  or donia, suicidal ideation, insomnia, feelings of

13  guilt, slash, hopelessness, fatigue, difficulty

14  concentrating, anorexia, so forth and so on.

15               So I guess my question is:  What is

16  the purpose of reviewing these things as mentioned

17  in this paragraph with the patient?

18          A.     The purpose of the review of systems is

19  to make sure that we go over any other psychiatric

20  symptoms that she has not mentioned in the history

21  of present illness.

22               So in her case, the history of

23  present illness is psychotic symptoms.  And so to

24  be thorough, we want to go through all the other

 1   possible symptoms that she could be experiencing.

 2   And the ones that you read are symptoms indicating

 3   depression.

 4         Q.    Okay.  So you said all -- I'm sorry.  I

 5   couldn't hear you.

 6                But can you repeat what you just

 7   said?  Like that last part?

 8         A.    Yeah.  I said the symptoms that you

 9   just read are indications of depression.

10         Q.    So is that -- I guess you said the

11   symptoms that I just read indicated depression,

12   correct?

13         A.    Yeah.

14         Q.    So I didn't read all the symptoms.

15         A.    Right.

16         Q.    But does all the symptoms, are they

17   associated with depression, or are all of these

18   symptoms associated with the psychosis?  I guess

19   I'm just trying to get a clearer understanding.

20         A.    No.  The purpose of the review of

21   systems is to evaluate the patient for any other

22   symptoms, psychiatric symptoms --

23         Q.    Okay.

24         A.    -- that were not in the history of

1  present illness.

2       Q.    Okay.  So these are the remaining

3  symptoms that I guess that weren't present when

4  you -- in the history, the history of present

5  illness, and you wanted to make sure that you

6  covered I guess, for lack of better words, all your

7  bases to make sure that if she's exhibiting any

8  other symptoms that that is documented in your

9  report as well; is that correct?  Is that fair to

10 say?

11      A.    That's correct.

12      Q.    Okay.  For me, I guess I'm trying to

13 understand, what is -- and correct me if I'm wrong,

14 I know I'm wrong -- but anhedonia, or I don't know

15 how to pronounce that?  What does that mean?

16      A.    Yeah.  Anhedonia is a symptom of

17 depression.  It means a loss of interest in normal

18 daily activity.

19      Q.    Okay.  And how would you go about

20 reviewing these other symptoms with the patient?

21      A.    Well, in review of symptoms, I'm asking

22 her if she experiences any of these symptoms, and I

23 observe it if she's exhibiting them at the time.

24      Q.    Okay.  And I guess the next sentence

 1  talks about reviewing anxiety symptoms, panic

 2  episodes, homicidal thoughts towards others and

 3  other psychiatric symptoms.

 4                    And the purpose of this is basically

 5  for the same purpose of the preceding paragraph?

 6  Just to make sure that you're covering your bases

 7  and making sure that you didn't miss anything that

 8  she's experiencing when you're evaluating her?

 9       A.    That's correct.

10       Q.    Okay.  And it says, Positive findings

11  are discussed in HPI.

12                    HPI is the history of present

13  illness?  Is that what that means?

14       A.    Yes.

15       Q.    All right.  So I'm going to scroll back

16  up and go to the -- to make sure I'm clear on the

17  what the positive findings are.

18                    So let me see.  So this -- at the

19  top where it says history of present illness, the

20  positive findings would that be the paragraph that

21  starts with, Upon evaluation, the patient is

22  cooperative.  Patient exhibits psychotic

23  disorganized thought, loose associations and

24  tangentiality?  That paragraph, is that the

1  positive findings that you're associating?

2       A.    Yes.  As well as the previous paragraph

3  from the emergency room.

4       Q.    Okay.  So that is in conjunction with

5  each other.

6       A.    Yes.

7       Q.    Basically the positive findings -- I

8  just want to make sure I'm clear for the record.

9             The positive findings that says,

10  Positive findings are discussed in HPI, you are

11  talking about the "Upon evaluation" paragraph, as

12  well as what the ER records states as well, correct?

13      A.    Correct.

14      Q.    All right.  And it says, Findings were

15  negative for all other psychiatric symptoms.

16            So that basically -- well, let me

17  ask you, because I feel like I'm telling you:  But

18  what does that mean?

19      A.    That sentence, Findings were negative

20  for all other psychiatric symptoms, that means

21  that -- you know, there are too many psychiatric

22  symptoms to list on every psychiatric evaluation,

23  so it means I didn't observe anything that is

24  not -- anything else.  Anything else was not

 1  observed.

 2          Q.     Okay.

 3          A.     Any other psychiatric symptom was not

 4  observed.   There's just too many to list.

 5          Q.     Okay.  So I'm going to move on to

 6  Mental Status Exam.

 7                  What's the purpose of this paragraph?

 8          A.     It's like the -- if you were just to go

 9  to a primary care doctor, they would do a physical

10  exam.  The mental status exam is the same thing for

11  a psychiatric patient.

12          Q.     Okay.  So it says, Patient presents as

13  fully alert and oriented X3.

14                  What does that mean?

15          A.     Times three means that she's oriented

16  to person, place, and time.

17          Q.     That she's oriented to -- I'm sorry.  I

18  didn't catch that.

19          A.     Person, place, and time.  That means

20  that she can state her name, where she is, as well

21  as the day, date, year.

22          Q.     Okay.  Exhibits no tic or abnormal

23  movements, what exactly does that mean in this

24  context?

```
 1        A.    Well, it means she doesn't present with
 2   obvious neurologic signs.
 3        Q.    Okay.  Attitude: cooperative, Speech:
 4   pressured, Mood: dysphoric.
 5                 I can't recall.  I don't think we
 6   talked about that, but what does dysphoric mean?
 7        A.    It means she's unhappy with her present
 8   circumstances of being taken to the hospital and
 9   feeling like others are harassing her.
10        Q.    Okay.  Do you recall -- do you recall
11   her saying that to you?  That she was -- what you
12   just said?
13        A.    I don't recall her specifically saying
14   that.
15        Q.    Okay.  Affect: labile.
16                 Am I pronouncing that correctly?
17   What does that mean?
18        A.    Labile affect is expressing --
19   expressing a person's immediate emotional state in
20   a way that is loud, erratic, often tearful or
21   angry, upset.  It would probably -- probably the
22   best way to describe it is a person appearing upset.
23        Q.    So it's fair to say when you were
24   evaluating Ms. Bass that she appeared upset because
```

1  you have "Affect: labile"?

2          A.    Yes.

3          Q.    Okay.  Thought Content, where it says,

4  exhibits paranoid delusional ideation, denies

5  active hallucinations, denies current suicidal

6  ideation or intent, and homicidal ideation or

7  intent.

8                  Can you explain what does that mean

9  in this context?

10         A.    Well, the paranoid delusions were

11  described in the HPI.  She would have said that

12  she's not having -- hearing voices.  I would have

13  asked her, you know, are you hearing voices; she

14  would have said no, according to this.

15                 And she would have said no to the

16  question, are you having suicidal thoughts, or do

17  you have thoughts of harming anyone else.

18         Q.    Okay.  And so if a person -- I guess if

19  a person denies hearing voices or said no to

20  suicidal thoughts, they could still also exhibit

21  paranoid delusional ideation, correct?

22         A.    Correct.

23         Q.    So it's safe to say in this particular

24  case, because Ms. Bass -- you got denied

1  hallucinations, denying current suicidal ideation

2  or intent and homicidal ideation, that does not

3  mean that she did not exhibit paranoid delusional

4  ideation, correct?

5       A.    That's correct.  In fact, that's --

6  someone who presents with paranoid delusions is

7  less likely to have hallucinations or suicidal

8  thoughts.

9       Q.    Okay.  And it says, Memory: intact for

10 recent events.

11            I guess what does that mean?

12      A.    Well, I would have asked her, Can you

13 remember what you had for breakfast this morning?

14 Can you remember what you had for dinner last night?

15      Q.    Okay.

16      A.    Can you remember the events surrounding

17 being brought to the hospital, recent events.

18      Q.    Okay.  And just because Ms. Bass'

19 memory was intact, she still exhibited -- although

20 her memory was intact, she still exhibited those

21 paranoid delusions and psychotic symptoms, correct?

22      A.    Correct.

23      Q.    Insight: impaired, what does that mean?

24      A.    It means that she doesn't have insight

1  into her illness.  She doesn't understand that the

2  accusations that she's making are highly unlikely

3  and probably just unrealistic.  She doesn't have

4  the insight to understand that she's having

5  psychotic beliefs.

6        Q.    And, Judgment: impaired, what does that

7  mean?

8        A.    Impaired judgment means that someone

9  will make a decision and act on it, take an action

10  that could harm themselves or someone else or lead

11  to deleterious effects.

12        Q.    And you said -- I'm sorry, and it's

13  probably my computer.

14              You said a person that would take an

15  action that could potentially harm themselves, can

16  you repeat that for me?

17        A.    Yeah.  Impaired judgment is when

18  someone will take an action or make a decision that

19  will lead to harmful effects for themselves or

20  someone else.

21        Q.    Okay.  So it's fair to say at this

22  particular time when you evaluated her that it was

23  your opinion or your professional opinion that

24  Ms. Bass' judgment could have caused harm to

1  herself.

2          A.    Yes.

3          Q.    Suicide/Homicide Risk Factors, what's

4  the purpose of this section?

5          A.    It's to assess for any risk factors

6  that the patient has that might either protect them

7  or endanger them in a suicidal context.

