## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JEANETTE BASS, | ) |
|           Plaintiff, | ) Case No. 19 CV 7557 |
| v. | ) Judge John Kness |
| SGT. A. DAKURAS, individually, and THE CITY OF CHICAGO, a Municipal Corporation, | ) Magistrate Judge Sunil R. Harjani |
|           Defendants. | ) JURY DEMAND |

### DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

NOW COME defendants, City of Chicago, ("City") and Chicago Police Lieutenant Andrew Dakuras[1], (collectively "Defendants"), and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, hereby submit this memorandum of law in support of their motion for summary judgment.

### SUMMARY OF L.R. 56.1 UNDISPUTED FACTS

On June 20, 2019, plaintiff, Janette Bass[2], ("Bass"), filed a police report, taken by unnamed Chicago police officers, against the management company of her condominium unit for allegedly entering her unit without permission, and videotaping Bass in her unit while she was undressed from the waist down. *See* Defendants' 56.1(a)(3) Statement of Undisputed Facts, "SOF", at ¶ 5. Three days later, on June 23, 2019, in the early evening hours, Bass called 9-1-1 because the police report taken on June 20, 2019 was classified as 'non-criminal,' and Bass wanted it changed to 'criminal.' SOF at ¶ 6. Dakuras was on duty in full uniform, including his department issued body worn camera, as a Chicago Police Sergeant on June 23, 2019. SOF at ¶ 7. Dakuras was dispatched to

---

[1] At the time of filing of plaintiff's, Janette Bass's, complaint, Andrew Dakuras was a sergeant. Subsequently he was promoted to lieutenant and will be referred to herein as "Dakuras."
[2] The correct spelling of plaintiff's name is "Janette."

1

Bass's home located at 260 E. Chestnut St., Unit 3103, for a request for a supervisor. SOF at ¶ 8. Upon arrival at 260 E. Chestnut St., Dakuras activated his body worn camera, capturing the entirety of his interaction with Bass on June 23, 2019. SOF at ¶ 9.

Upon Dakuras's arrival at Bass's unit, he knocked on her door. SOF at ¶ 10. After approximately 20 seconds of no one responding, Dakuras knocked again. SOF at ¶¶10-11. At that point, Bass responded that she would be a second because she was getting dressed. SOF at ¶ 11. Eventually Bass opened the door and allowed Dakuras into her condominium unit. SOF at ¶ 12. At that time, pursuant to Chicago Police Department policy, Dakuras informed Bass that she is being audio and video recorded by means of his body worn camera. *Id.* Bass responded that she also wanted to record Dakuras. *Id.*

Dakuras immediately noticed that Bass's condominium unit appeared in disarray. SOF at ¶ 13. Bass had pots, pans and other various items overcrowding the entirety of her kitchen counter tops. *Id.* In addition, Bass had what appeared to be thousands of papers thrown about all over her dining room table and floor, as well as two phones. *Id.* Bass immediately told Dakuras that she had to pay money to change her locks. SOF at ¶ 14. She then pointed to a water stain on her ceiling and told Dakuras her main water line was broken, and because she reported the broken water line to management, she was banned from the management office, at which time they threated to call the police on Bass. SOF at ¶¶ 14-15. Subsequently, Bass told Dakuras how management came into her unit without her permission and videotaped her naked. SOF at ¶ 16 . When Dakuras attempted to inform Bass that it is not necessarily criminal trespass, Bass argued with Dakuras over the law of criminal trespass. SOF at ¶ 17. In support of her allegations, Bass read texts messages to Dakuras, played recordings she took, and showed Dakuras pictures she took of management. SOF at ¶¶ 18-19, 24. The first recording she played was of one of her calls to 9-1-1. SOF at ¶ 19. Dakuras informed Bass that those calls are recorded by OEMC, which she responded she knew, but that she

