**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Jeanette Bass,

    *Plaintiff,*

v.

Sgt. A. Dakuras, *et al.,*

    *Defendants.*

No. 19 CV 7557

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

On June 23, 2019, Janette Bass[1] requested a police supervisor come to her home to address concerns about a police report she had previously filed. Andrew Dakuras, then a Chicago police sergeant, responded to the call. While at Bass's home, Dakuras concluded that Bass needed immediate mental-health treatment and detained her so she could be taken to the hospital. Bass brought this lawsuit against Dakuras and the City of Chicago (collectively, "Defendants"). [Dkt. 1.] Now before the Court are Defendants' motion for summary judgment [Dkt. 115] and Bass's cross-motion for partial summary judgment [Dkt. 112]. For the reasons discussed below, Defendants' motion is granted, and Bass's motion is denied.

## I.    Background

On June 20, 2019, Bass filed a police report against her condominium association's management "for allegedly entering her unit without permission and videotaping Bass in her unit when she was undressed from the waist down." [Dkt.

---

[1]    Bass's first name is misspelled "Jeanette" in the case caption. [*See* Dkt. 114 at 1 n.1.]

130 ¶ 5.] The police report characterized her complaint as noncriminal trespass, but Bass believed management had committed criminal trespass. On June 23, 2019, she called the police station and spoke to Sergeant Erick Seng; later that day, she called 911 and requested a supervisor come to her home to amend the classification from noncriminal to criminal. [Dkt. 133 ¶ 6.] Dakuras responded to the call. [Dkt. 130 ¶ 8.]

Footage from Dakuras's body-worn camera captures the entirety of his encounter with Bass. After Dakuras arrives at Bass's condo unit on the thirty-first floor, he introduces himself. [Dakuras Body-Worn Camera ("BWC") at 3:30–5:30.] Bass begins describing her conflicts with her condo association:

> I had to, obviously, change my locks, for the tune of $200. As you see, the main water line's broke. They banned me from the office because I asked them to fix it, and I've called the police several times to help me because they've called the police on me for no reason, so I have a history now, and I have them all recorded, how many times I've called you all to help me. On Thursday [June 20], they crossed the line. I was not notified that they were coming into my unit, so a bunch of men first come, and I was naked, and they came in and they wouldn't leave, for five minutes.

[*Id.* at 5:30–6:10.] While Bass is talking, Dakuras makes simple statements like "OK" [*id.*], and then he asks what the men did. Bass replies, "Nothing, except stare at me," and says they committed criminal trespass. [*Id.* at 6:10–:25.] Dakuras disagrees that the incident was criminal trespass and suggests that the entry would have been permissible in an emergency; Bass insists there was no emergency. [*Id.* at 6:25–:53.]

Bass describes the messages she sent to the condo association regarding the incident, then begins to play a recording she says captures "the second criminal entry." [*Id.* at 6:53–8:10.] As the recording plays, Bass states, "It's criminal entry when they don't have permission and there's no emergency." [*Id.* at 8:50–:58.]

Dakuras starts to say, "Ma'am, the report—" but Bass says, "No, the report does not say that." [*Id.* at 8:58–9:04.] She holds up a piece of paper she says is a copy of the report; tells Dakuras, "It does not say that"; and says she had spoken with the detective who filed the report. [*Id.* at 9:04–:15.]

The conversation then becomes more adversarial. Dakuras indicates that Bass can contact the detective so he can amend the report. [*Id.* at 9:15–:19.] Bass disagrees, and they begin talking over each other, disputing what Sergeant Seng told Bass. [*Id.* at 9:19–:45.] Then, Bass begins playing a recording of her earlier interaction with Seng, while Dakuras simultaneously calls Seng on the phone. [*Id.* at 9:45–10:21.] While Dakuras talks to Seng, Bass tries to speak to Dakuras, but he raises his voice and says, "Ma'am, I'm talking on the phone! Do not interrupt me!" [*Id.* at 10:22–:32.] Bass again tries to say something about the recording, and Dakuras says, "I'm talking to the sergeant on the phone right now." [*Id.* at 10:32–:36.] Bass says, "Don't scream at me, sir, I'm the victim." Dakuras responds that he is "trying to get to the bottom of this," and Bass says, "I'm the victim," twice more. [*Id.* at 10:37–10:46.] Seemingly out of patience, Dakuras ends the call with Seng and tries to terminate the interaction. [*Id.* at 10:47–:53.] Speaking over Bass, Dakuras says he has received a report, wishes her a good day, and moves toward the door. [*Id.* at 10:54–11:30.]