8          Q.    Okay.  So I guess going into the next

9  question, as far as you have, Protective factors

10  include family support, seeking treatment, history

11  of response to treatment.

12              So these protective factors are

13  factors that I guess in essence protect someone --

14  I guess I'm just trying to figure out what are

15  these protective factors in relation to the suicide

16  and homicide risk factors?

17          A.    I would have evaluated by asking her

18  what her home situation is like.  I would have

19  asked her questions pertaining to what would be

20  protective or supportive if she was having suicidal

21  thoughts.  So I would ask her about her family

22  support, her motivation to seek treatment, and the

23  response to treatment.

24          Q.    Okay.  And as far as those protective

1  factors, because it seems like you are indicating

2  that she has family support, seeking treatment, and

3  history or response to treatment, correct?

4        A.    Yes.

5        Q.    And just because Ms. Bass has that,

6  that does not mean that she was not exhibiting

7  psychosis symptoms the day that you evaluated her,

8  correct?

9        A.    That's correct.

10        Q.    Okay.  And that -- never mind.

11              The next sentence where it starts

12  with the, suicidal factors include history of mood

13  symptoms, impulsivity, what does that mean?

14        A.    Mood symptoms and impulsivity are

15  contributing factors to suicide, so she was

16  exhibiting those.

17        Q.    Okay.  And how -- I guess how does the

18  protective, slash, contributive suicidal factors

19  weigh into your analysis or your evaluation of

20  Ms. Bass?

21        A.    Well, it doesn't weigh into her

22  psychotic symptoms.  It's assessing how likely she

23  is to engage in suicidal behavior.

24        Q.    Okay.  And I guess based off what you

 1  have written there, like how likely --

 2          A.    She's moderate.  She would be in the

 3  moderate category of suicide risk.

 4          Q.    Okay.  And what does that mean,

 5  moderate?

 6          A.    Well, it's between, you know, severe

 7  and mild.  She's got some supportive factors, and

 8  she has had responsive treatment.  She doesn't have

 9  suicidal thoughts presently, but she's impulsive,

10  psychotic, and has poor judgment.

11          Q.    And I see you have a section labeled,

12  Patient strength and weaknesses.

13                  How does that play into your

14  evaluation of Ms. Bass?

15          A.    Oh, it doesn't.  Medicare requires that

16  we put that sentence in.  They don't really -- they

17  didn't teach us how to do this in medical school,

18  so I come up with what I think may be the patient's

19  strengths.  So she lives in a community, she's got

20  some social skills, her IQ appears average.

21          Q.    And the weaknesses, you got that from

22  evaluating her, correct, as far as from your --

23          A.    Well, it's all the same.  Patient's

24  strengths and weaknesses.  And yes, I got it from

1  evaluating her, yes.

2                    She's got a chronic mental illness,

3  and she's impulsive, and that appears to be a

4  weakness.

5        Q.    Okay.  Going into the

6  Assessment/Impression, what's the purpose of that

7  section?

8        A.    It's to sum up the previous sections of

9  the evaluation.

10       Q.    Okay.  So 59 female with exacerbation

11  of mood and psychotic symptoms, appears would

12  benefit from hospitalization, stabilization, and

13  treatment.  So will admit and start medication

14  therapy and place on appropriate precautions.

15                    So is it fair to say that you made

16  the decision to admit Ms. Bass when you evaluated

17  her?

18       A.    Yes.

19       Q.    And -- hold on.

20                    And just for the record, why did you

21  make that decision to admit Ms. Bass after you

22  evaluated her?

23       A.    Well, she was -- according to the note,

24  she was psychotic, unpredictable, impulsive, and

1  exhibited poor insight and judgment.  She was a

2  danger to herself and possibly others.

3          Q.     Okay.  So going down to the Diagnosis

4  section, what is the purpose for that particular

5  section?

6          A.     Well, to diagnose the mental illness.

7          Q.     Okay.  So we got Axis I through V, so

8  what exactly is Axis I?  What does that mean?

9          A.     It's the primary psychiatric diagnosis.

10         Q.     Okay.  So the primary psychiatric

11 diagnosis is schizoaffective

12 disorder/schizophrenia, correct?

13         A.     Correct.

14         Q.     And Axis II, where it says no

15 diagnosis, what is Axis II?

16         A.     That's for personality disorders.  And

17 it appears that she doesn't have one.

18         Q.     Okay.  Axis III, it says, as listed

19 above.

20                What does that mean?

21         A.     Axis III refers to the medical history.

22         Q.     Okay.  And Axis IV, what exactly does

23 that mean?

24         A.     Axis IV is referring to the

RONALD GORDINEER, MD, 03/30/2021                          Page 78

1  psychosocial stressors --

2       Q.   I'm sorry.  Can you repeat that?  Is

3  referring to?

4       A.   The psychosocial stressors, such as if

5  they are in conflict with their family or lost a

6  job or had a death in the family.

7       Q.   Okay.  So what does mild through -- or

8  dash, interpersonal conflict, what does that mean?

9       A.   She's having conflicts with her

10 neighbors.

11      Q.   Okay.  And how does that affect your

12 diagnosis of her, or how did that affect your

13 diagnosis?

14      A.   Well, that is the diagnosis.

15      Q.   Okay.

16      A.   It's five Axes.  It's schizophrenia, no

17 personality disorder, medical complications,

18 interpersonal conflict.  So that is the diagnosis.

19      Q.   Okay.  And Axis V, GAF, it looks like

20 an equal sign, 20.  What does that mean?

21      A.   GAF stands for Global Assessment of

22 Functioning, and it's a number assigned between

23 zero and a hundred.  And it tries to give a

24 numerical assignment to overall how well the person

```
 1   is functioning.

 2                   So 20 is pretty low.  20 means they

 3   need to be hospitalized.  40 means that they're

 4   under a lot of stress, but they can probably be

 5   okay at home with a lot of support.  You know, and

 6   then as the numbers ascend, it indicates higher

 7   levels of functioning.

 8        Q.    Okay.  So since it says 20, that was

 9   fairly low for Ms. Bass, and that's a part of the

10   reason why she was hospitalized at Methodist

11   Hospital, correct?

12        A.    That's correct.

13        Q.    It says estimated length of time, seven

14   days.

15                   I guess how did you come to the

16   seven days?

17        A.    It's based on like the average length

18   of stay for that hospital.

19        Q.    Okay.

20        A.    We're asked to estimate -- it's another

21   Medicare kind of thing.

22        Q.    Okay.

23        A.    They don't teach us how to do that in

24   medical school.  We can't predict the future, but
```

1   it's basically the average stay -- of the patients'

2   stay at the hospital.  All of the patients.

3        Q.    And that does not necessarily mean the

4   patient will stay seven days, because it says

5   Discharge Criteria, if the patient exhibited

6   remission of mood and psychotic symptoms, they

7   could be released, correct?

8        A.    That's correct.

9        Q.    And going back to the diagnosis -- one

10  second.

11            So going back to the diagnosis, in

12  your medical and professional opinion, did Janette

13  Bass display any symptoms or signs associated with

14  schizophrenia?

15       A.    Yes.

16       Q.    Okay.  In your professional and medical

17  opinion, was Ms. Bass a danger to herself when you

18  evaluated her?

19       A.    Yes.

20       Q.    Jumping around a little bit, as far as

21  when you are evaluating her, would you have

22  reviewed the nurses' notes prior to your evaluation?

23       A.    Oh, it's possible.  It just depends on

24  the circumstances.  If I, you know, can get to a

```
 1  computer before I see the patient, I probably would
 2  have reviewed all the notes.  If I can't get to a
 3  computer, then I see the patient without reviewing
 4  the notes.  The --
 5       Q.    And --
 6       A.    Uh-huh.
 7       Q.    In this case, do you recall if you
 8  reviewed the nurses' notes --
 9       A.    No, I don't recall.
10       Q.    -- prior to the evaluation?
11       A.    Uh-uh, no.
12       Q.    Okay.  If I were to show you the
13  nurses' notes, would you be able to take a look at
14  that and let me know if that is something that you
15  recall reviewing at the time before your evaluation --
16       A.    Yes.
17       Q.    -- of Janette Bass?  You said yes.
18             Okay.  Give me -- I'm going to take
19  like a little mini-break because I need to pull it
20  up, so give me about 3 minutes, unless anybody else
21  needs more time.
22                      (Brief recess.)
23       MS. MOORE:  Back on the record.  We're good.
24
```

1  BY MS. MOORE:

2        Q.    I'm going to show you, and I'll get

3  this to the court reporter as well, what I plan to

4  mark as Exhibit B.

5              Give me one second.  I'm going to

6  share the screen with you.

7              All right.  Can you see this,

8  Dr. Gordineer?

9        A.    Yes.

10       Q.    Do you recognize this?

11       A.    I can't say that I do.

12       Q.    Okay.  And this does not jog your

13  memory as to --

14       A.    Wait, wait, let me read -- let me read

15  it.  Let me read the first part here.  Yeah, right

16  there, right there.

17       Q.    Okay.

18       A.    Can you go up just the other way?

19  Yeah, right there.

20              Well, I don't recognize this

21  particular note.  Of course I read thousands.  But

22  yes, this appears to be a nurse's note.

23       Q.    Okay.  So you're not -- well, let me

24  ask you:  Turning your attention to the very bottom

1   where it says, Intervention:  Patient being

2   monitored for psychosis.  Patient has visible --

3   that paragraph, read that for a second?