2

recorded the calls for her own records. *Id.* She then played a recording of herself yelling about someone being at her door. SOF at ¶ 20. Dakuras began referencing the report, at which time Bass cut him off and told him the information she just provided was not in the report, despite the fact that she did not have a copy of the report. SOF at ¶ 21. During this time, Bass's speech is rapid, and she cuts Dakuras off without letting him finish what he is trying to explain. SOF at ¶ 21. When Dakuras mentioned that it did not appear she had a copy of the report, Bass insisted the information she just gave him was not in the report because she spoke to the detective. SOF at ¶ 22. Dakuras at that point, informed Bass that if she was in contact with the investigating detective, the detective had the ability to amend her report. *Id.* Bass argued with Dakuras about the detective's ability to amend her report, and played a recording of a call she made to the 018 District police station, wherein she believed she was told by Sergeant Erik Seng that she needed to call 9-1-1 to amend her report. SOF at ¶¶ 23-24.

In an attempt to figure out what was going on, Dakuras made a call to Sergeant Seng. SOF at ¶ 25. During this time, Bass continued to play the recording of her call to Sergeant Seng, in which she is telling the same story of the management company coming into her apartment and filming her naked. SOF at ¶¶ 24, 26. In the recording of the phone call to Sergeant Seng, you can hear Bass playing another recording of her interaction with management to Sergeant Seng. *Id..* She then begins to talk at Dakuras while he is on the phone with Sergeant Seng. SOF at ¶ 26. At this point, Dakuras asked Bass to let him talk to the Sergeant; causing Bass to tell Dakuras to not yell at her and continually repeat that she is the victim. SOF at ¶ 26. Unable to have a productive call with Sergeant Seng, Dakuras hangs up the phone. SOF at ¶ 27. At this point, Dakuras tells Bass his name, spells his name for her, and tells her that he is not doing another report, because she already had a report on the incident. SOF at ¶ 28. As Dakuras began walking out of her unit, Bass yelled at Dakuras for his name, despite that he had just given it to her and despite that she had been recording him. SOF

3

at ¶ 29. Bass at one point repeated phrases Dakuras said verbatim, including, "no ma'am," and "that's not going to happen." SOF at ¶ 31. Bass is visibly upset at this point, with a raised voice and rapid speech, arguing that the fact that she was filmed naked should be in a report. SOF at ¶ 32. At this point, Dakuras asked Bass twice if she was in crisis, after the second time responding, "because of you." SOF at ¶ 33.

Dakuras made the decision at this point to call for an ambulance to transport Bass for a mental health evaluation believing Bass may be a harm to herself. SOF at ¶ 30. Specifically, Dakuras thought she may harm herself based on the fact that: (i) upon his arrival Bass was not dressed even though she called police to respond to her unit; (ii) her condominium was disorganized and in disarray; (iii) her speech was rapid and disorganized; (iv) she cut Dakuras off and spoke over him; (v) she appeared agitated; (vi) she appeared paranoid in that she recorded every interaction she had with anyone, including Dakuras, the management office of her building, 9-1-1 call takers and police officers; (vii) after giving Bass his name several times, Bass requested his name again; and (viii) Bass responded in the affirmative when asked if she was in crisis. SOF at ¶ 34.

At the point that Dakuras informed Bass he arranged an ambulance to take her to the hospital for a mental health evaluation, Bass became belligerent. SOF at ¶¶ 36-37. She called 9-1-1 multiple times on Dakuras because he would not leave her unit and he was trying to take her to the hospital, she called a neighbor claiming Dakuras was trying to arrest her, and Bass yelled and paced her unit. SOF at ¶¶ 38, 41, 44. At one point, because Dakuras would not leave, Bass leaves her own unit with no shoes or socks on, and attempted to run away from Dakuras. SOF at ¶¶ 45-46. Bass admitted that once she was informed she was going to the hospital, she was in crisis mode. SOF at ¶ 37. Dakuras did not want Bass to be on her own because he was not sure what she would do. SOF at ¶ 38. Bass had further told Dakuras she suffered from PTSD from the police and was not under the care of a physician. SOF at ¶¶ 35, 39. Once Bass fled the unit, Dakuras pursued Bass up and