Bass continues to speak to Dakuras, which causes him to turn around. Bass says, "They can come into my unit and take me naked, and you're not going to put that down on the report?" [*Id.* at 11:30–:42.] Dakuras initially tells Bass not to yell at him, then asks, "Ma'am are you in crisis?" and repeats, "Are you in crisis?" when Bass

3

does not immediately answer. [*Id.* at 11:35–:45.] Bass says, "If you'd been broken in when you were naked, and you people"; points at Dakuras and adds, "Because of you"; she then sits down. [*Id.* 11:43–:49.] Dakuras asks, "You're in crisis because of me?" to which Bass responds, "Yeah, because of you, lying." [*Id.* at 11:49–:52.] Dakuras asks Bass if she is under the treatment of any doctor, and Bass says no. [*Id.* at 11:52–:55.]

Next, Bass tells Dakuras to leave her unit, and he refuses. [*Id.* at 12:04–:11.] Bass repeats the demand, and Dakuras again refuses. [*Id.* at 12:16–:18.] Dakuras then radios to ask for an ambulance and a "wagon" for a "mental-health transport." [*Id.* at 12:19–:27.] Bass stands and repeatedly insists Dakuras leave her unit. [*Id.* at 12:27–:42.] Dakuras asks what hospital he can take Bass to, and Bass says, "I have post-traumatic syndrome from the police." [*Id.* at 12:42–13:08.] Dakuras says her only two options are to go to the hospital voluntarily or involuntarily. [*Id.* at 13:10–:19.] Bass makes a call to "Michael," whom she tells to come as quickly as possible because "they're arresting me"; Dakuras explains he is not arresting her. [*Id.* at 13:20–:55.] Bass approaches Dakuras, and Dakuras says, "don't put your hands on me," although the video does not definitively show whether she touches him. [*Id.* at 13:55–14:08.] Bass calls 911 and reports Dakuras for refusing to leave, and she continues to speak to the 911 operator for over two minutes. [*Id.* at 14:08–16:45.]

Bass then walks out of her open front door, and Dakuras follows. [*Id.* at 16:45–17:00.] Dakuras tells Bass to stay where she is, but Bass enters the stairwell. [*Id.* at 17:00–:10.] Dakuras follows her down (and later up) several flights of stairs and through hallways. [*Id.* at 17:10–18:15.] He catches up with her on the twenty-seventh

floor, and Bass walks toward Dakuras, then tries to flee past him. [*Id.* at 18:15–:25.] Dakuras stops her by grabbing her arm and shirt, handcuffs her left hand as she drops to the floor, tries to handcuff her hands behind her back, and finally handcuffs her hands in front of her body. [*Id.* at 18:25–:48.] Bass' cell phone remained in her hand. Dakuras keeps one or two hands on Bass until paramedics and other police officers arrive, during which time Bass repeatedly says Dakuras is hurting her and asks for help while speaking on her phone to 911 and Michael. [*Id.* at 18:48–22:00.] The paramedics and other officers take Bass away in an elevator. [*Id.* at 22:00–24:30.] The camera footage ends shortly after.

Bass filed a five-count complaint against Dakuras and the City of Chicago. [Dkt. 1.] Counts I and II raise 42 U.S.C. § 1983 claims against Dakuras for unlawful seizure[2] and excessive force, respectively. Count III raises an intentional infliction of emotional distress ("IIED") claim against Dakuras under Illinois law. Count IV is a *Monell* claim against the City, and Count V seeks indemnification from the City. The Court previously granted the City's motion to dismiss Count IV. [Dkt. 26.] Defendants now move for summary judgment on Bass's remaining claims [Dkt. 115], and Bass moves for summary judgment on Count I [Dkt. 112].

---

[2]     Bass's complaint frames this as a false arrest claim [Dkt. 1 at 1], but the parties agree that Dakuras did not arrest Bass; he seized her for purposes of effectuating a mental health evaluation [*see* Dkt. 114 at 2; Dkt. 117 at 6–7].

## II.    Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 802 (7th Cir. 2023). When considering cross-motions for summary judgment, the Court views the facts in the light most favorable to party against whom the motion under consideration is made. *Frazier-Hill*, 75 F.4th at 802. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). Often, differing accounts of the events at issue preclude resolution at summary judgment, but video evidence can make factual disputes not "genuine" for summary judgment purposes. *Kailin v. Village of Gurnee*, —F.4th—, 2023 WL 5028149, at *4 (7th Cir. Aug. 8, 2023). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

The Seventh Circuit has made clear that it is a "rare case where video evidence leaves no room for interpretation by a fact finder," *id.* (citation omitted), but this is such a case. Dakuras turned his body-worn camera on before his encounter with Bass began, and it ran continuously until after paramedics took Bass to the hospital. The video footage is sharp, and—save for a few seconds here and there—Bass remains on camera during the entire roughly 20-minute encounter. The sound quality is good,

and nearly every word spoken is audible. The recording is nothing like the grainy, soundless video in *Kailin*, where "the entire video of the critical event last[ed] a mere six seconds" and "a reasonable juror might see different things in that inkblot of a blur." *Id.* at *5. The Court can therefore rely on the footage to resolve many factual disputes that ordinarily would be for a jury to decide.