4        A.    Okay.

5        Q.    Let me know when you're done.

6        A.    Okay.

7        Q.    Since you just read that paragraph,

8   where it starts with the, Intervention: Patient

9   being monitored for psychosis, so forth and so on,

10  does that refresh your recollection as to a note

11  you would have read?

12       MS. GIZZI:  Objection, lack of foundation.

13       THE WITNESS:  No, there are thousands of

14  notes just like this.  So no, I wouldn't be able to

15  remember any in particular.

16  BY MS. MOORE:

17       Q.    All right.  Let me get off of here.

18             All right.  Going back to the

19  incident, do you recall anything else that you

20  found or observed about Ms. Bass that we haven't

21  talked about today?

22       A.    No, I do not.

23       Q.    Do you recall anything else that

24  Janette Bass would have told you or told you that

1  we haven't talked about today?

2       A.    No.

3       Q.    Did you ever participate in Ms. Bass'

4  care again after completing this initial report?

5       A.    Well, I don't recall.  But if there are

6  no other notes, then no, I didn't see her after

7  that.

8       Q.    Okay.  And all of your opinions that

9  you've given today, they were given within a

10 reasonable degree of your medical certainty, right?

11      A.    Yes.

12      MS. MOORE:  All right.  I'm going to tender

13 you to Ms. Gianna Gizzi, if she has any questions

14 for you.  I'm done.

15                      EXAMINATION

16 BY MS. GIZZI:

17      Q.    Yes.  Good afternoon, Dr. Gordineer.

18 My name is Gianna, as I earlier mentioned, and I

19 represent Janette Bass in this case.

20              I do have some questions for you,

21 and most of them are clarifying so it will be a

22 little bit of jumping around.

23              But you mentioned that you weren't

24 sure how many times that you've seen Ms. Bass.

```
 1                  But is it safe to say that if there
 2   are no other documentation that you had examined
 3   her a second time, then you hadn't seen her a
 4   second time?
 5        A.    Yes, that's correct.
 6        Q.    Okay.  And did you prescribe Ms. Bass
 7   any medication?
 8        A.    Very probably.  We didn't get to that
 9   part of the notes, but it would have been at the
10   very end, and it would have listed what that
11   medication was.
12        Q.    Okay.
13        A.    So if -- I mean, I'm as certain as I
14   can be without having the note in front of me, yes,
15   there was med -- I prescribed medication for her.
16        Q.    Okay.  That's fine.
17                  And earlier you testified that
18   Ms. Bass was a moderate suicide risk based on your
19   evaluation.
20                  What would someone who you conclude
21   is a mild suicide risk look like or be manifesting?
22        A.    Uh-huh.  Well, they wouldn't have
23   psychotic symptoms, they wouldn't have a history of
24   mental illness, and they would have strong social
```

1  support, such as a family and a stable job.

2       Q.    And would you say that everyone -- in

3  your professional opinion, everyone who could fall

4  into the category of moderate suicidal risk need to

5  be hospitalized?

6       A.    No.  And she wasn't hospitalized for

7  that.

8       Q.    Okay.  Please clarify then what in your

9  medical opinion was she hospitalized for.

10      A.    For her psychotic symptoms, for her

11 delusions, for her, you know, psychotic accusations

12 of her neighbors, her paranoia, and her erratic,

13 unpredictable behavior.

14      Q.    Okay.  And that leads me to another

15 question.  You mentioned that her behavior appeared

16 impulsive.

17            What if you can remember

18 specifically was impulsive in that brief time span

19 you examined Ms. Bass?

20      A.    Well, I answered that question already,

21 and so I'll just repeat my former answer.

22            When I document that someone is

23 impulsive, it's a description that they are

24 restless, fidgeting, unable to focus their

RONALD GORDINEER, MD, 03/30/2021                          Page 87

```
 1  attention due to either internal distractions, such
 2  as hallucinations, or there are external
 3  distractions in the environment, which could be
 4  anything.
 5              They -- she would have been unable
 6  to restrain her, you know, inappropriate requests
 7  for things in the environment for instance.
 8      Q.   Okay, understood.
 9              Are some of those behaviors, those
10  symptoms, what you just described -- the
11  restlessness, fidgeting, inappropriate requests --
12  is that exclusive to patients who present with
13  psychosis?
14      MS. MOORE:  Objection to form.
15              You can answer.
16      THE WITNESS:  Is that exclusive to psychotic
17  symptoms, no.
18  BY MS. GIZZI:
19      Q.   So to expand on that, do other types of
20  mental illness also present with restlessness,
21  impulsiveness, unpredictability?
22      A.   Yes, but that's what schizoaffective
23  is.  It's psychotic symptoms and mood symptoms.  So
24  it would -- the mood symptoms that I'm describing
```

 1  in the evaluation are covered by that diagnosis of

 2  schizoaffective disorder.

 3       Q.    Okay.  You mentioned earlier a Global

 4  Assessment Function, the GAF score.

 5              Is that something that is determined

 6  for every patient at least at Methodist in your

 7  capacity as a doctor?

 8       MS. MOORE:  Objection to foundation and form.

 9              You can answer.

10       THE WITNESS:  Yes.  The GAF score -- the GAF

11  score is just -- it's standard throughout all

12  psychiatry throughout the country, probably

13  throughout the world.

14  BY MS. GIZZI:

15       Q.    Okay.  That's what I was wondering.

16              Earlier you testified that one of

17  the symptoms Ms. Bass was displaying was paranoid

18  delusions or ideations.

19              What -- and then you explained that

20  that involves false beliefs.  Is that a fair

21  summary?

22       MS. MOORE:  Objection to the extent it

23  mischaracterized his earlier testimony.

24

```
 1   BY MS. GIZZI:

 2        Q.    Could you just re-describe what -- how

 3   paranoid ideations are defined in your profession.

 4        A.    Paranoid ideation is a belief that the

 5   patient has that is -- that is impossible to be

 6   true from, you know, the universe that we know.

 7        Q.    Okay.  And did you conclude that

 8   Ms. Bass' beliefs were impossible?  Her beliefs

 9   that she was being filmed naked were impossible?

10        A.    Well, I mean, it's kind of

11   hair-splitting.  I mean, if I say, well, it's

12   possible, we're talking about, you know,

13   astronomical numbers of possibility.  So I suppose

14   it's possible that the sun won't rise tomorrow, but

15   it's highly, highly unlikely.

16               And the beliefs that she was

17   expressing under the circumstances would be highly,

18   highly unlikely.  But I guess in a universe of all

19   possibilities, maybe you can't use that word, so

20   that's --

21        Q.    Well, that's fine.  We can narrow it

22   down even more than that, and I'm not talking about

23   the universe of all possibilities.  Just in our

24   universe what is possible.
```

```
 1                  And when -- and who makes the
 2   judgment of what is paranoid as divulging from
 3   reality?  Do you make that judgment?
 4        MS. MOORE:  Objection to form.
 5                  You can answer.
 6        THE WITNESS:  Well, I'm asked to make that
 7   judgment, and so I do with the intention of helping
 8   this patient.  So yes, I do make the judgment after
 9   being asked to.
10   BY MS. GIZZI:
11        Q.    Okay, that's fair.
12                  And I understand that Ms. Bass might
13   have expressed a lot of different beliefs, but just
14   specifically her belief about police brutality, was
15   that a basis for you to find that she had paranoid
16   delusions?
17        MS. MOORE:  Objection.  Fact not in evidence
18   and foundation.
19                  You can answer.
20        THE WITNESS:  No, it wasn't the police
21   brutality.  That's not what led me to believe that
22   she was psychotic and paranoid.  It was the whole
23   context of all the details that are documented in
24   the evaluation.
```

RONALD GORDINEER, MD, 03/30/2021                    Page 91

```
 1   BY MS. GIZZI:
 2        Q.    And speaking of the evaluation, we
 3   talked earlier when opposing counsel was asking you
 4   questions about the mental status exam portion, and
 5   that Ms. Bass denied current suicidal ideation or
 6   intent and homicidal ideation or intent.
 7               Is this something that you will ask
 8   the patient, and in this case Ms. Bass, and based
 9   off of that note?
10        A.    Are you asking me is it -- is it a
11   question that I ask every patient?
12        Q.    I guess -- no.
13               What I'm asking is, do you ask them
14   that and then you notate their response?
15        A.    Yes.
16        Q.    And is there any other further
17   examination about potential suicidality or
18   homicidality?
19        A.    If anything that they do or say could
20   suggest thoughts of self-harm and thoughts of
21   suicide, then yes, that would be pursued.  But if
22   they don't seem to indicate that that's a likely
23   scenario, then no.  I mean, that's enough.  Asking
24   them if they're having suicidal thoughts or if
```

1  they've ever had suicidal thoughts or if they've

2  ever had suicidal history, that's enough.  There's

3  no other indication to pursue it.

4        Q.    Okay.  And did you observe any behavior

5  from Ms. Bass that you remember that led you to

6  think that she was suicidal?

7        A.    I did not.

8        Q.    Did you observe any behavior that

9  suggests -- by Ms. Bass that suggested that she was

10 homicidal?

11       A.    No.

12       Q.    Were there any physical manifestations

13 that you could have concluded as self-harm or

14 anything that she presented that might have looked

15 like she had tried to hurt herself?

16       A.    I don't recall, but I would have

17 documented it had I observed that.

18       Q.    Okay.  And at the bottom of the initial

19 psychiatric evaluation, the treatment plan -- I'll

20 just tell you since it's only one thing.

21             Will start -- it notes that it, will

22 start "olazapan" at HS and monitor.