4

down the floors of the condominium building, until he was eventually able to take her into custody on the 27th floor. SOF at ¶¶ 46-47. Because Bass was still attempting to flee from Dakuras, Dakuras grabbed Bass's arm and her shirt, at which time she brings her own body down to the ground. SOF at ¶¶ 47-48. Dakuras placed his hand on Bass's neck in an attempt to gain control of her and get her arms behind her back. SOF at ¶ 49. Because of her resistance and age, Dakuras determined he could not safely handcuff her behind her back, and at that time handcuffed her in front of her body to gain control. SOF at ¶¶ 49-50. Dakuras placed at various times, one to two hands on Bass's left arm while she laid on her right side on the ground, to keep her on the ground and prevent further flight. SOF at ¶ 51.

Bass was subsequently transported by ambulance to Northwestern Memorial Hospital. SOF at ¶ 53. Bass was independently evaluated in the emergency department, and a licensed social worker, Fred Cabras, signed the petition to have Bass involuntarily admitted. SOF at ¶ 54. At the time Bass is examined by physicians at Northwestern, she denies any complaints of physical injury. SOF at ¶ 56. Dr. Piorotte, one of her examining physicians, determined that Bass was suffering from a longstanding psychiatric problem with an acute flare-up/exacerbation and that Bass needed to be placed on a psychiatric hold for a full psychiatric evaluation. SOF at ¶ 57.

Physicians at Methodist Hospital also evaluated Bass. SOF at ¶ 58. Bass was found to have previously been diagnosed with schizophrenia and/or schizoaffective disorder, and doctors determined that Bass needed to be committed because her symptoms indicated she was a potential harm to herself. SOF at ¶¶ 59-62. Dakuras did not speak with any of the individuals who made the decision to admit Bass; rather the involuntary admission was based on independent examinations of medical providers. SOF at ¶¶ 54, 63.

As a result of the events of June 23, 2019, Bass filed her operative Complaint alleging mainly that Dakuras falsely arrested her, used excessive force against Bass in taking her into custody, and

5

intentionally caused her emotional distress. SOF at ¶ 1.

## STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.56(c); *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559 (7th Cir. 2009). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party establishes they are entitled to summary judgment, the burden shifts to the non-moving party to offer specific evidence establishing a triable issue of fact. *Eberts v. Goderstad*, 569 F.3d 757, 766-67 (7th Cir. 2009). A moving party is entitled to summary judgment where the non-moving party fails to establish an "essential element" of the case "with respect to which that party has the burden of proof." *Torry v. City of Chicago, et al*, 2018 WL 950099, at *6 (N.D. Ill., Feb. 20, 2018) (J. Blakey presiding) (internal citations omitted). Moreover, the existence of a factual dispute will not bar summary judgment unless the disputed fact is outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291-92 (7th Cir. 1997).

Even so, "when opposing parties set forth two different accounts and one is blatantly contradicted by the record so that no reasonable jury could believe it, [the] court should not adopt that version of the facts for purposes of ruling on [a] motion for summary judgment." *Scott v. Harris*, 550 U.S. 372 (2007). In cases where the incident is caught on videotape, the reviewing court should view the facts "in the light depicted in the videotape," even if it would contradict the non-movant's version of events. *Id.* at 380-81.

**I.  BASS'S UNLAWFUL SEIZURE CLAIM FAILS.**

While Bass frames her Count I as a "false arrest" claim, it is clear from the record that

6

Dakuras did not arrest Bass. SOF at ¶¶ 36, 42. Rather, Bass's claim is one for unlawful seizure governed by the Fourth Amendment. *See Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013)(Seizures for purposes of effectuating an involuntary mental health evaluation are analyzed under Fourth Amendment probable cause standard.) Because Dakuras had probable cause to believe Bass was a harm to herself, or in the alternative, arguably had probable cause to believe Bass was a harm to herself, Bass's unlawful seizure claim must fail.