The footage does not, however, resolve every possible dispute. One issue is perspective. Because the camera was mounted on Dakuras's body, it is not always possible to tell precisely where Dakuras's arms and legs are, or whether Dakuras is being touched. And although the words Bass and Dakuras utter are almost always clear, reasonable people could interpret their words or tone of voice differently. If these disputes were material, a jury would have to resolve them, *see id.* at *4 ("Video evidence … can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts." (citation omitted)), but as explained below, the only genuine disputes are about facts immaterial to the summary judgment decision.

## III. Constitutional Claims

Dakuras moves for summary judgment on Bass's 42 U.S.C. § 1983 claims for unlawful seizure and excessive force in violation of the Fourth Amendment (applied to the states through the Fourteenth Amendment), and Bass moves for summary judgment on her unlawful seizure claim. Dakuras has qualified immunity, which "protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021)

(internal quotation omitted). To survive Dakuras's motion for summary judgment, Bass has the burden to show that the evidence, construed in her favor, supports finding (1) that Dakuras violated a constitutional right and (2) that the right was clearly established. *See Prude v. Meli*, —F.4th—, 2023 WL 5010780, at *6 (7th Cir. Aug. 7, 2023); *McGee v. Parsano*, 55 F.4th 563, 570 (7th Cir. 2022). Courts may consider the two analytical steps in either order. *See McGee*, 55 F.4th at 572.

The Court decides the summary judgment motions at issue here at step two. Even construed in Bass's favor, the record shows that Dakuras did not violate any principle of clearly established law. He is therefore entitled to summary judgment on the § 1983 claims.

### A.  Count I: Unlawful Seizure

Both parties move for summary judgment on Bass's unlawful seizure claim. It is undisputed that Dakuras seized Bass when he refused to leave Bass's home and told her she would be taken to the hospital. [Dkt. 114 at 2–3; Dkt. 117 at 6–7.] The question is whether this seizure violated clearly established law.

The Fourth Amendment governs mental-health seizures. *Bruce v. Guernsey*, 777 F.3d 872, 875 (7th Cir. 2015). "Like ordinary seizures, mental-health seizures comply with the Fourth Amendment if officers have probable cause, which exists only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Id.* at 875–76 (cleaned up). Probable cause is an objective standard judged by the totality of the circumstances. *See, e.g.*, *United States v. Alexander*, —F.4th—, 2023 WL 5163946, at *2 (7th Cir. Aug. 11, 2023). Under Illinois law,

8

> [a] peace officer may take a person into custody and transport [her] to a mental health facility when the peace officer has reasonable grounds to believe that the person is subject to involuntary admission on an inpatient basis and in need of immediate hospitalization to protect such person or others from physical harm.

405 ILCS 5/3-606. This standard tracks the general rule that "a mental-health seizure is lawful if there is probable cause to believe that the person seized is a danger to herself or others." *Bruce*, 777 F.3d at 876 (citation omitted).

In the probable cause context, an officer does not violate clearly established law if he has "arguable probable cause," which means "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022) (internal quotation omitted). The Court has doubts that Dakuras actually had probable cause for the mental-health seizure,[3] but he at least had arguable probable cause, so he did not violate clearly established law.

The usual way to demonstrate a legal rule is clearly established is to show that it has "a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus

---

[3]     Illinois law permits such seizures only when there is a danger of physical harm, and the cases Dakuras cites in support of probable cause all contain clear evidence that the plaintiff was a danger to himself or others. *Sherman v. Four Cnty. Counseling Ctr.*, 987 F.2d 397, 401–02 (7th Cir. 1993); *Gutierrez v. May*, 1993 WL 322664, at *2 (7th Cir. Aug. 25, 1993) (nonprecedential); *Knope v. McElroy*, 2019 WL 4393075, at *2 (W.D. Wis. Sept. 13, 2019). Bass—although frustrated and arguably behaving erratically—made no threats and had no known history of self-harm or violence. Further, while Bass's statements may have been consistent with someone who might harm herself, they could also have been an angry outburst.

of cases of persuasive authority," not merely "suggested by" precedent. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up). Particularly in the Fourth Amendment context, the clearly established rule must be articulated with "a high degree of specificity." *Id.* (cleaned up). This level of specificity "does not require a case directly on point," but "existing precedent must have placed the … question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation omitted).