23       MS. MOORE:  Sorry.  Where are you at or what

24 are you --

```
 1         MS. GIZZI:  243, bottom, treatment plan.
 2         MS. MOORE:  Oh, okay.  Go ahead, sorry.
 3  BY MS. GIZZI:
 4         Q.    What is "olozapan"?
 5         A.    Oh, olanzapine?
 6         Q.    Yes.
 7         A.    Olanzapine, okay.  It's a dopamine
 8  antagonist.  It's an antipsychotic medication.
 9         Q.    And would that be the medication that
10  you would have prescribed?
11         A.    Yes.
12         Q.    Do you personally administer medication
13  to patients?
14         A.    No, the nurses do that.
15         Q.    And you alluded to it earlier, but sort
16  of best of your memory, you don't recall seeing
17  Ms. Bass before she was discharged a second time at
18  Methodist?
19         A.    That's correct.  I do not recall.
20         Q.    Earlier, you testified that you thought
21  Ms. Bass was a danger to herself or others, and I
22  want to clarify based on what you just testified
23  when I asked.
24                  What made you conclude that she was
```

1  a danger to herself or others?

2       A.    Well, the whole constellation of, you

3  know, signs and symptoms that she presented with.

4  Psychotic individuals are more likely to harm

5  themselves or others just statistically.

6              Paranoid people are more likely to

7  harm themselves or others because they feel like

8  others are trying to harm them.

9              People who are impulsive or -- are

10 more likely to harm themselves or others.  And her

11 poor judgment would indicate that she's more likely

12 to harm herself or others.

13             And by harming herself or others, it

14 also includes putting herself in a situation that

15 would lead to harm.  Such as in this case, a

16 paranoia, what you frequently see is that the

17 patient confronts the person or people that they

18 are paranoid about, and that leads to an

19 altercation.

20      Q.    Okay, understood.

21             And based on your evaluation with

22 Ms. Bass, that was your consensus that you just

23 described on her state of mind?

24      A.    Yes.

 1        MS. GIZZI:  I have no further questions,

 2   Laniya.

 3                    FURTHER EXAMINATION

 4   BY MS. MOORE:

 5        Q.    All right.  I do.

 6                    Just coming behind plaintiff's

 7   counsel in regards to the paranoid, and I didn't

 8   catch half of it so you might have to repeat it for

 9   me yet again.

10                    But when you say a paranoid person,

11   when they feel like they are -- that a person would

12   harm them, can you repeat that for me?  Because I

13   didn't catch the whole thing when you were talking

14   about what a paranoid person would do if they feel

15   like they were harmed.

16        A.    Well, I think she was asking why would

17   I consider that she may be a harm to herself or

18   others, and there is several reasons.

19                    But what you're referring to is I

20   said that especially someone who has paranoid

21   symptoms, they are likely to perceive the other

22   person, the person that they have a delusion about,

23   they are likely to confront that person or persons,

24   and that frequently leads to an altercation.  And

1  it's a frequent presentation to the emergency room.

2        Q.    And when you say "confront," would you

3  say that the person would be aggressive with the

4  person as far as would it be physical confrontation

5  or verbal confrontation?  What do you mean by

6  confront the person?  Or could it be both?

7        A.    Well, I don't recall in this case, but

8  it's -- it's frequently a verbal and physical

9  confrontation, and that's why the police is called,

10 and then the patient is taken to the ER.

11       Q.    So --

12       A.    It's a typical presentation.

13       Q.    In this particular case, because the

14 police was called, is it a possibility that

15 Ms. Bass could have perceived the police as a

16 person out to get her and confront them in the

17 physical or verbal aspect that you're talking about?

18       MS. GIZZI:  Objection, form.

19 BY MS. MOORE:

20       Q.    So basically what I'm trying to ask is:

21 Is it possible that if Ms. Bass perceived the

22 officers to be out to get her, that the encounter

23 with the officers could be confrontational in the

24 fact of verbal or physical abuse that you described

1  earlier?

2       MS. GIZZI:  Objection, same objection.

3  BY MS. MOORE:

4       Q.    You can answer.

5       A.    Oh.  Yes, that's very likely.  In fact,

6  it's common that a paranoid patient presents that

7  way to the emergency room.  They become verbally

8  and physically aggressive after the police have

9  been called, and their paranoid delusion is

10 projected onto the policeman or whoever's in front

11 of them.

12      MS. MOORE:  Okay.  No further questions,

13 unless the City, do you have any questions?

14      MS. GIZZI:  I have two more questions, sorry.

15                  FURTHER EXAMINATION

16 BY MS. GIZZI:

17      Q.    Dr. Gordineer, were you aware that

18 Ms. Bass called the police for assistance

19 predicating this -- her commitment to Methodist?

20      A.    No.

21      Q.    And did you ever speak with any Chicago

22 police officers following the incident about

23 Janette Bass?

24      A.    No.  But let me go back to your first

RONALD GORDINEER, MD, 03/30/2021                          Page 98

```
 1  question.  I want to answer it accurately.
 2                   After rereading the note, it
 3  seems -- no, I -- your original question was, was I
 4  aware that Ms. Bass is the one who called the
 5  police.
 6       Q.    Correct.
 7       A.    Okay, okay.  I don't -- I don't recall
 8  knowing which one called the police.  I don't
 9  recall.
10       MS. GIZZI:  That's all I have, thanks.
11       MS. SOTOMAYOR:  No questions for the City.
12       MS. MOORE:  I'm sorry.  I think I did have
13  one more question.
14                   FURTHER EXAMINATION
15  BY MS. MOORE:
16       Q.    Just going back behind plaintiff's
17  counsel, if a person is paranoid, does it matter
18  whether or not they called the police as far as --
19  I guess strike that.
20                   So if a person is paranoid, just
21  like you told me earlier, that if they're paranoid,
22  they could likely confront the officers with
23  physical and verbal -- I guess physical or verbal
24  altercation.  You remember saying that, correct?
```

```
1          A.    Yes.

2          Q.    And I guess does it matter if that

3    person called the police in terms of that paranoia?

4    Would it stop because that person actually was the

5    person that called the police?

6          MS. GIZZI:  Objection, form.

7          THE WITNESS:  Would what stop?  Say that

8    again?

9    BY MS. MOORE:

10         Q.    Basically I'm trying to ask if the

11   person is paranoid and they have those symptoms --

12   or strike that.

13               So if the person is paranoid, and

14   you just said that if they are paranoid, they're

15   likely to confront, for instance, i.e. an officer

16   with physical or verbal altercation, I guess what

17   I'm trying to ask is --

18         A.    Oh, okay.

19         Q.    -- I'm trying to ask:  Does it cease?

20   Like does that paranoia stop --

21         A.    Right.

22         Q.    -- because she called --

23         A.    So if the patient would call the police

24   and the police arrived, could the patient still be
```

1  paranoid about the person -- about the police that

2  she called?

3       Q.    Yes.

4       A.    Oh, definitely, yes, yes.

5       MS. MOORE:  All right.  That's all I wanted.

6  No further questions.

7       MS. GIZZI:  I think everyone's done now.

8       MS. MOORE:  Dr. Gordineer, you have two

9  options in this case.  You can reserve or waive.

10               So if you reserve, you will get a

11  chance to review the transcript that the court

12  reporter has graciously typed up for us for typos

13  or anything of that nature.  You cannot change the

14  substance of the transcript.  So you do have an

15  option if that's what you want to do, to review it.

16               Or you can waive it and trust that

17  the court reporter has taken down everything that

18  I've said, everything that plaintiff's counsel has

19  said, with accuracy.  And most people waive because

20  they do trust that the court reporter does

21  accurately take down what we've discussed today.

22               But ultimately, it is your decision.

23  And if you want to have that opportunity to view

24  the transcript before you officially sign off on

1  it, you can do that.

2                    So what would you like to do in this

3  aspect?

4        THE WITNESS:  I would just waive it.

5                         (The proceedings adjourned at

6                          2:42 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2                    REPORTER'S CERTIFICATE

3        I, Katie K. Elliott, do hereby certify that
RONALD GORDINEER, MD was duly sworn by me to
4   testify the whole truth, that the foregoing
deposition was recorded stenographically by me and
5   was reduced to computerized transcript under my
direction, and that the said deposition constitutes
6   a true record of the testimony given by said
witness.

7

        I further certify that the reading and
8   signing of the deposition was waived by the
deponent.

9

        I further certify that I am not a relative
10  or employee or attorney or counsel of any of the
parties, or a relative or employee of such attorney
11  or counsel, or financially interested directly or
indirectly in this action.

12

        IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my seal of office at Chicago,
Illinois, this 5th day of May 2021.