    a. <u>Dakuras reasonably believed Bass was a harm to herself.</u>

Seizures to effectuate an involuntary mental health evaluation are governed by probable cause under the Fourth Amendment. *Fitzgerald*, 707 F.3d at 732. Probable cause exists where there are "reasonable grounds for believing the person seized is subject to seizure under the governing legal standard." *Id.* (internal citations omitted). In Illinois, a police officer may take an individual into custody to transport them to a mental health facility where that officer, ". . . has reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm." 405 ILCS 5/3-606. This analysis is objective one based on the totality of the circumstances; an officer's subjective motivations do not invalidate a seizure otherwise supported by probable cause. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010). Essentially, the question is whether or not an officer was objectively reasonable in his or her belief that an individual required immediate hospitalization to protect them from self-harm. Id. at 457; *Bruce v. Guersey*, 777 F.3d 872, 876 (7th Cir. 2015).

In *Knope v. McElroy*, the court found Knope did not have a claim against an employee of the mental health center that involuntarily committed him. 2019 WL 4393075, at *2 (W.D. Wisc., Sept. 13, 2019). The Court noted that it was reasonable to believe Knope suffered from a mental illness and posed a danger to himself where, among other factors, he exhibited paranoid and erratic behavior, was not taking medications and was not under the care of a doctor, had a history of

7

mental health disorders and drug abuse, and had triggering events in his life including losing his job and going through a divorce. *Id.*

Similarly, in *Gutierrez v. May*, the Seventh Circuit affirmed the dismissal of a complaint where Gutierrez alleged he was wrongfully involuntarily committed. 4 F.3d 996, at *2 (7th Cir. 1993). Specifically the court found where Gutierrez displayed violent behavior, yelled about pornographic movies, refused to lower his voice, made threats of lawsuits, and berated hospital staff, these actions were sufficient to believe Gutierrez needed immediate hospitalization. *Id.*

Similarly here, Dakuras was reasonable in his belief that Bass required immediate hospitalization to prevent harm to herself. Bass was not dressed upon Dakuras's arrival, despite the fact that she called for police to respond to her home; she displayed paranoid behavior, in that she recorded every interaction she had with others, including the management of her condominium unit, Dakuras, 9-1-1 call takers, and police officers in the 018 District; her unit was in complete disarray, including thousands of papers that were thrown over her floor and dining table; she could not tell a cohesive story to Dakuras; she could not process information given to her by Dakuras, such as his name or the fact that a detective could amend her report; she continued to tell the same story regarding her condominium unit over and over to various officers; she appears to get agitated and irate when told by Dakuras she would not be getting a supplemental report by raising her voice and arguing with Dakuras; Bass responds in the affirmative when asked by Dakuras if she is in crisis; and finally, she tells Dakuras she is not under the care of a doctor. SOF at ¶¶ 11-13, 34, 35. As in *Knope* and *Gutierrez*, it was not unreasonable for Dakuras to believe that Bass may pose a harm to herself based on her obvious agitated state. *See Knope*, 2019 WL 4393075, at *2; *Gutierrez*, 4 F.3d 996, at *2; *see also Sherman v. Four County Counseling Center*, 987 F.2d 397, 402 (7th Cir. 1993)(Finding officer entitled to qualified immunity for involuntary commitment where Sherman was on bond for harassment, threatened the victim he was accused of harassing, visited the church where the victim

8

was a member, and cried publicly about the harassment charges.) In fact, Dr. Gordineer, one of Bass's treating physicians, found that based on Bass's impaired judgment, mood symptoms, and impulsivity, she could have caused harm to herself. SOF at ¶ 60.

As a result, Dakuras was reasonable in his belief that Bass required immediate hospitalization to prevent harm to herself, and Bass's Fourth Amendment claim (Count I) must fail.

b.  <u>Dakuras is otherwise entitled to qualified immunity</u>.

The doctrine of qualified immunity shields public officials from civil liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Tolliver v. City of Chicago, et. al.*, 820 F.3d 237, 244-45 (7th Cir. 2016). When examining a qualified immunity claim, the court must consider "whether that constitutional right was clearly established at the time of the alleged violation." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (citations omitted).