Bass fails to satisfy this standard.[4] She primarily cites cases where courts *found* probable cause because a "person ha[d] expressed threats to harm himself or others" or was "displaying threatening or dangerous behavior." [Dkt. 131 at 8–9 (citing cases).] Bass contends that "deductive reasoning dictates that officers ***do not*** have probable cause" to seize a person who "has neither made threatening comments nor displayed dangerous, violent, or aggressive behavior." [Dkt. 139 at 8.] This argument does not follow as a matter of logic or law: cases holding that probable cause existed based on different fact patterns do not help Bass show, to a high degree of

---

[4]    Bass seems not to understand that she bears the burden of showing that Dakuras violated clearly established law. *See Taylor*, 10 F.4th at 806. After citing caselaw, she argues that "an officer does not have arguable probable cause to detain a person for a mental health seizure under established law where that individual has not engaged in conduct that is analogous to conduct as described in the above-cited cases." [Dkt. 131 at 9–10.] This argument suggests that Dakuras is not entitled to qualified immunity unless established law supports his probable cause determination, but this framing gets qualified immunity doctrine backwards. *See Taylor*, 10 F.4th at 806.

specificity, that Dakuras did not have arguable probable cause to arrest her. *See Wesby*, 583 U.S. at 63.[5]

The only case Bass cites where a court did not find probable cause for a mental-health seizure is *Dobrzeniecki v. Vela-Sailsbery*, 2014 WL 4979185 (N.D. Ill. Oct. 6, 2014). The court concluded that granting summary judgment was inappropriate because it was disputed whether the plaintiff, while crying, said, "If [my son] dies, I want to die," or "I just want to die, I do, I just want to die." *Id.* at *5. The court reasoned that if the plaintiff made the former statement, then detaining her would have violated clearly established law; her son had not died, so she did not convey "an immediate threat to herself." *Id.* at *5–6.

*Dobrzeniecki* is not "controlling authority," nor has Bass placed it within "a robust consensus of cases of persuasive authority." *Wesby*, 583 U.S. at 63 (cleaned up). If anything, *Dobrzeniecki* supports finding that Dakuras is entitled to qualified immunity. A reasonable officer who read that case could extract the legal rule that imminence is the key factor for a mental-health seizure. If that officer witnessed Bass's unusual, agitated behavior; heard her say she suffers from post-traumatic

---

[5]     Bass also argues that Dakuras lacked arguable probable cause because when other officers went to her home on an earlier occasion (June 20, 2019), she behaved similarly, yet they did not conduct a mental-health seizure. [Dkt. 139 at 9.] But Bass cites no evidence showing that Dakuras knew about Bass's behavior during the earlier police visit, so an argument against finding arguable probable cause because Bass's conduct on June 23 was consistent with her usual behavior fails. *See Alexander*, 2023 WL 5163946, at *2 (explaining that probable cause is based on what an officer knew at the time). Further, even assuming both situations were materially identical, the fact that officers did not conduct a mental-health seizure on June 20 does not negate Dakuras's arguable probable cause, which depends on what "a reasonable officer in the same circumstances … could have reasonably believed," not what specific officers actually did believe. *Mwangangi*, 48 F.4th at 825 (cleaned up).

stress disorder; and received an affirmative answer when he asked if she was currently "in crisis" [*see* BWC at 11:35–:52], the officer might conclude—perhaps wrongly—that Bass posed "an immediate threat to herself" and there was probable cause to seize her, *Dobrzeniecki*, 2014 WL 4979185, at *6. To be sure, Dakuras never clarified what he meant by "crisis," and Bass argues she did not mean she was suffering from a mental-health crisis that required hospitalization [Dkt. 131 at 6], but it is undisputed that she agreed when Dakuras asked if she was in crisis. The Court cannot say that "every reasonable official would interpret" the caselaw Bass cites "to establish the particular rule" that an officer cannot seize someone who agrees she is in crisis without clarifying further what "crisis" means. *See Wesby*, 583 U.S. at 590 (citation omitted); *cf. Mustafa v. City of Chicago*, 442 F.3d 544, 548–49 (7th Cir. 2006) (holding it was at most arguable whether joking about making a bomb threat was a crime, so there could be no violation of clearly established law).

Bass also suggests that Dakuras's conduct could violate clearly established law based on a "[g]eneral statement[ ] of the law." [Dkt. 114 at 9.] Bass is correct that an analogous case is not always needed, but only when a violation is obvious. *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam). This rare method of overcoming qualified immunity applies to egregious conduct such as an Eighth Amendment violation for purposefully allowing a detainee to hit his head on a concrete floor, *Stockton v. Milwaukee County*, 44 F.4th 605, 621 (7th Cir. 2022), or due process violations as blatant as rigging disciplinary proceedings, *Prude*, 2023 WL 5010780, at *6, or deliberately manufacturing false evidence, *Whitlock v. Brueggemann*, 682

F.3d 567, 585–86 (7th Cir. 2012). The Court's above discussion of caselaw shows that Dakuras had arguable probable cause to seize Bass. If Dakuras did violate Bass's Fourth Amendment rights, the violation was not so obvious to overcome qualified immunity in the absence of a case on point. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (rejecting an obviousness argument and reiterating the importance of specificity).