14

15

16                    _____
                      Illinois CSR No. 084-004537
17

18

19

20

21

22

23

24

RONALD GORDINEER, MD, 03/30/2021

**Exhibits**

**B Gordineer, M.D. 033021-B**

**A Gordineer, M.D. 033021-A**

---

**1**

**19** 37:17

**1900** 47:13

---

**2**

**2** 40:19

**2-minute** 45:14

**20** 78:20 79:2,8

**2019** 44:19

**24** 44:19

**242** 45:23 61:9

**243** 61:2 63:7 93:1

**244** 45:24

**2:42** 101:6

---

**3**

**3** 81:20

---

**4**

**40** 79:3

---

**5**

**59** 76:10

**59-year-old** 50:5 51:16

---

**7**

**7557** 37:17

---

**A**

**A-L-A-N** 43:3

**ability** 40:14

**abnormal** 68:22

**abuse** 59:15,17,24 60:1,5,7,9,10,
11,22 61:10,12,15,17,18,21,23
62:1,3,4,19 63:4 96:24

**accuracy** 100:19

**accurate** 40:15 58:1

**accurately** 98:1 100:21

**accusations** 72:2 86:11

**act** 72:9

**action** 72:9,15,18

**active** 70:5

**activity** 65:18

**adjourned** 101:5

**administer** 93:12

**administrator** 44:1

**admit** 76:13,16,21

**advance** 49:2

**advice** 45:4,9

**affect** 40:14 59:9,10 60:20,23
69:15,18 70:1 78:11,12

**afternoon** 84:17

**aggressive** 96:3 97:8

**ahead** 56:3 60:14 93:2

**Alan** 42:24 43:1,2,6,14

**alcohol** 40:13 60:4,5,6,17,19
61:12,22 62:7

**alert** 68:13

**aliens** 57:4

**alluded** 93:15

**altercation** 94:19 95:24 98:24
99:16

**analysis** 74:19

**and/or** 49:8

**angry** 69:21

**anhedonia** 63:11 65:14,16

**anorexia** 63:14

**answering** 38:21

**antagonist** 93:8

**antipsychotic** 93:8

**anxiety** 66:1

**apartment** 55:10

**apologize** 61:9

**apologizing** 49:2

**appeared** 69:24 86:15

**appearing** 69:22

**appears** 47:14,15 57:14 75:20
76:3,11 77:17 82:22

**applicable** 37:21

**arrived** 99:24

**ascend** 79:6

**aspect** 96:17 101:3

**assess** 73:5

**assessing** 74:22

**Assessment** 78:21 88:4

**Assessment/impression** 76:6

**assigned** 78:22

**assignment** 78:24

**assistance** 97:18

**associating** 67:1

**association** 55:1

**associations** 54:6,8,10,18,20
66:23

**assume** 39:8

**astronomical** 89:13

**attempting** 56:19

**attention** 57:19 82:24 87:1

**Attitude** 69:3

**attorney** 43:23

**authored** 47:3,8

**average** 75:20 79:17 80:1

**aware** 57:4 97:17 98:4

**Axes** 78:16

**Axis** 77:7,8,14,15,18,21,22,24
78:19

---

**B**

**back** 45:17 46:1 53:13 61:8 63:7
66:15 80:9,11 81:23 83:18 97:24
98:16

**based** 74:24 79:17 85:18 91:8
93:22 94:21

Index: bases–counsel

RONALD GORDINEER, MD, 03/30/2021

**bases** 65:7 66:6

**basically** 53:8 61:12 66:4 67:7,16 80:1 96:20 99:10

**basis** 90:15

**Bass** 37:16 38:8 44:14,23 45:4,10 50:18 52:5 55:15 56:16 57:9 58:6 59:4 62:7,23 69:24 70:24 74:5,20 75:14 76:16,21 79:9 80:13,17 81:17 83:20,24 84:19,24 85:6,18 86:19 88:17 90:12 91:5,8 92:5,9 93:17,21 94:22 96:15,21 97:18,23 98:4

**Bass'** 71:18 72:24 84:3 89:8

**behalf** 38:5,7

**behavior** 57:14 58:1,6,11,12 74:23 86:13,15 92:4,8

**behaviors** 87:9

**belief** 57:3 89:4 90:14

**beliefs** 72:5 88:20 89:8,16 90:13

**benefit** 76:12

**bit** 38:12,23 41:6 44:11 46:1,6,19 52:21 55:2 61:9 80:20 84:22

**bottom** 82:24 92:18 93:1

**break** 40:2,5 45:14 56:24

**breakfast** 71:13

**Briefly** 47:1

**brought** 71:17

**brutality** 90:14,21

**business** 48:10

**butcher** 49:3

**C**

**call** 54:3 99:23

**called** 37:3 42:10 96:9,14 97:9,18 98:4,8,18 99:3,5,22 100:2

**capacity** 88:7

**care** 68:9 84:4

**case** 37:16 38:1 49:18 53:6 56:22 57:3 63:22 70:24 81:7 84:19 91:8 94:15 96:7,13 100:9

**cases** 42:9

**catch** 68:18 95:8,13

**category** 75:3 86:4

**Caucasian** 51:16

**caused** 72:24

**cease** 99:19

**certainty** 84:10

**chance** 61:5 100:11

**change** 100:13

**characterize** 58:1

**Chicago** 37:16 55:12 97:21

**chief** 48:19 49:9,10,13

**chronic** 76:2

**circumstance** 52:10

**circumstances** 52:19 69:8 80:24 89:17

**City** 37:16 38:6 55:12 97:13 98:11

**Civil** 37:20

**clarify** 86:8 93:22

**clarifying** 84:21

**clarity** 39:18

**clarity's** 45:22

**classified** 61:18

**clear** 40:11 42:11 44:18 56:21 66:16 67:8

**clearer** 61:15 64:19

**clinical** 63:9

**cocaine** 60:17

**combination** 60:12

**commitment** 41:21 97:19

**committed** 41:19

**common** 97:6

**commonly** 49:7

**community** 75:19

**complaint** 48:19 49:9,10,13

**completely** 55:16

**completing** 84:4

**complex** 55:10

**complications** 78:17

**computer** 37:11 46:17 72:13 81:1, 3

**concentrating** 63:14

**conclude** 85:20 89:7 93:24

**concluded** 92:13

**condition** 63:9

**conflict** 78:5,8,18

**conflicts** 78:9

**confront** 95:23 96:2,6,16 98:22 99:15

**confrontation** 96:4,5,9

**confrontational** 96:23

**confronts** 94:17

**confuse** 41:6

**conjunction** 67:4

**consensus** 94:22

**consideration** 52:4

**considered** 41:15,16 55:7 61:20, 23,24 62:3

**constellation** 94:2

**contained** 48:6

**Content** 70:3

**context** 68:24 70:9 73:7 90:23

**continue** 56:8

**continuing** 40:18

**contributing** 74:15

**contributive** 74:18

**control** 56:9

**conversation** 58:3

**conversations** 44:23

**cooperative** 53:14,18 66:22 69:3

**copy** 51:23

**correct** 38:17,18,21 40:24 41:10, 12 42:14 44:14,19,24 45:5,6,10,11 46:24 47:4,9,13 48:3,24 49:4 51:18 53:12,16 57:10,11 58:11 62:11 63:5,6 64:12 65:9,11,13 66:9 67:12,13 70:21,22 71:4,5,21,22 74:3,8,9 75:22 77:12,13 79:11,12 80:7,8 85:5 93:19 98:6,24

**correctly** 69:16

**counsel** 38:2 40:22 41:4 44:4 91:3 95:7 98:17 100:18

Index: country–evaluation

RONALD GORDINEER, MD, 03/30/2021

**country** 88:12

**court** 37:22 39:15,20 82:3 100:11, 17,20

**covered** 65:6 88:1

**covering** 66:6

**Criteria** 80:5

**current** 70:5 71:1 91:5

**CV** 37:17

**D**

**daily** 65:18

**Dakuras** 38:1

**danger** 77:2 80:17 93:21 94:1

**dash** 78:8

**date** 47:12 68:21

**day** 68:21 74:7

**days** 79:14,16 80:4

**death** 78:6

**decided** 41:4

**decision** 40:21,24 41:2 72:9,18 76:16,21 100:22

**defendant** 38:6

**defined** 89:3

**degree** 84:10

**deleterious** 72:11

**delusion** 95:22 97:9

**delusional** 70:4,21 71:3

**delusions** 49:8 70:10 71:6,21 86:11 88:18 90:16

**denied** 70:24 91:5

**denies** 70:4,5,19

**denying** 71:1

**depends** 52:10,19 80:23

**deponents** 40:11

**deposition** 37:14,19 38:17 39:5 40:18,19 41:8 42:17,20 43:9,12,15, 17,24 44:5,8 45:21 46:24

**depositions** 39:2

**depressed** 63:10

**depression** 64:3,9,11,17 65:17

**describe** 50:2 69:22

**describing** 87:24

**description** 86:23

**details** 90:23

**determined** 88:5

**diagnose** 77:6

**diagnosed** 50:6,10,15,19 51:11

**diagnosis** 45:3,9 51:7 59:10 60:23 77:3,9,11,15 78:12,13,14,18 80:9, 11 88:1

**diarrhea** 56:9

**dictate** 47:19

**difficulty** 63:13

**dinner** 71:14

**direct** 51:17

**Discharge** 80:5

**discharged** 93:17

**discussed** 66:11 67:10 100:21

**disorder** 50:7,11,20 51:4 78:17 88:2

**disorder/schizophrenia** 77:12

**disorders** 77:16

**disorganized** 53:19,21 54:3 66:23

**display** 80:13

**displayed** 56:16

**displaying** 88:17

**distractions** 87:1,3

**distributed** 58:6

**District** 37:17,22,23

**divulging** 90:2

**doctor** 41:16 42:7,8,14 48:11 68:9 88:7

**document** 46:13,15 47:9 48:15, 17,22 50:2 58:15 59:18,20 86:22

**documentation** 49:15,17,23 85:2

**documented** 65:8 90:23 92:17

**donia** 63:12

**dopamine** 93:7

**draft** 48:5

**drank** 60:4

**drug** 62:24

**drugs** 40:13 61:13

**due** 40:19 87:1

**duly** 37:3

**dysphoric** 69:4,6

**E**

**earlier** 61:11 84:18 85:17 88:3,16, 23 91:3 93:15,20 97:1 98:21

**Ed** 42:24 43:4,12,20

**effects** 72:11,19

**electronic** 53:5

**emergency** 48:23 49:15,17,19,22, 23 67:3 96:1 97:7

**emotional** 69:19

**encounter** 38:12 46:23 96:22

**end** 45:15 85:10

**endanger** 73:7

**endorses** 59:23

**engage** 53:24 74:23

**environment** 57:23 87:3,7

**episodes** 66:2

**equal** 78:20

**ER** 49:21 50:7,12 51:16,22 52:1,2, 6,7,8,12,13,17 67:12 96:10

**erratic** 69:20 86:12

**essence** 73:13

**estimate** 79:20

**estimated** 79:13

**et al** 37:16

**evaluate** 52:18 64:21

**evaluated** 44:18 58:10 72:22 73:17 74:7 76:16,22 80:18

**evaluating** 52:5 55:15 56:16 57:9 59:7 62:23 66:8 69:24 75:22 76:1 80:21

**evaluation** 46:16,21 47:3,17 48:9, 14 53:14,17 59:11 60:23 63:5 66:21 67:11,22 74:19 75:14 76:9 80:22 81:10,15 85:19 88:1 90:24