"A right is clearly established if it is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015) (citation omitted). "Viewed as a whole, the doctrine of qualified immunity erects a substantial barrier for plaintiffs, and appropriately so because qualified immunity is 'designed to shield from civil liability all but the plainly incompetent or those who knowingly violate the law.'" *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994)(internal citations omitted).

"Qualified Immunity protects officers who are 'reasonable, even if mistaken' in making probable cause assessments." *Tebbens v. Mushol*, 692 F.3d 807, 820 (7th Cir. 2012) (citations omitted). Arguable probable cause exists "when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that

9

probable cause existed in light of well-established law. *Id.* (citing *Flemming v. Livingston Cnty.*, 674 F.3d 874, 880 (7th Cir. 2012)).

As argued above, while there is no case directly on point, existing law and the facts faced by Dakuras establish, at a minimum, arguable probable cause to believe Bass needed immediate medical care to prevent harm to herself. *Supra* at 7-9; *see also Knope*, 2019 WL 4393075, at *2; *Gutierrez*, 4 F.3d 996, at *2; *Sherman*, 987 F.2d at 402. Therefore, Dakuras is entitled to qualified immunity with regards to Bass's Fourth Amendment unlawful seizure claim (Count I).

**II. DAKURAS'S USE OF FORCE WAS REASONABLE.**

Bass claims that Dakuras used excessive force against her when he "physically attacked," her. *See* Plaintiff's Complaint, ECF No. 1, at ¶ 10. However, this incident was captured on body worn camera, and should be viewed in the light depicted on the body worn camera video. *Scott*, 550 U.S. at 380-81.

a. <u>Dakuras's use of force was reasonable under the totality of the circumstances.</u>

The Fourth Amendment governs excessive force claims in the course of an arrest, investigatory stop or other "seizure." *See Graham v. Connor*, 490 U.S. 386 (1989). The objective reasonableness standard governs Fourth Amendment excessive force claims. *Id.* at 396. Courts look to the "totality of the circumstances known to the police officer at the time of the incident" to determine the reasonableness of the force used. *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988). Relevant factors include: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018). The reasonableness analysis "must embody

allowance for the fact that police officers are often forced to make split second judgments-in circumstances that are tense, uncertain and rapidly evolving-about the amount of force that is necessary in a particular situation." *Horton*, 883 F.3d at 950; see also *Bell v. Irwan*, 321 F.3d 637, 640 (7th Cir. 2003).

In *Fitzgerald*, the court held that the use of an arm-bar, wrist lock, and handcuffing did not constitute excessive force where the plaintiff was resisting the officer's efforts to seize her. *Fitzgerald*, 842 F. Supp.2d at 1070. Similarly, in *Turner*, the Seventh Circuit held it was not unreasonable for an officer to grab Turner's shoulder to stop his flight. 979 F.3d 563, 569 (7th Cir. 2020).

In the case at hand, the only force used by Dakuras is when he attempts to detain Bass until an ambulance arrived. SOF at ¶¶ 47-51. This is after Bass flees her apartment, without shoes or socks on, and attempts to evade capture by running down hallways and up and down stairwells. SOF at ¶ 46. Bass admits she fled from Dakuras. SOF at ¶ 52. When Dakuras finally catches up to Bass, he grabs her left arm and shirt, at which time she drops her body onto the ground. SOF at ¶¶ 47-48. While on the ground, Dakuras handcuffed her left hand, and placed his hand on the back of Bass's neck to try to bring her hands behind her back. SOF at ¶¶ 48-49. When he could not safely handcuff her behind her back because of Bass's resistance, Dakuras releases Bass's neck and handcuffs her hands together in the front of her body. SOF at ¶¶ 49- 50. Dakuras keeps 1-2 hands on Bass's left arm at all times to keep Bass on the ground to prevent further flight. SOF at ¶ 51. Based on Bass's resistance, *i.e.* her flight from Dakuras, grabbing her shoulder, handcuffing her, and keeping 1-2 hands on her shoulder to prevent further flight, was not unreasonable under the circumstances. Indeed, greater uses of force have been held to be reasonable under similar circumstances. *See Fitzgerald*, 842 F. Supp.2d at 1070; *Tuner*, 979 F.3d at 569; *see also Johnson v. Rogers*, 944 F.3d 966, 967 (7th Cir. 2019)(Leg sweep and/or kick to leg of non-compliant offender did not violate Fourth Amendment).