Whether or not Dakuras had probable cause to seize her, Bass has failed to overcome qualified immunity by showing that Dakuras could not "have reasonably believed that probable cause existed in light of well-established law." *Mwangangi*, 48 F.4th at 825 (cleaned up). The Court grants Defendants' motion for summary judgment as to Count I. Since Dakuras is entitled to qualified immunity when the record is construed in Bass's favor, it follows that when viewing the record in Dakuras's favor on Bass's cross-motion for summary judgment, she is not entitled to summary judgment. *See Frazier-Hill*, 75 F.4th at 802. The Court therefore denies Bass's motion for summary judgment as to Count I.

## B. Count II: Excessive Force

The Court now turns to Bass's excessive force claim, on which only Dakuras seeks summary judgment. "A claim for excessive force under § 1983 invokes the Fourth Amendment's protection against unreasonable seizures. The reasonableness standard is objective, 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Although police cannot use "significant force" to subdue someone who is merely

13

passively resisting police commands, it is reasonable to use "minimal force." *See id.* at 569 (citations omitted).

Dakuras is protected by qualified immunity unless he violated clearly established law. *Taylor*, 10 F.4th at 806. Clearly establishing a legal rule in excessive force cases requires an especially strong showing by a plaintiff. "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (cleaned up).

It is often inappropriate to resolve excessive force cases at summary judgment when parties give different accounts of events, *see Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010); *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009), but the video evidence here is definitive enough to dispel factual disputes that would otherwise preclude summary judgment. Disregarding facts blatantly contradicted by the video, *see Kailin*, 2023 WL 5028149, at *4, no reasonable jury could conclude that Dakuras's use of force violated clearly established law.

### 1.     The Video Evidence

The Court begins by analyzing the extent to which Bass's version of events is consistent with the video evidence. *See id.* According to Bass, after grabbing her "by her arm and her shirt," Dakuras "pull[ed] her towards himself," then "pushe[d] [her] onto the ground and utilize[d] his body weight to pin her down." [Dkt. 113 ¶¶ 53–54; *see* Dkt. 116-3 at 109 ("[H]e threw me down to the floor using excessive force."), 112 ("He took his arms and threw me to the floor.").] Dakuras then "handcuff[ed]" Bass "as she [was] on the ground" and "use[d] his left hand to shove [her] head down." [Dkt.

14

113 ¶¶ 55–56.] While Bass was on the ground, Dakuras "placed his knee in her back while pushing down with his body weight." [Dkt. 132 ¶ 17; *see* Dkt. 116-3 at 114 ("He had his knee on me. I couldn't breathe. I couldn't move.").] Dakuras kept Bass pinned to the floor with his knee in her back while she "begged him to stop and told him that he was hurting her." [Dkt. 132 ¶ 18; *see* Dkt. 116-3 at 114 ("I remember begging him to stop hurting me …."), 115 (Dakuras kept his knee on her for "many minutes.").]

Much of Bass's account is "blatantly contradicted by" the video evidence, and "no reasonable jury could believe it." *Kailin*, 2023 WL 5028149, at *4 (quoting *Scott*, 550 U.S. at 380). The video shows that Dakuras first grabs Bass's arm and shirt as she is attempting to run away from him; he "pull[ed] her towards himself" [Dkt. 113 ¶ 53] only in the sense that Dakuras used force to stop Bass from fleeing [BWC at 18:20–:30].[6] The video completely contradicts Bass's contention that Dakuras pushed her to the floor. [Dkt. 113 ¶ 54.] The video shows Bass's head dip toward the camera, then shows Bass smoothly dropping down to a seated position on the floor. [BWC at 18:30–:35.] Dakuras's hands are not fully visible during this sequence, but Bass remains largely in view, and Dakuras does not touch her torso or upper body. [*Id.* at 18:31–32.] When Bass goes to the floor, Dakuras's hands become visible, and the video shows him using both hands to fasten a handcuff around Bass's left wrist. [*Id.* at 18:33–:35.] The video shows no sudden movement by Dakuras or Bass that could be

---

[6]     In fact, the video appears to show Dakuras moving toward Bass's position, rather than pulling her toward himself, but brief shakiness in the footage prevents the Court from making a precise determination about Bass's and Dakuras's relative locations in that moment. [BWC at 18:25–:30.] This fact is not material for summary judgment purposes.

consistent with a shove or the reaction to a shove, and the handcuff can be heard tightening while Bass goes to the floor. [*Id.* at 18:30–:35.] In other words, the video makes clear that Bass sat or slumped down as Dakuras placed a cuff on her. No reasonable jury could find he pushed or threw her to the floor. *See Kailin*, 2023 WL 5028149, at *4.