RONALD GORDINEER, MD, 03/30/2021

91:2 92:19 94:21

**events** 71:10,16,17

**everyone's** 100:7

**evidence** 37:21 41:21 90:17

**exacerbation** 50:7 76:10

**exam** 68:6,10 91:4

**examination** 37:5 84:15 91:17 95:3 97:15 98:14

**examined** 37:4 85:2 86:19

**exclusive** 87:12,16

**exhibit** 45:21,23 48:6 70:20 71:3 82:4

**exhibited** 57:9 71:19,20 77:1 80:5

**exhibiting** 58:12 65:7,23 74:6,16

**exhibits** 53:18,21 56:5 66:22 68:22 70:4

**expand** 87:19

**experiences** 65:22

**experiencing** 64:1 66:8

**expert** 41:15 42:6,8,11

**explain** 47:17 48:14 51:2 57:1 70:8

**explained** 88:19

**expressed** 90:13

**expressing** 69:18,19 89:17

**extent** 88:22

**external** 87:2

F

**fact** 40:20 71:5 90:17 96:24 97:5

**factors** 73:3,5,9,12,13,15,16 74:1, 12,15,18 75:7

**fair** 39:9 45:7 55:14 65:9 69:23 72:21 76:15 88:20 90:11

**fairly** 79:9

**fall** 86:3

**false** 57:3 88:20

**familiar** 42:12

**family** 55:11 73:10,21 74:2 78:5,6 86:1

**fast** 45:24 46:9

**fatigue** 63:13

**favor** 41:21

**Federal** 37:20,21

**feel** 67:17 94:7 95:11,14

**feeling** 69:9

**feelings** 63:12

**female** 50:5 51:16 76:10

**fidgeting** 86:24 87:11

**fidgety** 57:18

**figure** 43:22 73:14

**filling** 47:18

**film** 56:19

**filmed** 89:9

**find** 90:15

**findings** 66:10,17,20 67:1,7,9,10, 14,19

**fine** 40:2 85:16 89:21

**fix** 45:15

**focus** 57:19 86:24

**form** 47:18 87:14 88:8 90:4 96:18 99:6

**found** 41:19 83:20

**foundation** 83:12 88:8 90:18

**frequent** 96:1

**frequently** 94:16 95:24 96:8

**front** 85:14 97:10

**fully** 68:13

**Function** 88:4

**functioning** 78:22 79:1,7

**future** 79:24

G

**G-O-R-D-I-N-E-E-R** 37:12

**GAF** 78:19,21 88:4,10

**gave** 41:24 42:1 55:17

**general** 52:16

**Gianna** 38:7 84:13,18

**give** 40:14 45:12,13 54:15 61:5 78:23 81:18,20 82:5

**giving** 41:9 42:5,6

**Gizzi** 38:7 50:21 83:12 84:13,16 87:18 88:14 89:1 90:10 91:1 93:1,3 95:1 96:18 97:2,14,16 98:10 99:6 100:7

**Global** 78:21 88:3

**good** 39:12 81:23 84:17

**Gordineer** 37:2,7,9,14 38:14 46:3 82:8 84:17 97:17 100:8

**graciously** 100:12

**Green** 42:24 43:4,12,20

**ground** 38:24 39:1

**guess** 40:18 48:5 50:9 51:2 52:4, 17 60:18,20 61:14 63:15 64:10,18 65:3,6,12,24 70:18 71:11 73:8,13, 14 74:17,24 79:15 89:18 91:12 98:19,23 99:2,16

**guilt** 63:13

**Gunsmoke** 54:23

**guys** 45:12

H

**hair-splitting** 89:11

**half** 95:8

**hallucinations** 49:7 70:5 71:1,7 87:2

**hand** 55:19

**happen** 39:16

**happy** 39:6

**harassing** 57:5 69:9

**harm** 72:10,15,24 94:4,7,8,10,12, 15 95:12,17

**harmed** 95:15

**harmful** 57:5 72:19

**harming** 70:17 94:13

**head** 39:14

**health** 41:10 42:2

**hear** 64:5

**hearing** 70:12,13,19

**hearings** 41:15

**helpful** 59:14

RONALD GORDINEER, MD, 03/30/2021

**helping** 90:7

**higher** 79:6

**highly** 72:2 89:15,17,18

**history** 47:22 49:24 52:22 58:14,
16 59:18,21,24 60:5 62:4 63:20,22
64:24 65:4 66:12,19 73:10 74:3,12
77:21 85:23 92:2