11

As a result, Bass's excessive force claim (Count II) must fail.

b. <u>The use of force in this case would further be entitled to qualified immunity</u>.

In cases involving use of force, plaintiffs must establish that "the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Abbott v. Sangamon County, Illinois*, 705 F.3d 725, 725 (7th Cir. 2013)(emphasis added). In essence, qualified immunity affords "enhanced deference to officers' on-scene judgments about the level of necessary force." *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 204 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001)).

At the time of this incident, there was no clearly established law as to the reasonableness of Dakuras's use of force in an effort to stop Bass from fleeing. Instead, this question must be answered on a case-by-case basis. *See Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012, 188 L.Ed.2d 1056 (2014); *see also Tolliver*, 820 F.3d 237. As stated above, a claim of excessive force is governed by the Fourth Amendment's reasonableness standard. *Supra* at 10.

In this case, Bass cannot show that the use of force used by Dakuras was unreasonable. Again, while there are no cases directly on point, the Seventh Circuit has held arguably greater uses of force in comparable situations to be reasonable, such as a leg sweep on a non-compliant arrestee. *Johnson*, 944 F.3d at 969- 970; *see also Findlay v. Lendermon*, 722 F.3d 895, 899–900 (7th Cir.2013) (holding that an officer who tackled a non-violent suspect was entitled to qualified immunity); *Boothe v. Wheeling Police Officer Sherman,* 190 F.Supp.3d 788, 799 (N. D. Ill., June 3, 2016)(holding officer that used straight-arm takedown was permissible "beyond debate" when minor plaintiff was resisting).

As argued above, this case, while not the same, is similar to that of *Fitzgerald and Turner. Supra* at 10-11. The minimum forced used here, grabbing Bass's shoulder, handcuffing her, and holding her down to prevent further flight, were not unreasonable to prevent Bass from fleeing. *See Fitzgerald*, 842 F. Supp.2d at 1070; *Tuner*, 979 F.3d at 569. Undoubtedly qualified immunity would apply to Dakuras's actions. *See id.*

12

As Dakuras's actions were reasonable under the totality of the circumstances; or at a minimum, because Bass cannot show Dakuras's actions violated a clearly established right, Bass's excessive force claim must fail, entitling Dakuras to summary judgment on this count (Count II).

**III.     BASS'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS.**

In order for a plaintiff to prevail on a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must show, " (i) that the defendant engaged in extreme and outrageous conduct toward the plaintiff; (ii) the defendant intended or recklessly disregarded the probability that the conduct would cause the plaintiff to suffer emotional distress; (iii) the plaintiff endured severe and extreme emotional distress; and (iv) the defendant's conduct actually and proximately caused the plaintiff's distress." *Duffy v. Orlan Brook Condominium Owners' Ass'n*, 2012 Il. App. (1st) 113577, 981 N.E.2d 1069 (Ill. App. Ct. 1st 2012).

   a. <u>Dakuras's conduct was not extreme and outrageous</u>.

In determining whether conduct is extreme and outrageous, an objective standard is used to determine if the conduct goes "beyond all possible bounds of decency, such that a reasonable person would hear the facts and be compelled to feelings of resentment and outrage." *Duffy*, 2012 Il. App. (1st) 113577. In determining whether a defendant's conduct was extreme and outrageous, there are multiple factors the court may consider. *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 52, 77 N.E.3d 50, 63, reh'g denied (Mar. 27, 2017). "The outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances pleaded and proved in a particular case." *McGrath v. Fahey,* 126 Ill. 2d 78, 90, 533 N.E.2d 806, 811 (Ill. 1988). Defendants are only found liable for IIED in cases "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schweihs*, 2016 IL 120041, ¶ 51, 77 N.E.3d at 63 (quoting Restatement (Second) of Torts § 46 cmt. d, at 73). "The standard for finding that conduct is

13

outrageous has been described as exceptionally higher than that required for assessing punitive damages or criminal liability." *Smith v. Sims*, 2019 WL 5430700, at * 5(S.D. Ill., Sept. 19, 2019)(internal citations omitted).