The video footage also blatantly contradicts much of what Bass says occurred once she was on the floor. To the extent she claims she was already fully handcuffed before Dakuras placed his hand on her neck [*see* Dkt. 113 ¶¶ 55–56], the video unambiguously shows that only her left hand was cuffed at this time [BWC at 18:35–:40]. The footage shows that Dakuras places his hand on Bass's neck for about three seconds, during which time he exerts pressure that moves her head downward, but Dakuras releases her neck as she leans her right side toward the floor. [*Id.*] The Court cannot say as a matter of law that Dakuras did not "shove" Bass's head down, because a jury could interpret Dakuras' contact with Bass's neck as a shove, *see Kailin*, 2023 WL 5028149, at *4, but this contact occurred for only three or four seconds while one of Bass's hands remained uncuffed as she held her phone.

Bass contends that Dakuras pinned her to the floor with his knee and she could not breathe. [Dkt. 132 ¶¶ 17–18.] Here, too, the video contradicts Bass's version of events in significant part. After removing his hand from Bass's neck, Dakuras leans down, a cuff is heard tightening, and he straightens up. [BWC at 18:40–:46.] Dakuras then bends down to tighten the cuffs, leaves his right hand on Bass's shoulder, and straightens up again. [*Id.* at 18:46–:56.] Bass's body stays in the video frame, but

16

most of Dakuras's body is off camera. Even so, Dakuras remains standing with both feet on the floor and one or two hands on Bass's arm or shoulder. [*Id.* at 18:56–19:28.] Dakuras continues to stand with one or both hands on Bass as she begins complaining that he is hurting her. [*Id.* at 19:28–20:15.] The camera angle changes slightly as Bass shifts on the floor, and Dakuras appears to shift his body downward. [*Id.* at 20:15–:23.] Bass's objections continue in the same vein, and several seconds later the camera angle rises slightly, suggesting that Dakuras shifted his weight back upward. [*Id.* at 20:23–:25.] Bass and Dakuras remain in the same basic positions for about half a minute [*id.* at 20:25–20:58], then Dakuras takes one of his hands off Bass and remains in that position [*id.* at 20:58–21:44]. Dakuras stands, placing one hand on Bass's hip to help steady himself, and removing the hand once he is upright. [*Id.* at 21:45–22:00.] Other officers arrive, and after helping the others lift Bass to her feet, Dakuras stops touching her. [*Id.* at 22:00–22:30.] During this time, Bass speaks almost constantly; she does not mention Dakuras's knee, anything specific he is doing that is hurting her, or that she is having difficulty breathing. [*Id.* at 20:25–22:30.]

In light of this segment of the video footage, no reasonable jury could find that Dakuras pinned Bass to the floor with his knee or kept his body weight on her for any significant length of time. *See Kailin*, 2023 WL 5028149, at *4. The video makes clear that for most of the time she was on the floor, Dakuras was standing beside Bass, not putting his weight on her, and even when Dakuras's legs are not visible, there is no significant change in the camera angle or reaction by Bass that could be consistent with Dakuras placing his knee or his full weight on her. At most, a jury could find

that Dakuras put some weight on Bass as he stood up or that his knee contacted her body as he crouched beside her. But no reasonable jury could find that Dakuras prevented Bass from breathing. Except when he touched her neck for a few seconds, Dakuras never touched Bass anywhere other than her arm and shoulder, and Bass spoke frequently and loudly throughout her time on the ground without giving any indication that she had difficulty breathing.

### 2.   Application

The Court now considers whether the record, viewed in the light most favorable to Bass after accounting for the video footage, could permit a reasonable jury to find that Dakuras's uses of force violated clearly established law. Dakuras's force can be broken down into three discrete uses: (1) grabbing Bass to stop her flight, (2) shoving Bass's head down while trying to handcuff her, and (3) keeping her on the floor after cuffing her. The Court analyzes the three uses of force independently, "asking whether each … was reasonable under the totality of the circumstances." *Turner*, 979 F.3d at 567 (citation omitted). All three uses of force were reasonable.

As to the first, an officer may use force to detain a fleeing individual if he has probable cause for the detention. *Id.* at 568. As explained above, Dakuras had arguable probable cause to conduct a mental-health seizure, meaning he could have reasonably believed he had probable cause. *Mwangangi*, 48 F.4th at 825. Thus, his decision to stop Bass could not have violated clearly established law. *See Wesby*, 583 U.S. at 63 ("'Clearly established' means that … every reasonable official would understand that what he is doing is unlawful." (cleaned up)).

The amount of force Dakuras employed was also reasonable. The first use of force closely tracks *Turner*, where the Seventh Circuit held that grabbing a fleeing suspect's shoulder to stop his flight constituted the "use of reasonable force to accomplish the detention." 979 F.3d at 569 (citations omitted). Like the suspect there, Bass was actively resisting detention by running from Dakuras, and grabbing her arm and shirt is a comparable amount of force to a shoulder grab. *See id.* And because the video evidence establishes that Bass went to the floor herself [BWC at 18:30–:35], the Court need not consider whether Dakuras would have been justified in taking Bass to the ground, *cf. Turner*, 979 F.3d at 569–71 (conducting such an analysis).