**hold** 61:3 76:19

**home** 73:18 79:5

**homicidal** 66:2 70:6 71:2 91:6
92:10

**homicidality** 91:18

**homicide** 73:16

**Honorable** 37:18

**hopelessness** 63:13

**hospital** 41:4,20 44:2 48:11,16
49:21 51:17 53:6,10 69:8 71:17
79:11,18 80:2

**hospitalization** 76:12

**hospitalizations** 58:18 59:5

**hospitalized** 79:3,10 86:5,6,9

**HPI** 66:11,12 67:10 70:11

**HS** 92:22

**hundred** 42:3,5 78:23

**hurt** 92:15

**HX** 52:21

**hyperverbal** 54:6 55:22

---

**I**

**i.e.** 99:15

**ideation** 56:18,21 57:1,2 63:12
70:4,6,21 71:1,2,4 89:4 91:5,6

**ideations** 88:18 89:3

**II** 77:14,15

**III** 77:18,21

**illegal** 61:18 62:5

**Illinois** 37:18,23

**illness** 49:6 50:1,3,4,16 63:21,23
65:1,5 66:13,19 72:1 76:2 77:6
85:24 87:20

**impaired** 71:23 72:6,8,17

**important** 59:7

**impossible** 89:5,8,9

**impulsive** 57:15,17 58:7 75:9
76:3,24 86:16,18,23 94:9

**impulsiveness** 87:21

**impulsivity** 74:13,14

**inappropriate** 87:6,11

**incident** 83:19 97:22

**include** 73:10 74:12

**includes** 94:14

**increased** 56:6

**independently** 44:22 45:3

**indicating** 64:2 74:1

**indication** 92:3

**indications** 64:9

**indicator** 61:12

**individuals** 94:4

**influence** 40:13

**information** 49:12 50:13 51:9
59:4

**informed** 40:21,24

**initial** 47:2,16 48:8,13 63:4 84:4
92:18

**Initiated** 47:6

**inquire** 44:3

**inside** 56:12

**insight** 71:23,24 72:4 77:1

**insisting** 56:18

**insomnia** 63:12

**instance** 52:12 60:8 61:20,21 87:7
99:15

**intact** 71:9,19,20

**intensity** 56:7

**intent** 70:6,7 71:2 91:6

**intention** 90:7

**intentions** 57:5

**interacted** 44:16,17

**interaction** 54:1

**interchangeable** 51:5

**interest** 65:17

**internal** 57:21 87:1

**interpersonal** 78:8,18

**interrupted** 56:7

**Intervention** 83:1,8

**introduce** 38:3

**involves** 88:20

**IQ** 75:20

**IV** 77:22,24

---

**J**

**Janette** 37:16 38:8 44:14,23 45:4,
10 56:15 58:6 59:4 62:7,23 80:12
81:17 83:24 84:19 97:23

**job** 48:10 78:6 86:1

**jog** 82:12

**Judge** 37:18

**judgment** 72:6,8,17,24 75:10 77:1
90:2,3,7,8 94:11

**jump** 40:17

**jumping** 41:6 80:20 84:22

**June** 44:19

---

**K**

**kind** 37:10 46:18 52:9 55:2 79:21
89:10

**Kness** 37:18

**knot** 54:22

**knowing** 98:8

---

**L**

**labeled** 63:3 75:11

**labile** 69:15,18 70:1

**lack** 57:19 65:6 83:12

**Laniya** 37:24 95:2

**lastly** 40:1

**lawyer** 43:16

**lawyers** 42:21,23

**lead** 72:10,19 94:15

RONALD GORDINEER, MD, 03/30/2021

**leads** 54:2 86:14 94:18 95:24

**led** 90:21 92:5

**legal** 42:12

**length** 79:13,17

**levels** 79:7

**Lieutenant** 38:1

**list** 67:22 68:4

**listed** 77:18 85:10

**lives** 75:19

**local** 37:22

**long-term** 41:20

**looked** 92:14

**loose** 54:5,8,10,17,20,21 55:1 66:23

**loosely** 54:13

**loss** 65:17

**lost** 78:5

**lot** 39:13 79:4,5 90:13

**loud** 39:12 69:20

**low** 37:10 46:18 79:2,9

---

**M**

**made** 48:10 76:15 93:24

**make** 38:13,24 40:11,20,23 44:11, 18,21 63:19 65:5,7 66:6,16 67:8 72:9,18 76:21 90:3,6,8

**makes** 54:2 61:15 90:1

**making** 66:7 72:2

**manic** 56:5

**manifestations** 92:12

**manifesting** 85:21

**marijuana** 60:6,17 61:22

**mark** 82:4

**marked** 45:20

**matter** 37:15 98:17 99:2

**MD** 37:2

**meaning** 38:20 55:3

**means** 47:8 53:24 56:23 57:1 60:11 65:17 66:13 67:20,23 68:15, 19 69:1,7 71:24 72:8 79:2,3

**med** 85:15

**medical** 45:4,5,8,9 49:3 52:21 53:5,9 75:17 77:21 78:17 79:24 80:12,16 84:10 86:9

**Medicare** 75:15 79:21

**medication** 59:14 76:13 85:7,11, 15 93:8,9,12

**medications** 40:13

**meditech** 52:24 53:3

**memory** 71:9,19,20 82:13 93:16

**mental** 41:10 42:2 49:6 50:15 68:6, 10 76:2 77:6 85:24 87:20 91:4

**mentioned** 63:16,20 84:18,23 86:15 88:3

**met** 44:16

**Methodist** 48:11 52:2 53:7 79:10 88:6 93:18 97:19

**mild** 75:7 78:7 85:21

**military** 47:13

**mind** 74:10 94:23

**mini-break** 81:19

**minutes** 81:20

**mischaracterized** 88:23

**misstates** 50:21

**moderate** 75:2,3,5 85:18 86:4

**monitor** 92:22

**monitored** 83:2,9

**mood** 50:8 56:4,5 63:10 69:4 74:12,14 76:11 80:6 87:23,24

**Moore** 37:6,13,24 38:9 45:12,17, 19 51:1 81:23 82:1 83:16 84:12 87:14 88:8,22 90:4,17 92:23 93:2 95:4 96:19 97:3,12 98:12,15 99:9 100:5,8

**morning** 71:13

**motivation** 73:22

**move** 68:5

**movements** 68:23

**moving** 39:14 54:5 61:2

**multiple** 58:17 60:6 61:24 62:14

---

**N**

**naked** 56:19 89:9

**narrow** 89:21

**nature** 40:10 100:13

**necessarily** 80:3

**neck** 54:21

**needed** 39:7

**negative** 67:15,19

**neighbors** 55:10 78:10 86:12

**neurologic** 69:2

**night** 71:14

**noose** 54:21

**normal** 65:17

**Northern** 37:17,23

**Northwestern** 49:19 51:17,21 52:1

**notate** 91:14

**note** 52:6,7,9,12 76:23 82:21,22 83:10 85:14 91:9 98:2

**notes** 53:9 80:22 81:2,4,8,13 83:14 84:6 85:9 92:21

**noticed** 47:14

**number** 78:22

**numbers** 79:6 89:13

**numerical** 78:24

**nurse's** 82:22

**nurses** 93:14

**nurses'** 80:22 81:8,13

---

**O**

**oath** 38:19

**objection** 50:21 83:12 87:14 88:8, 22 90:4,17 96:18 97:2 99:6

**Observation** 49:14

**observe** 65:23 67:23 92:4,8

**observed** 68:1,4 83:20 92:17

**obvious** 69:2

**Occasionally** 49:20

RONALD GORDINEER, MD, 03/30/2021

**offend** 40:9

**offended** 39:16

**officer** 99:15

**officers** 96:22,23 97:22 98:22

**officially** 100:24

**Ohio** 41:9

**olanzapine** 93:5,7

**olazapan** 92:22

**olozapan** 93:4

**Onset** 50:4

**opinion** 72:23 80:12,17 86:3,9

**opinions** 84:8

**opportunity** 100:23

**opposing** 91:3

**option** 100:15

**options** 100:9

**ordinary** 48:10

**organize** 54:1

**oriented** 68:13,15,17

**original** 49:23 98:3

**overresponding** 57:22

**P**

**p.m.** 101:6

**panic** 66:1

**paragraph** 61:4 63:17 66:5,20,24 67:2,11 68:7 83:3,7

**paranoia** 56:20 86:12 94:16 99:3, 20

**paranoid** 56:18 57:1,2 70:4,10,21 71:3,6,21 88:17 89:3,4 90:2,15,22 94:6,18 95:7,10,14,20 97:6,9 98:17,20,21 99:11,13,14 100:1

**part** 40:18,19 64:7 79:9 82:15 85:9

**participate** 84:3

**parties** 38:4

**past** 58:13

**paste** 51:24

**patient** 41:19 48:16 49:14 50:5,15 51:9 52:18 53:11,14,15,17,18,21

54:11 58:16,20,23 59:2,23 60:19, 21 63:8,17 64:21 65:20 66:21,22 68:11,12 73:6 75:12 80:4,5 81:1,3 83:1,2,8 88:6 89:5 90:8 91:8,11 94:17 96:10 97:6 99:23,24

**patient's** 75:18,23

**patients** 41:11 42:2 80:2 87:12 93:13

**patients'** 80:1

**pending** 37:17 40:4

**people** 39:13 94:6,9,17 100:19

**perceive** 95:21

**perceived** 96:15,21

**perfectly** 40:2

**peripherally** 54:13

**person** 39:21 60:24 61:22 68:16, 19 69:22 70:18,19 72:14 78:24 94:17 95:10,11,14,22,23 96:3,4,6, 16 98:17,20 99:3,4,5,11,13 100:1

**person's** 69:19

**personality** 77:16 78:17

**personally** 93:12

**persons** 95:23

**pertaining** 73:19

**physical** 68:9 92:12 96:4,8,17,24 98:23 99:16

**physically** 97:8

**place** 68:16,19 76:14

**plaintiff** 38:8

**plaintiff's** 45:23 95:6 98:16 100:18

**plan** 48:17 82:3 92:19 93:1

**play** 59:11,12,13 75:13

**point** 51:8 54:3 55:3,13 61:22

**police** 90:14,20 96:9,14,15 97:8, 18,22 98:5,8,18 99:3,5,23,24 100:1

**policeman** 97:10

**polysubstance** 59:24 60:1,7,10, 11,22 61:10,11,21,23 62:1,3,4,7,19 63:4

**poor** 75:10 77:1 94:11

**populates** 47:22

**portion** 91:4

**positive** 66:10,17,20 67:1,7,9,10

**possibilities** 89:19,23

**possibility** 89:13 96:14

**possibly** 77:2

**postponed** 40:19

**potential** 91:17

**potentially** 72:15

**practice** 48:4 52:16

**precautions** 76:14

**preceding** 66:5

**predicating** 97:19

**predict** 79:24

**predictable** 58:3

**prepare** 42:16

**prescribe** 85:6

**prescribed** 85:15 93:10

**present** 38:3 49:24 63:21,23 65:1, 3,4 66:12,19 69:1,7 87:12,20

**presentation** 48:23 96:1,12

**presented** 50:7,11 92:14 94:3

**presenting** 41:21 48:15 50:3

**presently** 75:9

**presents** 49:7 50:5 68:12 71:6 97:6

**pressured** 54:7 55:23 56:2,4,13 69:4

**pretty** 39:12 79:2

**previous** 49:15,16 58:18 59:5,24 67:2 76:8

**previously** 45:20 46:22 50:5,10, 19 51:11

**primary** 68:9 77:9,10

**prior** 52:4,7 80:22 81:10

**Procedure** 37:20

**proceed** 41:4

**proceedings** 101:5

**process** 53:19,22 54:4

**profession** 89:3

**professional** 72:23 80:12,16 86:3

**projected** 97:10

Index: pronounce–rules

RONALD GORDINEER, MD, 03/30/2021

**pronounce** 53:4 63:11 65:15

**pronouncing** 69:16

**protect** 73:6,13

**protective** 73:9,12,15,20,24 74:18

**provide** 44:4

**provisional** 51:7

**psychiatric** 46:16,21 47:2,17 48:8,14 58:15 63:4,10,19 64:22 66:3 67:15,20,21,22 68:3,11 77:9, 10 92:19

**psychiatry** 88:12

**psychosis** 48:24 49:5 64:18 74:7 83:2,9 87:13

**psychosocial** 78:1,4

**psychotic** 50:8 53:18,21 58:13,18 59:5 63:23 66:22 71:21 72:5 74:22 75:10 76:11,24 80:6 85:23 86:10, 11 87:16,23 90:22 94:4

**PT** 53:15

**pull** 81:19

**purpose** 48:13,20,21,22 50:1 58:14 59:16,17 63:16,18 64:20 66:4,5 68:7 73:4 76:6 77:4

**pursuant** 37:15,20

**pursue** 92:3

**pursued** 91:21

**pushed** 56:11

**pushing** 56:11

**put** 49:12 75:16

**putting** 94:14

———————————

**Q**

**question** 39:7,8,9 40:4,5 50:9 54:11,14 55:6,8,17,19 63:15 70:16 73:9 86:15,20 91:11 98:1,3,13

**questions** 38:11,21 39:3 43:18,20 46:6 55:16 61:7 73:19 84:13,20 91:4 95:1 97:12,13,14 98:11 100:6

**quick** 45:15 46:10

———————————

**R**

**R-O-N** 37:9

**re-describe** 89:2

**read** 52:6,7,8,12,17 61:5,6 64:2,9, 11,14 82:14,15,21 83:3,7,11

**reading** 49:14,16

**real** 45:14 46:10

**reality** 90:3

**reason** 40:2 48:23 51:6 79:10

**reasonable** 47:11 84:10

**reasons** 95:18

**recall** 44:15,22 45:3 51:23 52:11, 14,15 57:12 58:5,8 61:19 62:6,9,18 69:5,10,13 81:7,9,15 83:19,23 84:5 92:16 93:16,19 96:7 98:7,9