As argued above, Dakuras was reasonable in his actions in seizing Bass to undergo a mental health evaluation, and in the minimum amount of force used to prevent her from fleeing. *Supra* at 7-12. As Dakuras's actions were reasonable under the Fourth Amendment, his conduct cannot then be said to have been extreme and outrageous. *See Holder v. Ivanjack*, 93 F.Supp.2d 933, 941 (N.D. Ill., Apr. 28, 2000)("As the jury in this case found the police officers' conduct to be reasonable . . . the police officers' conduct cannot be extreme and outrageous.") Further, Dakuras's actions (including being reasonable) certainly do not rise to the level of being "utterly intolerable in a civilized community," when independent medical providers performed an independent assessment of Bass and determined she needed to be hospitalized for mental health treatment. *See Schweihs*, 2016 IL 120041, ¶ 51.

b. <u>Dakuras did not intend or act with reckless disregard, to cause Bass severe emotional distress</u>.

The record is completely void of any evidence that Dakuras intended to cause, or acted with reckless disregard to causing, Bass severe emotional distress. To the contrary, the record only supports that Dakuras was attempting to help Bass get the medical care she needed. SOF at ¶¶ 30, 34, 36, 39, 54; see also Duffy, 981 N.E.2d at 1081.

As Bass cannot meet essential elements of her IIED claim, it must fail, entitling Dakuras to summary judgment on this count (Count III).

**IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CONTIGENT CLAIMS OF INDEMNIFICATION.**

The City is entitled to summary judgment on all claims against it based on indemnification. "A local public entity is not liable for an injury resulting from an act or omission of its employees

where the employee is not liable." 745 ILCS 10/2-109; *Ross v. Mauro Chev.*, 369 Ill. App. 3d 794, 802-803, 861 N.E.2d 313, 320 (1st Dist. 2006). As argued above, Bass's underlying claims (Counts I-III) fail against Dakuras. *Supra* at 7-14. As a result, the City cannot be held liable to Bass (Count V)[3]. *See id.*

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion for Summary Judgment against Bass and in favor of the Defendants on all claims against them, and for such other further relief as this Court deems just and proper.

Dated: June 29, 2022

Respectfully Submitted,

By: /s/ Allison L. Romelfanger
Allison L. Romelfanger
Assistant Corporation Counsel Supervisor
Attorney No. 6310033

Nicholas Perrone, Assistant Corporation Counsel
City of Chicago, Dept. of Law
2 North LaSalle Street, Suite 420
Chicago, IL 60602
(312) 744- 5890 (Attorney Romelfanger)
(312) 744-6566 (fax)
**Attorneys for Defendant Dakuras**

/s/Marion Moore
Marion Moore
Chief Assistant Corporation Counsel

Mitchell Paglia, Assistant Corporation Counsel
City of Chicago, Department of Law
Federal Civil Rights Litigation Division
2 N. LaSalle Street, Suite 400
Chicago, Illinois 60602
(312) 744-5170 (Attorney Moore)
(312) 744-6566 (fax)
**Attorneys for Defendant City of Chicago**

---

[3] Bass filed a *Monell* Claim in her original complaint. However, Bass's *Monell* claim is dismissed pursuant to the Court's February 6, 2020 order (ECF No. 26) and July 9, 2021 order (ECF No. 85).

## CERTIFICATE OF SERVICE

I hereby certify that I filed the above memorandum in support of summary judgment with the Northern District of Illinois ECF System on this 29th day of June, 2022, thereby serving a copy on all counsel of record.

>  */s/ Allison L. Romelfanger*
>  Allison L. Romelfanger
>  Assistant Corporation Counsel Supervisor