The Court now turns to the second use of force, when Dakuras pushed on Bass's neck while trying to handcuff her right hand. The first issue to consider is whether Bass was actively or passively resisting. If she was still actively resisting, Dakuras would have been justified in using significant force to subdue her, *see id.* at 569, and his use of force would clearly have been reasonable. If Bass was passively resisting, however, then Dakuras could only use minimal force, *id.*, or more specifically, through the lens of qualified immunity, the amount of force a reasonable officer could have believed was minimal force, *Kisela*, 138 S. Ct. at 1153 ("An officer cannot be said to have violated a clearly established right unless … any reasonable official in the defendant's shoes would have understood that he was violating it." (cleaned up)). Because the Court construes the record in Bass's favor, it will assume that Bass's resistance had switched from active to passive when Dakuras placed his hand on her

19

neck,[7] but even so, it is relevant that the passive resistance followed seconds after active flight, *see id.* at 1152 (noting that whether the suspect is "attempting to evade arrest by flight" and whether "circumstances … are tense, uncertain, and rapidly evolving" impact the reasonableness of a use of force (cleaned up)).

The Seventh Circuit has not fleshed out the boundary between significant and minimal force. More commonly, it has said what minimal force is not. *See, e.g.*, *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (bringing knee down on suspect's jaw "with enough force to break it" was significant force); *Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013) (tasing suspect was significant force). The only case the Court has found where the Seventh Circuit described specific uses of force as "minimal" is *Smith v. Ball State University*, 295 F.3d 763 (7th Cir. 2002). The Seventh Circuit expressly described an attempted "knee strike" as a minimal use of force, *id.* at 771, and a later opinion suggested that the "straight arm bar" technique discussed in *Smith* was also a use of minimal force, *Abbott*, 705 F.3d at 732 (citing *Smith*, 295 F.3d at 770).

The Court does not, however, interpret *Smith* as establishing a rule that all such uses of force are minimal. *Smith* stressed that the permissible amount of force

---

[7]     Even construing the record in Bass's favor, it is possible that she was still actively resisting at this point. The Seventh Circuit has characterized "not respond[ing] to the first physical contact by complying with the officers' commands" but instead shoving and grabbing at officers as active resistance. *Turner*, 979 F.3d at 569; *see also Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("lying motionless and spread-eagled on the ground" was passive resistance); *Abbott v. Sangamon County*, 705 F.3d 706, 730 (7th Cir. 2013) ("not comply[ing] with [an] order to turn over onto [the plaintiff's] stomach" was passive resistance). Since the Court holds that Dakuras's force would be reasonable in response to passive resistance, it declines to take a firm position on this issue.

20

varies with the circumstances. 295 F.3d at 770. The two officers who used the arm bar needed to remove a nonresponsive suspect from a running car—a dangerous situation—and the officer who attempted a knee strike could have reasonably thought the suspect was resisting. *Id.* at 770–71. Still, *Smith* makes clear that minimal force can, in some circumstances, include as much force as a knee strike.

With these principles in mind, the Court considers Dakuras's use of force. The video shows that Dakuras keeps his hand on Bass's neck for only three or four seconds, but the video does not resolve how much force he exerted, so the Court assumes Dakuras used his full strength. *See Kailin*, 2023 WL 5028149, at *4. Even so, this use of force would not have violated clearly established law. Police can place detainees in handcuffs, *see, e.g.*, *Tibbs v. City of Chicago*, 469 F.3d 661, 665–66 (7th Cir. 2006) (rejecting excessive force claim based on overly tight handcuffs), including mental-health detainees, *see Turner*, 979 F.3d at 569; *Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997). Police can therefore use appropriate force to do so, minimal force in the case of a passive resistor. *Turner*, 979 F.3d at 569. Given Bass's active resistance seconds earlier and *Smith* recognizing arm bars and knee strikes can sometimes be considered minimal force, not every "reasonable official in [Dakuras's] shoes would have understood that he was violating" the Fourth Amendment by pushing down on Bass's neck for three or four seconds. *See Kisela*, 138 S. Ct. at 1153 (cleaned up); *see also Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (cleaned up)). Because

21

a reasonable officer could have thought it was a use of minimal force, Dakuras's second use of force did not violate clearly established law.

Finally, the Court considers Dakuras's third use of force, keeping one or two hands on Bass while she was on the floor. Here, too, the video dispels some of Bass's version of the facts, such as that Dakuras placed his knee on her. There remains a genuine dispute as to how much pressure Dakuras placed on Bass, so the Court assumes he used substantial pressure, even though the video evidence is inconsistent with him keeping his full body weight on her. *See Kailin*, 2023 WL 5028149, at *4. Seventh Circuit precedent recognizes that officers can keep a detainee on the ground after resistance is subdued. *See Est. of Phillips*, 123 F.3d at 591–94; *cf. Miller*, 761 F.3d at 829 (using more than minimal force on detainee spread-eagled on the ground would violate the Fourth Amendment). A reasonable officer could have believed that using one or two hands to keep Bass on the ground was a reasonable use of minimal force in light of her attempts to flee, so Dakuras is entitled to qualified immunity. *See Kisela*, 138 S. Ct. at 1153.