**receive** 59:4

**recent** 71:10,17

**recess** 45:16 81:22

**recognize** 46:12 82:10,20

**recollection** 83:10

**record** 37:8,13 39:18 45:18 51:16, 22 52:1 56:22 67:8 76:20 81:23

**records** 45:5,8 49:19 52:14,17 53:5,10 67:12

**recreation** 60:3

**recreational** 60:3,12,19 61:13 62:8,24

**redundant** 38:12 44:11

**referring** 77:24 78:3 95:19

**refers** 77:21

**reflect** 37:13

**refresh** 83:10

**regard** 63:9

**regular** 48:4

**related** 54:13

**relation** 73:15

**released** 80:7

**relevant** 55:8,18,19

**rely** 45:8

**remaining** 65:2

**remember** 41:12 42:10 46:22 51:12,13 71:13,14,16 83:15 86:17 92:5 98:24

**remission** 80:6

**rendered** 45:4,9

**repeat** 58:24 64:6 72:16 78:2 86:21 95:8,12

**rephrase** 39:7

**report** 48:8 49:11 62:11 65:9 84:4

**reporter** 39:15,20 82:3 100:12,17, 20

**reports** 48:5

**represent** 38:1 84:19

**represented** 40:22

**representing** 38:4

**requests** 87:6,11

**requires** 75:15

**rereading** 98:2

**reserve** 100:9,10

**responding** 57:20,21

**responds** 55:6

**response** 41:3 73:11,23 74:3 91:14

**responsive** 75:8

**restless** 57:18 86:24

**restlessness** 87:11,20

**restrain** 87:6

**review** 53:9 63:18 64:20 65:21 100:11,15

**reviewed** 46:23 49:11 52:24 80:22 81:2,8

**reviewing** 63:8,16 65:20 66:1 81:3,15

**rise** 89:14

**risk** 73:3,5,16 75:3 85:18,21 86:4

**role** 59:10,12,13

**Ron** 37:9

**Ronald** 37:2,14

**room** 48:23 49:15,17,19,22,23 57:20 67:3 96:1 97:7

**rules** 37:20,21,22 38:24 39:1

RONALD GORDINEER, MD, 03/30/2021

## S

S-P-I-T-Z 43:3

safe 42:13 50:17,23 53:11 56:14 62:22 70:23 85:1

sake 45:22

sat 46:24

scenario 91:23

schizoaffective 50:20 51:3 77:11 87:22 88:2

schizophrenia 50:19 51:3 78:16 80:14

schizophrenia/schizoaffective 50:6,11

school 75:17 79:24

score 88:4,10,11

screen 45:13 82:6

scroll 46:5 48:18 52:20 66:15

scrolling 45:24

section 47:23 48:20 50:1 58:14 59:3,16 73:4 75:11 76:7 77:4,5

sections 76:8

seek 73:22

seeking 73:10 74:2

self-harm 91:20 92:13

sense 54:2 56:10

sentence 65:24 67:19 74:11 75:16

sentences 54:2

severe 75:6

share 45:13 82:6

show 81:12 82:2

sign 78:20 100:24

significant 59:7

signs 50:3 69:2 80:13 94:3

sit 44:13

sitting 43:24 58:2

situation 41:18 73:18 94:14

skills 75:20

slash 51:3,7 63:13 74:18

slow 46:1

social 75:20 85:24

something's 56:11

sort 93:15

Sotomayor 38:5 98:11

sounds 47:10

span 86:18

speak 37:11 39:22 44:7 46:19 56:5 97:21

speaking 56:8 91:2

specifically 58:8 69:13 86:18 90:14

speech 54:7 55:23 56:4,13 69:3

spell 37:8 43:1

Spitz 42:24 43:2,7,14

spoke 41:8

stabilization 76:12

stable 86:1

stand 52:21

standard 88:11

stands 53:15 78:21

start 76:13 92:21,22

Starting 61:4

starts 54:11 66:21 74:11 83:8

state 37:8 51:10 68:20 69:19 94:23

stated 58:9

states 37:22 51:16 52:14 67:12

statistically 94:5

status 68:6,10 91:4

stay 79:18 80:1,2,4

Stephanie 38:5

stimuli 57:21

stop 39:5 53:20 99:4,7,20

strength 75:12

strengths 75:19,24

stress 79:4

stressors 78:1,4

strike 57:13 60:20 98:19 99:12

strong 85:24

subject 54:12,14 55:13

subpoena 37:15

substance 59:15,17 60:2,3,9 61:18 62:5 100:14

substances 40:14

suggest 91:20

suggested 92:9

suggests 92:9

suicidal 63:12 70:5,16,20 71:1,7 73:7,20 74:12,18,23 75:9 86:4 91:5,24 92:1,2,6

suicidality 91:17

suicide 73:15 74:15 75:3 85:18,21 91:21

Suicide/homicide 73:3

sum 76:8

summary 88:21

sun 89:14

support 73:10,22 74:2 79:5 86:1

supportive 73:20 75:7

suppose 89:13

surrounding 71:16

suspect 51:12

sworn 37:1,4 38:20

symptom 49:6 56:4 65:16 68:3

symptoms 48:15 50:3,8 63:10,20, 23 64:1,2,8,11,14,16,18,22 65:3,8, 20,21,22 66:1,3 67:15,20,22 71:21 74:7,13,14,22 76:11 80:6,13 85:23 86:10 87:10,17,23,24 88:17 94:3 95:21 99:11

system 53:8

systems 63:18 64:21

## T

taking 38:17 51:9

talk 42:19 43:6,11,14,23

talked 42:21,23 69:6 83:21 84:1 91:3

talking 54:12 56:12 67:11 89:12,22 95:13 96:17

RONALD GORDINEER, MD, 03/30/2021

**talks** 63:8 66:1

**tangent** 55:7

**tangentiality** 54:6,9 55:5 66:24

**teach** 75:17 79:23

**tearful** 69:20

**technology** 57:4

**telling** 67:17

**tendency** 39:13

**tender** 84:12

**tendered** 42:8

**terms** 42:12 49:3 99:3

**testified** 37:4 41:14 85:17 88:16 93:20,22

**testify** 45:8

**testifying** 42:14

**testimony** 40:15 41:9,16,24 42:1,5 50:22 88:23

**therapy** 76:14

**thing** 40:3 43:21 68:10 79:21 92:20 95:3

**things** 57:22 60:6 63:16 87:7

**Thorek** 44:1

**thought** 53:19,22 54:4 66:23 70:3 93:20

**thoughts** 66:2 70:16,17,20 71:8 73:21 75:9 91:20,24 92:1

**thousands** 82:21 83:13

**tic** 68:22

**tied** 54:22

**time** 39:5,11,21 40:8,23 41:23 42:4 43:10,13 47:12,13 53:10 54:23 62:5,11,17,21 63:1 65:23 68:16,19 72:22 79:13 81:15,21 85:3,4 86:18 93:17

**times** 42:1,3,5,7 43:6,11 61:24 62:6,15 68:15 84:24

**today** 38:17,21 40:15 43:24 44:13 83:21 84:1,9 100:21

**today's** 42:16,20 44:5,8

**told** 41:24 50:18 83:24 98:21

**tomorrow** 89:14

**top** 66:19

**transcript** 100:11,14,24

**transfer** 49:21

**treatment** 41:11,20,22 42:2 45:3,9 48:17 73:10,11,22,23 74:2,3 75:8 76:13 92:19 93:1

**true** 89:6

**trust** 100:16,20

**truth** 38:20

**truthful** 40:15

**Turning** 82:24

**type** 47:19

**typed** 48:2 100:12

**types** 87:19

**typical** 96:12

**typos** 100:12

**U**

**uh-hmm** 39:14

**Uh-huh** 81:6 85:22

**uh-uh** 39:14 81:11

**ultimately** 100:22

**unable** 54:1 86:24 87:5

**understand** 38:16,19 39:4,6 65:13 72:1,4 90:12

**understanding** 61:15 64:19

**understood** 39:9 87:8 94:20

**unhappy** 69:7

**United** 37:22

**universe** 89:6,18,23,24

**unpredictability** 87:21

**unpredictable** 57:15,18,24 58:4,7 76:24 86:13

**unrealistic** 72:3

**upset** 69:21,22,24

**V**

**velocity** 56:6

**verbal** 54:1 56:8 96:5,8,17,24 98:23 99:16

**verbally** 97:7

**verbiage** 52:13

**view** 100:23

**visible** 83:2

**voices** 70:12,13,19

**W**

**wait** 82:14

**waive** 100:9,16,19 101:4

**walk** 58:3

**wanted** 40:21 65:5 100:5

**weakness** 76:4

**weaknesses** 75:12,21,24

**weigh** 74:19,21

**whoever's** 97:10

**wondering** 88:15

**word** 51:13 89:19

**words** 56:9 65:6

**world** 88:13

**written** 50:18 57:8 62:11 75:1

**wrong** 41:10 65:13,14

**X**

**X3** 68:13

**Y**

**year** 68:21

**Z**

**Zoom** 38:3