Bass complained that Dakuras was hurting her, but the fact that a detainee complains of pain does not itself create a triable issue of fact in an excessive force case. *See Tibbs*, 469 F.3d at 665–66 (affirming the grant of summary judgment where the plaintiff alleged that he complained once that his handcuffs were too tight, but police did not loosen them); *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir. 2005) ("[T]he mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment …."); *see also Nolin v. Isbell*, 207

F.3d 1253, 1258 (11th Cir. 2000) ("[A] minimal amount of force and injury … will not defeat an officer's qualified immunity in an excessive force case."). True, Bass complained repeatedly that Dakuras was hurting her, but she never "elaborat[ed] on any injury … or degree of pain," which undermines the argument that any reasonable officer would have known he might be using excessive force. *See Tibbs*, 469 F.3d at 666.

Further, Bass points to no caselaw that could have given Dakuras "notice that [his] specific use of force [was] unlawful." *Kisela*, 138 S. Ct. at 1153 (citation omitted). She cites *Boothe v. Sherman*, where the court denied qualified immunity when the most favorable version of the facts to the nonmovant showed that "after body slamming and falling on top of [a student], [the officer] held her neck and dug his knee into her back for about one minute—even though, once on the ground, she did not attempt to pull away or to move her arms or legs in any way until he instructed her to do so." 190 F. Supp. 3d 788, 797 (N.D. Ill. 2016). But as discussed above, the most favorable version of the facts to Bass in light of the video evidence is nowhere close to that in *Boothe*: Dakuras kept her on the floor with one or two hands; he did not drive his knee into her or place his full body weight on her. *Boothe* is too factually dissimilar to permit the finding that Dakuras's conduct violated clearly established law. *See Kisela*, 138 S. Ct. at 1153. [*Contra* Dkt. 131 at 13–14.]

Because Dakuras did not violate clearly established law, he is entitled to qualified immunity on Bass's excessive force claim. The Court therefore grants Dakuras's motion for summary judgment on Count II.

## IV.    State Law Claims

### A.    Count III: Intentional Infliction of Emotional Distress

Dakuras also moves for summary judgment on Count III, Bass's IIED claim. Under Illinois law, an IIED claim fails unless the defendant engaged in conduct that was "truly extreme and outrageous," "so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80–81 (Ill. 2003) (cleaned up). Bass's complaint alleges that detaining her, placing her in handcuffs, and forcing her to undergo a mental-health examination despite knowing she suffered from post-traumatic stress disorder was extreme and outrageous. [Dkt. 1 ¶¶ 16–18.] Dakuras contends that his conduct could not have been extreme and outrageous because it was reasonable under the Fourth Amendment. [Dkt. 117 at 13–14.] Bass does not respond to this argument [*see* Dkt. 131], so she has waived any counterargument she might have made, *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

The Court agrees that Dakuras is entitled to summary judgment on this claim. Strictly speaking, the Court did not determine that Dakuras's conduct complied with the Fourth Amendment because it resolved Counts I and II on qualified immunity grounds. But given the high bar for extreme and outrageous conduct under Illinois law, Bass's inability to defeat qualified immunity by showing that Dakuras's conduct constituted an obvious constitutional violation, *see Taylor*, 141 S. Ct. at 53–54, and her failure to cite any authority finding similar conduct to be extreme and outrageous, the Court finds that no reasonable jury could find that Dakuras's conduct

24

transgressed all possible bounds of decency in a civilized society, *see Feltmeier*, 798 N.E.2d at 80–81. The Court grants the motion for summary judgment on Count III.

### B.     Count V: Indemnification

All that remains is Count V, Bass's indemnification claim against the City of Chicago. Indemnification is a derivative liability claim that requires Bass to prevail against another defendant. *Moran v. Calumet City*, 54 F.4th 483, 500 (7th Cir. 2022). Given that Dakuras is entitled to summary judgment on all claims against him, it follows that the City is entitled to summary judgment on Count V. *Id.*

## V.     Conclusion

For the reasons stated above, the Court grants Defendants' motion for summary judgment [Dkt. 115] and denies Bass's cross-motion for partial summary judgment [Dkt. 112]. A final judgment under Federal Rule of Civil Procedure 58 will enter in favor of Defendants and against Bass. Civil case terminated.

Enter: 19-cv-7557
Date:  August 29, 2023

_____
Lindsay C. Jenkins
United States District Judge